UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | CRIMINAL NO. 1:06-CR-0076 |
| CHIAN SPIRIT MARITIME | * | |
| ENTERPRISES, INC., | * | (Judge Sleet) |
| VENETICO MARINE S/A and M/V | * | |
| IRENE EM, EVANGELOS MADIAS, | * | |
| CHRISTOS PAGONES | * | |

Defendants

## OPPOSITION OF THE UNITED STATES
## TO DEFENDANT MOTION TO DISMISS, REQUEST BILL OF PARTICULARS,
## and EXCLUDE EVIDENCE

COMES NOW the United States of America, by and through the Assistant Attorney

General for the Environment and Natural Resources Division of the United States Department of

Justice, and the undersigned attorneys, and files this Opposition to the defendant's Motion.

## 1. INTRODUCTION

The defendants has moved to dismiss Count 2, which charges a violation of the Act to

Prevent Pollution from Ships (APPS),[1] arguing that the Count fails to state an offense for lack of

---

[1]The charges and defendants of the Indictment are as follows:
Count 1 (Conspiracy) Madias (Owner), Pagones (Technical Supervisor); Chian Spirit Maritime
Enterprises, Inc.; and Venetico Marine, S/A.
Count 2 (Act to Prevent Pollution from Ships - False Oil Record Book) Chian Spirit Maritime
Enterprises, Inc.; and Venetico Marine, S/A.
Count 3 (Witness Tampering), Pagones; Chian Spirit Maritime Enterprises, Inc.; and Venetico
Marine, S/A.
Count 4 (Witness Tampering) Madias; Chian Spirit Maritime Enterprises, Inc.; and Venetico
Marine, S/A.
Count 5 (Witness Tampering)Chian Spirit Maritime Enterprises, Inc.; and Venetico Marine, S/A.

federal jurisdiction; to exclude evidence of overboard discharges of oily waste occurring outside

of U.S. territorial waters based on an alleged lack of relevance in accordance with Federal Rule

of Criminal Procedure 402; and requests a Bill of Particulars. The United States respectfully

submits that the motion should be denied because: 1) the defendants do not dispute that their

vessel was in the waters of the United States when, during a proper United States Coast Guard

inspection, the defendants presented to the United States Coast Guard an inaccurate Oil Record

Book; 2) the government's ability to enforce, as a matter of United States law, violations

connected with activities occurring outside the United States is well-settled; (3) the defendants

rely on inapplicable and contravening case law; and 4) the request for a Bill of Particulars is

baseless.

The basic facts of this case involve knowing falsification of the M/V Irene EM's (Irene)

Oil Record Book and the presentation of that false Oil Record Book to the United States Coast

Guard. The Oil Record Book was falsified to conceal overboard discharges of oily waste during

an investigation involving potential violations of the MARPOL Protocol.[2] The discharges were

---

Adrien Dragomir, Chief Engineer for the Irene, pleaded guilty in the District of Delaware and
was sentenced on August 30, 2006 for violating 33 U.S.C. § 1908(a)(presenting a false Oil
Record Book to the United States Coast Guard during their inspection of December 2005.) The
Irene's Captain, Grigore Manaloche, in the District of Delaware, pleaded guilty on July 14, 2006
to one count of violating 18 U.S.C. 1001.

[2]The International Convention for the Prevention of Pollution from Ships, 1973, and
Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from
Ships, are together referred to as MARPOL or the MARPOL Protocol. MARPOL was signed by
the United States on June 27, 1978, and ratified by the United States Senate on July 2, 1980. As
set forth in the preamble, the Parties to the Convention explained that they were motivated by the
need to preserve the human environment in general and the marine environment in particular and
recognized that deliberate, negligent or accidental release of oil and other harmful substances
from ships constitutes a serious source of pollution. Congress implemented the treaty in the Act
to Prevent Pollution from Ships (APPS).

2

made by repeated bypasses of the Irene's oil pollution prevention equipment. As discussed below, under the MARPOL Protocol, oily waste may be discharged overboard into the ocean only if it does not exceed fifteen (15) parts per million (PPM) of oil and the ship has in operation required pollution prevention equipment, to include oil filtering equipment (*e.g.*, an Oil Water Separator), an alarm and an automatic stopping device (*e.g.*, an Oil Content Meter and a solenoid three-way valve) to prevent the discharge of a mixture containing more than the legally permitted concentration of oil.

The plain reading of 33 CFR § 151.25 requires vessels to record all oil movement and disposal in an Oil Record Book, regardless of where a vessel is located. Oil Record Books are subject to inspection and are regularly inspected by the United States Coast Guard while a ship is in port to determine compliance with United States and international law, and to ensure that the vessel does not pose a threat to the marine environment of the United States.

The defendant's motion attempts to apply the jurisdictional arguments and findings of the recent Third Circuit decision in United States v. Abrogar, 459 F.3d 430 (3d Cir. 2006).[3] The issue in Abrogar was whether extra-territorial misconduct, i.e. the repeated overboard discharge of oily waste, should trigger a federal sentencing guideline enhancement. The Third Circuit's decision focused on the limited issue of when a sentencing enhancement is triggered.[4] Moreover,

---

[3] The defendant's motion seeks to exclude the very evidence of high-seas overboard oily waste discharges that necessitated the conspiracy to avoid detection of those acts upon entering U.S. waters (See Count 1 of the Indictment). Excluding this evidence would also make it impossible to explain how the defendants violated APPS (See Count 2 of the Indictment), because it was the intentional omission of those discharges which caused the Oil Record Book to be inaccurate when the defendants made it available to United States Coast Guard inspectors.

[4] Discussed more fully below at 20.

Abrogar confirms the government's prosecution theory regarding the presentation of an inaccurate Oil Record Book in U.S. territory. Twisting the Abrogar decision to limit jurisdiction that Congress clearly provided would frustrate the United States' efforts to exercise jurisdiction in its territorial waters, and carry out its international treaty obligations. It would also be inconsistent with the well-settled jurisdictional underpinnings of prosecutions with extraterritorial aspects generally.

### 2. BACKGROUND FACTS

On December 8, 2005, four inspectors from the United States Coast Guard boarded the Irene at Big Stone Anchorage, Delaware Bay, Delaware, to conduct an "expanded ISM compliance exam"[5] of the vessel. The expanded examination was prompted by the vessel's visibly poor condition and obvious safety hazards, and to determine the vessel's prior history in U.S. waters. The Irene is a 21,000 gross ton vessel, one in a fleet of four merchant vessels incorporated in Liberia, flagged by Saint Vincent and the Grenadines, and owned by Greece-based Venetico Marine S.A. That corporation is owned by an individual, Evangelos Madias, who also resides in Greece. During all times relevant to the Indictment, Christos Pagones was a shore-side vessel Superintendent and representative of the corporation.

In addition to a non-working Oily Water Separator, [6] the inspectors found the bilge pump

---

[5]See more detailed explanation *infra* under the heading: "General Authority of the United States Coast Guard."

[6]An operable Oily Water Separator (OWS) removes bulk amounts of bilge oil from bilge water prior to discharge overboard. If the amount of oil-to-water exceeds the statutory limit of 15 parts per million (PPM), the OWS PPM alarm is sounded and the overboard discharge system is disengaged. A more detailed discussion of these issues is covered under the heading "Regulatory Structure: MARPOL/APPS", *supra*.

4

to be non-operational.  In May 2005 a flexible piping bypass system was engineered to replace

the original hard-pipe bilge pump system.  The new system bypassed the non-working OWS and

bilge pump with a flexible hose running from the bilge, through a "reversible pump" and directly

overboard.  The flexible hose was so widely known that it was referred to by the entire crew as

the "magic hose" for the its ability to disappear as the vessel approached port where it could have

been discovered by shore-side inspectors.  The original "magic hose" which had been used to

make overboard oily water discharges, complete with obvious leak repair markings, and a newer

replacement hose were hidden from United States Coast Guard inspectors and placed behind a

storage rack outside the engine room.  Both flexible hoses and flanges were found by inspectors

and taken into evidence.  The Irene also has a history of regulatory non-compliance and multiple

inspection deficiencies.

### 3. REGULATORY STRUCTURE

A.    The United States Coast Guard's Authority

The United States Coast Guard possesses general authority to board vessels in U.S.

waters subject to conduct warrantless safety and document inspections, as well as searches,

seizures, and arrests.  14 U.S.C. §89(a) provides as follows:

> The United States Coast Guard may make. . . inspections . . . upon the high seas and
> waters over which the United States has jurisdiction, for the prevention, detection, and
> suppression of violations of laws of the United States.  For such purposes, commissioned,
> warrant, and petty officers may at any time go on board any vessel subject to . . . examine
> the ships documents and papers, and examine, inspect, and search the vessel and use all
> necessary force to compel compliance.

The United States Coast Guard also has specific authority to inspect ships to determine

environmental compliance.  When Coast Guard inspectors boarded the Irene on December 8,

2005, they were undertaking a Port State Control Examination. Port State Control is the process through which a nation exercises its authority over foreign vessels when those vessels are in waters subject to its jurisdiction.[7] This authority is derived from several sources, both domestic and international. Nations that are party to certain international conventions, such as the International Convention for the Safety of Life at Sea (SOLAS) and the International Convention for the Prevention of Pollution from Ships 73/78 (MARPOL), are empowered to verify that vessels of other nations operating within their waters comply with theses conventions, and to take action to bring these ships into compliance if they do not. See Article 5(2) of MARPOL; U.S. v. Royal Caribbean Cruises, Ltd., 11 F.Supp.2d 1358, 1367 (S.D.Fla.,1998) (MARPOL authorizes, inter alia, a port state to inspect a ship to verify a discharge in violation of MARPOL . . .) Both the United States and Saint Vincent and the Grenadines, the Irene's flag state, are parties to SOLAS and MARPOL.

The United States Coast Guard has specific statutory and regulatory authority to inspect the engine room and Oily Water Separator equipment and documentation aboard vessels like the Irene while at a port. This authority includes the power to perform a general examination of the ship, an examination of the Oil Record Book, [and] the Oil Content Meter continuous record. 33 U.S.C. § 1901 et seq.; 33 CFR § 151.23. The APPS regulations which implement MARPOL

_____

[7] The goal of the Port State Control Program is to identify and eliminate substandard foreign merchant ships from U.S. waters and to encourage those committed to trading with the U.S. to adopt management philosophies that ensure compliance with accepted standards. This program was mandated by Congress in the 1994 Department of Transportation Appropriations Bill, which required the Coast Guard to change its approach to foreign vessel boardings to hold those most responsible for substandard ships accountable, including owners, classification societies and
flag states.

specifically require ships to fully maintain an Oil Record Book in which all overboard discharges must be recorded. 33 C.F.R. § 151.25. In setting out this requirement, the APPS regulations specifically require that the Oil Record Book shall be kept in such a place as to be readily available for inspection at all reasonable times and shall be kept on board the ship. 33 CFR § 151.25(i).

Federal regulations expressly authorize the United States Coast Guard to conduct inspections to determine that evidence of compliance with MARPOL 73/78, as required by 33 CFR § 151.2, is on board and that the condition of the ship and its equipment corresponds substantially with the particulars of this evidence. The purpose of this section is to determine whether a ship has been operating in accordance with, and has not discharged any oily or oily mixtures in violation of, the provisions of MARPOL 73/78. Id. 151.23 (a)(2)-(3).

B.    The Act to Prevent Pollution from Ships (APPS) and the MARPOL Protocol

APPS makes it unlawful to knowingly violate certain portions of MARPOL and federal regulations promulgated pursuant to the statute. 33 U.S.C. § 1907(a). A person who knowingly violates MARPOL or the regulations issued thereunder commits a class D Felony. 33 U.S.C. § 1908(a). As discussed below, Annex I of MARPOL contains detailed provisions concerning the discharge of oil from ships and related record keeping requirements.[8] Both MARPOL and the

---

[8] Pursuant to MARPOL, the discharge of oil or oily mixtures from the machinery spaces of a vessel is prohibited except when all of the following conditions are satisfied:

(1) the ship is not within a special area where all discharges are prohibited;
(2) the ship is proceeding en route (i.e., underway);
(3) the oil content of the effluent without dilution does not exceed 15 parts per million; and
(4) the ship has in operation equipment as required by regulation 16 of this Annex.
MARPOL, Annex I, Regulation 9.

APPS regulations require that vessels fully maintain an Oil Record Book that includes entries of

all overboard discharges of machinery space bilge waste.[9]  The APPS regulations track the

MARPOL Oil Record Book requirement and require vessels that enter United States ports and

waters to fully maintain this log.  In pertinent part, the APPS regulations require:

> (a) Each . . .ship of 400 gross tons and above. . .shall maintain an Oil Record Book
> * * *
> (d) Entries shall be made in the Oil Record Book on each occasion, on a tank to tank
> basis if appropriate, whenever any of the following machinery space operations take place
> on any ship to which this section applies--
>
> . . .
>
>> (3)   Disposal of oil residue; and
>> (4)   Discharge overboard or disposal otherwise of bilge water that has
>>       accumulated in machinery spaces.
> * * *
> (g) In the event of an emergency, accidental or other exceptional discharge of oil
> or oily mixture, a statement shall be made in the Oil Record Book of the circumstances
> of, and the reasons for, the discharge. [10]
> * * *
> (i) The Oil Record Book shall be kept in such a place as to be readily available
> for inspection at all reasonable times and shall be kept on board the ship.
> (j) The master or other person having charge of a ship required to keep an Oil Record
> Book shall be responsible for the maintenance of such record. 33 C.F.R. § 151.25

(emphasis added).

When read as a whole, 33 C.F.R. § 151.25(g) and Regulation 20 of MARPOL,

unambiguously require that any discharge of oily waste must be recorded in the Oil Record Book,

---

[9] Pursuant to APPS, MARPOL Annex I is applicable to ships of foreign registry when in
the navigable waters of the United States.  33 U.S.C. § 1902(a)(2).

[10] A discharge or even the probable discharge that is other than as permitted (i.e., more
than 15 ppm or made without 15 ppm equipment being in operation) must be reported without
delay and to the fullest extent possible by radio and the fastest available means.  33 C.F.R. §
151.15.  The MARPOL Protocol, Annex I, Appendix III, in pertinent part also requires logging
of the following information:  Quantity discharged or disposed of; Time of discharge or disposal
(start and stop); Method of discharge or disposal; Time of occurrence; Place or position of ship at
time of occurrence; Approximate quantity and type of oil.

regardless of where the vessel is located, and that information must be reported immediately and accurately recorded for later inspection.

## 4. PRIOR JUDICIAL TREATMENT of MARPOL and APPS

While there are no reported decisions directly upholding prosecutions charging 33 C.F.R § 151.25 for the failure to maintain an Oil Record Book, district courts have repeatedly and consistently reviewed and affirmed the sufficiency of this charge in accepting guilty pleas from individuals and corporations.[11] Meanwhile, in an APPS discharge case that did proceed to trial and was upheld on all grounds on appeal, APPS, the APPS regulations, MARPOL Annex I, and the MARPOL discharge regulation itself (Regulation 9) were held to be unambiguous and fairly placed those defendants on notice as to what the law forbids:

[T]he APPS statute unambiguously states that a person who knowingly violates the

---

[11] See United States v. MSC Ship Management et al. (D. Mass.) (APPS conviction of corporation and individuals); United States v. Fairdeal Group Management, SA (S.D.N.Y.) (APPS conviction of corporations and individuals); United States v. Panagiotis Kokkinos et al. (E.D.N.Y.) (APPS conviction of corporation and individuals); United States v. Boyang (Busan) Ltd, et al. (D. Alaska) (APPS convictions of corporations and individuals); United States v. DST Shipping, et al. (C.D. Calif.) (APPS conviction of corporation); United States v. MMS Company Ltd et al. (D. Oregon) (C.D. Cal.) (N.D. Cal.) (APPS conviction of corporation and individual); United States v. Rodolfo Esplana Rey (C.D. Calif.) (APPS conviction of individual); United States v. OMI (D. N. J.) (APPS conviction of corporation); United States v. Wallenius Ship Management, Pte., Ltd., et al. (D.N.J.) (APPS conviction of corporation and individual); United States v. Noel Abrogar (D.N.J.); United States v. First Marine Service Company (D. Oregon) (APPS conviction of corporation); United States v. Oilmar Company Limited, Inc. (D.S.C.) (APPS conviction of corporation); United States v. Bottiglieri di Navigazione (S.D. Ala.) (APPS conviction of corporation); United States v. Evergreen International, S.A. (C.D. Calif., D. N. J., D. Ore., D.S.C., W.D. Wash.) (APPS conviction of corporation); United States v. Schlussel Reederei KG (D. Hawaii) (APPS conviction of corporation); United States v. Fujitrans Corporation of Japan (D. Oregon, C.D. Calif.) (APPS conviction of corporation); United States v. Sabine Transportation Company (N.D. Iowa) (APPS conviction of corporation); United States v. Marmaras Navigation Ltd. (W.D. Wash.) (APPS conviction of corporation); United States v. Fairmont Shipping (Canada) Ltd. et al. (D. Oregon) (APPS conviction of corporation and individuals); United States v. Ta Tong Marine (W.D. Wash) (APPS conviction of corporation).

> statute, the MARPOL Protocol (including Annexes I, II, and V of MARPOL) or a
> regulation issued thereunder commits a class D felony.  MARPOL Annex I, Regulation
> 9, states that discharges of oil or oily mixtures are prohibited unless conditions set forth in
> that regulation are met, namely that such discharges be made with the use of a properly
> functioning oil discharge monitoring and control system.

United States v. Stickle, 355 F. Supp 2d 1317, 1335 (S.D. Fla. 2004), affd, 454 F.3d 1265 (11th

Cir. 2006).

### 5. JURISDICTION

The crime of maintaining an inaccurate Oil Record book on the Irene and presenting it to

United States Coast Guard inspectors occurred in the United States. The United States has

unfettered jurisdiction to prosecute violations of its national laws that occur within its borders.

Nevada v. Hall, 440 U.S. 410, 416 (1979) (domestic jurisdiction is absolute for crimes

committed within borders of a country); Wilson v. Girard, 354 U.S. 524, 529 (1957) (A

sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within

its borders, unless it expressly or impliedly consents to surrender its jurisdiction. (citations

omitted)).  In this case, the defendants made available the Oil Record Book to the United States

Coast Guard in Delaware Bay, Delaware, well within the baseline at which the territorial sea

begins and thus, within internal waters and navigable waters of the United States. 33 C.F.R. §

2.20.

The fact that the false entries and omissions in the Oil Record Book relating to illegal

discharges at sea involve conduct that took place outside the United States does not deprive the

United States of jurisdiction over crimes that took place within the United States. Royal

Caribbean, 11 F. Supp. 2d. 1158, at 1364.  Evidence relevant to those offenses is admissible.

The Court rejected arguments identical to those raised by the Defendants Chian and Venetico,

10

holding that the location of discharges or writing of the false entries in the Oil Record Book was irrelevant. Id. ("Whether or not the United States had the authority to regulate either the alleged ... unauthorized discharge ... or any attendant Oil Record Book violations at that time does not bear upon our inquiry as to whether the United States has jurisdiction to enforce its laws in port in Miami, Florida regarding the commission of false statements made to a United States agency performing its regular and proper duties.")[12]

Facing false statement charges that it used a false Oil Record Book in port, Royal Caribbean argued that because the log was created in international waters and pertained to discharges beyond United States waters, the United States had no jurisdiction to prosecute the false statement. In rejecting these arguments, the Court wrote:

> To find to the contrary would raise serious question about the government's ability to enforce, as a matter of domestic law, false statements made in connection with such matters as bank fraud, immigration, and visa cases, where the false statements at issue are made outside of the United States, perhaps acceptable or in the alternative unnecessary under the appropriate foreign regulatory scheme, but nonetheless illegal under United States law.

---

[12]The Court also relied on the long line of cases holding that the false statement statute was to be broadly construed. "We first start with the premise that jurisdiction based upon Section 1001 should not be unnecessarily confined. Indeed, the 'United States Supreme Court has stated that jurisdiction within the meaning of section 1001 should not be narrowly or technically defined.'" Royal Caribbean, 11 F. Supp. 2d at 1363 (quoting U.S. v. Herring, 916 F.2d 1543, 1547 (11th Cir.1990), citing United States v. Rodgers, 466 U.S. 475, 480 (1984)); see also United States v. Gafyczk, 847 F.2d 685, 690 (11th Cir.1988) (Section 1001 is necessarily couched in very broad terms to encompass the variety of deceptive practices which ingenious individuals might perpetrate upon an increasingly complex government.) In Gafyczk, the Eleventh Circuit held that jurisdiction under § 1001 is satisfied when documents are "commonly utilized by the [U.S. Customs] Service in the performance of its regularly conducted activities. Accordingly, when the appellants submitted their [Shippers' Export Declarations] to the Customs Service, that was sufficient to render those acts 'matters within the jurisdiction of the U.S. Customs Service' as set forth in the § 1001 counts and as required by statute." Id. at 691.

Id. at 1364. The Court held that the location at which a false statement was made was not

dispositive. Id. at 1363-64 (citing United States v. Cox, 696 F.2d 1294 (11th Cir.1983)

(upholding conviction for § 1001 violation where relevant documents filled out in Guatemala);

United States v. Godinez, 922 F.2d 752 (11th Cir. 1991) (upholding convictions under §1001 for

making false statements in connection with importation of goods where invoices describing

shipments were filled out in Latin America and the alleged false statement was contended to be a

true statement in the exporting country). "Rather, the correct analysis is to consider whether

documents containing the alleged false statement are routinely or commonly used by United

States officials during the course of their regularly conducted activities." Royal Caribbean, 11 F.

Supp. 2d. 1158 (citing United States v. Lawson, 809 F.2d 1514, 1517 (11th Cir.1987)).

Even if this were a case limited to acts taking place outside the United States, the

defendant's argument is contrary to longstanding precedent that the United States has jurisdiction

over extraterritorial acts that have an impact on the United States. See United States v. Williams,

617 F.2d 1063, 1076 (5th Cir. 1980) (en banc) (The jurisdiction of the United States embraces

offenses having an effect within its sovereign territory, even though the acts constituting the

offense occur outside the territory.); United States v. Postal, 589 F.2d 862, 885 (5th Cir. 1979)

(The United States has long adhered to the objective principle of territorial jurisdiction to attach

criminal consequences to extraterritorial acts that are intended to have effect in the United

States); See also Royal Caribbean, 11 F. Supp. 2d at 1364 (Deliberate use of false documents

before the United States Coast Guard has an effect within the sovereign territory insofar as the

12

agency's function is compromised and the laws that agency seeks to enforce undermined.)[13]

Under the defendant's argument, foreign corporations doing business in the United States, sailing the waters of the United States, and using United States ports are immune from prosecution even if they lie to the United States Coast Guard or fail to comply with comprehensive international requirements when they are in United States ports and waters.[14] This argument assumes that the United States cannot regulate the extraterritorial actions of foreign companies that enter our ports to enjoy our commerce. This is a misguided assumption.

To broaden the jurisdictional analysis, the United States clearly has jurisdiction to prosecute the conspiracy charge (Count 1) which also includes the overt acts and underlying conduct of overboard discharges of oil contaminated waste. Jurisdiction does not fail "merely because some of the underlying conduct occurred overseas. The government has the power to prosecute every member of a conspiracy that takes place in United States territory, even those conspirators who never entered the United States." United States v. Sadighi (9th Cir. 1999 (citing United States v. Correa-Negron, 462 F.2d 613-614 (9th Cir. 1972)).

As a general proposition, Congress has authority to enforce its laws beyond the territorial boundaries of the United States, and specifically, this power is often required in facts similar to those in the case at bar. In United States v. Yousef, 327 F.3d 56 (2nd Cir. 2003), it was held that

---

[13] See also United States v. Padilla-Martinez, 762 F.2d 942, 950 (11th Cir. 1985) (Merely because a vessel is of foreign registry or outside the territorial waters of the United States does not mean that it is beyond the jurisdiction of the United States. The United States has long taken the position that its jurisdiction extends to persons whose extraterritorial acts are intended to have an effect within the sovereign territory.)

[14] See infra at 23. The United States already has domestic laws in place to account for water pollution activities occurring in our territorial waters. The defense does not address this apparent conflict in an analysis of Congressional intent.

the District Court had jurisdiction relating to the bombing of civilian aircraft registered in another

country, even though the aircraft was not a U.S.-flagged aircraft, was flying between two

destinations outside the U.S., and no U.S. citizens were targets of the bombing. Id. (citing 18

U.S.C.A. § 32(b)(3)). The Second Circuit also held the prosecution and conviction was

consistent with and required by U.S. treaty obligations, pursuant to the Montreal Convention and

its implementing legislation. Id. (citing Suppression of Unlawful Acts Against the Safety of

Civil Aviation, Arts. 1, 7 (1973 WL 151803)).[15]

## 6. RELEVANT EVIDENCE

There is no categorical judicial test for relevancy and the trial court judge has broad

discretion to determine that evidence is relevant. See, e.g., Richards v. Relentless, Inc., 341 F.3d

35, 49 (1st Cir. 2003) ("A district court has broad discretion to make relevancy determinations,

and we review its decisions only for abuse of discretion.") The inquiry has been summarized as

follows:

> It has long been recognized that evidence which, when taken alone or in
> connection with other evidence, tends to prove or disprove a material or
> controlling issue or to defeat the rights asserted by one or the other of the parties,
> and sheds any light upon or touches the issues in such a way as to enable the jury
> to draw a logical and reasonable inference with respect to the matter or a principal

---

[15]This legal construct is not novel, and has been consistently applied throughout our history. In United States v. Palmer, 16 U.S. (3 Wheat.) 610, 4 L.Ed. 471 (1818), Chief Justice Marshall stated the Court's opinion regarding application of the *1790 Act for the Punishment of Certain Crimes Against the United States* and the jurisdiction of the United States over crimes committed on the high-seas. "The constitution having conferred on congress the power of defining piracy, there can be no doubt of the right of the legislature to enact laws punishing pirates, although they may be foreigners, and may have committed no particular offence against the United States. The only question is, has the legislature enacted such a law. Do the words of the act authorize the courts of the Union to inflict its penalties on persons who are not citizens of the United States, nor sailing under their flag, nor offending particularly against them?" Id. at 630-31.

fact in issue, is relevant.

29 Am. Jur. 2d. *Evidence* § 307 (2006).

There is no express jurisdictional limitation on "relevant" evidence admissible to prove a conspiracy. With regard to the standard for relevancy in general, the Supreme Court has stated:

> Rule 402 provides the baseline: All relevant evidence is admissible . . . Relevant evidence is defined as that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. The Rule's basic standard of relevance thus is a liberal one.[16]

The defendants base their argument for exclusion of the critical evidence described above entirely upon a recent Third Circuit opinion in Abrogar that addressed the application of the Federal Sentencing Guidelines in an APPS prosecution for the failure to maintain an accurate Oil Record Book. The defendants characterize the holding in Abrogar as follows: " In reviewing what conduct was relevant, for purposes of a sentencing enhancement, the Third Circuit Court of Appeals expressly found that any such improper discharges were not relevant and could not be part of the offense." Defendant's motion, p. 17. The defendants misstate the Third Circuit's conclusion in that case, however.

The Third Circuit's holding was limited to finding that a six-level guideline enhancement where the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission

---

[16]Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 587 (1993) (internal quotations omitted); see also, Complaint of Nautilus Motor Tanker Co., 85 F.3d 105, 112 (3d Cir. 1996) (quoting Daubert); United States v. Sriyuth, 98 F.3d 739, 745 (3d Cir. 1996) (stating Rule 401 and noting that "relevant evidence will be admissible unless the rules of evidence provide to the contrary"). The Supreme Court has deemed evidence "relevant" when "its demonstration [is] a step on one evidentiary route to the ultimate fact." Old Chief v. United States, 519 U.S. 172, 178 (1997) (noting admission of prior-conviction evidence as relevant to charge at issue).

15

of a pollutant into the environment was not applicable as relevant conduct in determining the sentencing guideline range because the discharges occurred outside of the jurisdiction of the United States. The Court limited its holding to the sentencing guidelines by stating that the "offense" did not "result in" repeated discharges of a pollutant.

In dicta, the Third Circuit embraced the underlying theory of prosecution that is common to this case: that the Oil Record Book requirement in APPS is enforceable against foreign ships while they are within the navigable waters or ports of the United States. Consequently, unrecorded, improper conduct such as the discharge of oily waste into international waters renders the Oil Record Book inaccurate. Once the vessel enters the United States and the inaccurate Oil Record Book is made available to the Coast Guard, the resulting offense can be prosecuted in the United States and all evidence relevant to it is admissible. The Third Circuit affirmatively stated that "[i]n sum, we conclude that Abrogar's 'offense of conviction' – taking into account the text of the relevant provisions of the APPS and accompanying regulations – was the 'failure to maintain an accurate oil record book while in U.S. waters or in a U.S. port.'" Id.

Nothing in Abrogar compels this Court to exclude highly relevant evidence necessary to prove the charged offense, over which the United States has jurisdiction - that is, evidence that the defendants engaged in causing illegal discharges into the ocean, no matter where they occurred, which they then failed to record in the vessel's Oil Record Book, thereby rendering it inaccurate. Without evidence that the illegal discharges occurred, it would be impossible to prove that the Oil Record Book was falsified to conceal those discharges.

Evidence of discharges in international waters is both relevant and admissible at trial. Each count of the Indictment alleges an offense that occurred within the jurisdiction of the

16

United States and within the District of Delaware. Evidence necessary to prove those underlying

charges therefore, is clearly relevant and admissible. The defendants cite no authority that would

support the exclusion of relevant evidence under FRE 402 pertaining to the charged crimes of

conspiracy, failing to maintain an Oil Record Book, or obstruction of justice while in a United

States port.

As such, relevant evidence occurring outside of the United States is admissible to prove

those crimes which resulted from foreign acts. If the defendant's argument was accepted,

prosecution of these crimes and others, including terrorist-related activities where much of the

criminal conduct occurred outside of the United States, would be nearly impossible. In this case,

the extraterritorial acts involved the overboard discharges of oily waste which led to the charged

false entries in the official ship's records. These acts revealed an intent to deceive and obstruct

United States Coast Guard inspections. Evidence relevant to those offenses is therefore both

admissible and essential to proving the crimes charged.[17]

The defendant argues that APPS requires any suspected violations of the MARPOL treaty

a) by a foreign-flagged vessel, and b) outside of U.S. waters, to be referred to the vessel's Flag

State for further action. Def. Motion at 4-5. Defendant then cites to United States v. Royal

Caribbean Cruises LTD as authority but, as noted above, misconstrues the holding in this

---

[17] United States v. Martinez-Hidalgo, 993 F2d. 1052 (3d. Cir. 1993) ("Accordingly, there is no doubt that the district court had jurisdiction even if there was not a nexus between Martinez's activities and the United States."); United States v. Tarkoff, 242 F3. 991 (11th Cir. 2001) ("We agree that these facts support a finding that Tarkoff participated in a 'financial transaction' as that term is defined in 18 USC § 1956(c)(2)(A) because the international travel and communications required to execute the wire transactions affected foreign commerce 'in any way or degree.")

important vessel pollution case.[18]  The defendant also argues that Count 2 of the Indictment

should be dismissed because any failure to maintain an accurate Oil Record Book outside of U.S.

waters does not constitute a federal offense. Def. Motion at 10.  However, the defendants admit

Congress specifically applied the criminal provisions of APPS to foreign ships while in the

navigable waters of the United States. Def. Motion at 6.  The defendants further admit that the

Coast Guard regulations requiring them to maintain an ORB applies to foreign ships while in the

navigable waters of the United States. Def. Motion at 6-7.

The defendants cite to the Third Circuit decision in Abrogar to make the argument that

the United States has no jurisdiction to prosecute a foreign vessel or its personnel for failure to

maintain an accurate oil record book outside of U.S. waters. Def. Motion at 7.  This entire line of

argument itself is irrelevant because the United States has charged the defendant with failure to

maintain an accurate oil record book in the District of Delaware. Indictment at para. 31.

The defendants argue that the maintenance of an accurate oil record book in U.S. waters

requires only the recording of unprocessed overboard discharges of oily sludge and bilge wastes

from the Irene _that occurred in U.S. waters_. (Ital. added) Def. Motion at 9.  Notwithstanding the

application of various domestic statutes that would apply in such circumstances, such as the Clean

Water Act,[19] the defendant's assertion is not based on the plain reading of the relevant statutes and

if adopted, would render useless the aims of MARPOL and obliterate Congress' intent to hold

[18]See full citation and discussion of this case at 11.

[19] See also 33 USC § 151.10  United States Coast Guard Regulation: Control of Oil
Discharges.  This statute covers oil discharges within (part a)  and outside (part b) the 12 nautical
mile limit of the United States. 33 USC § 151.10(b)(5) states that when within 12 nautical miles
of the nearest land, any discharge of oil or oily mixtures into the seas from a ship other than an
oil tanker or from machinery space bilges or an oil tanker is prohibited except when several
conditions are met, including the use of oily-water separating equipment.

18

accountable ships that pollute on the high seas while enjoying the benefit of commerce in the United States.[20] The defendant correctly states that the United States can pursue several punitive options upon discovery of suspected regulatory violations when a foreign vessel attempts to enter our ports: 1) refuse entry to the vessel; 2) allow entry but refuse debarkation until completion of remedial action; 3) referral of the violation to the Flag-State of the vessel; and/or 4) prosecution of the violation in the United States. Def. Motion at 3-4. If, as the defendants later argue, the United States can only prosecute record-keeping violations of events that occurred in the waters of the United States, the option to refuse entry of the vessel would not be possible.

The defendants also argue that Count 2 to of the Indictment must be dismissed as a matter of law for failure to allege that record keeping failures occurred in U.S. waters. Def. Motion at 9. However, the law clearly states that all vessels shall *maintain* an Oil Record Book.[21]  The statute also requires that entries shall be made in the Oil Record Book during the internal transfer of oil cargo during voyage.[22] The plain language of this statute speaks directly to the required maintenance of an accurate Oil Record Book which details specific activities, even if those activities occurred outside of U.S. waters.

### 7. PROSECUTORIAL DISCRETION[23]

---

[20] See the earlier discussion of <u>Stickle</u> at 22.  Unlike the <u>Irene,</u> the vessel in <u>Stickle</u> was United States-flagged, yet the principle which attaches the law of the United States to crimes originating on the high-seas is instructive.

[21] 33 C.F.R.  151.25(a) (Coast Guard Regulation and Implementation of MARPOL: Oil Record Book.)(*Italics* added)

[22] Id.

[23] This section also addresses, generally, the defense assertions related to the <u>United States Attorney's Manual</u>. Def. Motion at 10.

The defendant argues that MARPOL requires that the government of the State under whose authority the ship is operating (the Flag-State) is the proper body to prohibit and punish violations of MARPOL occurring on the high seas. Def. Motion at 11. However this assertion does not reflect Congress' view of the matter as detailed in the implementing statute APPS:

> [I]f the violation is by a ship registered in or the nationality of a country party to the MARPOL Protocol. . . the Secretary, acting in coordination with the Secretary of State, may refer the matter to the government of the country of the ships registry for appropriate action, rather than taking the actions required or authorized by this section.[24]

Congress clearly anticipated and directed the United States to take legal action in the United States for MARPOL violations that occurred in the high-seas and were discovered upon entry. Section 8 of APPS directs all practical measures of detection and environmental monitoring to accumulate evidence of MARPOL violations.[25] And upon completion of the investigation, Congress only requires the Secretary of Homeland Security, acting through the Secretary of State, to inform the party of the action taken or proposed if the initial evidence was provided by a party to MARPOL.[26]

The defendant also argues that adequate civil fine provisions can apply to the charged conduct, and no substantial Federal interest would be served by prosecution, therefore Count 2 of the Indictment should be dismissed. As set forth above, the criminal provision of APPS charged in Count 2 is unambiguous: A person who knowingly violates the MARPOL Protocol . . . this chapter, or the regulations issued thereunder commits a class D Felony . . . . 33 U.S.C. 1908(a). This clear criminalization of deliberate violations contains no escape hatch for violations that also

---

[24] 33 U.S.C. § 1907

[25] Id.

[26] Id.

happen to contain false statements. Even a cursory look at the text of the administrative penalty provision, reveals that unlike the criminal provision, it has no *mens rea* requirement. It is a strict liability provision available to the Coast Guard in any case where there is any violation or in which any false or erroneous information is made, and does so whether is material or not.[27] Moreover, the APPS count charges the knowing failure to fully maintain an accurate Oil Record Book, not the falsification of the log. While it is true that the evidence that may support conviction involves both false and misleading statements as well as omissions, these are not the charge itself.

The defendant's reading of the statute ignores the overall design which is similar to many other Coast Guard-administered statutes. The structure of APPS is that criminal sanctions are reserved for the worst types of violations, those committed knowingly. By contrast, the civil penalty provisions, including the civil infraction of making a false representation, have no *mens rea* requirement and may be imposed without any proof of intent. 33 U.S.C. § 1908(b). The availability of these civil penalties in no way negates or repeals the availability of criminal penalties provided in the preceding section when knowing conduct is at issue.

The government submits the defendant was fairly on notice that making false and fictitious entries that concealed his overboard discharges of oil waste violated the statutes charged in the Indictment. Indeed, his very conduct proves he was on notice and conscious of his guilt (see Indictment, Counts 1 and 3-5).

The facts of this case are not unique and to arbitrarily ignore the criminal provision of

---

[27] 33 U.S.C. § 1908(b)

MARPOL would have an adverse impact on the United States. Similar violations have reached epidemic proportions. Despite a decade long initiative by the Department of Justice and the United States Coast Guard to detect and deter falsification of ship logs concealing deliberate vessel pollution, and despite increasing penalties, criminal prosecutions of mariners and their employers in virtually every United States coastal jurisdiction have failed to stem the tide of deliberate vessel pollution. See generally (Industry Pays Big Price for Oily Sins, *TradeWinds*, December 22, 2005 (industry trade publication reporting that the shipping industry is baffled in the aftermath of recent prosecutions as to why engineers and shipping companies continue to deliberately violate MARPOL and falsify ship records).[28]

Routine and deliberate vessel pollution such as occurred in this case has been estimated to cause as much as eight times the amount of oil pollution each year as catastrophic spills such as the Exxon Valdez oil spill.[29] Whereas the Exxon Valdez release was both unintended and a one-time occurrence, waste oil discharges such as the ones that occurred repeatedly in this case under the direction of the defendants are both deliberate and routine. Intentional conduct such as that committed by the defendant is more reprehensible and insidious to the extent that it is deliberate

---

[28] In the most recent publication within the maritime industry, five major industry groups issued a widely-distributed pamphlet urging zero tolerance for MARPOL violations. The pamphlet specifically stresses the importance of insuring the accuracy of ship records. See www.marisec.org/ows, Shipping Industry Guidance on the Use of Oily Water Separators Ensuring Compliance with MARPOL, Endorsed by Baltic and International Maritime Council, Intercargo, International Champer of Shipping, International Shipping Federation, Intertanko, and Oil Companies International Marine Forum (2006).

[29]See Francis Wiese, Seabirds and Atlantic Canadas Ship-Source Oil Pollution, World Wildlife Fund Canada (2002) 11 (*On average, a minimum of 300,000 seabirds are killed every year in the waters of Atlantic Canada as a result of illegal activities of ship operators, a yearly seabird mortality equal to that caused by the Exxon Valdez disaster in Alaska in 1989.* (emphasis added)). Available at http://wwf.ca/Documents/Marine/SeabirdsReport.pdf

and harder to detect and deter, as well as having a cumulative impact on the marine environment.

A 2002 study undertaken in Canada estimated that approximately 300,000 seabirds are killed

annually in Atlantic Canada owing to illegal discharges of oil from ships.[30]

## 8. BILL OF PARTICULARS

The government requests that the defense petition for a Bill of Particulars should be denied

because:

a) The defense has been provided a detailed Indictment;
b) The defense participated in extensive criminal depositions of all the government's crew-
    based witnesses; and
c) The defense is in possession of all the government's investigative files.

On July 12-18, 2006, counsel for the defendants was present during depositions taken pursuant to

Federal Rule of Criminal Procedure 15. The defendants now hold in their possession the

complete testimony of every ship-based witness in this case.[31] Pursuant to a ruling of this Court,

the defense was also provided all Grand Jury transcripts, and all written reports and statements in

the government's possession. Counsel for the defense used this material to cross-examine every

witness during the taking of depositions.

Rule 7(f) of the Federal Rules of Criminal Procedure provides authorization for the Court

to direct the filing of a Bill of Particulars. Whether to grant such requests is discretionary with the

trial judge. The purpose behind this rule has been to inform the defendant of the nature of the

charges so that he or she can prepare their defense, to avoid surprise during the trial and to protect

---

[30] See Organization for Economic Cooperation and Development, Cost Savings
Stemming from Non-Compliance with International Environmental Regulations in the Maritime
Sector, DSTI/DOT/MTC(2002)8/Final, at 4. Available at:
www.oecd.org/dataoecd/4/26/2496757.pdf..

[31] The depositions taken included seven of Irene's crew, to include the second officer,
electrician, second through fourth engineers, the wiper, and oiler.

23

the defendant from a second prosecution for an inadequately described offense. <u>United States v. Addonizo,</u> 451 F.2d 49 (3rd Cir. 1972). This action should be taken when the indictment is too vague or indefinite to fulfill by itself the above-stated purposes.

Although there has been a liberalization of this rule towards greater disclosure, limits to its application continue to be firmly established. In <u>United States v. Manetti</u>, 323 F.Supp 683 (D.Del. 1971), this Court ruled that:

> Thus, it is not the function of a bill of particulars to fully inform the defendant of the evidence which the government will present. Of necessity, therefore, while one of its legitimate functions may be to reduce the rule of surprise in criminal cases, it will not do to say that the rule must be applied to shield defendants from the possibility of confrontation with unanticipated evidence. Nor is the rule intended to give the defendant the benefit of the government's investigative efforts. Id. At 695.

In <u>United States v. Boffa</u>, 513 F.Supp 444 (D.Del. 1980) the Court noted:

> One of the main policy reasons for restricting its applicability is to avoid "freezing the Government's evidence in advance of trial. Such freezing comes about because the rule that requires proof at trial to conform to the particulars furnished in the bill." <u>United States v. Neff</u>, 212 F.2d 297, 309 (C.A.3, 1954); <u>United States v. Allied Asphalt Paving Co.</u>, 451 F.Supp. 804, 812 (N.D. Ill. 1978). Thus the Court is required to balance restricting the Government's proof against protecting defendants from surprise. Id. at 485.

Thus, there is no doubt that defendants are not entitled to a wholesale discovery of the governments evidence nor is the United States required to weave in a neat package of evidence and legal theories of its case. <u>United States v. Addonizo</u>, *supra*; <u>United States v. Boffa</u>, *supra*; <u>United States v. Deerfield Spec. Papers, Inc.</u>, 501 F. Supp 796 (E.D. Pa., 1980); <u>United States v. Heldon</u>, 479 F. Supp. 316 (E.D. Pa. 1979). In short, as this Court noted in <u>Manetti</u>, a "defendant is entitled to have the Government inform him, either by way of Indictment or bill, only of those central facts which will enable him to conduct his own investigation of the transactions giving rise

24

to the charges."[32] 323 F. Supp. at 696.

When reviewing the demands made by the defendant's motion, the government humbly requests that the amount of discovery provided to the defendant be noticed. The Indictment also sets forth the charges in detail, consistent with the discovery provided. Because the Government has opened its entire file to the defendant and there has been over 5 full days of testimony, provided under oath and for use at trial, the defendant knows exactly the activity he is charged with violating and how that offense occurred. Thus, granting by this Court of the Bill of Particulars requested by the defendant will not foster the functions or purposes of this rule.

## 9. CONCLUSION

For the reasons stated, the United States respectfully requests that this Court enter an Order to DENY the Defendant's Motion.

RESPECTFULLY SUBMITTED

/S/

JEFFREY L. PHILLIPS
Trial Counsel
Environmental Crimes Section
United States Department of Justice

---

[32]Counsel for the defense had unfettered access to the crew-based government witnesses that testified during the Rule 15 depositions.

25

## CERTIFICATE OF SERVICE

I, Theresa A. Jordan, an employee with the United States Attorney's Office, hereby certify

that on October 20, 2006, I electronically filed the foregoing:

### OPPOSITION OF THE UNITED STATES
### TO DEFENDANT MOTION TO DISMISS, REQUEST BILL OF PARTICULARS, and EXCLUDE EVIDENCE

with the Clerk of the Court using the CM/ECF which will send notification of such filing to:

> GEORGE M. CHALOS, ESQUIRE
> gmc@frc-law.com
>
> CARL R. WOODWARD, III, ESQUIRE
> cwoodward@carellabyrne.com

*Theresa A. Jordan*