

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X

UNITED STATES OF AMERICA

        Plaintiff,

                          Criminal Action No. 06-76 (GMS)

      v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et al.*

        Defendants.

-----------------------------------------------------------X

## DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC. AND VENETICO MARINE, S.A.'s, OBJECTIONS AND REQUEST FOR PRETRIAL RULINGS AS TO THE ADMISSIBILITY OF THE FOLLOWING PORTIONS OF THE RULE 15 DEPOSITION TESTIMONY OF PASCUAL CONGE.

**COME NOW,** moving defendants, Venetico Marine, S.A. ("Venetico") and

Chian Spirit Maritime Enterprises, Inc. ("CSME")(collectively, "Moving Defendants"),

who respectfully request that this Honorable Court consider and rule, before the voir dire

of the jury panel, and out of the presence and hearing of the jury panel, as to the

admissibility of the following Rule 15 deposition testimony by Pascual Conge, which the

Government has stated it will seek to introduce at trial.[1]

Specifically, Moving Defendants object to the admissibility of the following

deposition testimony by Pascual Conge, the "Third Engineer" on board the M/V IRENE

---

1 For the Court's ready reference, Moving Defendants advise that in order to facilitate the deposition process, counsel for all parties agreed to expressly reserve making objections during the examination.

E., on the following grounds. For the Court's ready reference, a correct and true copy of the transcript of the Rule 15 deposition of Mr. Conge, conducted at the office of the United States Attorney, 700 Nemours Building, 1007 Orange Street, Wilmington, Delaware, on Friday, July 14, 2006 and Monday, July 17, 2006, is attached hereto as Exhibit "A".

### Pascual Conge  (Third Engineer)

Moving Defendants respectfully submit that during the Rule 15 deposition examination, Mr. Conge clearly, concisely and unambiguously testified, in sum and substance, that he never had any functional duties with respect to the vessel's oily water separation equipment and/or the maintenance of the purported oil record book. Specifically, Mr. Conge testified, *inter alia,* to the following during cross-examination:

> *Q  You were the third engineer on board the ship; right?*
> *A  Yes.*
> *Q  And as the third engineer, your duties relate to maintaining the generators; right?*
> *A  Yes*
> *Q  You don't have any – your job doesn't have any responsibility for the oily water separator, does it?*
> *A  No.*
> *Q  You don't maintain the oily water separator; right?*
> *A  No. I don't.*
> *Q  You don't fix the oily water separator, do you?*
> *A  No.*
> *Q  You don't operate the oily water separator?*
> *A  In the Irene E.M. I don't ;; I never run those things since I boarded the ship.*
> *Q  Okay.  So you don't turn – you don't make the decisions when to use the oily water separator?*
> *A  No.*
> *Q  Okay.  Now, as third engineer, you don't keep any logbooks, do you?*
> *A  No, nothing.*
> *Q  Okay, so you don't write in the engine log, do you?*
> *A  No.*

*Q You don't maintain the oil record book, do you?*
*A In the generator logbook.*
*Q Okay. So apart from the generator log book, you don't have any other responsibility for any other records?*
*A The spares for the generators.*
*Q Okay. So let's go back to my question. You don't write in the oil record book, do you?*
*A No.*
*Q You don't keep the oil record book in your cabin?*
*A No.*
*Q Okay. You don't have any responsibility to make entries in the oil record book, do you?*
*A No.*
*Q Okay. So all the questions that Mr. Phillips asked you about the oil record book were questions about a record you have nothing to do with?*
*A No.*
*Q No, you have nothing to do with it; right?*
*A No.*
*Q Okay. Now, in fact, had you ever seen the contents of this before the Government showed it to you?*
*A I don't remember.*

See Exhibit "A," *Transcript Page 48/line 9 through Page 50/line 19.*

In view of the foregoing, Moving Defendants object to the introduction of the following testimony, as it lacks sufficient foundation; calls for speculation; calls for strictly inadmissible hearsay responses; assumes facts not in evidence and, if admitted, would be unfairly prejudicial, confusing and otherwise misleading to the trier of fact:

Page 38/line 1 – Page 40/line 7.

Similarly, while Moving Defendants have moved the admission of CSME deposition exhibit 13 without objection, Moving Defendants seek to redact the last sentence of CSME Exhibit 13, (which reads: *The oil water separator did not work*)

3

before presenting a copy of same to the jury. For the Court's ready reference, a copy of CSME Exhibit 13 is attached hereto as Exhibit "B."

Moving Defendants further object to the introduction of the following testimony, for the following reasons:

Page 15/line 2 – Page 17/line 42 (leading; hearsay; lack of foundation; impermissibly calls for speculation);

Page 18/line 9 – Page 20/line 13 (leading; hearsay; lack of foundation; impermissibly calls for speculation);

Page 25/line 17 – Page 25/line 21 (leading);

Page 27/line 17 – Page 27/line 20 (lack of foundation)[2]; and

Page 98/line 20 – Page 100/line 20 (hearsay; as well as the additional basis for this objection as articulated in the transcript).

## CONCLUSION

For the reasons more fully set forth above, Moving Defendants respectfully request that this Honorable Court issue an Order:

(1)  Granting Moving Defendants' application to exclude, either in its entirety or to the extent the Court finds just and proper, the foregoing objectionable portions of the Rule 15 deposition testimony and redact CSME Exhibit 13 for the reasons more fully set forth above; and

---

2 Specifically, this witness confirmed that he had no functional role or responsibility for the vessel's oily water separator. Rather, 3/E Conge's expressly testified, on direct examination, that his duties were only "to maintain the generator and the boiler" and the fire pump. *See* Exhibit "A," *Transcript Page 11/lines 18 – 23; See also, Transcript page 48/line 4- Page 49/line 8.*

(2)  For any and all such other and further relief which the Court deems to be just

and proper under the specific circumstances of this matter.


Respectfully submitted,


By:  George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

## CERTIFICATE OF SERVICE

I do hereby certify that, on this  6th day of November 2006, I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:

United States Department of Justice
U.S. Attorney's Office
Nemours Building
1007 N. Orange Street, Suite 700
Wilmington, Delaware  19801
Attn:  Edmond Falgowski, Esq.

United States Department of Justice
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Street
Washington, D.C. 20026
Attn:  Gregory Linsin, Esq.
       Jeffrey Phillips, Esq.
       Tracy Katz, Esq.

Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,          :

                    Plaintiff,     :

            vs:                    :No. 1:06-CR-00076-GMS-2

CHIAN SPIRIT MARITIME              :
ENTERPRISES, INC., VENETICO
MARINE S.A. IRENE E/M,             :
EVANGELOS MADIAS, CHRISTOS
PAGONES, ADRIEN DRAGOMIR,          :

                    Defendants. :
                              - - -

            Deposition of PASCUAL CONGE, taken

pursuant to notice in the offices of the United States

Department of Justice, 700 Nemours Building, 1007

North Orange Street, Wilmington, Delaware, on Friday,

July 14, 2006, at 2:33 p.m., before Lorraine B.

Marino, Registered Diplomate Reporter and Notary

Public.

                              - - -

                    CORBETT & WILCOX

            230 North Market Street

            Wilmington, Delaware 19801

                (302) 571-0510

Pascual Conge

2 (Pages 2 to 5)

**Page 2**

1  APPEARANCES:
2      MARK W. KOTILA, ESQ.
      JEFFREY L. PHILLIPS, ESQ.
3      United States Department of Justice
      Environmental Crimes Section
4      P.O. Box 23985 - L'Enfant Plaza
      Washington, DC 20026-3985
5        for Plaintiff
6      GEORGE M. CHALOS, ESQ.
      Fowler Rodriguez & Chalos
7      366 Main Street
      Port Washington, NY 11050
8        for Defendants Chian Spirit and
      Venetico Marine
9
10     CARL R. WOODWARD, III, ESQ.
      Carella, Byrne, Bain, Gilfillan,
      Cecchi, Stewart & Olstein
11     5 Becker Farm Road
      Roseland, NJ 07068-1739
12       for Defendant Dragomir
13     MICHAEL K. TWERSKY, ESQ.
      Montgomery, McCracken, Walker &
14     Rhoads LLP
      123 South Broad Street
15     Philadelphia, PA 19109
        for the Witness
16
17  ALSO PRESENT:
18     ADRIEN DRAGOMIR
      LIVIU-LEE ROTH
      TRACY I. KATZ
19     JASON F BURGESS
      BRENT S. McKNIGHT
20     MICHELLE N. FERRERI
      CARA GOELLER
21     PRESTON SATCHELL
22        - - -
23
24

**Page 3**

1      CHRIS MASAOAY, having been first duly
2  sworn as the interpreter, translated as follows:
3      PASCUAL CONGE, having been first duly
4  sworn, was examined and testified through the
5  interpreter as follows:
6      DIRECT EXAMINATION
7  BY MR. PHILLIPS:
8      Q.    Mr. Conge, how are you?
9      A.    I am fine.
10     Q.    I am Jeff Phillips, with the United
11  States Department of Justice. And I will be asking
12  you some questions. And, Mr. Conge, we have met
13  before; correct?
14     A.    Yes.
15     Q.    And have you talked before about this
16  case with me?
17     A.    Yes.
18     Q.    Mr. Conge, could you tell us where
19  your home country is?
20     A.    We are coming from Brazil.
21     Q.    No. Your home country. Where are you
22  from?
23     A.    Mondragon, Northern Samar.
24     Q.    Is that in the Philippines?

**Page 4**

1      A.    Philippines.
2      Q.    Could you give us your home address?
3      THE INTERPRETER: I am going to ask
4  him to start over.
5      THE WITNESS: Face 4, Block 30, Lot
6  No. 7, Mabuhay 2000, Paliparan No. 2, Dasmarinas
7  Cavite, in the Philippines.
8  BY MR. PHILLIPS:
9      Q.    Thank you. Mr. Conge, how old are
10  you?
11     A.    I am 39.
12     Q.    And what is your occupation?
13     A.    Third engineer.
14     Q.    And we will talk about your training
15  in a moment, but when were you first employed by Chian
16  Spirit?
17     MR. CHALOS: Objection.
18     THE WITNESS: This is the first time.
19  BY MR. PHILLIPS:
20     Q.    And I will back up. Do you recall
21  when you -- first off, who do you currently work for?
22     A.    Chian Spirit.
23     Q.    And when were you first hired by that
24  company?

**Page 5**

1      A.    October 28, 2005.
2      Q.    And when you were hired by that
3  company, where did you report for work?
4      A.    You are asking me about the ship that
5  I reported to?
6      Q.    Is that where you reported to work?
7      A.    I first went to the agency.
8      Q.    And after the agency?
9      A.    Then they give us a principal.
10     Q.    And then what?
11     A.    If we qualify with all the
12  requirements, then we are sent somewhere, to the ship
13  somewhere.
14     Q.    Were you eventually sent to a ship?
15     A.    Yes.
16     Q.    What was the name of the ship?
17     A.    M.V. Irene E.M.
18     Q.    And where did you report to that ship?
19     A.    Tema, Ghana, Africa.
20     Q.    And when you reported to that ship,
21  did you report as a third engineer?
22     A.    Yes.
23     Q.    And is that your current position
24  still?

Pascual Conge

3 (Pages 6 to 9)

Page 6

1          MR. CHALOS: Objection.
2          THE WITNESS: Yes.
3  BY MR. PHILLIPS:
4      Q.     And to become a third engineer, what
5  kind of education do you take?
6      A.     I finished my mechanical engineering.
7      Q.     How many years?
8      A.     Five years.
9          MR. WOODWARD: Could we go off the
10 record for a minute.
11         (Recess taken.)
12 BY MR. PHILLIPS:
13     Q.     Mr. Conge, in addition to the five
14 years of education for engineering, did you take any
15 other training?
16     A.     Yes.
17     Q.     What kind?
18     A.     The MARPOL 1, the MARPOL 2.
19     Q.     And how long were those training
20 sessions?
21     A.     One week each.
22     Q.     Prior to joining the Irene, how many
23 assignments had you had on ocean-going vessels, if
24 any?

Page 7

1      A.     Seven to eight ships.
2      Q.     Back to your MARPOL training, what did
3  you learn in MARPOL 1?
4      A.     Preventive measures such as not
5  throwing trash, issues with things such as oil
6  dumping. That is against the law.
7      Q.     And what about MARPOL 2 training?
8      A.     It is just about the same. It is just
9  a revision of the first.
10     Q.     And in those you said seven or eight
11 prior vessel assignments, what was your title on those
12 ships?
13     A.     You are asking me what my positions
14 are.
15     Q.     Yes.
16     A.     As a fourth engineer.
17     Q.     And did you work your way up to?
18     A.     Yes. I was promoted as a third
19 engineer.
20     Q.     When were you promoted?
21     A.     I don't remember.
22     Q.     You said you boarded the Irene in
23 Africa.
24     A.     Yes.

Page 8

1      Q.     Do you remember the voyages that you
2  took from Africa, if any?
3      A.     I don't remember, sir.
4      Q.     Do you recall; did the boat -- did the
5  ship leave Africa?
6      A.     What is necessarily your question?
7      Q.     Before you got here to the United
8  States, where you are now, and after you boarded the
9  ship in Africa, in between where did it go?
10         MR. CHALOS: Objection.
11         THE WITNESS: Coming from Africa,
12 going to Brazil.
13 BY MR. PHILLIPS:
14     Q.     And do you remember when you left
15 Africa?
16     A.     You are leaving from where again?
17     Q.     Africa.
18     A.     I don't remember.
19     Q.     How long were you on board the Irene?
20     A.     When this thing has happened?
21     Q.     Total.
22     A.     Almost eight months.
23     Q.     From Brazil where did the Irene
24 travel?

Page 9

1      A.     Could you repeat that?
2      Q.     From Brazil where did Irene go to
3  next?
4      A.     To the United States coming from
5  Fortaleza.
6      Q.     Do you remember when you arrived in
7  the United States?
8      A.     I don't remember, sir.
9      Q.     Do you remember when you left Brazil?
10     A.     November 21.
11     Q.     So on November 21 you left Brazil.
12 What year was that?
13     A.     2005.
14     Q.     And approximately how many days was
15 the voyage from Brazil to the United States?
16     A.     I don't remember, sir.
17     Q.     Mr. Conge, do you remember testifying
18 earlier?
19     A.     And you are asking me?
20     Q.     Yes.
21     A.     This is my first time here.
22     Q.     Do you remember when you left Brazil
23 traveling to the United States, did it take more than
24 a month?

Pascual Conge

4 (Pages 10 to 13)

Page 10

1    A.    No, it didn't.

2    Q.    Less than a month?

3    A.    Yes.

4    Q.    And you left on the 21st of November?

5    A.    Yes.

6    Q.    I am going to move to something else

7    now. Did you observe oil waste collection on board

8    the Irene?

9          MR. CHALOS: Objection.

10         THE WITNESS: I don't remember, sir.

11   BY MR. PHILLIPS:

12   Q.    As part of your duties were you

13   required to handle oily waste?

14   A.    No.

15   Q.    Were you required to handle bilge

16   water?

17   A.    No.

18   Q.    Do you recall testifying in front of

19   other people earlier this year?

20   A.    Yes.

21         MR. PHILLIPS: For the record, I am

22   going to put in front of Mr. Conge --

23         MR. WOODWARD: Objection.

24         MR. CHALOS: Objection.

Page 11

1    BY MR. PHILLIPS:

2    Q.    Do you remember during that time

3    talking about your duties?

4    A.    Yes.

5    Q.    Do you remember talking about handling

6    a pump?

7          MR. WOODWARD: Objection; leading.

8          MR. CHALOS: Objection.

9          THE WITNESS: No.

10   BY MR. PHILLIPS:

11   Q.    Did you as part of your duties ever

12   have to start or stop a pump?

13         MR. WOODWARD: Objection; leading.

14         THE WITNESS: Could you repeat that

15   question?

16         MR. PHILLIPS: Sure.

17   BY MR. PHILLIPS:

18   Q.    As an engineer what are your duties on

19   the Irene?

20   A.    To maintain the generator and the

21   boiler.

22   Q.    What else?

23   A.    Emergency fire pump.

24         MR. CHALOS: Can I have that read

Page 12

1    back, please?

2          (The court reporter read back as

3    follows:

4          "Question: As an engineer what are

5    your duties on the Irene?

6          "Answer: To maintain the generator

7    and the boiler.

8          "Question: What else?

9          "Answer: Emergency fire pump.")

10   BY MR. PHILLIPS:

11   Q.    Do you remember what you did on

12   November 23?

13   A.    Yes.

14   Q.    Did you receive -- what did you do on

15   that day?

16   A.    May I ask you, could you repeat that?

17   Q.    What do you remember about

18   November 23?

19   A.    We did the pump on November 23.

20   Q.    Can you describe --

21   A.    A pump-out. Pump out the bilge.

22   Q.    Can you describe what that means?

23   A.    On November 23, when I went down to

24   the engine room, the fourth engineer turned over to me

Page 13

1    the pumps. It was running at that time. It was

2    suctioning of the bilge tank going overboard, from the

3    bilge tank going outside.

4    Q.    What is in the bilge tank?

5    A.    It is a mixture of oil, water.

6    Q.    You said the fourth engineer was

7    operating the pump?

8          MR. CHALOS: Objection.

9          MR. PHILLIPS: I will rephrase that.

10         THE WITNESS: When I came down, he was

11   the one who was running it.

12   BY MR. PHILLIPS:

13   Q.    Who was running it?

14   A.    The fourth engineer.

15   Q.    What is his name?

16   A.    Bryan.

17   Q.    Do you remember his last name?

18   A.    Espina.

19   Q.    So if you are the third engineer and

20   Bryan is the fourth engineer, are there other

21   engineers?

22   A.    Yes, a second engineer, a chief

23   engineer.

24   Q.    Who is the chief engineer?

Pascual Conge

Page 14

1    A.    Adrien Dragomir.
2    Q.    Would you recognize him if you saw him
3 today?
4    A.    Yes.
5    Q.    Do you see him today?
6    A.    (no interpreter) I salute you, Chief
7 (indicating).
8          MR. PHILLIPS: For the record, the
9 witness has identified Adrien Dragomir.
10 BY MR. PHILLIPS:
11    Q.    Does the fourth engineer give you
12 orders?
13    A.    No.
14    Q.    How are orders given?
15    A.    Coming from the second.
16    Q.    Does the second get orders from
17 anybody?
18          MR. WOODWARD: Objection.
19          MR. CHALOS: Objection.
20          MR. WOODWARD: No foundation.
21          THE WITNESS: From the chief engineer.
22 BY MR. PHILLIPS:
23    Q.    Where does the order start?
24          MR. WOODWARD: Objection.

Page 15

1          MR. CHALOS: Objection.
2          MR. WOODWARD: Same.
3          THE WITNESS: Could you please repeat?
4 BY MR. PHILLIPS:
5    Q.    When an order is given, how is it
6 given?
7          MR. CHALOS: Objection.
8          THE WITNESS: Sometimes the chief
9 engineer would write it down on the logbook, or
10 sometimes it would be verbal.
11 BY MR. PHILLIPS:
12    Q.    Do you remember on the 23rd of
13 November how the order was given --
14          MR. CHALOS: Objection.
15 BY MR. PHILLIPS:
16    Q.    -- to do the pumping?
17          MR. WOODWARD: Objection.
18          MR. CHALOS: Objection.
19          MR. WOODWARD: No foundation.
20          THE WITNESS: Out all engine room
21 bilges.
22 BY MR. PHILLIPS:
23    Q.    Can you describe, what is that term?
24          MR. CHALOS: Objection.

Page 16

1          THE WITNESS: That means that to pump
2 out the bilge tank, the bilge well.
3 BY MR. PHILLIPS:
4    Q.    When you approached Bryan and the pump
5 was going, what did you do?
6    A.    He turned it over to me. He told
7 me --
8          MR. WOODWARD: Objection; hearsay.
9          THE WITNESS: -- Third, the pump is
10 working. It is suctioning from the bilge tank going
11 to the overboard."
12 BY MR. PHILLIPS:
13    Q.    When you spoke of the order out bilge
14 tank, where did you -- how did you know about that
15 order?
16          MR. CHALOS: Objection.
17          MR. WOODWARD: Objection.
18          THE WITNESS: The fourth engineer told
19 me that he was ordered by the second engineer. And
20 the second engineer --
21          MR. WOODWARD: Objection.
22          THE WITNESS: -- of course, was
23 asked --
24          MR. WOODWARD: Hearsay.

Page 17

1          THE WITNESS: -- by the chief
2 engineer.
3          MR. CHALOS: I move to strike the
4 answer to the question; based solely on hearsay.
5 BY MR. PHILLIPS:
6    Q.    When you talked about how orders are
7 given, are they given by word or written?
8          MR. WOODWARD: Asked and answered.
9          THE WITNESS: Sometimes it is
10 verbally. I don't remember the other.
11 BY MR. PHILLIPS:
12    Q.    Do you ever see orders written?
13    A.    Yes.
14    Q.    Did you ever see an order from the
15 chief engineer written?
16    A.    Yes.
17    Q.    Where is it written?
18    A.    In the logbook.
19    Q.    Can you describe the logbook? Where
20 is it?
21          MR. CHALOS: Objection. It is two
22 questions.
23 BY MR. PHILLIPS:
24    Q.    First describe it.

Pascual Conge

6 (Pages 18 to 21)

Page 18

1    A.    It is an engine logbook like this
2  (indicating).
3    Q.    And where is it kept?
4    A.    In the engine room there is a table
5  close to the engine. The table is close to the engine
6  because this particular ship, it does not have a
7  control room. The logbook is just on top of the table
8  and so we can see it easily.
9    Q.    On the 23rd of November did you see an
10  order from the chief engineer in that book?
11    A.    Yes.
12    Q.    And what did it say?
13          MR. WOODWARD: Objection.
14          MR. CHALOS: Objection.
15          MR. WOODWARD: Hold it. Hold it.
16  Hold it. Objection; best evidence rule. Objection;
17  hearsay.
18  BY MR. PHILLIPS:
19    Q.    And what did it say?
20    A.    About the pumping.
21    Q.    And what did it say about the pumping?
22    A.    Out all engine room bilges.
23    Q.    And what did you think that meant?
24    A.    That we would pump out overboard the

Page 19

1  oil from the bilge tank.
2    Q.    Pump out the oil to where?
3    A.    Outside.
4    Q.    Are you sure?
5          MR. CHALOS: Objection.
6          THE WITNESS: Yes.
7          MR. PHILLIPS: For the record,
8  actually, should you mark that as a government
9  exhibit?
10          MR. CHALOS: We object. There is no
11  foundation if that is the oil record book.
12          MR. PHILLIPS: I am going to make a
13  foundation, but I want to have it marked first.
14          MR. WOODWARD: Just mark it first.
15          (Government Deposition Exhibit No. 1
16  was marked for identification.)
17          MR. CHALOS: Before we go to the next
18  set of questions, for the record, I note that we have
19  not seen this engine logbook --
20          MR. PHILLIPS: Neither have we.
21          MR. CHALOS: -- that Mr. Conge has
22  spoken about. So if that is something that is within
23  the government's possession, we ask that it be turned
24  over forthwith.

Page 20

1          MR. PHILLIPS: And the government asks
2  that if it is in the defense's possession, that it be
3  turned over forthwith. Back on the record.
4          MR. WOODWARD: Well, I can tell you
5  right now that speaking on behalf of Mr. Dragomir, we
6  don't have it.
7          MR. PHILLIPS: Okay.
8          MR. WOODWARD: And you also know from
9  our prior conversation, when he last saw it, it was in
10  the possession of the United States.
11          MR. PHILLIPS: So he says. Are we
12  back on the record?
13  BY MR. PHILLIPS:
14    Q.    Mr. Conge, back to the order and what
15  you saw on the 23rd of November, how do you know that
16  the oil was being pumped outside?
17          MR. CHALOS: Objection.
18          THE WITNESS: The pump has a pressure
19  gauge. It has a suction and delivery.
20  BY MR. PHILLIPS:
21    Q.    How do you know, if you know, that it
22  went outside the ship?
23          MR. CHALOS: Objection.
24          THE WITNESS: You would know that

Page 21

1  because the pressure would be moving.
2  BY MR. PHILLIPS:
3    Q.    Now, in describing the pipe, what --
4  can you describe what the pipe looked like?
5          MR. CHALOS: Objection. What pipe?
6          THE WITNESS: Should I draw it? Can I
7  draw it?
8  BY MR. PHILLIPS:
9    Q.    No. You can describe the way it
10  looked.
11    A.    It is a plastic hose, about four
12  meters. There is a flange on both ends.
13    Q.    And going from where to where?
14    A.    It is connected to the end of the
15  bilge pump. Going towards outside there is another
16  flange on the end. This would be the walling of the
17  ship going towards overboard. There is another flange
18  there.
19    Q.    And that is what you saw operating on
20  the 23rd of November?
21    A.    Yes.
22    Q.    Did that pipe go through the oily
23  water separator?
24          MR. CHALOS: Objection.

Pascual Conge

Page 22

1          THE WITNESS: No.
2    BY MR. PHILLIPS:
3          Q.    Are you familiar with the oily water
4    separator? Do you know what it looks like?
5          A.    Yes.
6          MR. PHILLIPS: For the record, I would
7    like Mr. Conge to look to his right at the plastic
8    bag. Actually, we need to mark that as an exhibit.
9    This will be marked as Government Exhibit No. 2.
10   BY MR. PHILLIPS:
11         Q.    Mr. Conge, do you recognize what is in
12   that plastic bag?
13         MR. CHALOS: Objection.
14         THE WITNESS: Yes.
15   BY MR. PHILLIPS:
16         Q.    What is it?
17         A.    This is what is being used as a magic
18   pipe.
19         MR. PHILLIPS: Chris, I am going to
20   have to move around. How should I do that?
21         (Recess taken.)
22         (Government Deposition Exhibit No. 2
23   was marked for identification.)
24

Page 23

1    BY MR. PHILLIPS:
2          Q.    Mr. Conge, do you recognize this?
3          A.    Yes.
4          Q.    What is it?
5          A.    Magic pipe plastic hose.
6          Q.    Is there only one hose there?
7          A.    I cannot clearly see it because it is
8    inside, but --
9          Q.    Feel free to look at it.
10         A.    Two hoses.
11         Q.    Do you recognize each hose?
12         A.    I don't remember.
13         Q.    Do you know what this is? For the
14   record, I am pointing at a rag wrapped around the hose
15   closest to the window.
16         A.    This is the plastic hose magic pipe.
17         Q.    Okay. You can sit down, Mr. Conge.
18         Why do you call it a magic hose or
19   magic pipe?
20         A.    Because that is what you would use
21   coming from the bilge pump going into the overboard.
22         Q.    The overboard, describe what you mean
23   by the overboard?
24         A.    It is connected outside in the walling

Page 24

1    of the ship. That's where it is connected.
2          Q.    And where does it come out?
3          A.    Going outside.
4          Q.    Outside above or below the water?
5          A.    I don't remember.
6          Q.    How often did you see the magic pipe?
7          MR. CHALOS: Objection.
8          THE WITNESS: Since we left Brazil and
9    as we were going here to the United States.
10   BY MR. PHILLIPS:
11         Q.    How many times?
12         A.    I don't remember.
13         Q.    Was it more than once?
14         A.    Two times I saw it.
15         Q.    Two times. And who, if anybody, did
16   you see operating?
17         MR. CHALOS: Objection.
18         THE WITNESS: I don't remember.
19   BY MR. PHILLIPS:
20         Q.    Did you ever operate the magic pipe?
21         A.    No, because normally it is the oiler
22   that does it, but I just don't remember.
23         Q.    Did you ever turn on or off the pump
24   that you spoke of?

Page 25

1          A.    Yes.
2          Q.    Describe that.
3          A.    Five days before the arrival here in
4    the United States the second ordered the fourth
5    engineer that the bilge tank, we needed to empty it
6    out.
7          MR. WOODWARD: Objection; hearsay.
8    Objection; hearsay.
9          THE WITNESS: That we needed to lessen
10   the contents of the bilge tank.
11   BY MR. PHILLIPS:
12         Q.    When you observed the magic pipe being
13   used, how long was the pumping?
14         MR. CHALOS: Objection.
15         THE WITNESS: I don't remember.
16   BY MR. PHILLIPS:
17         Q.    Was it one hour?
18         MR. WOODWARD: Objection; leading.
19         THE WITNESS: On the second time that
20   I pumped, I am the one that started it. I am the one
21   that stopped it. It was for one hour that I pumped.
22   BY MR. PHILLIPS:
23         Q.    Did you ever know how much liquid you
24   pumped?

Pascual Conge

8 (Pages 26 to 29)

Page 26

```
1    A.    I don't remember, sir.
2    Q.    Did you ever do soundings?
3    A.    No, sir.
4    Q.    Did anyone ever do soundings?
5    A.    The oiler, sometimes the chief
6  engineer.
7    Q.    And how would you use the soundings,
8  if at all?
9          MR. CHALOS: Objection.
10         MR. WOODWARD: Object; speculation.
11         THE WITNESS: The tank has a tube that
12  goes down that leads to the tank. So then you have a
13  measuring tape. You would put it there so you would
14  know what the contents are.
15  BY MR. PHILLIPS:
16    Q.   When you saw the magic pipe, where was
17  it in the engine room?
18         MR. CHALOS: Objection.
19         THE WITNESS: I don't remember, sir.
20  BY MR. PHILLIPS:
21    Q.   Were there other people going in and
22  out of the engine room?
23    A.   Yes.
24    Q.   Who would go in and out of the engine
```

Page 27

```
1  room?
2    A.    Sometimes people from the deck. They
3  would borrow the tools.
4    Q.    Who from the deck?
5    A.    I don't remember.
6    Q.    Did the engineers go into the engine
7  room?
8          MR. CHALOS: Objection.
9          THE WITNESS: Yes.
10  BY MR. PHILLIPS:
11    Q.   Did you ever see the chief engineer in
12  the engine room?
13    A.   Yes, every day.
14    Q.   Going back to the oily water
15  separator, did you ever see anyone use it?
16    A.   No.
17    Q.   Do you know if it worked?
18         MR. CHALOS: Objection.
19         THE WITNESS: It's not working.
20  BY MR. PHILLIPS:
21    Q.   In the 13 months that you were on the
22  ship -- I am sorry. In the months -- in the month
23  that you were on the ship --
24         MR. WOODWARD: Objection.
```

Page 28

```
1          MR. CHALOS: Objection.
2  BY MR. PHILLIPS:
3    Q.    -- did you ever see the oily water
4  separator work?
5          MR. WOODWARD: Objection; leading.
6          THE WITNESS: No.
7  BY MR. PHILLIPS:
8    Q.    Did you ever see anyone working on the
9  oily water separator?
10    A.   Yes.
11    Q.   Who?
12    A.   They were testing it.
13    Q.   Who tested it?
14    A.   The chief engineer, the second
15  engineer, the electrician.
16         MR. PHILLIPS: For the record, the
17  government would like to move into evidence what has
18  been previously marked as Government Exhibit No. 2 for
19  identification.
20         MR. CHALOS: Objection.
21         MR. WOODWARD: Objection. There are
22  two hoses. Only one has been identified.
23  BY MR. PHILLIPS:
24    Q.   The pumping on the 23rd, was that done
```

Page 29

```
1  in the day or the night?
2    A.    It was nighttime.
3    Q.    The second time was it day or night?
4    A.    I don't remember.
5    Q.    Did you ever pump out near shore?
6          MR. CHALOS: Objection.
7          MR. WOODWARD: Leading.
8          THE WITNESS: No.
9          MR. PHILLIPS: Another sticker,
10  please.
11         (Government Deposition Exhibit No. 3
12  was marked for identification.)
13         (Recess taken.)
14         (CSME Defendants' Deposition Exhibit
15  Nos. 8 through 16 were marked for identification.)
16  BY MR. PHILLIPS:
17    Q.   Mr. Conge, back to what has been
18  marked as Government Exhibit 2, for the record, I am
19  pointing to the plastic pipe that is closest to the
20  window. Mr. Conge, do you see what I am pointing at
21  here?
22    A.   Yes.
23    Q.   Can you tell me what it is I am
24  pointing at?
```

Pascual Conge

9 (Pages 30 to 33)

Page 30

1    A.    Rags, rags.
2    Q.    Okay. Do you see anything on the
3  other pipe to indicate something similar or not?
4    A.    No.
5    Q.    The pipe that you spoke of, the magic
6  pipe, of these two, which one was the magic pipe?
7         MR. WOODWARD: Objection.
8         MR. CHALOS: Objection.
9         THE WITNESS: This (indicating).
10        MR. PHILLIPS: Let the record reflect
11  that Mr. Conge is pointing to the one on the right
12  without the rag.
13  BY MR. PHILLIPS:
14    Q.    How do you know that this is the one
15  that you saw? And again, I am pointing to the one on
16  the right without the rag.
17    A.    Because this is the piece that we
18  attached to that piece over there (indicating), and
19  the other piece over there is attached to the end of
20  this.
21    Q.    Okay. Now, Mr. Conge, the government
22  is showing you what has been marked previously as
23  Government Exhibit 3. Do you recognize this?
24    A.    Yes.

Page 31

1         MR. PHILLIPS: And do you have that,
2  Chris? And you can sit it down, Jason.
3  BY MR. PHILLIPS:
4    Q.    Mr. Conge, what are those?
5    A.    Flange.
6    Q.    And how do you -- what -- you said
7  flanges?
8    A.    Yes.
9    Q.    And how do you recognize them?
10    A.    Because those, these are the things
11  that are attached and you would put the clip, clip
12  right here (indicating).
13    Q.    And what would the flanges be
14  connected to?
15         MR. WOODWARD: Objection.
16         THE WITNESS: Delivery from the bilge
17  pump to the ocean.
18  BY MR. PHILLIPS:
19    Q.    So would these flanges be connected to
20  something?
21    A.    No.
22    Q.    These flanges would not be connected
23  to anything?
24    A.    On the corner of the delivery from the

Page 32

1  bilge pump, the other corners is attached, and the
2  other one, it goes to the ocean, outside.
3    Q.    It goes to the ocean outside?
4    A.    Yes.
5    Q.    Now, what is in between?
6    A.    (without interpreter) I don't remember
7  the --
8    Q.    The distance?
9    A.    (without interpreter) The clearance,
10  the distance.
11         (through interpreter) I don't remember
12  the clearance, the distance.
13    Q.    Mr. Conge, going back to the written
14  orders that you described, and you described seeing an
15  order from Chief Engineer Dragomir, how did you know
16  that that was his order?
17    A.    I know his penmanship and I know his
18  signature.
19    Q.    What color was the penmanship made in
20  the engine room logbook?
21         MR. WOODWARD: Objection.
22         THE WITNESS: Red.
23  BY MR. PHILLIPS:
24    Q.    Now, the government is going to show

Page 33

1  you what has been previously marked as Government
2  Exhibit No. 1 for you to look at. And I will show it
3  first to defense counsel.
4         MR. CHALOS: We have seen it before.
5  We object to the introduction of it.
6         MR. PHILLIPS: I am not introducing it
7  for --
8         MR. WOODWARD: I would like to look at
9  it.
10         MR. PHILLIPS: Are we okay there,
11  Chris?
12         Let the record reflect that I am
13  putting down what has been previously marked as
14  Government Exhibit 1 for identification in front of
15  Mr. Conge.
16  BY MR. PHILLIPS:
17    Q.    And, Mr. Conge, can you tell me what
18  are the dates on this page?
19         MR. WOODWARD: Objection.
20         MR. CHALOS: Objection.
21         MR. WOODWARD: You haven't identified
22  that he knows the book.
23  BY MR. PHILLIPS:
24    Q.    Can you tell me what -- if you

Pascual Conge

10 (Pages 34 to 37)

Page 34

1 recognize what this is?
2 　　　　MR. WOODWARD: Again, I object.
3 　　　　MR. CHALOS: One second. For the
4 record, I would like to make an objection --
5 　　　　THE WITNESS: I don't recognize --
6 　　　　MR. KOTILA: Hold on. Hold on. They
7 are making an objection. Let that go on the record;
8 then continue.
9 　　　　MR. CHALOS: Do you have his answer?
10 　　　　THE COURT REPORTER: I have everything
11 that was said.
12 　　　　MR. PHILLIPS: Let the record reflect
13 that I am pointing to the upper left-hand corner.
14 And, Mr. Conge, can you read what this says?
15 　　　　MR. CHALOS: Objection.
16 　　　　MR. WOODWARD: I am going to object.
17 In fact, I think he already testified he doesn't know
18 what it is.
19 　　　　MR. PHILLIPS: He just testified that
20 he did.
21 　　　　MR. WOODWARD: I am sorry. Could we
22 have the last couple questions read back, please.
23 　　　　(The court reporter read back as
24 follows:

Page 35

1 　　　　"Mr. Phillips: Let the record reflect
2 that I am putting down what has been previously marked
3 as Government Exhibit 1 for identification in front of
4 Mr. Conge.
5 　　　　"Question: And, Mr. Conge, can you
6 tell me what are the dates on this page?
7 　　　　"Mr. Woodward: Objection.
8 　　　　"Mr. Chalos: Objection.
9 　　　　"Mr. Woodward: You haven't identified
10 that he knows the book.
11 　　　　"By Mr. Phillips:
12 　　　　"Question: Can you tell me what -- if
13 you recognize what this is?
14 　　　　"Mr. Woodward: Again, I object.
15 　　　　"Mr. Chalos: One second. For the
16 record, I would like to make an objection --
17 　　　　"The Witness: I don't recognize --
18 　　　　"Mr. Kotila: Hold on. Hold on. They
19 are making an objection. Let that go on the record;
20 then continue.
21 　　　　"Mr. Chalos: Do you have his answer?
22 　　　　"The Court Reporter: I have
23 everything that was said.
24 　　　　"Mr. Phillips: Let the record reflect

Page 36

1 that I am pointing to the upper left-hand corner.
2 And, Mr. Conge, can you read what this says?
3 　　　　"Mr. Chalos: Objection.
4 　　　　"Mr. Woodward: I am going to object.
5 In fact, I think he already testified he doesn't know
6 what it is.
7 　　　　"Mr. Phillips: He just testified that
8 he did.
9 　　　　"Mr. Woodward: I am sorry. Could we
10 have the last couple questions read back, please.")
11 　　　　MR. WOODWARD: Okay. I'd just say
12 that I think at least half of his answer said he
13 doesn't recognize, but in any event, continue. But I
14 don't think you have laid any kind of an adequate
15 foundation for questioning the witness from this
16 document.
17 　　　　MR. PHILLIPS: We are not looking at
18 this document. We are looking at a page. And I have
19 asked -- again, for the record, I have pointed to the
20 top left-hand corner of this box.
21 BY MR. PHILLIPS:
22 　　Q.　　And, Mr. Conge, can you read what that
23 says?
24 　　A.　　Date.

Page 37

1 　　Q.　　And as you follow the column down, can
2 you read what the first written entry says?
3 　　　　MR. CHALOS: Objection.
4 　　　　MR. WOODWARD: Objection.
5 　　　　MR. CHALOS: Object to this whole line
6 of questioning of this document of this witness.
7 　　　　MR. WOODWARD: It is totally improper.
8 　　　　THE WITNESS: You are asking me what
9 question again?
10 BY MR. PHILLIPS:
11 　　Q.　　Following the column "date" down, what
12 is the first entry?
13 　　　　MR. CHALOS: Wait. Objection.
14 　　　　THE WITNESS: '05. November 6, 2005.
15 BY MR. PHILLIPS:
16 　　Q.　　Then going down --
17 　　　　MR. PHILLIPS: I know. You are going
18 to have an objection. Go ahead.
19 　　　　MR. WOODWARD: We have a continuing
20 objection to this whole questioning.
21 BY MR. PHILLIPS:
22 　　Q.　　Going down to the end of this column,
23 what is the final entry in the date column?
24 　　A.　　December 1, 2005.

Pascual Conge

11 (Pages 38 to 41)

Page 38

1      Q.      Now, on this page that we have
2  identified, do you see any signatures that you
3  recognize?
4              MR. CHALOS: Objection. This man is
5  not a handwriting expert.
6              THE WITNESS: Yes.
7              MR. PHILLIPS: Is the objection
8  finished being heard?
9  BY MR. PHILLIPS:
10     Q.      And what signature do you recognize?
11     A.      The signature of the captain.
12     Q.      Are there any other signatures that
13  you recognize on this page, on this page?
14     A.      Chief engineer.
15     Q.      Do you recognize that signature?
16             MR. CHALOS: Objection.
17             THE WITNESS: Yes.
18  BY MR. PHILLIPS:
19     Q.      Thank you. Now, I am going to ask
20  you, do you recognize that?
21             MR. CHALOS: Objection.
22             MR. PHILLIPS: For the record, it is
23  Government Exhibit 1 for identification.
24             THE WITNESS: Yes.

Page 39

1  BY MR. PHILLIPS:
2      Q.      What is it?
3      A.      Oil record book.
4      Q.      How do you know that's what it is?
5      A.      Because all of the oil records are
6  written here by the chief engineer.
7              MR. WOODWARD: Objection. Objection.
8  That's not responsive. Ask that the answer be
9  stricken.
10             MR. PHILLIPS: Is there any other
11  signature there that you recognize?
12             MR. WOODWARD: Do you know what page
13  is being looked at?
14             MR. PHILLIPS: For the record, it is
15  the page that was identified before by dates, those
16  dates being November 6, 2005 through December 1, 2005.
17             THE WITNESS: It is from the bilge,
18  the bilge.
19             MR. WOODWARD: Objection. Again, this
20  witness has not made -- you haven't laid any
21  foundation for him to testify from this, and it is
22  just like reading a piece of evidence into the record.
23  It is totally improper.
24

Page 40

1  BY MR. PHILLIPS:
2      Q.      Is there -- when you said you
3  recognized this book --
4      A.      Yes.
5      Q.      -- have you ever seen this book or a
6  book like it on other ships?
7      A.      Yes.
8      Q.      Now, do you know; is there anything
9  from looking at this document that tells you where
10  this book belongs?
11             MR. CHALOS: Objection; leading.
12             MR. WOODWARD: Objection.
13  BY MR. PHILLIPS:
14     Q.      Which ship does this book belong to?
15             MR. WOODWARD: Objection. Once again
16  no foundation.
17             THE WITNESS: Irene E.M.
18  BY MR. PHILLIPS:
19     Q.      How do you know?
20     A.      Name of ship, Irene E.M.
21     Q.      Is there anything else that you
22  recognize on that document?
23             MR. WOODWARD: Objection.
24             MR. CHALOS: Objection.

Page 41

1              MR. WOODWARD: It doesn't say that he
2  recognizes anything. There is no foundation.
3              MR. PHILLIPS: He did. He already
4  said that he recognized it. Would you like it read
5  back?
6              MR. WOODWARD: Continue.
7              MR. PHILLIPS: Okay.
8              THE WITNESS: The date.
9  BY MR. PHILLIPS:
10     Q.      And what are the dates?
11     A.      February 6, '04.
12     Q.      Does it say anything else about the
13  dates?
14             MR. CHALOS: Objection.
15             MR. WOODWARD: Objection. You are
16  asking the witness to read the document.
17             MR. CHALOS: The document speaks for
18  itself.
19             MR. WOODWARD: It is not in evidence.
20  It hasn't been offered in evidence. No foundation.
21  BY MR. PHILLIPS:
22     Q.      The date that you just -- what does
23  the date that you just read refer to?
24             MR. WOODWARD: Objection.

Pascual Conge

12 (Pages 42 to 45)

Page 42

BY MR. PHILLIPS:
1
2    Q.    Do you know what it refers to?
3    A.    It is the beginning date, but it does
4  not have the ending date.
5    Q.    And what is the beginning date?
6          MR. CHALOS: Objection.
7          THE WITNESS: January 6, 2004.
8  BY MR. PHILLIPS:
9    Q.    And what is the ending date?
10    A.    There is nothing written.
11    Q.    And when were you on the ship?
12    A.    October 28, 2005.
13    Q.    Is this or is this not the oil record
14  book from when you were on the ship --
15          MR. CHALOS: Objection.
16          MR. WOODWARD: Objection; no
17  foundation.
18  BY MR. PHILLIPS:
19    Q.    -- based on those dates?
20    A.    No.
21    Q.    Based on those? Again, let me repeat
22  the question. Is that the record book while you were
23  on the ship based on those dates?
24          MR. WOODWARD: Objection.

Page 43

1          MR. CHALOS: Objection.
2          MR. WOODWARD: No foundation.
3          MR. CHALOS: And leading.
4          THE WITNESS: Yes.
5          MR. PHILLIPS: Thank you. And the
6  government is going to move to have this what has been
7  previously marked as Government Exhibit 1 for
8  identification into evidence as Government Exhibit 1.
9          MR. CHALOS: Objection.
10          MR. WOODWARD: Well, totally --
11  objection; totally lacking of any foundation.
12  BY MR. PHILLIPS:
13    Q.    Now, moving back to November 23, when
14  you were told to pump the bilges out, do you see that
15  date written in the oil record book?
16          MR. CHALOS: Objection.
17          MR. WOODWARD: Objection.
18          THE WITNESS: It's not written.
19          MR. WOODWARD: Objection, by the way,
20  to that answer.
21  BY MR. PHILLIPS:
22    Q.    When you saw the magic pipe connected
23  on the voyage from Brazil to the United States, did
24  the magic pipe -- was the magic pipe still connected

Page 44

1  when you got to the United States?
2          MR. CHALOS: Objection.
3          MR. WOODWARD: Objection; leading.
4  BY MR. PHILLIPS:
5    Q.    Yes or no?
6          MR. CHALOS: Objection.
7          THE WITNESS: No.
8  BY MR. PHILLIPS:
9    Q.    Do you know when the magic pipe was
10  removed on the trip from Brazil to the United States?
11    A.    Three days before we arrived at
12  America.
13    Q.    How do you know?
14    A.    Robert took it out together with the
15  second.
16    Q.    Once you were in the United States, do
17  you remember what happened after you got to the United
18  States?
19    A.    Yes.
20    Q.    What happened?
21    A.    When we arrived in anchorage, the
22  Coast Guard, U.S. Coast Guard boarded. Everything in
23  the ship, they wanted to check it. We were gathered
24  in the officers' mess room, all of us. And one by one

Page 45

1  they asked us to sit in the chairs. We could not step
2  out or go outside. If we needed to use the bathroom,
3  there was a security.
4    Q.    Do you remember when that was, the
5  date?
6    A.    I don't remember the date.
7    Q.    Do you remember the month?
8    A.    December.
9    Q.    Of what year?
10    A.    2005.
11    Q.    Do you remember where the ship was
12  when the Coast Guard came on board?
13    A.    Would you repeat that?
14    Q.    Do you remember where the ship was
15  located when the Coast Guard came on board?
16    A.    Anchorage in Delaware.
17    Q.    Do you recall if anybody else was on
18  board when the Coast Guard was on board?
19          MR. CHALOS: Objection; leading.
20          THE WITNESS: Yes.
21  BY MR. PHILLIPS:
22    Q.    There was other people on board?
23    A.    The owner of the ship, Christos,
24  superintendent.

Page 46

1    Q.    Let's go back to the owner first. Do
2  you remember the owner's name?
3    A.    Yes.
4    Q.    What was it?
5    A.    Madias.
6    Q.    And the second name that you said,
7  what was the second name?
8    A.    Christos, superintendent.
9    Q.    And did either of those gentlemen talk
10  to you?
11    A.    Yes.
12    Q.    Who?
13    A.    Superintendent Christos.
14    Q.    And what did he say to you?
15    A.    When he boarded, he asked the second
16  engineer and the fourth engineer to make a statement.
17  The second and the fourth engineer prepared the
18  statement, and they made us read it, all of us, and
19  then we signed. Each of us signed. And after we have
20  signed, the second gave it to Mr. Christos.
21          After the Superintendent Christos had
22  read it, we were eating in the mess hall. The second
23  engineer was there, myself, the fourth engineer, Paje,
24  Mario, Damasing. He said that impossible; could we

Page 47

1  change the statements. And then we said we could not
2  change it because we are just telling the truth.
3    Q.    Did he -- go ahead.
4    A.    And then he said that if we don't
5  change it, then we would go to jail.
6    Q.    And what did you say?
7    A.    I said we are just telling the truth.
8  We cannot change it.
9    Q.    Did he tell you how he wanted to
10  change the statement?
11          MR. CHALOS: Objection.
12          THE WITNESS: They want that we change
13  the statement.
14  BY MR. PHILLIPS:
15    Q.    Did he tell you what words to use?
16    A.    I don't remember.
17          MR. PHILLIPS: Before we finish up, I
18  want to talk to my counsel.
19          That is done for me for right now.
20          MR. CHALOS: Okay. Passing him?
21          MR. PHILLIPS: Passing him.
22          MR. CHALOS: One second. I have got
23  to move back up to my spot.
24          MR. PHILLIPS: Thank you.

Page 48

1          THE WITNESS: Thank you.
2          CROSS-EXAMINATION
3  BY MR. CHALOS:
4    Q.    Ready? Mr. Conge, good afternoon. My
5  name is George Chalos, and I represent the company
6  which owns the Irene E.M. and the company which
7  manages the Irene E.M. And I would like to just
8  clarify a couple things before we go too much further.
9          You were the third engineer on board
10  the ship; right?
11    A.    Yes.
12    Q.    And as the third engineer, your duties
13  relate to maintaining the generators; right?
14    A.    Yes.
15    Q.    You don't have any -- your job doesn't
16  have any responsibility for the oily water separator,
17  does it?
18    A.    No.
19    Q.    You don't maintain the oily water
20  separator; right?
21    A.    No, I don't.
22    Q.    You don't fix the oily water
23  separator, do you?
24    A.    No.

Page 49

1    Q.    You don't operate the oily water
2  separator?
3    A.    In Irene E.M. I don't -- I never run
4  those things since I boarded the ship.
5    Q.    Okay. So you don't turn -- you don't
6  make the decisions when to use the oily water
7  separator?
8    A.    No.
9    Q.    Okay. Now, as third engineer, you
10  don't keep any logbooks, do you?
11    A.    No, nothing.
12    Q.    Okay. So you don't write in the
13  engine log, do you?
14    A.    No.
15    Q.    You don't maintain the oil record
16  book, do you?
17    A.    In the generator logbook.
18    Q.    Okay. So apart from the generator
19  logbook, you don't have any other responsibility for
20  any other records?
21    A.    The spares for the generators.
22    Q.    Okay. So let's go back to my
23  question. You don't write in the oil record book, do
24  you?

Pascual Conge

14 (Pages 50 to 53)

Page 50

1   A.   No.
2   Q.   You don't keep the oil record book in
3   your cabin?
4   A.   No.
5   Q.   Okay.  You don't have any
6   responsibility to make entries in the oil record book,
7   do you?
8   A.   No.
9   Q.   Okay.  So all the questions that
10  Mr. Phillips asked you about the oil record book were
11  questions about a record you have nothing to do with?
12  A.   No.
13  Q.   No, you have nothing to do with it;
14  right?
15  A.   No.
16  Q.   Okay.  Now, in fact, had you ever seen
17  the contents of this before the government showed it
18  to you?
19  A.   I don't remember.
20  Q.   Okay.  Thank you.  So let's go back
21  and talk a little bit more about you.  English is not
22  your first language; right?
23  A.   No.
24  Q.   Okay.  Now, did you study a little

Page 51

1   English?
2   A.   Yes.
3   Q.   Okay.  And where did you study it?
4   A.   University of the Philippines,
5   Catarman, Northern Samar.
6   Q.   Okay.  Do you feel comfortable enough
7   to speak in English in an official meeting like this?
8   A.   Yes.
9   Q.   Okay.  And do you believe that you
10  will be able to answer my questions accurately?
11  A.   I need an interpreter.
12  Q.   Oh, okay.  So let's go back.  To
13  participate in an official meeting like this, you need
14  the assistance of an interpreter; right?
15  A.   Yes.
16  Q.   Okay.  Now, when the Coast Guard came
17  on board, they talked to you; right?
18  A.   Yes.
19  Q.   They called all the crew for an
20  official meeting in the mess room; right?
21  A.   Yes.
22  Q.   Did the Coast Guard offer an
23  interpreter for you?
24  A.   No, they didn't.

Page 52

1   Q.   Was an interpreter available for your
2   use and assistance?
3   A.   None.
4   Q.   Okay.  Were you advised that you had
5   the right to have an attorney present to represent
6   your interests?
7   A.   Nothing.
8   Q.   Okay.  Let's talk about your
9   employment with -- your employment contract with this
10  vessel.  I am going to show you what we have marked as
11  CSME Defendants' Deposition No. 8.  And for the
12  record, I will make a representation it is a four-page
13  document.
14       And my first question to you,
15  Mr. Conge, is this your employment contract that you
16  signed before joining the Irene E.M.?
17  A.   Yes.
18  Q.   Okay.  Now, at the time -- strike
19  that.
20       Let's just go back and talk about you
21  a little bit more.  You have been a sailor since when?
22  A.   1991, 1992.
23  Q.   Okay.  So by the time that you got on
24  board the Irene E.M., you had been at sea almost 15

Page 53

1   years?
2   A.   Almost 13 to 14 years.
3   Q.   Okay.  And did I understand you to
4   tell Mr. Phillips before that I had been on seven or
5   eight prior ships?
6   A.   Yes.
7   Q.   Okay.  Now, when you work, you stand a
8   watch in the engine room; right?
9   A.   Yes.
10  Q.   And what hours is that watch?
11  A.   12:00 to 4:00.
12  Q.   Okay.  When you say you work 12:00 to
13  4:00, what that really means is you work 12:00 to 4:00
14  in the afternoon and 12:00 to 4:00 at night?
15  A.   Yes.
16  Q.   Okay.  Now, you were the third
17  engineer?
18  A.   Yes.
19  Q.   Okay.  Now, take a look at your
20  contract.  Now, tell us how you went about getting
21  this job.  What you did was, you went to a crewing
22  agent in the Philippines; right?
23  A.   Yes.
24  Q.   And you went to the crewing agent

Pascual Conge

15 (Pages 54 to 57)

Page 54

1  looking for a ship to join?
2      A.    Yes.
3      Q.    And the reason why you wanted to join
4  a ship was because you wanted to go back to work?
5      A.    Yes.
6      Q.    Okay. And that's how you make a
7  living, by going to sea?
8      A.    Yes.
9      Q.    Okay. Now, you signed this contract
10 when?
11     A.    I don't remember, sir.
12     Q.    Take a look at the document. And it
13 says at the bottom, "In witness whereof the parties
14 have" --
15          MR. PHILLIPS: Objection. I don't
16 even know what you are referring to right now.
17          MR. CHALOS: The contract of
18 employment.
19          MR. WOODWARD: CSME 8.
20          MR. PHILLIPS: Is it in evidence? Is
21 there an exhibit on it?
22          MR. CHALOS: We have it.
23          MR. WOODWARD: There is an exhibit.
24          MR. CHALOS: It is an exhibit.

Page 55

1          MR. WOODWARD: It has been marked.
2          MR. PHILLIPS: It has not been marked,
3  and I don't have a copy of it.
4          MR. CHALOS: Let's take care of the
5  formalities.
6  BY MR. CHALOS:
7      Q.    You have already testified, Mr. Conge,
8  that this is your employment contract; right?
9      A.    Yes.
10          MR. CHALOS: Okay. Now, we move into
11 evidence CSME Defendants' Exhibit 8, Mr. Conge's
12 employment contract.
13          MR. PHILLIPS: We need a copy of it.
14          MR. CHALOS: You need a copy. Okay.
15 One second.
16          MR. WOODWARD: Why don't you just show
17 it to him right now so he can see it.
18          MR. CHALOS: I have another one.
19          MR. WOODWARD: That is marked?
20          MR. CHALOS: No.
21 BY MR. CHALOS:
22     Q.    Okay, Mr. Conge, where did you join
23 the vessel, meaning when did you go to work?
24     A.    What do you mean by that?

Page 56

1      Q.    Okay. Well, where did you get on the
2  ship?
3      A.    Tema, Ghana, Africa.
4      Q.    Okay. So before you got on board the
5  ship, you had to go to the crewing agent's office to
6  sign the contract; right?
7      A.    Yes.
8      Q.    Okay. And when you went, you were
9  given some training; right?
10     A.    Yes.
11     Q.    And some of that training was related
12 to the company's SMS, safety management system?
13     A.    Yes.
14     Q.    And part of that training included the
15 company's environmental protection policy; right?
16     A.    Yes.
17     Q.    Okay. So before you got on board the
18 ship, you had to learn about the company's policies
19 with respect to protecting the environment; right?
20     A.    Yes.
21     Q.    Okay. Now, take a look, Mr. Conge, at
22 the second page of that exhibit. Now, this is a
23 declaration that you signed?
24     A.    Yes, yes.

Page 57

1      Q.    Okay. And I will focus your attention
2  to the bottom. That's your signature?
3      A.    Yes.
4      Q.    Okay. Now, and it says in sum and
5  substance -- well, I will withdraw that and we will
6  just move on.
7          MR. CHALOS: Now, I would like to mark
8  this as the next exhibit. I am sorry to ask.
9  Actually, you know what? I can --
10          (Discussion off the record.)
11 BY MR. CHALOS:
12     Q.    I am going to show you what was marked
13 previously as CSME Deposition, Defendants' Deposition
14 Exhibit No. 7. Okay. Now, earlier today Mr. Tudor
15 identified that as the Chian Spirit environmental
16 protection policy. Is he right?
17     A.    Yes.
18     Q.    Now, a copy of that policy was
19 provided to you during your training; right, before
20 getting on board the ship?
21     A.    Yes, yes.
22     Q.    Okay. And copies of that were also
23 available on board the vessel; right?
24     A.    Yes.

Pascual Conge

16 (Pages 58 to 61)

Page 58

1    Q.    Okay.  There was a copy of that in the
2  ship's office?
3    A.    Yes.
4    Q.    And a copy in the hallway?
5    A.    Yes.
6    Q.    And a copy in the mess room?
7    A.    Yes.
8    Q.    There was a copy on the bridge?
9    A.    Yes.
10    Q.    And there was a copy in the engine
11  room on the plywood bulletin board; right?
12    A.    Yes.
13    Q.    Okay.  Now, I will take that back.
14  Thank you very much.  I will take back number --
15  now -- okay, Mr. Conge, I am going to show you what we
16  have marked as CSME Defendants' Deposition Exhibit
17  No. 9.  I will ask you to just take a look at that.
18  And can you identify for the record what each page of
19  that exhibit is?
20    A.    This is the seaman book.
21    Q.    Wait a minute.  Just so I am clear,
22  that is a photocopy of the first page of your seaman's
23  book?
24    A.    Page 1, yes.

Page 59

1    Q.    Okay.  And what is the next page?
2    A.    This is seaman book.
3    Q.    Okay.  And the next page.  No, the
4  next page.
5    A.    Passport.  Seaman book.
6    Q.    Okay.  All right.  Let's go back.  The
7  first page you are correcting.  That is a copy of your
8  passport?
9    A.    Passport, yes.
10    Q.    Okay.  The second page of the exhibit
11  is a copy of your seaman book?
12    A.    Seaman book.
13    Q.    Okay.  And the next page of the
14  exhibit.  Next page?
15    A.    Seaman book.
16    Q.    Okay.  So the third page is a copy of
17  your seaman book?
18    A.    Yes.
19    Q.    Okay.  And the next page?
20    A.    Seaman book.
21    Q.    Okay.  So is it fair to say that all
22  four pages are copies of documents that you needed in
23  order to go to work as the third engineer on the Irene
24  E.M.?

Page 60

1    A.    Yes.
2        MR. CHALOS:  Okay.  I would like to
3  move CSME Defendants' Exhibit No. 9 into evidence.
4        MR. PHILLIPS:  No objection.
5        MR. CHALOS:  Okay.
6        (Recess taken.)
7  BY MR. CHALOS:
8    Q.    Mr. Conge, I am going to show you what
9  we have previously marked as CSME Deposition,
10  Defendants' Deposition Exhibit No. 10.  I ask you to
11  take a look at those documents.  (Pause)
12        Mr. Conge, are those all certificates
13  for various training sessions you attended before you
14  boarded the Irene E.M.?
15    A.    Yes.
16    Q.    Okay.  And take a look at the first
17  page of that exhibit.  It says, "Bright Maritime
18  certificate of attendance in-house training program."
19  Do you see that?
20    A.    Yes.
21    Q.    It says, "For having attended a
22  seminar on the International Safety Management Code
23  and have been briefed on the policies and safety
24  management system of Chian Spirit from October 17

Page 61

1  through October 18, 2005."  Now, did you attend that
2  training program?
3    A.    Yes.
4        MR. CHALOS:  And I would like to move
5  into evidence what we previously marked as CSME
6  Deposition Exhibit 11.
7        MR. PHILLIPS:  No objection.
8  BY MR. CHALOS:
9    Q.    Okay.  Now, also, Mr. Conge, I would
10  like to show you what we have marked as CSME
11  Deposition Exhibit 11.  And for the record, I will
12  identify it as a series of five documents.
13        MR. WOODWARD:  Excuse me.  What you
14  just moved in was 10?
15        MR. CHALOS:  Yes.
16        MR. WOODWARD:  I think he said 11.
17        MR. CHALOS:  If I misspoke, so the
18  record is clear, what we have just moved in is CSME
19  Defendants' Deposition Exhibit No. 10 without
20  objection from the government.
21        MR. PHILLIPS:  No objection.
22  BY MR. CHALOS:
23    Q.    Mr. Conge, looking at Defendants' CSME
24  Exhibit 11, is that a copy of your license and

Pascual Conge

17 (Pages 62 to 65)

Page 62

1 endorsements by the flag state for the Irene E.M.?

2    A.    Yes.

3    Q.    Okay. So let me just be clear. The

4 first page is a copy of your third engineer's license?

5    A.    Yes.

6    Q.    And behind that are the certificates

7 which the flag state administration for the Irene E.M.

8 vessel issued as endorsements to your license?

9    A.    Yes.

10    Q.    Okay. Now, before you were able to go

11 on board the ship, did you have to obtain a second

12 license or another third engineer's license from the

13 flag state for the vessel?

14    A.    No.

15    Q.    Okay. Fine. The flag state just

16 endorsed your prior license?

17    A.    Third engineer.

18    Q.    Okay. Did you have to get a third

19 engineer's license from the flag state?

20    A.    Yes, because this is my license, third

21 engineer.

22    Q.    Okay. So I am clear, by the time you

23 got on board the Irene E.M., you had a third

24 engineer's license issued in the Philippines?

Page 63

1    A.    Yes.

2    Q.    And then you had another third

3 engineer's license from the flag state administration?

4    A.    Yes.

5    MR. CHALOS: Okay. Now, also, the

6 last question before we take a break for today,

7 Mr. Conge -- for the record, I would like to move into

8 evidence what has previously been marked as CSME

9 Defendants' Deposition Exhibit No. 11.

10    MR. PHILLIPS: I think that's --

11    MR. CHALOS: The engineer license.

12    MR. PHILLIPS: Yes. No objection.

13 BY MR. CHALOS:

14    Q.    Okay. Now, Mr. Conge, before you went

15 on board -- before you were permitted to go on board

16 the vessel to go to work, did you have to go to a

17 doctor for a physical examination?

18    A.    Yes.

19    Q.    And the company required that you be

20 checked and make sure you are fit for service; right?

21    A.    Yes.

22    Q.    Okay. And that is because they don't

23 want anything to happen to you on board?

24    A.    Yes.

Page 64

1    Q.    They want to make sure you are in good

2 health?

3    A.    Yes.

4    Q.    Okay. Now, I am going to show you

5 what has been previously marked as CSME Defendants'

6 Deposition Exhibit No. 12 and ask if you can identify

7 that -- I ask you if you can confirm that those are

8 records of your medical examinations prior to joining

9 the Irene E.M.

10    A.    Yes.

11    MR. CHALOS: Okay. Thank you very

12 much. This is probably a very good time to take a

13 break.

14    MR. PHILLIPS: Are you going to put

15 that into evidence?

16    MR. CHALOS: Oh. Yes, just before we

17 break, I would like to move CSME Defendants'

18 Deposition Exhibit No. 12 into evidence.

19    MR. PHILLIPS: No objection.

20    - - -

21    (Deposition adjourned at 5:22 p.m.)

22    - - -

23

24

Page 65

1 I HAVE READ THE FOREGOING DEPOSITION, AND IT IS TRUE

2 AND CORRECT TO THE BEST OF MY KNOWLEDGE.

3

4

5

6

7    PASCUAL CONGE

8    - - -

9    INDEX

9 PLAINTIFF'S WITNESSES  Direct  Cross  Redr.  Recr.

10 Pascual Conge          3      48    --    --

11 GOVERNMENT'S EXHIBITS                  Marked

12 1 Irene E.M. oil record book----------------- 19

13 2 Two plastic pipes------------------------ 22

14 3 Flanges------------------------------- 29

15 CSME DEFENDANTS' EXHIBITS

16 8 Employment contract dated 9/15/05, between

   Chian Spirit and Mr. Conge---------------- 30

17

   9 Copy of Mr. Conge's passport and seaman's

18 book---------------------------------- 30

19 10 Mr. Conge's Bright Maritime certificate

   of attendance for ISM seminar 10/17-18/05-- 30

20

   11 Mr. Conge's Philippine and flag state

21 third engineer's licenses---------------- 30

22 12 Mr. Conge's medical exam report dated 9/9/05 30

23 13 Mr. Conge's handwritten statement dated

   12/9/05------------------------------ 30

24

18 (Pages 66 to 67)

Page 66

1  CSME DEFENDANTS' EXHIBITS, Cont'd.          Marked
2  14  Four-page handwritten statement signed
      by Mr. Conge and others------------------ 30
3
   15  Letter dated 1/11/06, from Mr. Connolly to
4      Mr. Twersky----------------------------- 30
5  16  Declaration of Pascual Conge, dated 6/26/06  30
6              - - -
7  (Government's Exhibit Nos. 1 through 3 retained
   by Mr. Phillips. CSME Exhibit Nos. 8 through 16
8  attached to original transcript and copies.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 67

1                  CERTIFICATE
2          I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, PASCUAL CONGE, after being
5  duly sworn by me, was examined by counsel for the
6  respective parties and the questions of said witness
7  and his answers were taken down by me in stenotype
8  notes and thereafter transcribed into typewriting at
9  my direction.
10         I certify that the foregoing is a true
11  and correct transcript of the testimony given at said
12  examination of said witness.
13         I further certify that the deposition
14  was made available to the witness for reading and
15  signing.
16         I further certify that I am not
17  counsel, attorney, or relative of either party, or
18  otherwise interested in the event of this suit.
19
20
21
         Registered Diplomate Reporter and Notary Public
22         Certificate No. 181PS/Exp.: Permanent
23
   Date: 7/24/06
24

Page 68

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

— — —

UNITED STATE OF AMERICA,

     Plaintiff,

        vs.

CHIAN SPIRIT MARITIME
ENTERPRISES, INC., VENETICO
MARINE S.A., IRENE E/M,
EVANGELOS MADIAS, CHRISTOS
PAGONES, ADRIEN DRAGOMIR,

     Defendants.

: No.
: 1:06-CR-00076-GMS-2
:
:
:

:

— — —

           Videotaped deposition of PASCUALE
CONGE, Volume II, taken pursuant to notice before
Gail Inghram Verbano, CSR, RMR, in the offices of
United States Department of Justice, 700 Nemours
Building, 1007 Orange Street, Wilmington, Delaware,
on Monday, July 17, 2006, beginning at approximately
10:50 a.m..

— — —

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street     Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

Pascuale Conge

2 (Pages 69 to 72)

Page 69

1  APPEARANCES:
2      MARK W. KOTILA, ESQ.
       JEFFREY L. PHILLIPS, ESQ.
3      United States Department of Justice
       Environmental Crimes Section
4      P.O. Box 23985 - L'Enfant Plaza
       Washington, DC 20026-3985
5       Attorneys for Plaintiff
6      GEORGE M. CHALOS, ESQ.
       FOWLER, RODRIGUEZ & CHALOS
7      366 Main Street
       Port Washington, NY 11050
8       Attorney for Defendants Chian Spirit
        and Venetico Marine
9
       CARL R. WOODWARD, III, ESQ.
10     CARELLA, BYRNE, BAIN, GILFILLAN,
       CECCHI, STEWART & OLSTEIN
11     5 Becker Farm Road
       Roseland, NJ 07068-1739
12      Attorney for Defendant Dragomir
13 ALSO PRESENT:
14     Chris Weiss, Videographer
       Chris Masaoay, Tagalog Interpreter
15
       Adrien Dragomir
16     Liviu-Lee Roth
       Brent McKnight
17     Jason F. Burgess
18          - - -
19
20
21
22
23
24

70

1       THE VIDEOGRAPHER: This is Chris
2  Weiss, the videographer, and the court reporter today
3  is Gail Verbano. We are both here from the firm of
4  Corbett & Wilcox, located at 230 North Market Street,
5  Wilmington, Delaware.
6       The time is 10:50 a.m., on Monday,
7  July 17th, 2006. We are documenting the videotaped
8  deposition of Pascuale Conge for the Plaintiff in the
9  matter of the United States of America versus Chian
10 Spirit Maritime Enterprises, Inc., Venetico Marine,
11 Irene E.M., Evangelos Madias, Christos Pagones,
12 Adrien Dragomir, in the United States District Court,
13 District of Delaware.
14      We are at the location of the
15 United States Attorney's Office, Nemours Building,
16 1007 North Orange Street, Suite 700, Wilmington,
17 Delaware.
18      Will the attorneys please state
19 their appearance for the record.
20      MR. KOTILA: Mark Kotila on behalf
21 of the United States.
22      MR. PHILLIPS: Jeffrey Phillips,
23 United States.
24      MR. CHALOS: George Chalos for

Page 71

1  Venetico and Chian Spirit.
2       MR. WOODWARD: Carl Woodward on
3  behalf of Adrien Dragomir.
4       MR. TWERSKY: Mike Twersky on
5  behalf of the witness.
6       MR. CHALOS: Just before we begin,
7  on Friday when we left off, we left the exhibits with
8  the court reporter. Do we have them available?
9       MR. PHILLIPS: She says that you
10 have the last three that you tried to put in.
11      MR. CHALOS: I have the last three
12 we marked but we didn't offer yet, but I don't have
13 the first 12.
14      Great. Thank you.
15      (CHRIS MASAOAY was previously sworn
16 in as Tagalog-English interpreter.)
17          - - -
18      PASCUALE CONGE, having first been
19 previously duly sworn through the interpreter
20 according to law, was examined and testified further
21 as follows:
22          - - -
23      CROSS-EXAMINATION
24 BY MR. CHALOS:

Page 72

1    Q    Good morning, Mr. Conge.
2    A    Good morning as well.
3    Q    Mr. Conge, do you understand that this is
4  a continuation of your Federal Rule of Criminal
5  Procedure Rule 15 deposition?
6    A    Yes.
7    Q    And do you understand that you're still
8  under oath?
9    A    Yes.
10   Q    Okay. Now, Mr. Conge, what did you do
11 over the weekend?
12   A    I just stayed in the hotel.
13   Q    Did you discuss your testimony with
14 anybody?
15   A    No, I did not.
16   Q    Did you meet with anyone from the
17 Government?
18   A    No, I didn't.
19   Q    Did you meet with anybody from the Coast
20 Guard?
21   A    When we came to pick us up in the hotel.
22   Q    Okay. And when was that?
23   A    Sunday.
24   Q    When the Coast Guard picked you up from

Pascuale Conge

Page 73

1  the hotel, where did they take you?
2    A    Here in the hotel.
3    Q    So did you --
4    A    The Doubletree Hotel.
5    Q    So on Sunday is it fair to say that you
6  changed hotels?
7    A    Yes, sir.
8    Q    And the Coast Guard assisted you with
9  that move?
10    A    Yes.
11    Q    Now, during the time that you were with
12  the Coast Guard, did you discuss this proceeding?
13    A    No, we did not.
14    Q    All right.  Let's go back to where we
15  left off.
16          You were the third engineer on
17  board the Irene E.M.; correct?
18    A    Yes.
19    Q    And there came a time that you were asked
20  to get off the ship; right?
21    A    Yes.
22    Q    When was that?
23    A    I don't remember.
24    Q    Was it before Christmas, after Christmas

Page 74

1  or something else?
2    A    January 3.
3    Q    So the record is clear that you recall
4  being asked to come off the ship on or about
5  January 3, 2005?  2006.  I misspoke, I'm sorry.
6    A    Yes.
7    Q    And who asked you to come off the ship?
8    A    The Coast Guard.
9    Q    Did the Coast Guard tell you why they
10  wanted you to come off the ship?
11    A    I really don't know.  I don't remember.
12    Q    But is it fair to say that you came off
13  the ship and remained in the United States since
14  January 3rd?
15    A    Yes.
16    Q    Because the Coast Guard asked you to?
17    A    They didn't ask me to do anything.  They
18  just asked us to get off the ship.
19    Q    And they also asked you to stay in the
20  United States; right?
21    A    Yes.
22    Q    Now, you weren't here voluntarily, were
23  you?
24    A    No.

Page 75

1    Q    It was because the Coast Guard made you
2  stay; right?
3    A    We are here because we are a witness to
4  this case.
5    Q    And a witness for the Government; right?
6    A    Yes, sir.
7    Q    You told us the other day that you work
8  12:00 to 4:00 in the afternoon and 12:00 to 4:00 at
9  night in the engine room; correct?
10    A    Yes, sir.
11    Q    And when you work, you're the duty
12  engineer during those times; correct?
13    A    Yes.
14    Q    And during those times that you're the
15  duty engineer, you have someone that works for you
16  an oiler; correct?
17    A    Yes, sir.
18    Q    And your oiler was a gentleman named
19  Felix Bersamino?
20    A    Yes, sir.
21    Q    Felix Bersamino was also asked to come
22  off the ship and stay in the United States on or
23  about January 3rd, 2006; right?
24    A    Yes, sir.

Page 76

1    Q    And he stayed in the same hotel where you
2  were?
3    A    Yes, sir.
4    Q    And when you were in the engine room, he
5  was working in the engine room; right?
6    A    Yes, sir.
7    Q    And he would have seen what you would
8  have seen during your ship?
9          MR. PHILLIPS:  Objection;
10  speculation.
11          THE WITNESS:  Sometimes I don't
12  know what he's doing sometimes.  Sometimes he would
13  make his rounds, and I also do my rounds.
14  BY MR. CHALOS:
15    Q    Okay.  But whatever Mr. Bersamino would
16  do, he would do following your instructions; correct?
17    A    Yes.
18    Q    And so you were Mr. Bersamino's boss?
19    A    Yes, sir.
20    Q    Now, Mr. Bersamino is not here anymore,
21  is he?
22    A    No, sir.  He's already in the
23  Philippines.
24    Q    When did he go back to the Philippines?

Pascuale Conge

4 (Pages 77 to 80)

Page 77

1      MR. PHILLIPS: Objection;
2  speculation.
3      THE WITNESS: I don't remember the
4  date.
5  BY MR. CHALOS:
6      Q   A long time ago?
7      A   I don't remember the date, sir.
8      Q   Well, was it in January?
9      A   March or April.
10     Q   Okay. And did Mr. Bersamino tell you why
11 he was allowed to go and you weren't?
12     A   I don't know.
13     Q   Do you have any idea why he was allowed
14 to go and you weren't?
15     A   No, I don't, sir.
16     Q   Now, before you joined the Irene E.M.,
17 you had been at sea as a sailor for 13 or 14 years;
18 is that right?
19     A   Yes, sir.
20     Q   And before you got on board the Irene
21 E.M., you had gone for various training and seminars
22 in the Philippines?
23     A   Yes, sir. Yes, sir.
24     Q   And also you went for an in-house

Page 78

1  training at the crewing agent?
2      A   Yes.
3      Q   And at that training session, you learned
4  Chian Spirit's environmental protection policy;
5  correct?
6      A   Yes, sir.
7      Q   And before you got on board the ship, you
8  had learned that it was wrong to dump oil or oily
9  wastes into the sea; correct?
10     A   Yes, sir.
11     Q   And you were also trained that if you had
12 observed anyone doing that, you were supposed to
13 report that to the chief engineer, the captain or the
14 company; right?
15     A   Yes, sir.
16     Q   And you also knew if someone on board the
17 ship was dumping oil or oily waste into the sea, that
18 the company could get into trouble?
19     A   Yes, sir.
20     Q   And I think we talked about this the last
21 time, but just so the record is clear, the Chian
22 Spirit environmental policy, the environmental
23 protection policy was posted on the ship in several
24 places?

Page 79

1      A   Yes, sir.
2      Q   And just so the record is clear -- I
3  think we covered this -- that was available and
4  easily in view for the crew in the engine room?
5      A   Yes.
6      Q   And the hallways?
7      A   Yes.
8      Q   And the mess room?
9      A   Yes.
10     Q   And the ship's office?
11     A   Yes.
12     Q   And on the bridge?
13     A   Yes, sir.
14     Q   You boarded the ship in Africa at the end
15 of October 2005?
16     A   Yes, sir. Yes, sir.
17     Q   And then after Africa, the ship went to
18 Brazil; right?
19     A   Yes, sir.
20     Q   And at what point in time did you learn
21 that the ship was going to come to the United States?
22     MR. PHILLIPS: This is asked and
23 answered. Objection.
24     THE WITNESS: I don't remember

Page 80

1  that.
2  BY MR. CHALOS:
3      Q   Okay. You told Mr. Phillips the other
4  day that there was an incident where some oil wastes
5  were discharged overboard on or about November 23rd,
6  2005. Do you recall that testimony?
7      A   Yes, sir.
8      Q   Okay. Now, at the time that that
9  happened, you didn't know the ship was coming to the
10 United States, did you?
11     MR. PHILLIPS: Objection. That's
12 asked and answered.
13     THE WITNESS: No, I did not.
14 BY MR. CHALOS:
15     Q   And you also told Mr. Phillips about a
16 second time where there might have been some oily
17 waste dumped overboard about six days before arrival
18 in the United States?
19     A   Six days before we arrived at the United
20 States, that was the second time that we had pumped
21 out. This was turned over to me by the fourth
22 engineer that the bilge tank should have -- should be
23 emptied. He made a sounding to pump out the bilge
24 tank. And so I started the pump, and I was the one

Pascuale Conge

5 (Pages 81 to 84)

Page 81

1  that stopped it as well.  It was turned over to me by
2  the fourth engineer.
3      Q   Okay.  So the record is clear and so I
4  understand what you're saying, are you telling us
5  that the second time that you're aware that oil was
6  pumped over the side, the pumps were started by
7  someone else, meaning the fourth engineer?
8      A   Yeah.  Yeah.
9      Q   So if you told us on Friday that you
10 turned the pumps on yourself -- if I understood,
11 that's what you said last Friday -- that would be
12 wrong?
13     A   Yes.  I was the one that started it.
14     Q   Okay.  So let me see if I understand it.
15         The second time, about six days
16 before arrival in the United States, you started the
17 pump?
18     A   Yes, sir.
19     Q   And at the time you started the pump, you
20 intended to discharge oily wastes into the sea;
21 right?
22     A   Yes, sir.
23     Q   Now, did you personally tell the chief
24 engineer that you were doing this?

Page 82

1      A   Because it was turned over to me by the
2  fourth engineer.
3      Q   Okay.  Just listen to my question.  Yes
4  or no, did you tell the chief engineer that you were
5  turning on the pumps or you had turned on the pumps
6  to discharge oily wastes into the sea?
7      A   No, because that was a turned over to me
8  by the fourth engineer.
9      Q   My question is yes or no.  And the answer
10 to my question is no, right, you didn't tell the
11 chief?
12     A   No, no.  Yes.
13     Q   So the record is clear, no, you never
14 told the chief engineer what you did?
15     A   No, I did not.  It was a turnover to me
16 by the fourth engineer.
17     Q   Okay.  Now, did you ever tell the captain
18 what you did?
19     A   No, I did not.
20     Q   Did you ever tell anybody from the
21 company before arrival what you did?
22     A   No, I did not, because they don't really
23 talk to me.  It's only the second engineer that they
24 speak to.  The second engineer is the highest-ranking

Page 83

1  MOS.  He is the one that directs the work flow as to
2  what we need to do.
3      Q   All right.  Let me just go over this one
4  more time.
5          Mr. Conge, you never told either
6  the owner -- strike that.
7          You never told the owner what you
8  were doing on board the ship before arrival in the
9  United States; right?
10     A   No, I did not.
11     Q   And you never told the manager before
12 arrival what you were doing on board the ship?
13     A   No, I did not.
14     Q   You never told the captain what you were
15 doing on board the ship before arrival in the U.S.?
16     A   No, I did not, sir.
17     Q   And you never told Chief Engineer
18 Dragomir what you were doing before arrival in the
19 U.S.?
20     A   No, I did not.  Because they and the
21 second engineer, they're the two that are always
22 talking with each other.
23     Q   Okay.  So let me see if I got this right.
24         At the time that you turned the

Page 84

1  pump on, you knew that it was wrong; right?
2      A   I know that, sir.
3      Q   And you knew it was illegal?
4      A   Yes, sir.
5      Q   And you knew that you could get in
6  trouble for it?
7      A   Yes, I know that, sir.  That was an order
8  that was made to me.  If I don't -- if I don't follow
9  the orders, then they would send us home and I would
10 lose my job.
11         MR. CHALOS:  Okay.  Well, wait a
12 minute.  I move to strike the portion nonresponsive
13 from the record.
14 BY MR. CHALOS:
15     Q   At the time that you turned the pumps on,
16 Mr. Conge, you knew that the operator of the ship and
17 the owner of the ship could also get in trouble;
18 right?
19     A   Yes, sir.
20     Q   So you didn't think that your actions
21 were for the benefit of the company at all, did you?
22     A   No, sir.  That was just an order that was
23 given to me.
24     Q   But now, even though you know what you

Pascuale Conge

6 (Pages 85 to 88)

---

Page 85

1  did was wrong, the Government has made a promise to
2  you in this case; right?
3      A   No, they didn't tell us anything.
4      Q   Well, didn't the Government promise you
5  that if you came here and told us about the
6  discharging overboard, that you wouldn't get in
7  trouble?
8      A   Yes, I know that.  I know that I could be
9  in trouble.
10      Q   But the Government promised you that if
11  you came here and testified about --
12          MR. PHILLIPS:  Objection.  That's
13  not what he testified to.
14          MR. CHALOS:  Okay.  Fine.  Let me
15  rephrase my question.
16  BY MR. CHALOS:
17      Q   You're aware, are you not, that the
18  Government made a promise to you that if you came and
19  cooperated with the Government and testified about
20  what happened on board the ship, you wouldn't get in
21  trouble?
22      A   No, they didn't tell us that.
23      Q   Okay.  Well, let's take a look at your
24  Grand Jury testimony.

---

Page 86

1          Do you remember, Mr. Conge,
2  testifying before the Grand Jury?
3      A   Yes, sir.
4      Q   Do you remember Mr. Falgowski, the local
5  U.S. Attorney, asked you some questions?
6      A   Yes, sir.
7      Q   And do you remember Mr. Falgowski saying
8  to you, "However" -- this is on Page 4, beginning at
9  Line 4.
10          Do you remember on or about
11  February 2nd, 2006, coming here to Delaware?
12      A   Yes, sir.
13      Q   And do you remember Mr. Falgowski saying
14  to you "However, the agreement that we've reached is
15  that if you tell the truth, we won't prosecute you,
16  even if you did commit a crime.  Is that your
17  understanding?"
18          Your answer "Yes."
19          "And so you just have to tell us
20  the truth."
21          And your answer:  "Yeah, yeah."
22          And then a little further down
23  beginning on Line 14, Mr. Falgowski said, "And also,
24  is it fair to say that you've been advised that you

---

Page 87

1  are not a subject and you're not a target of this
2  investigation?"
3          And your answer was, "I
4  understand."
5          Do you remember that?
6      A   Yes, I do.  Yes.
7      Q   So it's fair to say that the Government
8  made a promise to you that if you cooperate with the
9  Government, that you wouldn't get in trouble for
10  doing something that you knew was wrong?
11      A   No, sir.
12      Q   Let's take this again slowly.
13          You knew starting the pumps was
14  illegal; right?
15      A   Yes, I know, sir.
16      Q   And you knew you could get in trouble for
17  it?
18      A   Yes, sir.
19      Q   And you know that the Government told you
20  that they won't take any action against you if you
21  cooperate in their prosecution; right?
22      A   Yes, sir.
23      Q   And that's the basis why you're here
24  today?

---

Page 88

1      A   Yes, sir.  Yes, sir.
2      Q   And you expect that once you finish with
3  this, you'd be free to return to your home?
4      A   Yes, sir.
5      Q   And I'm just going to show you what we've
6  marked previously as CSME Defendants' Exhibit
7  Exhibit 15.  It's a little out of order.  There's a
8  couple other exhibits we haven't looked at yet.
9          (Discussion held off the record.)
10  BY MR. CHALOS:
11      Q   Mr. Conge, I'm going to show you what
12  we've marked as Defendants' Exhibit 15 for the
13  record.  I'll make a representation, it's the same as
14  Defendants' Deposition Exhibit No. 5.  It's just a
15  scrivener's error in re-marking.
16          And I'll move its admission, which
17  I believe has already addressed previously.
18          (Document marked CSMR Exhibit 15
19  moved into evidence.)
20  BY MR. CHALOS:
21      Q   Now, Mr. Conge, have you seen that
22  document before today?
23      A   Just now, sir.
24      Q   Okay.  Let's go back and talk about the

---

Pascuale Conge

7 (Pages 89 to 92)

Page 89

1  first time -- the first of the two times that you
2  believe you saw a magic pipe being used to discharge
3  overboard.
4         Okay. You said that the first time
5  you saw it being used was on or about November 23rd,
6  2005?
7     A   Yes, sir.
8     Q   And you told Mr. Phillips that; right?
9     A   Yes, sir.
10    Q   How do you know it was November 23rd?
11    A   I know that, sir, because in our engine
12 room there is a table, a small table. That logbook,
13 it's there on top of the table. And so I had read
14 that order by the chief engineer. It was written
15 with a red ink ball pen.
16    Q   Well, Mr. Conge, have you ever seen this
17 logbook since you've gotten off the ship?
18    A   That book, I had not seen it since we
19 arrived here in the States.
20    Q   So is it fair to say that since you got
21 off the ship, you've never seen this logbook with
22 that entry?
23    A   No, I have not seen it, because it was
24 collected by the chief engineer and put in his cabin.

Page 90

1     Q   Did the Coast Guard take it?
2         MR. PHILLIPS: Objection;
3  speculation.
4         THE WITNESS: No.
5  BY MR. CHALOS:
6     Q   Okay. Well, has either Mr. Phillips or
7  Mr. Kotila ever showed this to you since you've been
8  here?
9     A   No, because that logbook, it's a large
10 book. It's an engine logbook. That's where the
11 chief engineer had written down the order "Out of
12 engine room bilge," and the ball pen that was used
13 was red.
14        That was an order made by the chief
15 engineer. If the chief engineer did not order us to
16 do that, then we wouldn't have done the pump-out.
17        The chief engineer is the highest
18 officer among us. We just follow the orders, the
19 orders that he makes. If we don't follow his orders,
20 then we would be sent home. We would lose our jobs.
21    Q   Mr. Conge, let me just ask my question
22 again. My question to you was, has the Government
23 ever shown you this logbook, since you've been here?
24    A   I don't remember.

Page 91

1     Q   You don't remember -- you've met with the
2  Government several times; right?
3     A   Yeah, yeah.
4     Q   And you met with them before your Grand
5  Jury testimony; right?
6     A   Yeah.
7     Q   You met with them the day of your Grand
8  Jury testimony?
9     A   Yes, yeah.
10    Q   You met with them preparing for Friday?
11    A   Yeah.
12    Q   And you're here again today?
13    A   Yeah.
14    Q   And you met with the Coast Guard guys a
15 couple times?
16    A   Yeah.
17    Q   And in all those meetings, you don't
18 remember if you ever saw this logbook?
19        MR. PHILLIPS: Objection; asked and
20 answered. He said he hasn't seen it since he got to
21 the United States.
22        THE WITNESS: That logbook, it's a
23 large book.
24 BY MR. CHALOS:

Page 92

1     Q   Well, Mr. Conge, listen to my question.
2  It's very simple: You don't remember if anyone from
3  the Government or the Coast Guard has showed you this
4  logbook since you got off the ship, do you?
5         MR. PHILLIPS: Objection; asked and
6  answered.
7         THE WITNESS: I don't remember
8  that.
9         MR. CHALOS: Okay. We've got to
10 take a break, I guess.
11        THE VIDEOGRAPHER: Off the record
12 at 10:34.
13        (Discussion held off the record.)
14        THE VIDEOGRAPHER: On the record at
15 10:34.
16 BY MR. CHALOS:
17    Q   Now, Mr. Conge, you just told us before,
18 and you told Mr. Phillips on Friday, that you believe
19 that you need to follow the chief engineer's orders
20 or else you might lose your job; right?
21    A   Yes, sir.
22    Q   Did Chief Engineer Dragomir, the
23 gentleman sitting here --
24    A   Yes, sir. Yes, sir.

Pascuale Conge

8 (Pages 93 to 96)

Page 93

1    Q   He's the chief engineer; right?
2    A   Yes, sir.
3    Q   He never said to you personally, "Pump
4  out overboard or else you're going to lose your job,"
5  he did?
6    A   No, he didn't, sir.
7    Q   Okay.  Now, in fact, Mr. Dragomir never
8  told you personally to discharge anything overboard;
9  right?
10   A   Yes, sir.
11   Q   "Yes, sir" meaning he never told you;
12  right?
13   A   He did not order me personally; he
14  ordered the second.  It's written in the logbook.
15        When I went down for my duty, it
16  was turned over to me by the fourth engineer.  And so
17  I read what was written by the chief engineer that
18  pump was already working.
19   Q   So let me see if I understand this right.
20        It's fair to say that Chief
21  Engineer Dragomir never personally spoke to you and
22  ordered you to discharge overboard?
23   A   No, he did not, sir.
24   Q   Okay.  Now, there came a time, right, on

Page 94

1  board the ship shortly after arrival in the United
2  States that the Coast Guard gathered all the crew in
3  the mess room.  Do you remember that?
4    A   Yeah.
5    Q   And Mr. McKnight, the gentleman over
6  here, was there?
7    A   Yeah.
8    Q   And Mr. McKnight asked you to write down
9  what happened on board the ship; right?
10   A   Yes, sir.
11   Q   Now, I want to show you what we've
12  premarked as CSME Defendants' Deposition Exhibit
13  13 -- show it to the Government and I'll show it to
14  you.
15        Mr. Conge, I'm going to show you
16  what we marked as Defendants' Exhibit No. 13.
17        Now, Mr. Conge, is that your
18  signature on top of the diagonal line?
19   A   Yeah, yeah.
20   Q   And this is a document that you prepared
21  on or about December 9th, 2005, in your own
22  handwriting; correct?
23   A   Yes, sir.
24   Q   And we can agree, Mr. Conge, that

Page 95

1  December 9th, 2005, is a lot closer to November 23rd,
2  2005, than today?
3    A   Could you repeat your question.
4    Q   Yeah.  Well, December 9th is about 15,
5  16, 17 days after November 23rd; right?
6    A   Yes, sir.
7    Q   Okay.  Well, you remember the months of
8  the year; right?
9    A   Yeah.
10   Q   And you know how to count to 30 or 31
11  right?
12   A   Yeah.
13   Q   So December 9th was a lot closer to
14  November 23rd than today?
15   A   Yes.
16   Q   And your memory of the events of
17  November 23rd would have been a lot fresher than they
18  are today; right?
19   A   Yes, sir.
20   Q   Do you write anywhere in your statement
21  on December 9th that you pumped out on the 23rd of
22  November?
23   A   It is put in that general statement that
24  was made by the second engineer.  This one, this is

Page 96

1  no good, because we had put everything in that other
2  document, written by the second engineer.
3    Q   Mr. Conge, I understand that you have a
4  story to tell, but I'd like you to just answer my
5  questions.
6        When you wrote the statement at the
7  request of Mr. McKnight from the Coast Guard, you
8  didn't write anything about discharging on
9  November 23rd, did you?
10   A   No, sir, because this was about the oily
11  water separator.
12   Q   So the answer to my question is, no, you
13  didn't write anything about discharging overboard on
14  November 23rd when you wrote this on December 9th,
15  2005?
16   A   No, sir, I did not.
17   Q   Okay.  Now, and you also didn't write
18  about discharging overboard twice, did you?
19   A   No, sir.
20   Q   Okay.  Now -- and then you turned this
21  over to the Coast Guard at their request; right?
22   A   Yes, sir.
23        MR. CHALOS:  Thank you.  I'd like
24  to move into evidence Defendants' Exhibit 13.

Pascuale Conge

9 (Pages 97 to 100)

Page 97

1          MR. PHILLIPS: No objection.
2          (Document marked CSMR Exhibit 13
3      moved into evidence.)
4  BY MR. CHALOS:
5      Q   Now, Mr. Conge, you told us just a moment
6  ago about a statement that was prepared; right?
7      A   Yes, sir.
8      Q   Now, you didn't write the statement;
9  right?  That's not your handwriting?
10      A   Where is the statement?  Can you show it
11  to me?
12      Q   Well, I'm going to ask you some questions
13  first.
14          You didn't write the statement, did
15  you?
16          MR. PHILLIPS: Objection.  We don't
17  know what we're talking about.  If there's a
18  statement for identification, we should see it.
19          MR. CHALOS: Okay.  Well, it's my
20  examination.  I'll do it the way I think is best.
21  BY MR. CHALOS:
22      Q   You just told us; right?  You made a
23  representation on the record that there was a
24  statement prepared by the crew; right?

Page 98

1      A   Yes.  It was prepared by the second and
2  the fourth.
3      Q   Okay.  So the record is clear, you didn't
4  write the statement that was prepared by the second
5  or the fourth?
6      A   No, sir.
7      Q   Okay.  And in fact, the statement that
8  was prepared by the crew was prepared at the request
9  of Christos, the superintendent; right?
10      A   Yes, sir.
11      Q   And Christos told the crew, when you were
12  present, that he wanted the crew to write a statement
13  of what happened to give to the company's lawyers;
14  right?
15      A   Yes, sir.
16      Q   Okay.  So that was something that was
17  prepared by the crew for the company's lawyers;
18  right?  In your mind.
19      A   Yes, sir.
20      Q   I'm going to show you what we've
21  previously marked as Defendants' Exhibit 14.
22          Now, is that the statement you were
23  talking about?
24      A   Yes, sir.

Page 99

1          MR. CHALOS: I'd like to move that
2  into evidence.
3          MR. PHILLIPS: No objection.
4          (Document marked CSMR Exhibit 14
5      moved into evidence.)
6          MR. CHALOS: One second.  Can we
7  take a break.
8          THE VIDEOGRAPHER: Off the record
9  at 10:43.
10          (Discussion held off the record.)
11          THE VIDEOGRAPHER: We are on the
12  record at 10:44.
13          MR. PHILLIPS: This is Phillips for
14  the Government.
15          Can you re-read the last part of
16  the read that included the movement into evidence or
17  nonmovement into evidence of the last document.
18          (Record read.)
19          MR. WOODWARD: So we're absolutely
20  clear, I object to it going into evidence.
21          MR. CHALOS: Absolutely what I'd
22  like to do is -- I misspoke.  The procedure here
23  today of this de bene esse deposition, I wanted to
24  mark it for identification.  I don't want to move it

Page 100

1  into evidence.
2          It's been clear that this witness
3  has testified that he's neither the author of it nor
4  the drafter of its contents, and it was prepared at
5  the request of counsel.  I'm going to assert
6  privilege to this record.
7          But so the record is clear, I'm
8  withdrawing my motion to move it into evidence, but
9  I'd like to mark it for identification as Defendants'
10  Exhibit 14 for later use during these proceedings,
11  potentially.
12          MR. PHILLIPS: Objection.  It's
13  into evidence already.
14          MR. CHALOS: Okay.
15          MR. PHILLIPS: As defense
16  Exhibit 15 -- 14.
17          MR. CHALOS: That's 14; right.
18          MR. WOODWARD: Yeah, that's 14.
19          (Discussion held off the record.)
20  BY MR. CHALOS:
21      Q   Mr. Conge, you said that you saw an order
22  in a logbook that said "pump out engine bilges";
23  right?
24      A   Yes, sir.

Pascuale Conge

10 (Pages 101 to 104)

---

Page 101

1    Q    Now, it's a fact, is it not, that the
2    engine bilge wells were, from time to time, pumped
3    and pumped into a bilge storage tank; right?
4    A    Yes.
5    Q    And, in fact, when that pumping took
6    place, nothing went into the sea; right?
7    A    Sir, in the bilge well, it is put in the
8    bilge tank.
9    Q    And when you put materials from the bilge
10   well to the bilge tank, nothing goes into the sea;
11   right?
12   A    Yes, sir.  But when the reading in the
13   bilge tank is up, the second engineer instructs us to
14   empty it out going overboard.  The one that does that
15   work is the oiler.
16   Q    Okay.  Now, Mr. Bersamino never did that
17   work, did he?
18        MR. PHILLIPS:  Objection;
19   speculation.
20        THE WITNESS:  Bersamino is my
21   oiler.  Sometimes he's the one that pumps outside to
22   the bilge well.  That is his job.
23   BY MR. CHALOS:
24   Q    Okay.  And when Bersamino pumps from the

---

Page 102

1    bilge well, you pump it to the bilge tank; right?
2    A    Sometimes they don't let it pass through
3    the bilge tank.  They directly do it overboard.
4    Q    And how many times did you see that with
5    your own eyes?
6    A    I don't remember, sir, because Bersamino
7    is the one who do this job for the bilge well.
8    Q    So you don't know if Mr. Bersamino did
9    that?
10   A    I don't remember, sir.
11   Q    You don't really know if he did that,
12   because you didn't do it?
13   A    Yes, sir.
14   Q    Okay.  Now, you personally never
15   connected what you told us the other day was called
16   the magic hose; right?
17   A    No, I did not connect it.
18   Q    And you personally never disconnected a
19   magic hose?
20   A    No, sir.
21   Q    In fact, when you saw the chief
22   engineer's order in the logbook, you weren't sure
23   what it meant and you had to talk to the fourth
24   engineer; right?

---

Page 103

1    A    Yes, because he's the one that I follow.
2    Q    Okay.  So really you didn't follow the
3    written order; you followed what the fourth engineer
4    told you; right?
5    A    No, sir.  The order in the logbook, I
6    read it, and then it was turned over to me by the
7    fourth engineer.  They were the ones that started it
8    first, doing the pumping.
9    Q    Now, when you read the order in the
10   engine logbook, you didn't expect that order to mean
11   to dump into the sea, did you?
12   A    When it's written "Out of engine room
13   engine," that means out at sea, overboard.
14   Q    Well, is that because you've done this
15   before on other ships?
16        MR. TWERSKY:  I'm going to object
17   and I'm going to instruct the witness not answer that
18   question on the basis of the Fifth Amendment.
19        Explain to him not to answer the
20   question.
21        THE WITNESS:  Yes.
22        MR. CHALOS:  Well, he's been given
23   immunity this deal.  I don't know why he would invoke
24   the Fifth Amendment.

---

Page 104

1         MR. TWERSKY:  As I read the
2    immunity, it's limited to this case.  If the
3    Government wants to expand it, that's another story.
4    BY MR. CHALOS:
5    Q    Mr. Conge, were you surprised when you
6    read the order?
7    A    Yes, I was surprised.  Because, you know,
8    sir, when you write in the logbook, you cannot write
9    your order on the logbook saying that you need to
10   pump out overboard.  That's against the law.
11   Q    Now, when you saw this order, you never
12   went up to the chief engineer to talk to him about
13   it, did you?  Yes or no.
14   A    No, I did not.
15   Q    And when you saw the order, you never
16   went and talked to the captain about it, did you?
17   A    No, I did not.
18   Q    And you never called anybody.  You have a
19   cell phone; right?
20   A    No, I did not.  No one.
21   Q    Okay.  So you just followed what you
22   thought was the chief's order?
23        MR. PHILLIPS:  Objection.  This
24   whole line is asked and answered.

---

Corbett & Wilcox

Pascuale Conge

11 (Pages 105 to 108)

Page 105

1      THE WITNESS: Yes, sir.
2  BY MR. CHALOS:
3      Q    Without checking with the chief engineer?
4      MR. PHILLIPS: Objection; asked and
5  answered twice.
6      THE WITNESS: No, I did not,
7  because the pump was already working when I got down
8  there. I was not the one that started it.
9  BY MR. CHALOS:
10     Q    Okay. And you don't know what, if
11 anything, the chief engineer said to the fourth
12 engineer? You weren't there; right?
13     A    No, I did not.
14     Q    Okay. Now, let's talk about the magic
15 hose.
16     MR. CHALOS: If I unhook this -- if
17 unhook this, will you still be able to pick me up?
18     Okay. Okay. Let me see?
19 BY MR. CHALOS:
20     Q    Mr. Conge, I'd like to --
21     MR. PHILLIPS: Jason, go and help
22 him.
23     MR. CHALOS: Can we go off the
24 record for a second.

Page 106

1      THE VIDEOGRAPHER: Off the record
2  at 10:54.
3      (Brief recess.)
4      THE VIDEOGRAPHER: We are on the
5  record at 11:01.
6  BY MR. CHALOS:
7      Q    Okay. Mr. Conge, remember the other day
8  in response to some questions by Mr. Phillips, you
9  identified what's been previously marked as, I
10 believe, Government Exhibit 1.
11     MR. PHILLIPS: No, it's not 1. I
12 think it's 2.
13     MR. WOODWARD: It's Government
14 Exhibit.
15 BY MR. CHALOS:
16     Q    2. These two hoses; right?
17     Just so the record is clear,
18 Mr. Conge, most ships that you've served on, if not
19 all of them, have flexible hoses on board; right?
20     A    Yes, there is.
21     Q    In fact, flexible hoses are standard
22 equipment on board ocean-going ships; right?
23     A    Yes.
24     Q    And there's many, many legitimate uses

Page 107

1  for flexible hoses on board; right?
2      A    Yes.
3      Q    And oftentimes they're even used for
4  internal transfers of oil and oily wastes; right?
5      A    Yes.
6      Q    Sometimes with fuel oils?
7      A    Yes.
8      Q    Sometimes with lube oils?
9      A    Yes.
10     Q    And sometimes with the generators?
11     A    Yes, sir.
12     Q    And sometimes with the boilers?
13     A    Yes.
14     Q    Okay. So just because there is flexible
15 hoses on board the Irene E.M., that doesn't mean that
16 there was something illegal going on, does it?
17     A    Yes.
18     Q    "Opo" is yes or no?
19     A    Yes, with respect.
20     Q    So, and you told us before that you never
21 connected the magic hose; right?
22     A    Yes.
23     Q    You've never done it?
24     A    Yes, sir.

Page 108

1      Q    And you've never disconnected it; right?
2      A    No, sir.
3      Q    And you don't know where it's stored on
4  board the ship; right?
5      A    No, I don't know, sir.
6      Q    So it's fair to say that you've never
7  handled the magic pipe or what you've identified as
8  magic pipe on board the ship?
9      A    I just saw it.
10     Q    Okay. My question was, you've never
11 handled it; right?
12     A    No, I did not.
13     Q    So you really don't know if this is the
14 magic pipe you saw, do you?
15     MR. PHILLIPS: Objection; asked and
16 answered.
17     THE WITNESS: I know that it is,
18 because on my duty it's always there. I see it.
19 It's attached to the delivery from the bilge pump
20 going out to sea. On my duty, on my specific duty, I
21 see it.
22 BY MR. CHALOS:
23     Q    What you're really saying is --
24     MR. PHILLIPS: Objection.

Pascuale Conge

12 (Pages 109 to 112)

Page 109

1  BY MR. CHALOS:
2      Q    -- you know that there's a hose, but you
3  don't know that this is the hose.
4          MR. PHILLIPS:  Objection.  He
5  can't --
6          THE WITNESS:  I know that this is
7  it, because I see it on my duty.  It's fixed -- it's
8  fixed in the bilge delivery going outside.
9          MR. PHILLIPS:  Objection;
10  characterizing the testimony of the witness.
11          MR. WOODWARD:  Cross-examination.
12  BY MR. CHALOS:
13      Q    Okay.  Now, Mr. Conge, I'm going to show
14  you what was previously marked as Government
15  Exhibit --
16          MR. PHILLIPS:  3.
17          MR. CHALOS:  3?
18          MR. PHILLIPS:  Yeah.
19  BY MR. CHALOS:
20      Q    And those are two metal pieces I think
21  you've identified as flanges; right?
22      A    Yes, sir.
23      Q    Now, on board the Irene E.M., there were
24  lots of flanges in the engine room; right?

Page 110

1      A    Yes, there is.
2      Q    Okay.  And you never connected this hose
3  to these flanges personally, did you?
4      A    No, I did not.
5      Q    And you never disconnected these flanges
6  from these hoses?
7      A    No, I did not.
8      Q    Okay.  And you can't tell for sure
9  whether or not these two particular flanges were ever
10  attached to these hoses, can you?
11      A    Sir, I know that it is, because on my
12  duty, my fingers almost got cut out because the pump
13  was running.
14          I see this, if it has suction or no
15  suction.  When they are pumping out, I see that.
16      Q    Okay.  Were there any markings that you
17  can show us today that you saw?
18      A    Sir, this is attached over here on the
19  end of this.
20          This has a clip, right here, and
21  it's attached here.  And this piece is on the end of
22  this piece.  It's attached here, and there's also a
23  clip.
24      Q    Now, did you ever tell the chief engineer

Page 111

1  that you saw these flanges attached to this hose?
2          Listen to my question.  Did you
3  ever personally speak to Chief Engineer and tell him
4  that this was connected?
5      A    The chief engineer knows about it because
6  he's the one that ordered that.
7      Q    Listen to my question.  Okay?
8          Did you ever speak to the chief
9  engineer personally and tell him that these flanges
10  were connected to this hose?
11      A    No, I did not have a conversation with
12  the chief.
13      Q    Did you ever speak to the captain of the
14  ship and tell him that there were flanges connected
15  to a hose in the engine room?
16      A    No.
17      Q    Did you ever tell the captain of the ship
18  that there was a magic pipe on board the ship?
19      A    No.
20      Q    Did you ever tell anybody from the
21  company, before the ship arrived in the United
22  States, that there was a magic pipe on board?
23      A    No.
24      Q    Now, Mr. Conge, did you bring these hoses

Page 112

1  from the ship here?
2      A    No, I did not.
3      Q    So you don't know how these hoses got
4  here, did you?
5      A    No, I don't know, sir.
6      Q    And did you bring these flanges from the
7  ship here?
8      A    No, I did not.
9      Q    So you don't know how the flanges got
10  here?
11      A    No, I don't.
12      Q    In fact, sir, if you look at either of
13  two hoses or the flanges, there's no markings that
14  show that these came from the Irene E.M., is there?
15  And take a good look at them.  Take a look.
16      A    Yes.
17      Q    So you don't know if these actually came
18  from the Irene E.M.?
19      A    There are rags attached to it.
20      Q    So the answer to my question is you don't
21  really know, do?  It looks like what you saw, but you
22  don't know.
23      A    I'm not sure, because when they brought
24  it here, I didn't see it.

Pascuale Conge

13 (Pages 113 to 116)

Page 113

1    Q    Okay.  Now, I think we're done with those
2    exhibits.  I'll move back to my spot.
3          Now, Mr. Conge, I'd like to go over
4    just a few more points with you, and I think we'll be
5    finished.
6          Now, the chief engineer never asked
7    you to lie to anyone, did he?
8    A    No, he did not.
9    Q    Mr. Conge, the captain of the ship never
10   asked you to lie to anyone, did he?
11   A    No, he did not.
12   Q    Okay.  And when you were on board the
13   ship, you saw a man named Mr. Madias; right?
14   A    Yes, sir.  Yes, sir.
15   Q    Now, Mr. Madias never asked you to lie to
16   anyone, did he?
17   A    No, he did not, sir.
18   Q    Now, you told Mr. Phillips the other day
19   that a guy named Mr. Christos asked the crew if they
20   could retract their statement; right?
21   A    Yes, sir.
22   Q    Now, he didn't ask the crew to lie; he
23   asked them to retract their statements; right?
24   A    He told us that we should change the

Page 114

1    statement.
2    Q    Okay.  And you never did change your
3    statement, did you?
4    A    No, we did not.
5    Q    And in fact, Mr. Christos, before he left
6    the ship, told you to tell the truth; right?
7    A    Yes, sir.
8    Q    And that's what you've done so far?
9    A    Yes, sir.
10   Q    Okay.  Let's take a look at what's been
11   marked as CSME Defendants' Deposition Exhibit No. 16.
12   For the record, it's a three-page document with a
13   heading, "Declaration of Pascual Conge."
14         And before we look at that,
15   Mr. Conge, even after Mr. Christos asked you to
16   change your statement, the captain never asked you to
17   change your statement, did he?
18   A    No, he did not.
19   Q    And the chief engineer never asked you to
20   change your statement?
21   A    No, he did not.
22   Q    And Mr. Madias never asked you to change
23   your statement?
24   A    No, he did not.

Page 115

1    Q    And in fact, Mr. Christos changed his
2    instruction and told you to tell the truth; right?
3    A    I don't remember that, sir.
4    Q    But you never lied to anybody?
5    A    Yes, sir.
6    Q    Okay.  Take a look at what we've marked
7    as CSME Defendants' Deposition Exhibit No. 16, and
8    just ask you to take a look at Page No. 3.
9          And on Page No. 3, that's your
10   signature?
11   A    Yes, sir.
12   Q    And when you signed it, the contents of
13   that document were accurate and truthful to the best
14   of your knowledge; right?
15   A    Yet.
16         MR. CHALOS:  I move into evidence
17   defendants Exhibit 16.
18         MR. PHILLIPS:  Objection;
19   bolstering.
20         MR. CHALOS:  Is there an objection
21   for bolstering in the federal rules?
22         MR. KOTILA:  Probably.
23         (Document marked Exhibit CSMR 16
24   moved into evidence.)

Page 116

1          MR. CHALOS:  Okay.  Now --
2          MR. WOODWARD:  Can I see.
3          MR. CHALOS:  Sure.
4    BY MR. CHALOS:
5    Q    Mr. Conge, you don't know what the level
6    of the bilge tanks were -- or the bilge wells were on
7    November 23rd at the start of the day, did you?  As
8    you sit here today.
9    A    No, I did not.
10   Q    And you don't know what they were at the
11   end of the day, at the end of your shift, do you?
12   A    No.  There is a sounding that the chief
13   engineer is supposed to follow.
14   Q    My question was you:  You don't know?
15   A    No, I don't know.
16   Q    And you don't know what the sounding
17   results were on the 24th of November, as you sit here
18   today, do you?
19   A    No, I don't know, sir.
20         MR. CHALOS:  Okay:  I'm just going
21   to take a break for one second, look at my notes, and
22   I think I may pass the witness.
23         MR. PHILLIPS:  Okay.
24         MR. TWERSKY:  I'm going to get --

Pascuale Conge

14 (Pages 117 to 120)

Page 117

1          THE VIDEOGRAPHER: Off the record,
2   11:15.
3          (Brief recess.)
4          THE VIDEOGRAPHER: On the record at
5   11:17.
6   BY MR. CHALOS:
7       Q   Mr. Conge, just a few final questions
8   before I finish.
9          When you told us about Mr. Christos
10   asking the crew to change statements -- do you
11   remember that testimony?
12      A   Yes, sir.
13      Q   Now, the truth is, Mr. Christos wasn't
14   speaking directly to you, was he?
15      A   Just at the mess hall, sir.
16      Q   And in the mess hall, Mr. Christos was
17   talking to the second engineer, meaning he addressed
18   his comments to the second engineer, which you
19   overheard?
20      A   He was addressing all of us that was in
21   the mess hall.
22      Q   Okay.  And did you respond to him
23   personally?
24      A   Yes, sir.

Page 118

1          MR. CHALOS: Okay.  Nothing
2   further.
3          RECROSS-EXAMINATION
4   BY MR. WOODWARD:
5       Q   Mr. Conge, my name is Carl Woodward.  I
6   represent the chief engineer, Mr. Dragomir.  I want
7   to ask you a few questions about your testimony and
8   what you did on the ship.
9          Now, Mr. Phillips asked you about
10   Government Exhibit 1.  It's labeled Oil Record Book.
11   Do you remember that?
12      A   Yes, sir.
13          (Discussion held off the record with
14          the videographer.)
15          MR. WOODWARD: Let's go off the
16   record for a minute.
17          THE VIDEOGRAPHER: Off the record,
18   11:19.
19          (Discussion held off the record.)
20          THE VIDEOGRAPHER: We are on the
21   record at 11:21.
22   BY MR. WOODWARD:
23      Q   Now, Mr. Conge, I'm showing you again
24   Government Exhibit 1.  Okay?

Page 119

1       A   Yes, sir.
2       Q   And that is labeled "Oil Record Book."
3          Just so I'm clear, on this ship,
4   the Irene, you never made any entries in the Oil
5   Record Book; correct?
6       A   Yes.
7       Q   You didn't keep the Oil Record Book;
8   correct?
9       A   No, I did not.
10      Q   The Oil Record Book was not kept in the
11   engine room, was it?
12      A   No, sir.
13      Q   It was kept by the chief engineer;
14   correct?
15      A   Yes, sir.
16      Q   And you've never actually seen that Oil
17   Record Book before, have you?
18      A   No, because it's in the cabin.  I know
19   his signature.  That's it.
20      Q   Yeah.  But you've actually never seen
21   that book before last Friday; isn't that correct?
22      A   No, sir.
23      Q   That is, you have not seen it; correct?
24      A   Yes, sir.

Page 120

1       Q   All right, fine.  Thank you.
2          Now, you were asked by Mr. Phillips
3   about a statement that you made with the other crew.
4   Do you recall that testimony?
5       A   Yes, sir.
6       Q   And do you recall saying that the
7   statement was not prepared by you?
8       A   The one that is multiple pages?
9       Q   Yes.
10      A   No, I did not make that.  The second and
11   the fourth did.
12      Q   That's correct.  And in fact, you didn't
13   know -- excuse me.
14          Did you read the statement over
15   before you signed it?
16      A   Yes, sir.
17      Q   But in fact, you didn't know whether all
18   the information was true?
19      A   I read it, everything.
20      Q   Yes.  But any conversations that took
21   place between the chief engineer and the second
22   engineer you didn't know about, did you?
23      A   No, I did not.
24      Q   And any conversations that took place

Pascuale Conge

15 (Pages 121 to 124)

Page 121

1  between the second engineer and the fourth engineer
2  you didn't know about either, did you?
3      A   No, I did not.
4      Q   And any conversation that took place
5  between the second engineer and the oiler, Roberto
6  Damasing, you didn't know about that either, did you?
7      A   No, I don't.
8      Q   So much of the information in the
9  statement that you signed you had no knowledge of; is
10 that correct?
11     A   I know something about it.
12     Q   But you don't know what the second
13 engineer and the chief engineer spoke about, do you?
14     A   No, I don't.
15     Q   You don't know whether anything that's
16 recounted in this statement between the chief
17 engineer and the second engineer is true?
18     A   No, because this is a statement that was
19 asked to be made by Mr. Christos.
20     Q   I understand that.  But you signed this
21 statement, didn't you?
22     A   Yes, sir.  Yes, sir.
23     Q   Did you mean that all of the information
24 in there was true?

Page 122

1      A   Yes, sir.
2      Q   But you couldn't say whether all the
3  information was true; isn't that correct?
4      A   What was written there is the truth.
5      Q   You don't know that, do you?
6      A   No, because I read it.
7      Q   Well, just because you read it doesn't
8  make it true; isn't that correct?
9      A   So what is your question?
10     Q   My question is that you can't say whether
11 everything in this statement is true, can you,
12 because you weren't present for many of the
13 conversations.
14     A   When this was made, we were asked to read
15 it, each of us.  And so I know.
16     Q   But that's the only way you know anything
17 in this statement, is by reading it; correct?
18     A   Yes, sir.
19     Q   You don't know of your own knowledge what
20 the chief engineer and the second engineer said to
21 each other, do you?
22     A   No, I don't.
23     Q   So you don't know whether that's true;
24 isn't that correct?

Page 123

1      A   Yeah, because that's the statement made
2  by the second engineer.  We were asked to read it.
3      Q   But you don't know if the second engineer
4  is telling the truth, do you?
5      A   That I don't know.
6      Q   And you don't know if the fourth engineer
7  is telling the truth, do you?
8      A   That I don't know.
9      Q   Now, when you testified that you were
10 asked by Mr. Phillips and by Mr. Chalos about pumping
11 overboard; what shift did that occur on?  The first
12 time.
13     A   May I ask you, you're talking about the
14 pump-out?
15     Q   Yes.  You said, I think, that you -- that
16 the pump-out occurred on November 23rd.
17     A   Yes, sir.
18     Q   Do you recall that?
19     A   Yes, sir.
20     Q   Okay.  So when did that -- what time?
21 Did that take place while you were on duty?
22     A   It was in the evening of the 23rd.
23     Q   The evening?  What is --
24     A   Yes.

Page 124

1      Q   What is your duty?
2      A   12:00 to 4:00, sir.
3      Q   So zero hundred hours to 0400 hours?
4      A   Yes.
5      Q   On the 23rd?
6      A   Yes, sir.
7      Q   Or on the 24th?
8      A   Yes, between 23 and 24 of that date.
9      Q   All right.  Let me just try to understand
10 this.
11         On the 23rd, did you -- did this
12 occur between 000 and 0400 on the 23rd?
13     A   Yes.
14     Q   So it occurred very early on the 23rd?
15     A   On the 23rd, 10:00 to 12:00, I went down.
16 That is on November 23rd.
17         On the 12:00 to 4:00, that is
18 coming into November 24th.
19     Q   Okay.  So when you were working, you were
20 working on the 24th, not the 23rd; isn't that
21 correct?
22     A   Yes, sir.  But I came down 10 minutes
23 before it's midnight on November 23rd.
24     Q   But when you shut off the pump, it was on

16 (Pages 125 to 128)

Page 125

1  November 24th; right?
2      A   Yes, sir.
3      Q   Now, the logbook, I think you described
4  it as being in the engine room on a table?
5      A   Yes, sir.
6      Q   And in the course of a day, someone would
7  take that logbook up to the chief's cabin; correct?
8      A   Yes, sir.
9      Q   And then it would come back to the engine
10 room; correct?
11     A   Yes, sir.
12     Q   What was the name of this logbook?
13     A   "Main engine logbook."
14     Q   Did it have a name called "dirty log"?
15     A   No, sir.
16     Q   Do you know what -- do you know whether
17 information that was in that logbook was transferred
18 into another logbook?
19     A   Yes, sir.  The final one is transferred
20 by the chief engineer.  He transfers it.
21     Q   Right.  And that was the main formal
22 logbook; correct?
23     A   Yes, sir.  Yes, sir.
24     Q   So the logbook that was in the engine

Page 126

1  room was a dirty log or a rough log?
2      A   Yes, sir.
3      Q   Okay.  When was the last time that you
4  saw that logbook?
5      A   Before we arrived in the Americas.  It
6  was brought by the chief engineer to his cabin.
7      Q   Did the chief engineer take it or did
8  someone else take it to the chief engineer's cabin?
9      A   There was an oiler that was asked by the
10 chief engineer to bring it up to him.
11     Q   And that was done every day, wasn't it?
12     A   Yes, sir.
13     Q   Now, that was the last time you saw the
14 logbook; right?
15     A   Yes, sir.
16     Q   Do you know if the Coast Guard took the
17 logbook?
18     A   I have no idea, sir.
19     Q   Now, I think you testified about what was
20 written in the logbook.  And I think what you said
21 was -- and I quote, exact words were "Out all engine
22 room bilges."
23     A   Yes, sir.
24     Q   Is that correct?

Page 127

1      A   Yes, sir.
2      Q   Was the word "pump" used in that phrase?
3      A   What that means, "out" --
4      Q   No, I'm not asking what you mean.  I want
5  to know what the exact words were.  And the word
6  "pump"" was not included, was it?
7      A   Yeah.
8      Q   And then it says, "all engine room
9  bilges"; right?  Correct?
10     A   Yes.
11     Q   It didn't say "bilge tank," did it?  Yes
12 or no.
13     A   No, sir.
14     Q   Didn't say "sludge tank," did it?
15     A   No, sir.
16     Q   That's all it said?
17     A   Yes, sir.
18     Q   By the way, had you ever worked on this
19 ship before?
20     A   Yes.
21     Q   When?
22     A   I don't remember.
23     Q   More than a year before this last trip?
24     A   No, sir.

Page 128

1      Q   Let me just go back.
2          Have you ever worked on this ship
3  before this voyage?
4      A   No, sir.
5      Q   So this was your first time on this ship?
6      A   Yes, sir.
7      Q   And had you ever worked with Mr. Dragomir
8  before?
9      A   No, sir.
10     Q   Had you ever worked with the second
11 engineer before?
12     A   No, sir.
13     Q   Or the fourth engineer?
14     A   No, sir.
15     Q   Or any of the oilers?
16     A   No, sir.
17     Q   Or any of the wipers?
18     A   No, sir.
19     Q   Or the electrician, Paul Tudor?
20     A   No, sir.
21     Q   Now, the chief engineer is Romanian;
22 correct?
23     A   Yes, sir.
24     Q   Were there any other Romanians on the

Pascuale Conge

17 (Pages 129 to 132)

## Page 129

1  ship?
2     A   Yes, sir.
3     Q   Captain?
4     A   Yet.
5     Q   The electrician?
6     A   Yes, sir.
7     Q   And a fitter?
8     A   Fitter, sir.
9     Q   That's it; right?  Just four?
10    A   Yes.
11    Q   All the other crew were Filipino;
12 correct?
13    A   Yes, sir.
14    Q   When you were on the ship between the
15 time you got on the ship in the end of October until
16 you got off the ship in December or January, how many
17 conversations did you have with the chief engineer?
18    A   I don't remember, sir.
19    Q   Did you have any conversations with him
20 in which he gave you orders?
21    A   No.
22    Q   But orders -- the written order in this
23 book, the logbook, "out all engine room bilges," that
24 was written in English; correct?

## Page 130

1     A   Yes, sir.
2     Q   Now, did you ever have any conversations
3 at all of any kind between the chef engineer between
4 the time you got on the ship and the time you got off
5 of it?
6     A   No, sir.
7     Q   You never spoke with him about anything?
8     A   Sometimes he would ask me to do things.
9     Q   Like what?
10    A   For example, my generator.
11    Q   Correct.  He would give you an order
12 about the generator?
13    A   Yeah.
14    Q   And he would speak with you in English?
15    A   Yes, sir.
16    Q   He didn't speak with you in Romanian, did
17 he?
18    A   No.
19    Q   You don't understand Romanian, do you?
20    A   No, sir.
21    Q   And he didn't speak to you in Tagalog or
22 any other language of the Philippines, did he?
23    A   No, sir.
24    Q   Okay.  And English is not his native

## Page 131

1 language, is it?
2     A   Yes.
3     Q   It is not his native language, is it?
4     A   No, it's not.
5     Q   And it's not your native language either,
6 is it?
7     A   No, sir.
8         MR. WOODWARD:  Let's go off the
9 record for a minute.
10        THE VIDEOGRAPHER:  Off the record
11 at 11:39.
12        (Discussion held off the record.)
13        THE VIDEOGRAPHER:  We're on the
14 record at 11:41.
15 BY MR. WOODWARD:
16    Q   Mr. Conge, the first time you saw the
17 magic hose was on November 23rd?
18    A   Yes, sir.
19    Q   You didn't see it before then?
20    A   No, I did not.
21        MR. WOODWARD:  No further
22 questions.
23        REDIRECT EXAMINATION
24

## Page 132

1 BY MR. PHILLIPS:
2     Q   This is Jeff Phillips again for the
3 Government.
4         Mr. Conge, can you hand me this.
5         Just for the record, is this or is
6 this not the engine room logbook that you spoke of?
7 Referring to what is marked as Government Exhibit 1
8     A   No, it's not.  It's the larger one, sir.
9     Q   Now, speaking about Mr. Chalos' question
10 to you about the company's environmental and safety
11 policies that were posted on the ship, how did the
12 company put into practice those policies?
13    A   They just put -- they just display it.
14    Q   What about the safety policy?  How did
15 the company -- what did they provide you to practice
16 those policies?
17        MR. CHALOS:  Objection.
18        THE WITNESS:  Sometimes they gave
19 us a drill.  But sometimes they just make us sign the
20 papers.
21 BY MR. PHILLIPS:
22    Q   Did they make you sign the papers?
23        MR. WOODWARD:  Objection.
24 BY MR. PHILLIPS:

Pascuale Conge

18 (Pages 133 to 136)

Page 133

1    Q   What do you mean?
2          MR. WOODWARD:  It's irrelevant.
3    BY MR. PHILLIPS:
4    Q   What do you mean, sometimes they just
5    made you sign the papers?
6          MR. CHALOS:  Objection.
7          THE WITNESS:  This is regarding the
8    drill.
9    BY MR. PHILLIPS:
10   Q   Explain.
11   A   Sometimes there is no drill, but they
12   make us sign the papers -- the papers.
13   Q   What were the papers?
14   A   I don't remember the -- the papers, sir.
15   Q   Okay.  Now, Mr. Conge, why would you pump
16   oily waste overboard into the ocean if you know it's
17   wrong?
18   A   Sir, because there is no other place to
19   put it.
20   Q   And why would you pump oily waste
21   overboard into the ocean if you knew that it was
22   against company policy?
23   A   Because, you see sir, we are just
24   following the orders.

Page 134

1    Q   Okay.  Now, going back to Mr. Christos
2    and Mr. Chalos' question about Mr. Christos telling
3    you to just tell the truth, when did Christos say
4    that?  Was it before or after you said you would only
5    tell the truth?
6          MR. WOODWARD:  Objection; leading.
7          THE WITNESS:  I don't remember,
8    sir.
9    BY MR. PHILLIPS:
10   Q   Okay.  Now, you have met with the
11   Government.  How many times have you met with the
12   defense before today?
13   A   Two times, sir.
14         MR. PHILLIPS:  Okay.  I think
15   that's all the Government has.
16         FURTHER RECROSS-EXAMINATION
17   BY MR. CHALOS:
18   Q   Mr. Conge, you just told Mr. Phillips
19   that you met with the defense two times.  Do you know
20   what he meant when he said "defense"?
21   A   Are you referring to my defense?  What
22   are you --
23   Q   Well, what did you understand
24   Mr. Phillips mean when he said "the defense"?

Page 135

1    A   The defense for the case.
2    Q   When you said you met two times, was that
3    two times with Mr. Twersky?
4    A   A lot of times with Mr. Twersky.  More
5    than that.
6    Q   And Mr. Twersky is your lawyer; right?
7    A   Yes, sir.
8    Q   Now, how many times have you met with me?
9    A   Three times, sir.
10   Q   Three times?  That's not true, is it?
11   We've met one time.
12   A   First at the office -- at the office of
13   Michael Twersky, here last Friday, and, of course,
14   this time.  Three times.
15   Q   Okay.  So is it fair to say that before
16   we came here on Friday, we've only met one time;
17   right?
18   A   Could you repeat that.
19   Q   Yeah.  Before we started here last
20   Friday, we only got together one time; right?
21   A   Oh, yes, sir.
22   Q   And that was at Mr. Twersky's office?
23   A   Yes.
24   Q   And that was a short meeting; right?

Page 136

1    A   Yes, sir.
2    Q   How long?
3    A   Almost two hours, sir.
4    Q   Almost two hours.  Okay.
5          Now, let's talk about the company's
6    environmental protection policy.
7          Mr. Phillips just asked you about
8    what the company did to implement its policy.  Do you
9    remember that?
10   A   Yes, sir.
11   Q   Now, they did a lot; right?
12   A   Yes, there are things they did.
13   Q   They gave you training?
14   A   Yes, sir.
15   Q   They required you to have specific
16   training before even considering you for a job;
17   right?
18   A   Yes, sir.
19   Q   And they made sure that you had training
20   about MARPOL and the protection of the environment?
21   A   Yes, sir.  Yes, sir.
22   Q   And they gave you specific training about
23   its own policies; right?
24   A   Yes, sir.

Pascuale Conge

19 (Pages 137 to 140)

|  | Page 137 |  | 139 |
|---|---|---|---|
| 1 | Q   And that was a two-day class before | 1 | I N D E X |
| 2 | joining the vessel that you had to go to in Manila? | 2 | WITNESS:                                      PAGE |
| 3 | A   Yes. | 3 | PASCUALE CONGE |
| 4 | Q   And from time to time, the company would | 4 | Mr. Chalos                     71 |
| 5 | send auditors on board to make sure that its policies | 5 | Mr. Woodward                  118 |
| 6 | were being implemented; right? | 6 | Mr. Phillips                    132 |
| 7 | A   Yes, sir. | 7 | Mr. Chalos                     134 |
| 8 | Q   And if the auditor found a problem, you | 8 | Mr. Woodward                  137 |
| 9 | would correct it; right? | 9 | |
| 10 | A   Yes, sir. | 10 | |
| 11 |      MR. CHALOS:  Okay.  Nothing | 11 | EXHIBITS MOVED INTO EVIDENCE |
| 12 | further.  Thank you. | 12 | CSMR Exhibit No.              PAGE |
| 13 |      FURTHER RECROSS-EXAMINATION | 13 | 13                     97 |
| 14 | BY MR. WOODWARD: | 14 | 14                     99 |
| 15 | Q   Now, you were asked by Mr. Phillips why | 15 | 15                     88 |
| 16 | you pumped it overboard, and you said there was no | 16 | 16                    115 |
| 17 | place to put it. | 17 | |
| 18 | A   Yes, sir. | 18 | |
| 19 | Q   No place to put the bilge; right? | 19 | |
| 20 | A   Yes. | 20 | |
| 21 | Q   But on November 23rd, you didn't know how | 21 | |
| 22 | full the tank was, did you? | 22 | |
| 23 | A   No, I did not. | 23 | |
| 24 | Q   So therefore, you don't know whether the | 24 | |

|  | Page 138 |  | 140 |
|---|---|---|---|
| 1 | bilges could have been pumped into the bilge tank, do | 1 | |
| 2 | you? | 2 | CERTIFICATE OF SHORTHAND REPORTER |
| 3 | A   That I don't know, sir. | 3 |      I, Gail Inghram Verbano, CSR, RMR, |
| 4 |      MR. WOODWARD:  No further | 4 | the officer before whom the foregoing proceedings |
| 5 | questions. | 5 | were taken, do hereby certify that the foregoing |
| 6 |      THE VIDEOGRAPHER:  Off the record | 6 | transcript is a true and correct record of the |
| 7 | at 11:50. | 7 | proceedings; that said proceedings were taken by me |
| 8 |      (Signature having been waived, the | 8 | stenographically and thereafter reduced to |
| 9 |      deposition of PASCUALE CONGE was | 9 | typewriting under my supervision; and that I am |
| 10 |      concluded at 11:50 a.m.) | 10 | neither counsel for, related to, nor employed by any |
| 11 | | 11 | of the parties to this case and have no interest, |
| 12 | | 12 | financial or otherwise, in its outcome. |
| 13 | | 13 | |
| 14 | | 14 | |
| 15 | | 15 | |
| 16 | | 16 | |
| 17 | | 17 | Gail Inghram Verbano, CSR, RMR |
| 18 | | | CSR No. 8635 |
| 18 | | 18 | Certification No.: 220 |
| 19 | | | (Expires 1-31-2008) |
| 19 | | 19 | |
| 20 | | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |
| 23 | | 23 | |
| 24 | | 24 | |

Corbett & Wilcox

# EXHIBIT B

DEC. 9, 2005

I 3/E PASCUAL CONGE JR. ; I ON BOARD THIS VESSEL M/V IRENE E.M. FROM OCT. 28, 2005. C/E ORDERED IN THE LOG BOOK TO PUMP-OUT BILGES. I FOLLOW ONLY THE ORDER BECAUSE THEY ARE HIGHER OFFICER IN ENGINE DEPARTMENT. THE BILGES WATER PUMP-OUT OVER BOARD. THE OIL WATER SEPARATOR DID NOT WORK.

PASCUAL C. CONGE JR.
3/E PASCUAL C. CONGE JR.
SIP BOLD MESTAMP

CSME
DEPOSITION
EXHIBIT
L3  9/14/06
FENCAD 800-631-0989