IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X

UNITED STATES OF AMERICA

         Plaintiff,

                                 Criminal Action No. 06-76 (GMS)

     v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et al.*

         Defendants.

-----------------------------------------------------------X

## DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC. AND VENETICO MARINE, S.A.'s, OBJECTIONS AND REQUEST FOR PRETRIAL RULINGS AS TO THE ADMISSIBILITY OF THE FOLLOWING PORTIONS OF THE RULE 15 DEPOSITION TESTIMONY OF ROBERTO DAMASING.

      **COME NOW,** moving defendants, Venetico Marine, S.A. ("Venetico") and

Chian Spirit Maritime Enterprises, Inc. ("CSME")(collectively, "Moving Defendants"),

who respectfully request that this Honorable Court consider and rule, before the voir dire

of the jury panel, and out of the presence and hearing of the jury panel, as to the

admissibility of the following Rule 15 deposition testimony by Roberto Damasing, which

the Government has stated it will seek to introduce at trial.[1]

      Specifically, Moving Defendants object to the admissibility of the following

deposition testimony by Roberto Damasing, an unlicensed "oiler" from the M/V IRENE

E., on the following grounds. For the Court's ready reference, a correct and true copy of

the transcript of the Rule 15 deposition of Mr. Damasing, conducted at the office of the

---

1 For the Court's ready reference, Moving Defendants advise that in order to facilitate the deposition process, counsel for all parties agreed to expressly reserve making objections during the examination.

United States Attorney, 700 Nemours Building, 1007 Orange Street, Wilmington,

Delaware, on Monday, July 17, 2006 and Tuesday, July 18, 2006, is attached hereto as

Exhibit "A".

### Roberto Damasing  (Oiler)

Moving Defendants respectfully submit that during the Rule 15 deposition

examination, Mr. Damasing clearly, concisely and unambiguously testified, in sum and

substance, that he never personally worked on, with and/or had any functional

responsibility or role with respect to the operation of the oily water separation equipment.

Specifically, Mr. Damasing testified, *inter alia*, in pertinent part, to the following:

> Q  *And in fact, as an oiler, you have no authority to decide what equipment to use in the engine room; right?*
> A  *Yes.*
> Q  *Okay.  And as an oiler, you don't decide whether or not you're going to use the oily water separator, do you?*
> A *Yes.*
> Q *And in fact, you have no responsibility to operate the oily water separator on board the Irene E.M., do you?*
> A  *Yes.*
> Q  *And you don't have any responsibility for maintaining the oily water separator on the Irene E.M., do you?*
> A  *Yes.*
> Q  *And you have no responsibility to repair the oily water separator on the Irene E.M.?*
> A  *Yes.*
> Q  *So when Mr. Phillips was asking you questions about the oily water separator, we can agree that your answers were all about a piece of equipment that you never used on the Irene E.M.?*
> A  *Yes.*

See Exhibit A, *Transcript at Page 60/line 8 through Page 61/line 7.*

* * *

> Q   *Okay.  Now, let's go back to the oily water separator.  At the time you were on board the Irene E.M., you were not authorized to operate the oily water separator; right?*

*THE INTERPRETER: I'm sorry. What was that?*

*Q  You were not authorized to operate it.*
*A  That's right.*
*Q  And you were not authorized to make any repairs to it.*
*A  Yes.*
*Q  And you were not authorized to maintain it.*
*A  Yes.*
*Q  And you were not authorized to either turn it on or turn it off.*
*A  Yes.*
*Q  And you made no decisions about whether or not it should be used.*
*A  Yes.*
*Q  And you made no decisions about whether or not it was capable of*
*    being used.*
*A  Yes.*

*See* Exhibit "A." *Transcript at Page 98/line 15 through Page 99/line 15.*

As for the admissibility of Mr. Damasing's testimony regarding his knowledge of

alleged "pump outs during direct examination, there is no dispute that Mr. Damasing

clearly and unambiguously testified, *inter alia*, to the following:

*Q  Do you remember how many times you observed overboard pumping?*

*MR. CHALOS: Objection.*

*THE WITNESS:  I can't exactly tell you, because I didn't see it.*

*BY MR. PHILLIPS:*
*Q  That's okay.  You've – when you were coming from the – to the United*
*    States from Brazil, how many times did you see overboard pumping?*

*MR. CHALOS: Objection; asked and answered.*
*MR. WOODWARD: Objection; it's been asked and answered.*
*                    He said he didn't see it.*
*MR. CHALOS: Objection.*

*THE WITNESS: I couldn't tell you.*

*BY MR. PHILLIPS:*
*Q  You couldn't tell me because you don't know or you don't remember?*

MR. CHALOS:  Objection --
MR. WOODWARD:  Objection.
MR. CHALOS:  -- objection. Objection.

THE WITNESS:  *I didn't see it.*

See Exhibit "A," Transcript at Page 39/line 4 through Page 40/line 3
(emphasis added).

\* \* \*

Q   Roberto, did you see overboard discharges between Brazil and the
United States?
A   No.

See Exhibit "A," Transcript at Page 42/lines 5-7.

In view of the foregoing, Moving Defendants object to the introduction of the

following testimony, as it lacks sufficient foundation; calls for speculation; calls for

strictly inadmissible hearsay responses; assumes facts not in evidence and, if admitted,

would be unfairly prejudicial, confusing and otherwise misleading to the trier of fact:

Page 6/line 22   -  Page 7/line 2;
Page 8/line 6   -   Page 9/line 9;
Page 9/line 21   -  Page 11/line 3;
Page 11/line 10 – Page 14/line 18;
Page 21/line 21 – Page 22/line 2;
Page 22/line 16 -  Page 23/line 19;
Page 24/line 5 – Page 24/line 22;
Page 30/line 15  -  Page 24/line 22;
Page 32/line 11 -  14;
Page 34/line24 – Page 35/line 4;
Page 35/line 19  - Page 35/line 24;
Page 36/line 12 – Page 37/line 6;
Page 37/line 10   -  Page 38/line 23;
Page 44/line 5 –   Page 45/line 20;
Page 73/lines 7-19;
Page 74/lines 1-7;
Page 74/line 21 -  Page 76/line 23;
Page 78/line 5 - Page 79/line 1;
Page 93/line 4 – Page 93/line 16; and
Page 96/line 5-15.

Additionally, Moving Defendants object to the following testimony on the following grounds:

> Page 18/line 1 – Page 19/line 6 (relevance);
> Page 19/line 12 – Page 20/line 18 (relevance; leading, foundation; assumes facts not in evidence);
> Page 20/line 21 – Page 21/line 13 (relevance);
> Page 27/line 21 – Page 29/line 24 (improper use of prior Grand Jury testimony; leading; hearsay; lack of foundation);
> Page 30/line 15 – Page 32/line 8 (relevance; hearsay);
> Page 33/line 18  -  Page 34/line 18 (hearsay; leading);
> Page 40/line 5 – Page 42/line 3 (leading; lack of foundation; improper use of prior Grand Jury testimony);
> Page 51/line 1 – Page 51/line 12 (relevance);
> Page 70/line 18 – Page 71/line 13 (relevance);
> Page 82/line 16- Page 84/line 5 (relevance; hearsay; lack of foundation);
> Page 84/line 18 - Page 89/line 24 (impermissible use of prior Grand Jury testimony; beyond the scope of direct and cross-examination; hearsay; leading; and relevance);
> Page 90/line 13 – Page 92/line 9 (impermissible use of prior Grand Jury testimony; beyond the scope of direct and cross-examination; hearsay; leading; and relevance);
> Page 93/line 18 – Page 93/line 24 (relevance; foundation; calls for speculation);
> Page 96/line 3 –Page 96/line 4 (relevance);
> Page 99/line 24  -  Page 100/line 17 (relevance);
> Page 101/line 22 – Page 102/line 19 (hearsay; relevance); and
> Page 109/line 14 - Page 113/line 5 (relevance).

Finally, Moving Defendants object to the Government's introduction of Government Exhibit 4, a document also marked for identification as CSME deposition exhibit 28, (a copy of which is attached hereto as Exhibit "B," on the basis that the Government has failed to lay the necessary foundation and that the document is replete with inadmissible hearsay.

## CONCLUSION

For the reasons more fully set forth above, Moving Defendants respectfully request that this Honorable Court issue an Order:

(1)   Granting Moving Defendants' application to exclude, either in its entirety or to the extent the Court finds just and proper, the foregoing objectionable portions of the Rule 15 deposition testimony for the reasons more fully set forth above; and

(2)   For any and all such other and further relief which the Court deems to be just and proper under the specific circumstances of this matter.

Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

6

## CERTIFICATE OF SERVICE

I do hereby certify that, on this  6th day of November 2006,  I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:

United States Department of Justice
U.S. Attorney's Office
Nemours Building
1007 N. Orange Street, Suite 700
Wilmington, Delaware  19801
Attn:  Edmond Falgowski, Esq.


United States Department of Justice
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Street
Washington, D.C. 20026
Attn:  Gregory Linsin, Esq.
        Jeffrey Phillips, Esq.
        Tracy Katz, Esq.


Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

# EXHIBIT A

Robert Damasing

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

—    —    —

UNITED STATE OF AMERICA,              :
                                      : No.
        Plaintiff,                    : 1:06-CR-00076-GMS-2
                                      :
            vs.                       :
                                      :
CHIAN SPIRIT MARITIME                 :
ENTERPRISES, INC., VENETICO           :
MARINE S.A., IRENE E/M,               :
EVANGELOS MADIAS, CHRISTOS            :
PAGONES, ADRIEN DRAGOMIR,             :
                                      :
        Defendants.                   :


            —    —    —


            Videotaped deposition of ROBERTO
DAMASING, Volume I, taken pursuant to notice before
Gail Inghram Verbano, CSR, RMR, in the offices of
United States Department of Justice, 700 Nemours
Building, 1007 Orange Street, Wilmington, Delaware,
on Monday, July 17, 2006, beginning at approximately
5:10 p.m.




            —    —    —

            CORBETT & WILCOX
        Registered Professional Reporters
1400 French Street    Wilmington, DE 19801
            (302) 571-0510
        www.corbettreporting.com

Robert Damasing

2 (Pages 2 to 5)

Page 2

APPEARANCES:
MARK W. KOTILA, ESQ.
JEFFREY L. PHILLIPS, ESQ.
United States Department of Justice
Environmental Crimes Section
P.O. Box 23985 - L'Enfant Plaza
Washington, DC 20026-3985
   Attorneys for Plaintiff
GEORGE M. CHALOS, ESQ.
FOWLER, RODRIGUEZ & CHALOS
366 Main Street
Port Washington, NY 11050
   Attorney for Defendants Chian Spirit
   and Venetico Marine

CARL R. WOODWARD, III, ESQ.
CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, NJ 07068-1739
   Attorney for Defendant Dragomir

ALSO PRESENT:

   Chris Weiss, Videographer
   Chris Masaoay, Tagalog Interpreter
   Adrien Dragomir
   Liviu-Lee Roth
   Brent McKnight
   Jason F. Burgess

       - - -

Page 3

1  THE VIDEOGRAPHER: This is Chris
2 Weiss, the videographer, and the court reporter today
3 is Gail Verbano. We are both here from the firm of
4 Corbett & Wilcox located at 230 North Market Street,
5 Wilmington, Delaware.
6      The time is 5:10 p.m. on Monday,
7 July 17, 2006. We are documenting the videotaped
8 deposition of Roberto Damasing for the plaintiff in
9 the matter of United States of America versus Chian
10 Spirit Maritime Enterprises, Inc., Venetico Marine,
11 Irene E.M., Evangelos Madias, Christos Pagones,
12 Adrien Dragomir in the United States District Court,
13 District of Delaware.
14      We are at the location of the
15 United States Attorney's office, Nemours Building,
16 1007 North Orange Street, Suite 700, Wilmington,
17 Delaware.
18      Will the attorneys please state
19 their appearance for the record.
20      MR. PHILLIPS: Jeff Phillips,
21 United States District of Delaware, Environmental
22 Crimes Section.
23      MR. KOTILA: Mark Kotila,
24 Department of Justice.

Page 4

1      MR. CHALOS: George Chalos on
2 behalf of Venetico and Chian Spirit.
3      MR. WOODWARD: Carl Woodward on
4 behalf of the defendant, Adrien Dragomir.
5      MR. TWERSKY: Michael Twersky on
6 behalf of the witness.
7      THE VIDEOGRAPHER: Will the court
8 reporter please administer the oath.
9      THE WITNESS: Yes.
10      (CHRIS MASAOAY was previously sworn
11 in as Tagalog-English interpreter.)
12         - - -
13      ROBERTO DAMASING, having first been
14 duly sworn through the interpreter according to law,
15 was examined and testified as follows:
16 BY MR. PHILLIPS:
17    Q  Mr. Damasing, good afternoon. I'm
18 Jeffrey Phillips. We've met before, have we not?
19    A  Yes, sir.
20    Q  And you've also testified before about
21 this matter; correct?
22    A  Yes, sir.
23    Q  Mr. Damasing, where are you from
24 originally?

Page 5

1    A  From the Philippines.
2    Q  Can you give the court your home address?
3    A  442 Santos Street, Santa Mesa, Manila.
4    Q  And how old are you?
5    A  I'm becoming 33.
6    Q  And what is your occupation?
7    A  Oiler/seaman.
8    Q  And for whom do you work now?
9    A  I work in a ship.
10    Q  What's the name of the ship?
11    A  Irene E.M.
12    Q  How long have you worked on that ship?
13    A  19 months.
14    Q  How long -- how many of those 19 months
15 were at sea?
16    A  12 months.
17    Q  Where was the Irene when you first
18 boarded?
19    A  In China.
20    Q  How many prior ships have you worked on
21 before the Irene?
22    A  Five ships.
23    Q  And on the Irene, what was your duty?
24    A  As an oiler.

Robert Damasing

3 (Pages 6 to 9)

Page 6

1    Q    What does an oiler do?
2    A    We put the oil in the -- oil sometime.
3  We also put the water in the water tanks.  And we
4  also do a watch in the engine room.
5    Q    Do you work with any other pieces of
6  machinery?
7    A    Yes.
8    Q    On the Irene, what other machinery did
9  you work on?
10    A    The main engine, generator engine,
11  auxiliary machineries.
12    Q    Did you ever have an opportunity to
13  observe or work with oily waste on the Irene?
14    A    Yes.
15    Q    Could you describe what you did.
16    A    Before we arrived here in the United
17  States -- sorry -- we did a cleaning of the oily
18  water separator.
19    Q    Can you describe that?
20    A    We opened the oil separator itself.  We
21  cleaned the inside, the oil that was inside.
22    Q    During the 12 months that you were at sea
23  on the Irene, did the oily water separator work?
24    MR. CHALOS:  Objection.

Page 7

1    THE WITNESS:  No.
2  BY MR. PHILLIPS:
3    Q    Can you describe the oily waste that you
4  observed on the Irene.  What did it look like?
5    A    It's black in color and it's very thick.
6    Q    Were you on board the Irene when -- can
7  you describe where the Irene went after China.
8    A    To Thailand.
9    Q    And then where?
10    A    In Africa.
11    Q    And then where?
12    A    Argentina.
13    Q    Did the Irene ever go to Poland?
14    A    After Argentina, to Poland.
15    Q    And did you observe oily waste being
16  handled in Poland?
17    A    Yes.
18    Q    What did you observe?
19    A    We transferred into the port facilities.
20    Q    What did you transfer into the port
21  facilities?
22    A    The first thing that we were ordered to
23  do, the oil sludge.
24    Q    Did you ever discharge oily sludge into a

Page 8

1  port facility after Poland?
2    A    No more.
3    Q    Do you remember about what month and what
4  year that was in Poland?
5    A    In the month of May in 2005.
6    Q    After that, how was oily waste handled on
7  the Irene?
8    MR. CHALOS:  Objection.
9  BY MR. PHILLIPS:
10    Q    You can answer.
11    A    Directly overboard.
12    Q    And did you have an opportunity to
13  observe this?
14    A    Yes.
15    Q    Describe it.
16    A    First --
17    MR. WOODWARD:  Objection as to
18  time.
19    THE WITNESS:  -- we would attach --
20  BY MR. PHILLIPS:
21    Q    Go ahead.
22    A    -- we would attach the magic pipe that we
23  had made.  And then we would run the pumps, which
24  does the suction, either the bilge oil tank or the

Page 9

1  bilge water tank.
2    Q    When you did this, who ordered you to do
3  it, if anybody?
4    A    Normally the person that is on duty, the
5  particular officer that is on duty during our shift.
6    Q    Do you remember the name of the officers
7  that would order it?
8    A    On my particular duty, it's the second
9  engineer, Edgar Villano.
10    Q    And after Poland, could you describe the
11  journeys of the Irene.  Which ports did it go to?
12    A    I don't remember anymore.
13    Q    Do you remember when you arrived at
14  the -- to the United States, here?
15    A    It was on November 4th.
16    Q    To the United States?
17    A    Yes.
18    Q    Do you remember where you were before the
19  United States?
20    A    Brazil.
21    Q    Did you observe overboard discharges
22  between Brazil and the United States?
23    A    Yes.
24    Q    How many?

Robert Damasing

4 (Pages 10 to 13)

**Page 10**

1    A   I don't remember anymore.
2    Q   Was it more than one?
3    A   Yes.
4    Q   Was it more than five?
5    A   I'm not sure.
6    Q   How did the overboard discharges take
7  place from Brazil to the United States?
8    A   Direct overboard using the magic pipe.
9    Q   Who ordered the overboard discharges?
10       MR. CHALOS:  Objection.  Objection.
11  You're asking him --
12       MR. PHILLIPS:  I'll rephrase the
13  question.
14  BY MR. PHILLIPS:
15    Q   Did you observe anybody ordering
16  overboard discharges?
17    A   From my side, it's the second officer.
18    Q   And who tells you?
19    A   The second engineer.
20       MR. CHALOS:  Hold on a second,
21  Jeff.  I can leave it for cross, but he said "second
22  officer."  You want to qualify as second engineer
23  or --
24  BY MR. PHILLIPS:

**Page 11**

1    Q   When you say "second officer," do you
2  mean second officer for second engineer?
3    A   Yes, second engineer, Edgar Villano.
4    Q   Do you remember whether or not you talked
5  to any other engineers?
6    A   No more.
7    Q   Do you remember, or you did not talk to
8  other engineers?
9    A   I don't remember.
10    Q   Do you remember talking to me up in
11  Philadelphia?
12    A   Where in Philadelphia?
13    Q   At Mr. Twersky's office.
14    A   Yes.
15       MR. PHILLIPS:  I'd like the
16  interpreter to read this first bullet to you.
17       THE INTERPRETER:  The highlighted
18  one?
19       MR. WOODWARD:  I'm going to object.
20       MR. PHILLIPS:  The first bullet.
21       MR. WOODWARD:  Could we see what
22  the document is?
23       MR. PHILLIPS:  The first and second
24  bullet down.

**Page 12**

1       MR. CHALOS:  Wait a minute.
2       MR. WOODWARD:  Wait, wait.  Just so
3  we understand what the procedure is.
4       MR. PHILLIPS:  He said he did not
5  remember whether he talked to other engineers.
6       MR. WOODWARD:  Yeah, but showing
7  him a document that you wrote, apparently, is not the
8  way to refresh his recollection.  It's totally
9  improper.
10       MR. CHALOS:  I join in that
11  objection.
12  BY MR. PHILLIPS:
13    Q   Mr. Damasing, do you remember talking to
14  me -- do you recall talking to me in Philadelphia,
15  Mr. Twersky's office?
16    A   Yes, sir.
17    Q   Do you remember me asking you about your
18  trip from Brazil to the United States?
19    A   Okay.
20    Q   And do you remember me asking you about
21  the chief engineer?
22    A   Yes.
23    Q   Does that help refresh your recollection
24  about who you talked to on the trip from Brazil to

**Page 13**

1  the United States?
2       MR. CHALOS:  Objection; leading.
3       MR. WOODWARD:  Objection; leading.
4       THE WITNESS:  Okay.
5  BY MR. PHILLIPS:
6    Q   Now, I'll ask you again:  Did you talk to
7  any other engineers besides the second engineer about
8  overboard discharges?
9    A   Yes.
10       MR. CHALOS:  Objection; leading.
11  BY MR. PHILLIPS:
12    Q   Who?
13    A   Chief engineer.
14    Q   And what did he say?
15    A   It just so happened that we met each
16  other in the stairway by the engine room, and he told
17  me to pump out bilge water overboard.
18    Q   When the overboard discharges took place,
19  what time did they take place?
20    A   Normally it's during the time that it's
21  dark.
22    Q   Why?
23       MR. CHALOS:  Objection.
24  BY MR. PHILLIPS:

Corbett & Wilcox

Robert Damasing

5 (Pages 14 to 15)

Page 14

1    Q   Why when it was only dark?
2           MR. CHALOS:  Objection.
3           THE WITNESS:  So that the other
4   ships or the airplanes that are passing by could not
5   see it.
6           MR. PHILLIPS:  All right.
7   Mr. Damasing, we're going to stop today, and we'll
8   start again tomorrow.
9           THE WITNESS:  Okay.  Yes.
10          MR. PHILLIPS:  Is everybody okay
11  with that?
12          MR. CHALOS:  That's fine.
13          MR. PHILLIPS:  Off the record.
14          THE VIDEOGRAPHER:  Off the record,
15  5:27.
16          (Signature having been waived, the
17          deposition of ROBERTO DAMASING was
18          adjourned at 5:27 p.m.)
19
20
21
22
23
24

Page 15

1        CERTIFICATE OF SHORTHAND REPORTER
2
3           I, Gail Inghram Verbano, CSR, RMR,
4   the officer before whom the foregoing proceedings
5   were taken, do hereby certify that the foregoing
6   transcript is a true and correct record of the
7   proceedings; that said proceedings were taken by me
8   stenographically and thereafter reduced to
9   typewriting under my supervision; and that I am
10  neither counsel for, related to, nor employed by any
11  of the parties to this case and have no interest,
12  financial or otherwise, in its outcome.
13
14
15
16  _____
    Gail Inghram Verbano, CSR, RMR
17  CSR No. 8635
    Certification No.: 220
18  (Expires 1-31-2008)
19
20
21
22
23
24

Corbett & Wilcox

Roberto Damasing

Page 16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATE OF AMERICA,                :
                                        : No.
        Plaintiff,                      : 1:06-CR-00076-GMS-2
                                        :
            vs.                         :
                                        :
                                        :
CHIAN SPIRIT MARITIME                   :
ENTERPRISES, INC., VENETICO             :
MARINE S.A., IRENE E/M,                 :
EVANGELOS MADIAS, CHRISTOS              :
PAGONES, ADRIEN DRAGOMIR,               :
                                        :
        Defendants.                     :


            Videotaped deposition of ROBERT
DAMASING, VOLUME 2, taken pursuant to notice before
Gail Inghram Verbano, CSR, RMR, in the offices of
United States Department of Justice, 700 Nemours
Building, 1007 Orange Street, Wilmington, Delaware,
on Tuesday, July 18, 2006, beginning at approximately
10:03 a.m.


CORBETT & WILCOX
Registered Professional Reporters
1400 French Street    Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

Roberto Damasing

2 (Pages 17 to 20)

Page 17

1  APPEARANCES:
2    MARK W. KOTILA, ESQ.
     JEFFREY L. PHILLIPS, ESQ.
3    United States Department of Justice
     Environmental Crimes Section
4    P.O. Box 23985 - L'Enfant Plaza
     Washington, DC 20026-3985
5      Attorneys for Plaintiff
6    GEORGE M. CHALOS, ESQ.
     FOWLER, RODRIGUEZ & CHALOS
7    366 Main Street
     Port Washington, NY 11050
8      Attorney for Defendants Chian Spirit
       and Venetico Marine
9
     CARL R. WOODWARD, III, ESQ.
10   CARELLA, BYRNE, BAIN, GILFILLAN,
     CECCHI, STEWART & OLSTEIN
11   5 Becker Farm Road
     Roseland, NJ 07068-1739
12     Attorney for Defendant Dragomir
13  ALSO PRESENT:
14   Chris Weiss, Videographer
     Chris Masaoay, Tagalog Interpreter
15
     Adrien Dragomir
16   Liviu-Lee Roth
     Brent McKnight
17   Jason F. Burgess
18      - - -
19
20
21
22
23
24

Page 18

1       THE VIDEOGRAPHER: This is Chris
2  Weiss, the videographer. The court reporter today is
3  Gail Verbano. We are here both from the firm of
4  Corbett & Associates, located at 230 North Market
5  Street, Wilmington, Delaware.
6       The time is 10:03 a.m. on Tuesday,
7  July 18th, 2006. We are documenting the videotaped
8  deposition of Robert Damasing for the plaintiff in
9  the matter of United States of America versus Chian
10 Spirit, Maritime Enterprises, Inc., Venetico Marine,
11 Irene E.M., Evangelos Madias, Christos Pagones,
12 Adrien Dragomir, in the United States District Court,
13 District of Delaware.
14      We are at the location of the
15 United States Attorney's office, Nemours Building,
16 1007 North Orange Street, Suite 700, Wilmington,
17 Delaware.
18      Will the attorneys please state
19 their appearance for the record.
20      MR. PHILLIPS: Jeffrey Phillips for
21 the United States.
22      MR. CHALOS: George Chalos for
23 Venetico Marine and Chian Spirit.
24      MR. WOODWARD: Carl Woodward for

Page 19

1  Adrien Dragomir.
2       MR. TWERSKY: Michael Twersky for
3  the witness.
4       THE VIDEOGRAPHER: And it's all
5  yours.
6       REDIRECT-EXAMINATION (Continued)
7  BY MR. PHILLIPS:
8    Q    Okay. Roberto, good morning.
9    A    Good morning, sir.
10   Q    We're going to continue the conversation
11 we were having yesterday.
12      Do you recall yesterday when we
13 were talking about conversations you had with
14 engineers. What were the names of the engineers on
15 the Irene with whom you worked?
16      MR. CHALOS: Objection. At what
17 point in time?
18      THE WITNESS: Second engineer Edgar
19 Villano; third engineer Pascual Conge; and fourth
20 engineer Bryan Espina; and chief engineer Adrien
21 Dragomir.
22 BY MR. PHILLIPS:
23   Q    And to be clear for the record, yesterday
24 when I asked you about conversations you had with the

Page 20

1  engineers, did you assume I was asking about the
2  other engineers that you worked with, to include the
3  chief engineer or only the lower-level engineers?
4       MR. CHALOS: Objection.
5       MR. WOODWARD: Objection; leading.
6       THE WITNESS: Just the lower ones.
7  BY MR. PHILLIPS:
8    Q    Okay, thank you.
9       Now, going back to your
10 conversations with the chief engineer --
11   A    Yes, sir.
12      MR. WOODWARD: Objection. I'm
13 going to object, and let me put my objection on the
14 record. This man was on the ship, we know, for 13
15 months. And unless we are specific as to which chief
16 engineer you're referring to, I'm going to object.
17 BY MR. PHILLIPS:
18   Q    Who was the chief engineer with whom you
19 worked on your trip from Brazil to the United States?
20   A    Chief Engineer Dragomir, sir.
21      MR. TWERSKY: Can we go off the
22 record? Sorry.
23      MR. PHILLIPS: Sure.
24      THE VIDEOGRAPHER: Off the record

Roberto Damasing

Page 21

1   at 10:06.
2          (Discussion off the record.)
3          THE VIDEOGRAPHER:  We are on the
4   record at 10:07.
5   BY MR. PHILLIPS:
6      Q   Roberto, do you see Chief Engineer
7   Dragomir in the room today?
8      A   Yes, sir.
9      Q   Could you point to him?
10     A   (Indicating.)
11         MR. PHILLIPS:  For the record, he
12  pointed to Adrien Dragomir.
13  BY MR. PHILLIPS:
14     Q   Now, Roberto, I'll call your attention
15  over to that plastic bag, what has been previously
16  marked as Government Exhibit 2.
17         Do you recognize that?
18     A   Yes.
19     Q   What is it?
20     A   It's a plastic pipe.
21     Q   How do you -- what is it, besides a
22  plastic pipe?
23         MR. CHALOS:  Objection.
24         THE WITNESS:  This is what we had

Page 22

1   used to pump out.
2   BY MR. PHILLIPS:
3      Q   And I'll also call your attention to that
4   plastic bag --
5          And Jason, if you could open that
6   plastic bag so he can actually see what's inside of
7   it.
8          -- and what has been previously
9   marked as Government Exhibit 3.
10         Just show him what's inside of it.
11         Do you recognize Government
12  Exhibit 3?
13     A   Yes.  Yes.
14     Q   What is it?
15     A   Fabricated flange.
16     Q   And how do you know what they are?
17     A   That's what we use.
18     Q   Used for what?
19     A   To pump out.
20     Q   Now, when is the last time you saw these
21  two things, the pipe and the metal flanges?
22     A   Our last voyage:  Coming from Brazil,
23  going into the United States.
24     Q   Do you remember approximately what month

Page 23

1   of the year that was?
2      A   In November.
3      Q   Of what year?
4      A   In 2005.
5      Q   And can you describe what happened the
6   last time you saw those two things.
7          MR. CHALOS:  Objection; no
8   foundation, leading.
9          THE WITNESS:  It was attached to
10  the bilge pump and then overboard.
11  BY MR. PHILLIPS:
12     Q   What was overboard?
13     A   Excuse me?
14     Q   When you said "overboard" -- explain what
15  you mean by "overboard."
16     A   Overboard means that there's another
17  valve; and so this is attached to it.
18     Q   And where does overboard go?
19     A   To the sea.
20     Q   Now, did you ever operate the equipment
21  attached to that?
22     A   Yes, I have.
23     Q   How many times?
24     A   Many times.  Many times.

Page 24

1      Q   From Brazil to the United States, how
2   many times?
3      A   I don't remember anymore, but I had
4   started it.
5      Q   Describe how.  First --
6          MR. WOODWARD:  Objection.  What's
7   "start" mean?
8          MR. PHILLIPS:  That's what I'm
9   going to ask.
10  BY MR. PHILLIPS:
11     Q   When you say "start," describe how you
12  start it.
13         MR. CHALOS:  Objection.
14         THE WITNESS:  It's a normal
15  procedure.  You open up the valves --
16  BY MR. PHILLIPS:
17     Q   Just one moment.
18         Do you -- who decides to start it?
19         MR. CHALOS:  Objection?  How is he
20  going to know.  The question has got to be whether he
21  decides or not.
22  BY MR. PHILLIPS:
23     Q   Do you decide to start it?
24     A   No.

Roberto Damasing

4 (Pages 25 to 28)

Page 25

1    Q   Who does?
2        MR. WOODWARD: Calls for
3  speculation.
4        THE WITNESS: The engineer that
5  works with me.
6  BY MR. PHILLIPS:
7    Q   How do you know?
8    A   He tells me.
9    Q   What's the name of the chief engineer
10 that told you?
11       MR. CHALOS: Objection.
12       MR. WOODWARD: No time.
13       MR. CHALOS: He didn't say "chief,"
14 he said "the engineer" I work with.
15       THE WITNESS: Adrien Dragomir.
16 BY MR. PHILLIPS:
17   Q   And when did he tell you to start the
18 pump?
19       MR. CHALOS: Objection; leading.
20       MR. WOODWARD: Same objection.
21       THE WITNESS: I don't remember the
22 time.
23 BY MR. PHILLIPS:
24   Q   Which voyage?

Page 26

1        MR. CHALOS: Objection.
2        THE WITNESS: Going towards here to
3  this United States.
4  BY MR. PHILLIPS:
5    Q   And what did Chief Engineer Dragomir say?
6    A   That we should pump out the bilge water.
7    Q   And so what did you do?
8    A   I didn't do anything. Because then I
9  waited -- I waited for the second engineer to give me
10 the instructions.
11   Q   And did he?
12   A   Yes.
13   Q   And then what did you do?
14   A   I attached the hose.
15   Q   What next?
16   A   That's it. Because then the next thing
17 that will happen is the next duty person, they would
18 be the one to pump out.
19       MR. CHALOS: Objection.
20 BY MR. PHILLIPS:
21   Q   Did you see this?
22   A   No.
23   Q   Going back to the last time you saw the
24 pipe and the flanges, when was that? Which voyage?

Page 27

1    A   Brazil to America.
2    Q   And where in that voyage? How long in
3  the voyage?
4    A   The last time that I saw it was about
5  four to three days before we arrived.
6    Q   And what happened?
7        MR. CHALOS: Objection.
8        THE WITNESS: It was still there
9  attached.
10 BY MR. PHILLIPS:
11   Q   Did you talk to the chief engineer about
12 it again?
13       MR. CHALOS: Objection.
14       MR. WOODWARD: Leading.
15       THE WITNESS: No.
16 BY MR. PHILLIPS:
17   Q   Did -- when you were coming to the United
18 States, the last time that you saw the pipe and the
19 flanges, did you do anything with them?
20   A   No.
21   Q   Roberto, do you remember testifying --
22       MR. CHALOS: Objection. He didn't
23 say he didn't remember.
24       MR. WOODWARD: He said no.

Page 28

1        MR. CHALOS: The answer was clear.
2  He doesn't need his recollection refreshed.
3  BY MR. PHILLIPS:
4    Q   Do you remember testifying in another
5  proceeding?
6        MR. CHALOS: Objection.
7        THE WITNESS: "Proceeding"?
8  BY MR. PHILLIPS:
9    Q   Do you remember talking to other
10 attorneys, including myself --
11   A   Yes.
12   Q   -- about what happened to those pipes and
13 those flanges when you approached the United States?
14       MR. CHALOS: Objection. This is
15 totally improper.
16       THE WITNESS: All right.
17 BY MR. PHILLIPS:
18   Q   Now, I'll ask you again: What was the
19 last thing you did with those pipes and flanges?
20       MR. CHALOS: Objection.
21       MR. WOODWARD: Asked and answered.
22       THE WITNESS: We took it off from
23 where it was attached. And then we were asked -- I
24 was asked to hide away the flange and the hose.

Roberto Damasing

## Page 29

1  BY MR. PHILLIPS:

2      Q   Is that the last time you saw the pipes

3  and the hose?

4      A   Yes.

5      Q   Who asked you to hide away the flange and

6  the hose?

7      A   There were three of us that particular

8  day: The second -- the second engineer, Edgar

9  Villano; Chief Engineer Dragomir; and myself.

10          The chief engineer was talking to

11  the second engineer and telling me that I should hide

12  away the flange outside the engine room, because he

13  had had an experience at a previous time that

14  somebody had gotten caught with a flange and so there

15  was a big problem.

16      Q   And so what did you do?

17      A   I hid it in the laundry room.

18          MR. WOODWARD:  Hid what?

19          THE WITNESS:  The flange.

20  BY MR. PHILLIPS:

21      Q   What about the pipes?

22      A   It was just hidden in the engine room.

23      Q   Where did you take them from?

24      A   From the engine room.

## Page 30

1      Q   Did you ever talk to the chief engineer

2  again about the pipe and the flange?

3      A   No longer.

4      Q   And did you eventually arrive to the

5  United States?

6      A   Yes.

7      Q   Do you remember when?

8      A   I really didn't understand the question.

9  Could you repeat.

10      Q   The date, the month that you arrived to

11  the United States.

12      A   November 4.

13      Q   What year?

14      A   2005.

15      Q   And what happened when you arrived to the

16  United States?

17      A   When the Coast Guard boarded, it also so

18  happened that there was oil in the sea.

19          The A.B. who was on guard gave us

20  an alarm that there was oil in the sea.  Somebody

21  came down into the engine room and told me that

22  there's an oil spill.

23          MR. CHALOS:  I object to this,

24  because this has nothing to do with the charges that

## Page 31

1  are before the Court.  It is not responsive to the

2  question that's been posed.  And anything that

3  Mr. Damasing is talking about now is wholly

4  irrelevant to the proceedings.

5          MR. PHILLIPS:  Continue.

6          MR. WOODWARD:  Join in the

7  objection.

8  BY MR. PHILLIPS:

9      Q   Just continue for me.

10      A   So the person that came down, from what I

11  can remember, Engineer -- I believe it was the second

12  engineer told me to open the overboard from the bilge

13  pump, that perhaps there were still some oil there

14  that were left over.

15          So what I did, I opened it so I let

16  the water go through it into the engine room so that

17  the inside could be cleaned.  And then I returned it

18  back to where it was, yes.  And then that's it.

19      Q   Which engineer came to speak to you?

20      A   The second engineer, Villano.

21      Q   Okay.  Did the Coast Guard eventually

22  come on board?

23      A   Yes.

24      Q   Then what happened?

## Page 32

1      A   They looked at the source of where the

2  oil was from, and then we discovered that it was

3  coming from the lube oil cooler of the generator.

4      Q   Did you say anything else to the Coast

5  Guard?

6      A   At that time, no.

7      Q   Did you later?

8      A   Not yet.

9      Q   Did you ever write a statement?

10      A   Yes, we were asked to.

11      Q   And describe how you did that.

12      A   From what I can remember, I wrote down

13  that the oily water separator was not working.

14  That's it.

15      Q   And did anybody else come on board?

16      A   Yes.

17      Q   Who else came on board?

18      A   The superintendent.

19      Q   What was his name?

20      A   From what I can remember, it's Christos.

21      Q   And when you say "superintendent," do you

22  know where he was from?  Did he tell you?

23      A   He's a superintendent of the ship coming

24  from Greece.

Roberto Damasing

6 (Pages 33 to 36)

Page 33

1    Q    Did anybody else come on board, that you
2  know of?
3              MR. CHALOS:  Objection.
4              THE WITNESS:  The owner.
5  BY MR. PHILLIPS:
6    Q    Do you know his name?
7    A    Madias and Irene.
8    Q    Did you talk to any of those individuals?
9    A    No, we just met.
10    Q    But after you met, did you talk to any of
11  them?  Did you talk to Christos?
12    A    We were called by Christos.
13    Q    Where?
14    A    First in the mess hall.  We were there
15  together with the other Filipinos, the second
16  engineer Edgar Villano, the third engineer Pascual;
17  Edgardo Paje.  That's all I can remember.
18    Q    And what did Christos say?
19    A    He told us that we should change our
20  testimony because otherwise we would go to jail.
21    Q    And did you ever talk to Christos alone?
22              MR. CHALOS:  Objection.
23              THE WITNESS:  Yes, on the second
24  time that he called to me by the Coast Guard.

Page 34

1  BY MR. PHILLIPS:
2    Q    And when was that?
3    A    It was already in nighttime.  I was
4  called by the Coast Guard in the mess hall.  And in
5  that mess hall, Christos was there at the officers'
6  mess.  He told me that I need to change my testimony.
7    Q    Did he say to what?
8    A    That I should say that I don't remember
9  that at that time that the oily water separator was
10  not working?
11    Q    Was not working or was working?
12              MR. CHALOS:  Objection.  The answer
13  is what he answered.
14              MR. PHILLIPS:  I'm making sure
15  through the interpreter.
16              THE WITNESS:  That I should change
17  my testimony to say that it was working.
18  BY MR. PHILLIPS:
19    Q    Now, Roberto, where was the ship located
20  when you talked to Christos that time?
21    A    I'm not exactly sure what part that was,
22  but it was already after the Coast Guard had caught
23  us.
24    Q    Okay.  Going back to the pump-outs, how

Page 35

1  much bilge -- oily bilge was pumped out?
2              MR. WOODWARD:  Objection to the
3  form of the question.
4              THE WITNESS:  I don't know.
5  BY MR. PHILLIPS:
6    Q    Do you -- when you operated -- when did
7  you -- when did you operate the pump and the flanges
8  the pump that was connected to those flanges?
9    A    I don't remember anymore.
10    Q    Do you remember how long you operated
11  them?
12              MR. WOODWARD:  Objection to the
13  form of the question.
14              THE WITNESS:  The previous times,
15  more than four hours, five hours.
16              MR. WOODWARD:  Continued objection
17  to the question and the answer.
18  BY MR. PHILLIPS:
19    Q    And where would you pump from?
20              MR. WOODWARD:  Objection;
21  speculative.
22              MR. CHALOS:  Objection.
23              THE WITNESS:  Coming from the bilge
24  tank.

Page 36

1  BY MR. PHILLIPS:
2    Q    Do you know how big the bilge tank was?
3    A    I don't know what the capacity is, but I
4  know that it's a large one.
5    Q    Would you stop the pump?
6              MR. CHALOS:  Objection.
7              MR. WOODWARD:  Objection; same:
8  Form.  Totally lacking temporal context.
9              THE WITNESS:  I don't understand
10  that question.
11  BY MR. PHILLIPS:
12    Q    Would you -- you recall testifying about
13  pumping from the bilge tank?
14              MR. CHALOS:  Objection.
15  BY MR. PHILLIPS:
16    Q    Who would start the pump?
17              MR. CHALOS:  Objection.
18              THE WITNESS:  Normally it would
19  have to be the oiler that would start, because
20  they're the ones that are being asked to do it.
21  BY MR. PHILLIPS:
22    Q    And who would stop the pump?
23              MR. WOODWARD:  Same objection.
24              MR. CHALOS:  Objection.  Hold on a

Roberto Damasing

7 (Pages 37 to 40)

Page 37

1 second, one second.
2          For the record, you're asking this
3 guy to speculate. Why don't you ask him specific
4 incidents. Because I don't think he can identify a
5 specific incident; he's just guessing.
6 BY MR. PHILLIPS:
7      Q    How long were you on board the Irene?
8      A    Starting China, upon arrival here in the
9 United States, 11 months. More than 11 months.
10      Q    How many times did you see overboard
11 pumping? How many times per week?
12          MR. CHALOS: Objection.
13          MR. WOODWARD: Objection. Ask the
14 first question.
15          MR. CHALOS: He didn't say ever.
16          MR. PHILLIPS: He might say zero.
17          MR. WOODWARD: Well, you have two
18 questions pending, so there's an objection.
19 BY MR. PHILLIPS:
20      Q    How many times did you pump -- see
21 pumping?
22          MR. CHALOS: Objection.
23 BY MR. PHILLIPS:
24      Q    -- during your time on the Irene?

Page 38

1          MR. CHALOS: Is the question how
2 many times did he pump or how many times --
3 BY MR. PHILLIPS:
4      Q    How many times did he see pumping on the
5 Irene during those months?
6      A    Many times.
7      Q    How many times?
8      A    All I can tell you is that when we leave
9 port, we start pumping out.
10      Q    And when would you stop?
11      A    It all depends. If the tank is empty for
12 that one particular time, for that one particular
13 duty, then we would stop it.
14      Q    Okay. Was that the way -- was that
15 regular practice?
16          MR. WOODWARD: Objection to
17 leading.
18          MR. CHALOS: Objection.
19 BY MR. PHILLIPS:
20      Q    -- to pump until empty?
21          MR. CHALOS: Objection.
22          MR. WOODWARD: Same objection.
23          THE WITNESS: Yes.
24 BY MR. PHILLIPS:

Page 39

1      Q    Do you remember the trip from Brazil to
2 the United States?
3      A    Yes.
4      Q    Do you remember how many times you
5 observed overboard pumping?
6          MR. CHALOS: Objection.
7          THE WITNESS: I can't exactly tell
8 you, because I didn't see it.
9 BY MR. PHILLIPS:
10      Q    That's okay.
11          You've -- when you were coming from
12 the -- to the United States from Brazil, how many
13 times did you see overboard pumping?
14          MR. CHALOS: Objection; asked and
15 answered.
16          MR. WOODWARD: Objection; it's been
17 asked and answered. He said he didn't see it.
18          MR. CHALOS: Objection.
19          THE WITNESS: I couldn't tell you.
20 BY MR. PHILLIPS:
21      Q    You couldn't tell me because you don't
22 know or you don't remember?
23          MR. CHALOS: Objection --
24          MR. WOODWARD: Objection.

Page 40

1          MR. CHALOS: -- objection.
2 Objection.
3          THE WITNESS: I didn't see it.
4 BY MR. PHILLIPS:
5      Q    Roberto, do you remember testifying in a
6 Grand Jury?
7          MR. CHALOS: Objection. This is
8 improper questioning of the witness. This is
9 intimidating and harassing, and if you're going to
10 continue, we'll have to call the judge.
11 BY MR. PHILLIPS:
12      Q    Do you?
13      A    Yes.
14          MR. PHILLIPS: I'm looking at
15 Page 13 of his Grand Jury proceedings.
16          MR. WOODWARD: What's the date?
17          MR. PHILLIPS: January 13th, 2006.
18          MR. WOODWARD: Let us find the
19 page.
20          MR. PHILLIPS: Have him read
21 Page 13,
22          MR. CHALOS: Objection. That's
23 improper. The guy testified clearly. This is
24 improper line of questioning. This is just --

Roberto Damasing

8 (Pages 41 to 44)

Page 41

1      MR. WOODWARD: You can't use it to
2 refresh his recollection.
3      MR. CHALOS: -- solely meant to
4 intimidate the witness. He's already scared being
5 here.
6      MR. PHILLIPS: Objections,
7 objections, objections. Get them on the record.
8      MR. WOODWARD: What line?
9      MR. PHILLIPS: It's Page 13, all of
10 it.
11      (Whereupon the requested portions of
12      transcript were read by the
13      interpreter in Tagalog to the
14      witness.)
15      MR. PHILLIPS: Thank you. Thanks.
16 Good.
17      MR. CHALOS: For the record, I'd
18 like to make the objection that the witness on that
19 page was never asked if he saw it. And in fact,
20 that's the basis of this whole -- my objection to
21 this whole line of questioning, because all the
22 questions suppose a predicate that was never
23 established.
24      The guy never saw it. He has no

Page 42

1 firsthand knowledge. His testimony has been nothing
2 but hearsay, inadmissible hearsay, and we continue
3 our objection to this line of question.
4 BY MR. PHILLIPS:
5   Q  Roberto, did you see overboard discharges
6 between Brazil and the United States?
7   A  No.
8   Q  Did you ever operate the magic pipe and
9 the flanges and the pump?
10      MR. WOODWARD: Objection to the
11 form of the question.
12 BY MR. PHILLIPS:
13   Q  From Brazil to the United States?
14   A  What I did was to attach it.
15   Q  And how long did you see it attached?
16   A  I'm not sure. But I know that a few days
17 after we had left Brazil, I was asked to attach it.
18 That's it.
19   Q  Did you ever see anybody using it?
20      MR. CHALOS: Objection.
21      THE WITNESS: No more, because, you
22 know, I had finished my duty.
23 BY MR. PHILLIPS:
24   Q  You never had duty again from Brazil to

Page 43

1 the United States?
2      MR. CHALOS: Objection. That's not
3 what he said.
4      THE WITNESS: Yes, there was. But
5 at that time it was very early. There's still bright
6 sun outside.
7 BY MR. PHILLIPS:
8   Q  What does that mean?
9      MR. CHALOS: Objection; move to
10 strike.
11      THE WITNESS: From 1600 hours to --
12      MR. CHALOS: Hold on, Chris. Hold
13 on, Chris. I have an objection.
14      I move to strike the portion of the
15 answer that's nonresponsive to the question.
16      MR. WOODWARD: Join in the
17 objection.
18 BY MR. PHILLIPS:
19   Q  What time were your duty hours?
20   A  Coming from Brazil going into the United
21 States, I was changed, from 400 hours to 800 hours,
22 to 1600 hours to 2000 hours.
23   Q  So it was never dark outside during your
24 duty?

Page 44

1      MR. CHALOS: Objection.
2      THE WITNESS: Sometimes in the
3 morning, yes. But in the afternoon, it's not.
4 BY MR. PHILLIPS:
5   Q  And what is important about the fact that
6 it was light outside during your duty?
7      MR. CHALOS: Objection.
8      Hold on one second. Objection.
9 He's never said anything about light being important
10 or irrelevant.
11      MR. PHILLIPS: He has. He's
12 testified about it before on other trips.
13      MR. CHALOS: The guy works in the
14 engine. There's no windows in the engine room.
15 What's light have to do with it?
16      MR. PHILLIPS: He testified earlier
17 about trips that were taken during his tenure on this
18 ship and about regular practice of things that
19 happened at night. I'm establishing that this
20 happened and was also important on the trip from
21 Brazil to the United States.
22      MR. CHALOS: Only I object to the
23 form of the question to ask him what's important or
24 significant about day or night, because he's never

Roberto Damasing

Page 45

1  testified that there's any significance to it.
2          MR. PHILLIPS: Okay.
3          MR. CHALOS: So my objection is
4  lack of foundation, form and leading.
5          MR. WOODWARD: Join in the
6  objection.
7  BY MR. PHILLIPS:
8      Q   What is important about the fact that
9  your duty was only during the daytime --
10         MR. CHALOS: Objection.
11  BY MR. PHILLIPS:
12     Q   -- as it relates to the magic pipe and
13  pumping?
14         MR. CHALOS: Objection.
15         THE WITNESS: Because they don't
16  want anybody to see, especially the airplanes and the
17  other ships, if there is oil that's coming out of
18  there.
19         MR. PHILLIPS: Okay. One second
20  Roberto.
21         Okay I have no further questions
22  right now.
23         CROSS-EXAMINATION
24

Page 46

1  BY MR. CHALOS:
2      Q   Roberto, let's get something straight.
3  You worked two four-hour shifts a day; right?
4      A   Yes.
5      Q   4:00 in the afternoon to 4:00 at night;
6  right? Sorry, let me say that again.
7          You worked from 4:00 in the
8  afternoon to 8 o'clock at night; right?
9      A   Yes.
10     Q   And when you worked -- and you also
11  worked 4 o'clock in the morning to 8 o'clock in the
12  morning; right?
13     A   Yes.
14     Q   Okay. Now, when you're on board the
15  ship, there's plenty of times that it's dark out that
16  you're working before 8:00 p.m. at night; right?
17     A   Yes.
18     Q   Okay. And when you go to work at
19  4 o'clock in the morning, it's also dark out?
20     A   Yes.
21     Q   So there's times that, during both
22  shifts in a day, it's dark out when you're working;
23  right?
24     A   Yes.

Page 47

1      Q   Okay. And the truth of the matter is you
2  never saw any overboard discharges between Brazil and
3  the United States?
4      A   Yes.
5      Q   Okay. Now, let's talk about your
6  position on board the ship.
7          You're an oiler; right?
8      A   Yes.
9      Q   And when you work as an oiler, you work
10  with a duty engineer; right?
11     A   Yes.
12     Q   And the duty engineer that you worked
13  with between Brazil and the United States was the
14  second engineer, Edgar Villano; right?
15     A   Yes, sir.
16     Q   And Mr. Villano was your boss; right?
17     A   Yes.
18     Q   And you talked to Mr. Villano yesterday,
19  lunchtime; right?
20     A   Yes, sir.
21     Q   And you talked to him again last night;
22  right?
23     A   Yes, this morning.
24     Q   And you talked to him again this morning?

Page 48

1      A   Yes.
2      Q   And you know that Mr. Villano is going
3  home to the Philippines tonight; right?
4      A   A while ago, I didn't. Just now.
5      Q   Okay. So as you sit here now, you know
6  that Mr. Villano is going home to the Philippines
7  tonight?
8      A   Yes.
9      Q   And you know that Mr. Villano had a deal
10  with the Government --
11         MR. PHILLIPS: Objection;
12  irrelevant.
13  BY MR. CHALOS:
14     Q   -- that if he came here and cooperated
15  with the Government, they would let him go home?
16         MR. PHILLIPS: Objection;
17  speculation.
18         THE WITNESS: No, that is not the
19  conversation that we had.
20  BY MR. CHALOS:
21     Q   Okay. But you a deal with the
22  Government; right?
23     A   No.
24     Q   You don't have a deal with the

Roberto Damasing

10 (Pages 49 to 52)

Page 49

1  Government?
2      A   No.
3      Q   You don't have an agreement with the
4  Government that if they -- if you come here and
5  cooperate, that they wouldn't prosecute you for
6  anything you did wrong?
7      A   What do you mean by that?
8      Q   The Government told you, did they not,
9  that if you cooperate with them, they won't punish
10 you?
11     A   The jury, they told him that.
12     Q   Okay.  But that's -- that's the
13 understanding you had as well; right?
14     A   Yes.
15     Q   Okay.  So in order for you not to be
16 punished, it's fair to say that you know you need to
17 cooperate with the Government?
18     A   No, as long as I tell the truth.
19     Q   Okay.  You, as an oiler, Mr. Damasing,
20 don't have an engineer license, do you?
21     A   Yes, I do.
22     Q   You have an engineer license?
23     A   Just a new one, yes.
24     Q   To be an oiler, you don't need an

Page 50

1  engineer license, do you?
2      A   Yes.
3      Q   Okay.  So the record is clear, in order
4  to work as an oiler, no special license is required?
5      A   Yes.
6      Q   But you have a fourth engineer's license;
7  right?
8      A   Yes.
9      Q   Okay.  But on this ship, you were hired
10 as an oiler; right?
11     A   Yes.
12     Q   Okay.  And had the company hired you as a
13 fourth engineer, you would have made a lot more money
14 than you make now as an oiler; right?
15     A   Oh, yes.
16     Q   Okay.  Now let's talk about -- well,
17 before I move on.
18         The company didn't hire you as an
19 oiler, did they -- as an fourth engineer, did they --
20 strike that.  Let me rephrase the question.
21         But the company didn't hire you as
22 a fourth engineer; they only hired you as an oiler;
23 right?
24     A   Yes.  That's what I applied for.

Page 51

1          MR. CHALOS:  Okay.  Can we take two
2  minutes so we can pull out the rest of my stuff and
3  we can premark some exhibits.
4          MR. PHILLIPS:  Uh-huh.
5          MR. CHALOS:  Thank you.
6          THE VIDEOGRAPHER:  Off the record
7  at 10:49.
8          (Brief recess.)
9          (Documents marked CSMR Exhibits 23
10         through 27 for identification.)
11         THE VIDEOGRAPHER:  We're on the
12 record at 11:06.
13 BY MR. CHALOS:
14     Q   Okay.  Mr. Damasing, let's talk about how
15 you went about getting employed to work on board this
16 vessel.
17         Okay.  You went to a crewing agent
18 in the Philippines, did you not?
19     A   Yes.
20     Q   And when you went to the crewing agent,
21 you had to prepare some papers in order to look for a
22 job; right?
23     A   Yes.
24     Q   And you did that?

Page 52

1      A   Yes.
2      Q   And then what happens is the crewing
3  agent proposes jobs to you; right?
4      A   Yes.
5      Q   And then you either accept the job or
6  not; right?
7      A   Yes.
8      Q   And at the time that the crewing agent
9  proposed the job as oiler on the Irene E.M., you had
10 been going to sea for eight years already; right?
11     A   Yes.
12     Q   And during that eight years, you had
13 received various training?
14     A   Yes.
15     Q   And some of that training related to what
16 we call MARPOL; right?
17     A   Yes.
18     Q   And MARPOL is the international pollution
19 prevention treaty?
20     A   Yes.
21     Q   And you knew at the time that you were
22 applying for this job, that it was illegal to
23 discharge any oily wastes into the sea; right?
24     A   Yes.

Roberto Damasing

Page 53

1    Q   Okay. Now, take a look at what we've
2  marked as CSME Deposition Exhibit No. 23. For the
3  record, I'll represent that it's four pages.
4    A   This is my contract.
5    Q   Okay. Thank you, Mr. Damasing, but just
6  wait for my questions. Okay?
7         That document is the paperwork that
8  you prepared when you signed your contract; right?
9  To work on board the Irene E.M.?
10   A   Yes.
11   Q   And that first page has your signature on
12  the bottom?
13   A   Yes.
14   Q   Okay. Now, part of the deal when you
15  were applying for the job on board the Irene E.M. was
16  that you had to go to some training at the manning
17  agent's office; right?
18   A   Yes, there was.
19   Q   Okay. And part of that training included
20  training on the ship's safety management system and
21  environmental protection policies; right?
22   A   Yes.
23   Q   Okay. Now, take a look at the second
24  page of that exhibit, Exhibit 23. That's your

Page 54

1  signature on the bottom?
2    A   Yes.
3    Q   And part of that training was that if you
4  were found to violate the company's environmental
5  protection policy, you would be fired; right?
6    A   Yes.
7    Q   And the company was very serious about
8  their environmental protection, were they not?
9    A   Yes.
10   Q   Okay. Take a look at what we've marked
11  as CSME Defendants' Exhibit No. 24. For the record,
12  I'll represent it's a four-page exhibit, and I'll
13  take back the last one.
14        That's a copy of your seaman's book
15  and your passport; right?
16   A   Yes.
17   Q   Okay. I'll take that back. Thanks.
18        For the record, I'd like to move
19  into evidence what's previously been marked as
20  Exhibit No. 23.
21        MR. PHILLIPS: No objection.
22        MR. CHALOS: And Exhibit No. 24.
23        MR. PHILLIPS: No Objection.
24        MR. CHALOS: Thank you.

Page 55

1        (Documents marked CSMR Exhibits 23
2          and 24moved into evidence.)
3  BY MR. CHALOS:
4    Q   Now, I'm going to show you what's
5  previously been marked and I believe moved into
6  evidence as Defendants' Exhibit No. 7, and ask you to
7  take a look at that, Mr. Damasing.
8        That's the company's environmental
9  policy; right?
10   A   Yes.
11   Q   And this is the policy that you received
12  training about before you were allowed to go on board
13  the ship; right?
14   A   I don't remember this particular one.
15   Q   Okay. Well, that particular document was
16  posted and in plain view for the crew on board the
17  ship, was it not?
18   A   There is a logbook where all the policies
19  are written. Sometimes it's in the mess hall, in the
20  bridge, in the engine room. That's it.
21   Q   Okay. Now, take a look, though,
22  Mr. Damasing. That particular section of the policy
23  was posted -- it was hanging in the mess hall, was it
24  not?

Page 56

1    A   There's just a book there.
2    Q   Okay. Well, that policy was also hanging
3  in the hallway, was it not? Think.
4    A   I don't remember. There's just a manual
5  that I can remember.
6    Q   That policy was also hanging on the
7  plywood bulletin board in the engine room, was it
8  not?
9    A   What I can remember is that -- that we
10  don't have any control rooms, so everything was put
11  on a table.
12   Q   Okay. But just so I'm clear,
13  Mr. Damasing, you knew at the time you got on board
14  the ship that it was wrong to put any oil or oily
15  wastes into the sea; right?
16   A   Yes.
17   Q   And you knew if the company found out you
18  were doing it, they would fire you; right?
19   A   Yes.
20   Q   Okay. Now, you told us earlier today
21  when Mr. Phillips was asking some questions that
22  there were some discharges while you were on board
23  the ship; right?
24   A   Yes.

Roberto Damasing

12 (Pages 57 to 60)

Page 57

1      Q   Now, you never reported that to the
2  company that owns the ship, did you?
3      A   I could not report that, because, you
4  know, I'm just asked to do this.
5      Q   My question to you, yes or no:  You
6  personally never made a report to the company that
7  owns the ship, did you?
8      A   Yes.
9      Q   "Yes" meaning you agree, you never made
10  that report, did you?
11      A   Yes.
12      Q   And you never made a report to the
13  company that operates or manages the ship, did you?
14      A   Yes.
15      Q   "Yes" meaning you never made that --
16      A   No, I did not.  Yes.
17      Q   Okay.  And you never -- strike that.
18          You would agree with me that it's a
19  fact that you never even told the captain that you
20  saw discharges overboard?
21      A   Yes.
22      Q   Now, you knew, though, based on your
23  training, that if you saw any discharges, you were
24  supposed to report it to the captain; right?

Page 58

1      A   How could I do that?  When it's coming
2  from the officers, the orders.
3      Q   Mr. Damasing, listen to my question:  You
4  knew that if you saw a discharge overboard or any
5  MARPOL violation, you were supposed to tell the
6  captain; right?
7      A   All the people that make the reports are
8  officers themselves.
9      Q   I'm just going to show you what we've
10  marked as Exhibit 25, CSME Defendants' Exhibit 25.
11  Just for the record, Mr. Damasing, those are some of
12  the certificates for some of the training you had
13  before being hired on board the ship.
14          And those were requirements in
15  order to work on the ship; right?
16      A   Yes.
17          MR. CHALOS:  Okay.  I'd like to
18  move that into evidence.
19          MR. PHILLIPS:  No objection.
20          (Document marked CSMR Exhibit 25
21          moved into evidence.)
22  BY MR. CHALOS:
23      Q   Now, Mr. Damasing, in addition to the
24  environmental protection policy the company had, the

Page 59

1  company was also serious about having crew that was
2  physically and mentally able to do the job for which
3  they're hired; right?
4      A   Yes.
5      Q   And in fact, another requirement was for
6  you to go and have a series of tests done; right?
7      A   Yes, medicals.
8      Q   And I'm going to show you what we've
9  marked as Exhibit 26, CSME Defendants' Exhibit 26.
10  And those are the medical tests and the results that
11  you had before you were able to go on board the Irene
12  E.M.; right?
13          MR. PHILLIPS:  Objection.  This is
14  beyond the scope of direct --
15          THE WITNESS:  Yes.
16          MR. PHILLIPS:  -- and irrelevant.
17          MR. CHALOS:  Move it into evidence.
18          You object to it?
19          MR. PHILLIPS:  Object to that.
20          MR. CHALOS:  Okay.
21          (Document marked Exhibit CSMR 26
22          moved into evidence.)
23  BY MR. CHALOS:
24      Q   Now, as an oiler, Mr. Damasing, you've

Page 60

1  already told us that you're not a licensed engineer;
2  right?
3      A   I have a license.
4      Q   I understand you do.  But on board the
5  Irene E.M., the job that you were functioning in does
6  not require a license?
7      A   Yes.
8      Q   And in fact, as an oiler, you have no
9  authority to decide what equipment to use in the
10  engine room; right?
11      A   Yes.
12      Q   Okay.  And as an oiler, you don't decide
13  whether or not you're going to use the oily water
14  separator, do you?
15      A   Yes.
16      Q   And in fact, you have no responsibility
17  to operate the oily water separator on board the
18  Irene E.M., do you?
19      A   Yes.
20      Q   And you don't have any responsibility for
21  maintaining the oily water separator on the Irene
22  E.M., do you?
23      A   Yes.
24      Q   And you have no responsibility to repair

Roberto Damasing

13 (Pages 61 to 64)

Page 61

1  the oily water separator on the Irene E.M.?
2      A   Yes.
3      Q   So when Mr. Phillips was asking you
4  questions about the oily water separator, we can
5  agree that your answers were all about a piece of
6  equipment that you never used on the Irene E.M.?
7      A   Yes.
8      Q   Now, there was a practice on board the
9  Irene E.M. to transfer some of the materials from the
10 bilge wells to the bilge holding tank; right?
11     A   Yes.
12     Q   And in order to do that, no oily waste
13 would go into the sea, would it?
14     A   Yes.
15     Q   And the bilge holding tank was gigantic;
16 right?
17     A   Yes.
18     Q   More than 106 cubic meters; right?
19     A   I'm not sure about that.
20     Q   But it was the biggest bilge holding tank
21 you've ever seen on any ship you've ever been on?
22         MR. PHILLIPS: Objection. He's
23 never testified to that.
24         THE WITNESS: No, only in the

Page 62

1  Irene.
2  BY MR. CHALOS:
3      Q   This was the biggest bilge holding tank
4  you've ever seen?
5      A   Only in the Irene.
6      Q   Okay. Now, the captain never told you to
7  lie to the Coast Guard, did he?
8      A   Yes.
9      Q   So it's a fair -- you agree with me that
10 the captain never told you to lie; correct?
11     A   Yes.
12     Q   And you agree with me that Mr. Madias
13 never told you to lie to the Coast Guard?
14     A   Yes.
15     Q   And you agree with me that you personally
16 didn't have any communications with either the Chian
17 Spirit or Venetico Marine?
18     A   Yes.
19     Q   So neither one of those companies told
20 you to lie?
21     A   Yes.
22     Q   Okay. Now, the captain never gave you an
23 order to pump anything overboard, did he?
24     A   Yes.

Page 63

1      Q   So you agree with me that he never gave
2  you that order?
3      A   Yes.
4      Q   And you also agree with me that the Chian
5  Spirit never ordered you to pump anything overboard?
6      A   Yes.
7      Q   And you would also agree with me that
8  Venetico Marine never told you to pump anything
9  overboard?
10     A   Yes.
11     Q   One second.
12         Mr. Damasing --
13     A   Yes.
14     Q   -- you told us before about a discussion
15 that you had with a gentleman named Christos;
16 correct?
17     A   Yes.
18     Q   Okay. Now, you told Mr. Phillips that
19 Mr. Christos told you to change a statement that you
20 had made.
21     A   Yes, sir.
22     Q   What language did that conversation take
23 place in?
24     A   English.

Page 64

1      Q   Okay. Now, let me see if I understand
2  this right: Your first language is called Cebuano;
3  right?
4      A   Yes.
5          MR. CHALOS: And for the record,
6  that's C-E-B-U-A-N-O.
7  BY MR. CHALOS:
8      Q   Now, besides Cebuano, you also speak the
9  Philippine language Tagalog; right?
10     A   Yes.
11     Q   And that's the language which Mr. Masaoay
12 is speaking with you today; right?
13     A   Yes.
14     Q   So at a minimum, English is your third
15 language; right?
16     A   Yes.
17     Q   And in fact, the reason why Mr. Masaoay
18 is here as our interpreter is because you're more
19 comfortable speaking in your native language at a
20 formal meeting like this; right?
21     A   Yes.
22     Q   Now, Mr. Christos, you told us, was a
23 Greek guy; is that right?
24     A   Yes.

Roberto Damasing

14 (Pages 65 to 68)

Page 65

1    Q    And English wasn't his first language,
2    was it?
3    A    Yes.
4    Q    So we can agree that there was some
5    language barrier to your communications with
6    Christos; right?
7    A    That I don't know.
8    Q    You don't know.
9         Okay.  Now, you did tell us,
10   though, it was your understanding that Mr. Christos
11   wanted you to change a statement you had made to the
12   Coast Guard; right?
13   A    Yes.
14   Q    But the truth of the matter is, you told
15   Mr. Christos that you were not going to change your
16   statement; right?
17   A    What I told him was that I was just
18   telling the truth.
19   Q    Okay.  And in fact, you've never changed
20   your statement, have you?
21   A    Yes.
22   Q    You agree with me that you never changed
23   your statement?
24   A    Yes.

Page 66

1    Q    Okay.  One second.
2         okay.  Now, Mr. Damasing, you've
3    been here in the United States for almost eight
4    months; right?
5    A    Yes.
6    Q    And you're here because the Government
7    has detained you here; right?
8         MR. PHILLIPS:  Objection.
9         THE WITNESS:  Yes.
10   BY MR. CHALOS:
11   Q    You don't have your passport, do you?
12   A    Yes.
13   Q    The Government has your passport?
14   A    Yes.
15   Q    And you can't go home if you wanted to,
16   can you?
17   A    Yes.
18   Q    And you told the Government you wanted to
19   go home?
20   A    Yes.
21   Q    Okay.  And in fact, you -- in fact you
22   and Mr. Twersky, your lawyer, have recently filed a
23   petition with the Court for you to go home; right?
24   A    Yes, sir.

Page 67

1    Q    And you prepared a declaration in support
2    of that petition; correct?
3         MR. PHILLIPS:  Objection.  This is
4    irrelevant, and it's also beyond the scope of direct.
5         THE WITNESS:  Yes.
6    BY MR. CHALOS:
7    Q    I'm going to show you what we've marked
8    as CSME Deposition Exhibit No. 27.  For the record,
9    it's three pages.  First page has a heading
10   "Declaration of Roberto Damasing."
11        Mr. Damasing, take a look at the
12   third page of that exhibit.  Is that your signature?
13   A    Yes.
14   Q    Is that a statement that you've made
15   since you've been here in the United States?
16   A    No.  This is already made and I signed.
17   Q    And you read it before you signed it?
18   A    Yes.
19   Q    And you agreed with its contents?
20   A    Yes.  There is nothing that's bad about
21   this.
22        MR. CHALOS:  Okay.  I'd like to
23   move into evidence Defendants' CSME Exhibit No. 27.
24        MR. PHILLIPS:  Objection to

Page 68

1    relevance.
2         (Document marked CSMR Exhibit 27
3         moved into evidence.)
4    BY MR. CHALOS:
5    Q    One second.
6         Mr. Damasing, earlier today
7    Mr. Phillips asked you about Government Exhibit 2 and
8    Government Exhibit 3.  Take a look at Exhibit No. 2.
9    That's the big plastic bag with the hoses.
10        Now, can you really see what's in
11   that bag from where you're sitting?
12   A    Yes, sir.
13   Q    Now, you didn't bring those here from the
14   ship, did you?
15   A    Yes.
16   Q    You carried them to this building?
17   A    No.
18   Q    So you didn't bring them here to this
19   building?
20   A    Yes.
21   Q    And you don't know how those materials
22   came to this building, do you?
23   A    Yes.
24   Q    And you would agree with me that you

Roberto Damasing

15 (Pages 69 to 72)

---

Page 69

1  don't know if this exact hose came from the Irene?
2      A    These things came from the Irene.
3      Q    But you don't know that for a fact, do
4  you?
5      A    I'm sure.
6      Q    And how are you sure?
7      A    Can I go near it?
8      Q    Sure.
9      A    This was tied with a piece of rubber.
10 That means that there is a hole here.
11     Q    Okay.  And you're saying it was tied with
12 rubber when it was on board the ship?
13     A    Yes.
14     Q    And it's not tied with rubber now, was
15 it?
16     A    There is still.
17     Q    Okay.  Now, about the flanges, you didn't
18 bring them to the office, did you?
19     A    Yes.
20     Q    "Yes" meaning you agree you didn't bring
21 them?
22     A    No.
23     Q    Okay.  Now, just so the record is clear,
24 there's lots of hoses on board the ships that you've

---

Page 70

1  worked on, are there not?
2      A    Yes.
3      Q    And there's also lots of flanges on board
4  the ship?
5      A    Yes.
6      Q    And there's lots of uses for hoses and
7  flanges that are legal; correct?
8      A    Yes.
9      Q    And you could use them for lube oils;
10 right?
11     A    Yes.
12     Q    And for fuel oils?
13     A    Yes.
14     Q    And for use with the generators?
15     A    Yes.
16     Q    And the boilers?  Or boiler blow-downs?
17     A    I don't understand.
18     Q    Okay.  Just a few final questions,
19 Mr. Damasing.
20          When you told us before about when
21 the A.B. on watch sounded the alarm for oil being in
22 the water, that oil wasn't because of an illegal
23 discharge, was it?
24     A    Yes.

---

Page 71

1      Q    You agree with me that it was not an
2  illegal discharge?
3          MR. PHILLIPS:  Objection.  No basis
4  for him to state what's illegal and not illegal.
5          THE WITNESS:  Yes.
6  BY MR. CHALOS:
7      Q    In fact, the Coast Guard was on board
8  when it happened; right?
9      A    Yes.
10     Q    Okay.  And that was because of a leak?
11     A    Yes.
12     Q    And then it was the Coast Guard —
13 withdraw.
14          Nothing further.  I'm ready to pass
15 the witness.
16          MR. WOODWARD:  Just off the record,
17 please.
18          THE VIDEOGRAPHER:  Off the record,
19 11:36.
20     (Brief recess.)
21          THE VIDEOGRAPHER:  On the record at
22 11:42.
23          CROSS-EXAMINATION
24

---

Page 72

1  BY MR. WOODWARD:
2      Q    Mr. Damasing, my name is Carl Woodward
3  and I represent the chief engineer, Adrien Dragomir.
4          How are you today?
5      A    I'm fine, sir.
6      Q    Good, good.
7          Now, as I understand it, you've
8  been on this ship, the Irene, for 11 months; correct?
9      A    Yes, sir.
10     Q    And in fact, of the present crew, you
11 served the longest of anyone; isn't that right?
12     A    Yes.
13     Q    Was the captain on longer than you?
14     A    We were there at the same time.
15     Q    You came at the same time?
16     A    I don't exactly remember.
17     Q    All right.  The prior chief engineer was
18 Mr. Tomondong; right?
19     A    Yes.
20     Q    And he was on the ship when you joined
21 it; correct?
22     A    Yes.
23     Q    When you joined the ship, the ship was in
24 dry dock in China?

---

Roberto Damasing

16 (Pages 73 to 76)

Page 73

1    A    Yes.
2    Q    What was being done to the ship at that
3    time?
4    A    When I arrived there, there was only a
5    little bit of things that they needed to do. Mostly,
6    it's outside of the ship.
7    Q    Okay. When you joined the ship in China,
8    do you know whether the oily water separator was
9    working?
10            MR. CHALOS:  Objection.
11            THE WITNESS:  No, it wasn't.
12   BY MR. WOODWARD:
13   Q    Do you know whether the company sent
14   money to have it repaired?
15   A    I don't know.
16   Q    Do you know whether money was sent to
17   Mr. Tomondong or Mr. Tanasi, who was the
18   superintendent, to repair the oily water separator?
19   A    That I don't know.
20   Q    Now, when you were on the ship after
21   China and before it got to Africa in October,
22   October 2005, Mr. Tomondong was the chief engineer;
23   right?
24   A    Yes.

Page 74

1    Q    And it was while he was the chief
2    engineer that you had received orders to pump
3    overboard; correct?
4    A    There were times.
5    Q    And you knew that Mr. Tomondong allowed
6    that?
7    A    Yes.
8    Q    Now, Mr. Dragomir came on the ship in
9    October; correct?
10   A    That I don't remember.
11   Q    Okay. But do you remember that you were
12   in Africa when he came on the ship?
13   A    Perhaps.
14   Q    Do you remember when he came on the ship?
15   A    I don't exactly remember where he
16   boarded, but I remember when he boarded.
17   Q    All right, fine.
18            And he replaced Mr. Tomondong;
19   correct?
20   A    Yes.
21   Q    Now, you knew that what Mr. Tomondong had
22   allowed, which was pumping overboard, was against the
23   law; right?
24   A    Yes.

Page 75

1    Q    You knew it was wrong?
2    A    Yes.
3    Q    When Mr. Dragomir joined the ship, did
4    you tell Mr. Dragomir that that was illegal conduct
5    going on?
6    A    I have no right to tell him that.
7    Q    You don't have any right to send him a
8    note or talk to him and say, "I know there's an
9    illegal practice on this ship"?
10   A    I don't think that that is part of my job
11   anymore.
12   Q    Well, didn't you sign some document from
13   the company that indicated that you would tell the
14   company or its representatives that if there was
15   illegal conduct in violation of MARPOL, that you
16   would inform those authorities?
17   A    I am a lower-ranking person that knows
18   that these things are being done are illegal. How
19   about them higher officials? Don't they know what's
20   going on?
21   Q    Well, the question is, did you tell
22   Mr. Dragomir that what had gone on before he came on
23   the ship was illegal?
24   A    No, we did not have a conversation.

Page 76

1    Q    So you never told him that, did you?
2    A    Yes.
3    Q    You agree with me that you never told him
4    that?
5    A    Yes.
6    Q    Now, when you said the oily water
7    separator wasn't working, do you know what it was
8    that was not working on the oily water separator?
9    A    Everything was not working.
10   Q    The whole thing didn't work?
11   A    It was running, but it didn't run in the
12   proper procedure.
13   Q    And what was it that wasn't proper?
14   A    First of all, the suction from the oil
15   sludge tank is not attached to the suction pipe, but
16   it was attached to the inlet. And then the sensors
17   on the ppm reading, it did not read correctly.
18   Q    Did you ever operate the oily water
19   separator?
20   A    No.
21   Q    So that information that you just stated
22   didn't come from your direct observation; correct?
23   A    I can see it.
24   Q    When Mr. Dragomir came on the ship, did

Roberto Damasing

Page 77

1  you tell him that the oily water separator didn't
2  work?
3      A   It was turned over to him by the other
4  engineers.
5      Q   I understand that.  That wasn't my
6  question.
7          Did you tell him that it was
8  broken?
9      A   No, I did not.
10     Q   Now, I'm going to direct your attention
11  to a question that was asked to you about the
12  Government Exhibit 2, the magic hose.  And I think
13  you told Mr. Phillips that you were present when the
14  chief engineer, Mr. Dragomir, was talking to the
15  second engineer.  Do you recall that?
16     A   Yes.
17     Q   Okay.  And I think you indicated that you
18  received -- or that you overheard instruction about
19  dismantling the magic hose.  Do you recall that?
20     A   Yeah.
21     Q   And in fact, Mr. Dragomir told the second
22  engineer to disassemble the magic hose and the
23  flanges; correct?
24     A   Right.

Page 78

1      Q   He also told you -- or he also told the
2  second engineer that he wanted the magic hose and the
3  flanges taken away from the engine room; correct?
4      A   Yes.
5      Q   He also told the second engineer that he
6  wanted the magic hose destroyed so that it could not
7  be used in the future; didn't he say that?
8      A   Could you repeat that question.
9          MR. WOODWARD:  Sure.  In fact,
10  could you read it back, please.
11         (Record read.)
12         THE WITNESS:  I didn't hear that.
13  BY MR. WOODWARD:
14     Q   Did you hear him tell the second engineer
15  that he did not want the magic hose used again?
16     A   That I didn't hear.
17     Q   Okay.  Now, he also did not tell him to
18  hide it; isn't that correct?
19     A   He told the second engineer to hide it.
20     Q   No, he told him to take it out of the
21  engine room, didn't he?
22     A   Yes.
23     Q   But he didn't tell him to hide it; he
24  told him to take it away; isn't that correct?

Page 79

1      A   To hide it outside of the engine room.
2      Q   Now, the chief engineer never told you to
3  lie to any Coast Guard or Government authorities, did
4  he?
5      A   Yes.  And in fact, we were called by the
6  second engineer that we should tell everything that
7  is of the truth, that the separator was not working.
8      Q   That's correct.
9      A   Yes.
10     Q   But the chief engineer -- you never
11  talked to the chief engineer about that, did you?
12     A   Yes.
13     Q   You agree?
14     A   Yes.
15     Q   Did you ever take soundings on the Irene?
16     A   In the bilge tank and in the sludge tank.
17     Q   And do you record those anywhere, those
18  soundings?
19     A   In a piece of paper, and I hand it over
20  to the chief engineer or to the engineer.
21     Q   Is there a blackboard in the engine room?
22     A   Yes, there is, but nothing is written on
23  it.
24     Q   You never write on it?

Page 80

1      A   No.
2      Q   At least you don't write on it.
3      A   Yes.
4          MR. WOODWARD:  Okay.  I have no
5  further questions.
6          THE VIDEOGRAPHER:  Off the record
7  at 11:58.
8          (Discussion held off the record.)
9          THE VIDEOGRAPHER:  We're on the
10  record at 12:01.  This is Tape 2 of Roberto
11  Damasing's deposition.
12         MR. WOODWARD:  I think, for the
13  record, we should have this document marked for
14  identification.
15         (Document marked CSMR Exhibit 28 for
16  identification.)
17  BY MR. WOODWARD:
18     Q   Mr. Damasing, do you recall when the
19  Coast Guard came on board the ship?
20     A   Yes.
21     Q   And that was in December of 2005?
22     A   Yes.
23     Q   Do you recall being asked by the Coast
24  Guard -- in fact, Mr. McKnight -- to write a

Corbett & Wilcox

Roberto Damasing

18 (Pages 81 to 84)

Page 81

1 statement?
2    A   Yes.
3    Q   And do you recall that Mr. McKnight
4 wanted you to be as truthful as possible about what
5 happened --
6    A   Yes.
7    Q   -- on the ship?
8        And this statement contained
9 everything you knew; correct?
10   A   Yes.
11   Q   And your memory of what happened was
12 fresher then, in December 2005, than it is now;
13 right?
14   A   I'm not really sure.
15   Q   Okay. Well, it was certainly closer in
16 time to the events in November of 2005 than it is
17 today; correct?
18   A   I don't know.
19   Q   You don't know. You don't know whether
20 December is closer in time to November off 2005 than
21 today is?
22   A   All right, sir.
23   Q   You agree with me that it is?
24   A   Yes.

Page 82

1    Q   Okay. I'm not trying to be hard with
2 you. I just want you to, you know, agree what's
3 pretty obvious. There's no trick here. All right?
4        Now, I want you to take a look at
5 this statement. Just read it to yourself.
6    A   All right, sir.
7    Q   There's nothing in this statement, is
8 there, about hiding -- an order to hide the magic
9 pipe, is there?
10   A   Yes.
11   Q   You agree with me that there is not such
12 a statement?
13   A   Yes.
14       MR. WOODWARD: Thank you. No
15 further questions.
16       MR. PHILLIPS: The Government is
17 going to -- was that moved into evidence?
18       MR. WOODWARD: No.
19       MR. PHILLIPS: The Government is
20 going to ask that that last defense exhibit be moved
21 into evidence to complete the record, since it was
22 referred to.
23       MR. WOODWARD: It doesn't mean that
24 there's a foundation for it. You can do what you

Page 83

1 want. We object.
2        MR. PHILLIPS: I'm going to take
3 what was marked as Defense Exhibit CSME 28.
4 BY MR. PHILLIPS:
5    Q   Mr. Damasing, is that your signature on
6 that?
7    A   Yes, sir.
8    Q   Do you recall writing that document?
9    A   Yes, sir, in the ship, in the bridge.
10   Q   Is that a true and accurate reflexion of
11 what you wrote on that date?
12   A   Yes.
13   Q   Has it been modified in any way?
14   A   No.
15       MR. PHILLIPS: And the Government
16 is going to move that this exhibit, CSME 28, be moved
17 into evidence as -- I guess it would be Government
18 Exhibit -- it was marked as a CSME exhibit for
19 identification. The Government is going to move that
20 it be placed into evidence as a Government Exhibit,
21 whatever the next number is.
22       MR. CHALOS: I think it's
23 Government 4.
24       (Document marked CSMR Exhibit 28

Page 84

1        moved into evidence.)
2        MR. PHILLIPS: Thank you.
3        MR. WOODWARD: Objection.
4        MR. CHALOS: I object as well.
5        RE-DIRECT EXAMINATION
6 BY MR. PHILLIPS:
7    Q   And Mr. Damasing, you were asked by both
8 Mr. Woodward and also Mr. Chalos about Second
9 Engineer Villano.
10       Do you remember speaking to Villano
11 on the trip from Brazil to the United States?
12       MR. CHALOS: Objection; leading.
13       THE WITNESS: No longer.
14 BY MR. PHILLIPS:
15   Q   You don't remember?
16   A   Whatever it was that we were talking
17 about. I can't remember.
18   Q   Do you remember testifying before a Grand
19 Jury in January of 2006?
20       MR. CHALOS: I object for -- hold
21 on one second.
22       I object, because I don't think
23 there's any record that cross-examination ever
24 explored discussions between this witness and Second

Roberto Damasing

19 (Pages 85 to 88)

Page 85

1  Engineer Villano.
2          MR. WOODWARD: It goes beyond the
3  scope of cross-examination. Go ahead.
4  BY MR. PHILLIPS:
5      Q   Do you recall testifying before the Grand
6  Jury?
7      A   Yes.
8      Q   And we are on January 12th, Page 14 into
9  15. I'm going to ask that the interpreter read to
10 you.
11         MR. WOODWARD: What lines do you
12 want read?
13         MR. PHILLIPS: I've marked them.
14 And, Mr. Interpreter, can I --
15         MR. WOODWARD: Can I ask what they
16 are?
17         MR. PHILLIPS: -- can I see it so I
18 can see exactly which line it is; and then you'll
19 know, Mr. Interpreter.
20         It's on Page 14, starting at
21 Line 8; and then through to Page 15, ending on
22 Line 10.
23         MR. TWERSKY: I'd ask that the
24 interpreter read beginning on Page 13, Line 3, to

Page 86

1  give context to the gentleman, who doesn't speak the
2  language. And the Grand Jury testimony was in
3  January. So that's what I'd ask.
4          MR. PHILLIPS: That's fine.
5          THE INTERPRETER: 13, Line 3?
6          MR. TWERSKY: Yeah, begin there,
7  please.
8          MR. WOODWARD: I'm going to -- just
9  a minute. I'm going to object. This is again beyond
10 the scope of cross-examination. Furthermore, it's
11 not clear what this is being done for. Why is the
12 witness being asked to re-read his Grand Jury
13 testimony?
14         MR. PHILLIPS: Because he said he
15 didn't remember speaking with Villano.
16         But go ahead; the objection is on
17 the record.
18         (Whereupon the requested portions of
19         transcript were read by the interpreter
20         in Tagalog to the witness.)
21         MR. PHILLIPS: Thank you.
22 BY MR. PHILLIPS:
23     Q   Mr. Villano, does that help you remember?
24     A   Yes.

Page 87

1          MR. PHILLIPS: And for the record,
2  this also goes to the questions from Mr. Chalos about
3  how Mr. Damasing received orders to pump overboard.
4          MR. CHALOS: Objection. I never
5  asked any questions about that.
6  BY MR. PHILLIPS:
7      Q   Mr. -- I'm sorry. Mr. Damasing, this
8  Grand Jury testimony was closer in time to the
9  conversation you had with Second Engineer Villano
10 than today; correct?
11         MR. CHALOS: Objection -- one
12 second. Objection.
13         I mean, this is an improper attempt
14 to put into evidence Grand Jury testimony which, in
15 and of itself, is inadmissible based on the form of
16 questions that were posed there. My objection is the
17 question is also improper as to form, leading, and --
18         MR. WOODWARD: Same objections.
19         MR. CHALOS: -- I can't think of
20 any more.
21 BY MR. PHILLIPS:
22     Q   Now, Mr. Damasing, what did Second
23 Engineer Villano say to you on that trip from --
24         MR. WOODWARD: Objection; hearsay.

Page 88

1          MR. PHILLIPS: Let me rephrase.
2  BY MR. PHILLIPS:
3      Q   When you spoke to Villano, what was the
4  conversation about?
5          MR. WOODWARD: Objection; hearsay.
6          MR. CHALOS: Hearsay.
7          THE WITNESS: I don't exactly
8  remember what was said, but that we should pump out
9  BY MR. PHILLIPS:
10     Q   What did you do as the result of talking
11 with Mr. Villano?
12         MR. CHALOS: Objection; leading.
13         THE WITNESS: When he told me, he
14 told me --
15         MR. WOODWARD: Objection; hearsay.
16 Go ahead.
17 BY MR. PHILLIPS:
18     Q   And -- I'll stop you.
19         What did you do after talking to
20 Mr. Villano?
21         MR. CHALOS: Objection; hear --
22 leading.
23 BY MR. PHILLIPS:
24     Q   What did you do?

Roberto Damasing

20 (Pages 89 to 92)

Page 89

1          MR. CHALOS: And it's "if
2 anything"; right?
3          MR. PHILLIPS: If anything.
4          THE WITNESS: I think he asked me
5 to attach the --
6          MR. WOODWARD: Objection; hearsay.
7          THE WITNESS: -- the magic hose.
8 BY MR. PHILLIPS:
9    Q    Pay attention to my question if you can.
10         After you talked to the second
11 engineer, what did you do, if anything? Not what he
12 asked you: What did you do?
13   A    I don't remember.
14   Q    We just talked -- you have just said that
15 this helped you remember --
16         MR. CHALOS: Objection. He says --
17 one second.
18         You showed it to him because he
19 said he didn't recall the substance of the
20 discussion.
21         MR. PHILLIPS: That's right.
22         MR. CHALOS: Nothing about what he
23 did. He hasn't even testified he did anything. In
24 fact, he told you he didn't do anything.

Page 90

1 BY MR. PHILLIPS:
2    Q    Mr. Damasing, on the trip from Brazil to
3 the United States, do you remember speaking with the
4 chief engineer?
5    A    No. We just met each other.
6          MR. WOODWARD: Objection; asked and
7 answered.
8 BY MR. PHILLIPS:
9    Q    What did he say?
10   A    That we could go ahead and pump out.
11   Q    And did you?
12   A    No.
13   Q    Mr. Damasing, I'm going to read from what
14 you just read --
15         MR. CHALOS: Objection. It's
16 improper use of prior testimony. He didn't testify
17 that he doesn't remember.
18         MR. PHILLIPS: This is what he read
19 to improve his recollection.
20         MR. WOODWARD: I'm going to object
21 to reading into the record his Grand Jury testimony.
22         MR. PHILLIPS: Object, and I'm
23 going to read it.
24 BY MR. PHILLIPS:

Page 91

1    Q    "Did Dragomir ever personally order you
2 to discharge overboard?
3         "Answer: Yes, sir.
4         "Question: When did he do that?
5         "Answer: It was three days after we
6    left Brazil, sir.
7         "And what did he say to you?
8         "Answer: That I must have to pump out
9    bilges overboard.
10        "Question: And when you pumped out
11   the bilges, was the bilge tank -- was it
12   more or less than half full?
13        "Answer: Full, sir."
14        And the question to you back then
15 was, "And how far did you pump it down?"
16        Your answer was "Empty, sir."
17        Is that what you recall testifying
18 to?
19        MR. CHALOS: Objection.
20        THE WITNESS: I'm just confused
21 when you ask me that question, because there were
22 also other engineers that I had worked with on
23 previous occasion that had asked me a similar.
24 BY MR. PHILLIPS:

Page 92

1    Q    Did you pump the bilges out?
2         MR. CHALOS: Objection; asked and
3 answered, beyond the scope of cross.
4         THE WITNESS: Yes.
5 BY MR. PHILLIPS:
6    Q    And how much did you pump out?
7         MR. WOODWARD: Asked and answered.
8         THE WITNESS: Whatever the contents
9 of the tank is.
10 BY MR. PHILLIPS:
11   Q    Thank you.
12        Okay. Now, going back to a
13 question -- I know this can be confusing.
14        Going back to a question that
15 Mr. Chalos asked about the company's environmental
16 protection policies, he asked, "The company was
17 serious about environmental protection?"
18        And you answered, "Yes."
19   A    Yes.
20   Q    Did the company have a working oily water
21 separator on the Irene?
22        MR. CHALOS: Objection; no
23 foundation.
24        THE WITNESS: They have an oily

Page 93

1  water separator. It was working, but it's not
2  functioning properly.
3  BY MR. PHILLIPS:
4      Q  So did they have a properly functioning
5  oily water separator?
6          MR. CHALOS: Objection; leading.
7          MR. WOODWARD: Also, no --
8          THE WITNESS: Yes.
9  BY MR. PHILLIPS:
10     Q  Which is it? Did they have a working
11  oily water separator?
12         MR. CHALOS: Objection; asked and
13  answered.
14         MR. PHILLIPS: He's answered two
15  things.
16         THE WITNESS: No.
17  BY MR. PHILLIPS:
18     Q  Now, how did the company handle garbage
19  on the Irene?
20         MR. CHALOS: Objection; beyond --
21         MR. WOODWARD: Beyond the scope of
22  direct.
23         MR. PHILLIPS: This goes to
24  environmental protection practices.

Page 94

1          MR. CHALOS: Well, objection; lack
2  of foundation. He has no responsibility for garbage.
3          MR. PHILLIPS: How do we know?
4  BY MR. PHILLIPS:
5      Q  Did you observe garbage on the Irene?
6          MR. CHALOS: Objection.
7          THE WITNESS: We would collect it,
8  and then we throw it out to sea.
9  BY MR. PHILLIPS:
10     Q  Why didn't you burn it in the
11  incinerator?
12         MR. CHALOS: Objection.
13         MR. WOODWARD: Objection.
14         MR. CHALOS: Come on.
15         MR. WOODWARD: No foundation.
16         THE WITNESS: We don't have an
17  incinerator.
18  BY MR. PHILLIPS:
19     Q  So the company didn't have an
20  incinerator?
21         MR. CHALOS: Objection.
22         THE WITNESS: Yes.
23         MR. CHALOS: It's like chasing
24  rabbits a hole, man.

Page 95

1  BY MR. PHILLIPS:
2      Q  Based on that testimony, I'll repeat the
3  question: Was the company serious about
4  environmental protection?
5      A  I don't know.
6      Q  Okay. You were asked about language by
7  Mr. Chalos.
8          How many other ships have you been
9  on before the Irene?
10     A  A lot.
11     Q  Were the crew always Filipino?
12     A  Not always. It's mixed.
13     Q  Were the engineers always Filipino?
14     A  No, it's mixed.
15     Q  And how did you communicate?
16     A  On a simple English.
17     Q  Now, when you were asked whether or not
18  you were detained by the Government, did you stay in
19  a jail?
20         MR. CHALOS: Objection.
21         THE WITNESS: No.
22  BY MR. PHILLIPS:
23     Q  Where did you stay?
24     A  In a hotel.

Page 96

1      Q  Did you have to stay inside the hotel?
2      A  No.
3      Q  Were you getting paid by the company?
4      A  Yes.
5      Q  And Mr. Woodward asked you about illegal
6  practices that started with Mr. Tomondong. And you
7  said when Chief Engineer Dragomir came on board, you
8  didn't tell him about the illegal practices.
9      A  Yes.
10     Q  Why?
11     A  We don't have this conversation like
12  that. Because I'm just a low and an average worker.
13  Usually it should be the engineers that are having a
14  conversation with him.
15     Q  Okay. That's fair.
16         And finally, Mr. Woodward asked you
17  about soundings.
18         Did you ever do a sounding on the
19  bilge tank during the voyage from Brazil to the
20  United States?
21     A  Yes.
22     Q  And how many times?
23     A  Almost every time that I'm on duty.
24     Q  And who did you tell about the soundings?

Roberto Damasing

22 (Pages 97 to 100)

Page 97

1    A  To the duty engineer that I'm with.
2    Q  Why did you do that?
3    A  That's what we do. That's what we
4  normally do. We check on the reading of the tank so
5  that we know if there's any water that may have
6  entered; or hopefully there's not any water.
7    Q  Okay. Do you remember how much the
8  soundings read, how much was in the tanks?
9    A  I don't really exactly remember what the
10  contents were, but then I can tell you that they were
11  full.
12    Q  Always full?
13        MR. CHALOS: Objection.
14        THE WITNESS: I don't really
15  remember.
16  BY MR. PHILLIPS:
17    Q  Do you recall if they were ever empty --
18  if the bilge tank was ever empty?
19    A  Yes.
20    Q  When?
21    A  After we pump out.
22        MR. PHILLIPS: Okay. Thank you.
23  No further questions.
24        RE-CROSS EXAMINATION

Page 98

1  BY MR. CHALOS:
2    Q  Mr. Damasing, let's get a couple things
3  cleared up here, if we can.
4        You never reported to Venetico
5  Marine the practices you told Mr. Phillips that
6  Mr. Tomondong was employing with respect to disposal
7  of oily waste, did you?
8    A  No, I did not tell him.
9    Q  And you didn't tell Chian Spirit about
10  Tomondong's practices, did you?
11    A  No, I did not.
12    Q  And you didn't tell the captain of the
13  ship about that either, did you?
14    A  Yes.
15    Q  Okay. Now, let's go back to the oily
16  water separator.
17        At the time you were on board the
18  Irene E.M., you were not authorized to operate the
19  oily water separator; right?
20        THE INTERPRETER: I'm sorry. What
21  was that?
22  BY MR. CHALOS:
23    Q  You were not authorized to operate it.
24    A  That's right.

Page 99

1    Q  And you were not authorized to make any
2  repairs to it.
3    A  Yes.
4    Q  And you were not authorized to maintain
5  it.
6    A  Yes.
7    Q  And you were not authorized to either
8  turn it on or turn it off.
9    A  Yes.
10    Q  And you made no decisions about whether
11  or not it should be used.
12    A  Yes.
13    Q  And you made no decisions about whether
14  or not it was capable of being used.
15    A  Yes.
16    Q  So the answers that you gave Mr. Phillips
17  about the oily water separator are based solely on
18  things that either you're guessing about or someone
19  else told you; right?
20    A  No, I know that it's not functioning.
21    Q  Okay. And you know that because someone
22  told you; right?
23    A  No, I see it.
24    Q  Now, you said that you were disposing

Page 100

1  some garbages into the sea; right?
2    A  Yes.
3    Q  Now, the garbage that went into the sea,
4  from your experience, is legal; right?
5    A  Illegal.
6    Q  Illegal. The garbage was separated on
7  board the ship, was it not?
8    A  Based on the law, that's what it should
9  be done.
10    Q  And plastics are retain on board; right?
11    A  Yes.
12    Q  And oil is supposed to be retained on
13  board?
14    A  Yes.
15    Q  But biodegradable materials can go into
16  the sea?
17    A  Yes.
18    Q  Now, you said that you communicated with
19  other crew members that were not Filipino in simple
20  English; right?
21    A  Yes.
22    Q  But you communicated with the Filipino
23  crew members in Tagalog?
24    A  Oh, yes.

Roberto Damasing

23 (Pages 101 to 104)

Page 101

1    Q   And so after the ship was detained in the
2   United States, there was a meeting held by the second
3   engineer with all the Filipinos; right?
4    A   No, there wasn't.
5    Q   You just told Mr. Phillips that the
6   second engineer called everybody together. Remember
7   that? Yes?
8    A   I said, but it was -- but we were still
9   in the ship at that time.
10   Q   That's my -- okay. Let me make sure I
11  understand.
12          After the ship was in the United
13  States and after the Coast Guard came on board,
14  Second Engineer Villano called the meeting for all
15  the Filipino crew members; right?
16   A   Yes.
17   Q   And at that meeting he told you various
18  things; correct?
19   A   Yes. What he told us was that we should
20  tell the Coast Guard that the oily water separator
21  was really not working.
22   Q   So if I understand you correctly, you're
23  telling us now that the second engineer told you what
24  to tell the Coast Guard; right?

Page 102

1    A   No.
2    Q   Well, the second engineer is the guy that
3   told you that the separator wasn't working; right?
4   You just told us that.
5          MR. PHILLIPS: Objection; hearsay.
6          THE WITNESS: What he told us was
7   that it was not functioning. That's coming from the
8   chief engineer.
9   BY MR. CHALOS:
10   Q   Okay. But you learned that the oily
11  water separator wasn't functioning from the second
12  engineer at this meeting; right? Second engineer
13  told you?
14          MR. PHILLIPS: Again, objection;
15  hearsay.
16          THE WITNESS: Since the beginning,
17  when I boarded the ship, it was not functioning.
18          MR. CHALOS: I move to strike the
19  answer, because --
20  BY MR. CHALOS:
21   Q   Listen to my question. You had this
22  meeting on board the ship; right?
23   A   Yes.
24   Q   And at the meeting, the second engineer

Page 103

1   told you what to tell the Coast Guard about the oily
2   water separator; right?
3    A   Yes.
4    Q   What he told you was to tell the
5   Government that it wasn't working; right?
6    A   Yes.
7    Q   Okay. Now, you told us -- and that
8   meeting was held only with the Filipinos there;
9   right?
10   A   Yes.
11   Q   And that meeting was in your native
12  language; right?
13   A   Yes.
14   Q   Okay. Now, the chief engineer wasn't
15  there, was he?
16   A   Yes.
17   Q   Now, he's the boss of all the engineers;
18  right?
19   A   Yes.
20   Q   And the captain wasn't there; right?
21   A   Yes.
22   Q   And he's the boss of the ship; right?
23   A   Yes.
24   Q   And no one from the manager, Chian

Page 104

1   Spirit, was present, for that meeting; right?
2    A   Yes.
3    Q   And that's the manager of the ship;
4   right?
5    A   Yes.
6    Q   And no one from Venetico Marine was
7   present; right?
8    A   Yes.
9    Q   And that's the owner of the ship?
10   A   Yes.
11   Q   Now, Mr. Phillips asked you whether or
12  not you stayed in jail; right?
13          THE INTERPRETER: I'm sorry?
14  BY MR. CHALOS:
15   Q   Mr. Phillips asked you whether or not you
16  were staying in jail.
17   A   Yes.
18   Q   Now, there were no bars on your hotel;
19  right?
20   A   Yes.
21   Q   But could you come and go from the United
22  States as you would like?
23   A   Yes.
24   Q   You could leave the United States?

Roberto Damasing

24 (Pages 105 to 108)

Page 105

1      A   No.
2      Q   Why not?
3      A   Because we were detained.
4      Q   By whom?
5      A   By the U.S. Coast Guard.
6      Q   Okay. Now, for eight months that you
7   were here, you weren't able to see your family, were
8   you?
9      A   Yes, through the telephones only.
10     Q   My question was, you weren't able to go
11  visit your family.
12     A   Yes.
13     Q   You weren't able to go see your friends
14  back home, were you?
15     A   Yes.
16     Q   You weren't able to go get a job, were
17  you?
18     A   Yes.
19     Q   When you say "yes," you agree with me?
20     A   Yes. Yes.
21     Q   And you weren't able to work while you
22  were here?
23     A   Yes.
24     Q   You weren't able to see your friends?

Page 106

1      A   Yes, we can see our friends.
2      Q   And that's the other crew members, you
3   mean?
4      A   Yeah.
5      Q   And you weren't able to see your family?
6      A   I don't have any family here.
7      Q   So then the answer is, you weren't able
8   to see your family in the last eight months?
9      A   Yes.
10     Q   Now, if -- during the time you were here,
11  the company paid for your hotel; right?
12     A   Yes.
13     Q   And they paid for your meals; right?
14     A   Yes.
15     Q   And they paid your salary; right?
16     A   Yes.
17     Q   And if they didn't do that, you would
18  have had nowhere to stay; right?
19     A   Yes.
20     Q   You would have had nothing to eat?
21     A   Yes.
22     Q   And you would have had no money?
23     A   Yes.
24     Q   And no ability to make money, because you

Page 107

1   couldn't work.
2      A   Yes.
3          MR. CHALOS: Nothing further.
4          RE-CROSS EXAMINATION
5   BY MR. WOODWARD:
6      Q   Mr. Damasing, when you did the soundings,
7   the bilge holding tank was very large, wasn't it?
8          MR. PHILLIPS: Objection; asked and
9   answered.
10         THE WITNESS: Yes.
11  BY MR. WOODWARD:
12     Q   And it was always full when you sounded
13  it?
14     A   No.
15     Q   In fact, most of the time it was less
16  than half full, wasn't it?
17     A   Perhaps.
18     Q   Okay. And the sludge tank was very
19  difficult to get an accurate reading, wasn't it?
20     A   Yes.
21     Q   And the reason was?
22         MR. PHILLIPS: Objection; no
23  foundation for him saying that he sounded the sludge
24  tank.

Page 108

1          MR. WOODWARD: Let the record
2   reflect whatever it reflects, but I believe he was
3   already asked about that.
4   BY MR. WOODWARD:
5      Q   But with respect to the sludge tank, the
6   reason that it was difficult to get an accurate
7   reading was why?
8      A   Because there is something that's in the
9   bottom of it.
10     Q   You mean the thick -- the sludge is
11  thick?
12     A   Yes.
13     Q   It's too thick?
14     A   It's not really that thick, but it is
15  thick.
16     Q   Okay. But what was it that prevented you
17  from taking an accurate reading of the sludge tank?
18     A   Sometimes it hits the metal portion and
19  it wouldn't go down straight.
20     Q   Okay. Now, when you appeared in front of
21  the Grand Jury, there was an interpreter there;
22  right?
23     A   Yes.
24     Q   But you answered all the questions

Roberto Damasing

## Page 109

1  yourself; isn't that right?
2      A   Yes.
3      Q   The interpreter did not translate for
4  you; isn't that correct?
5      A   There were some portions that he
6  translated for me.
7      Q   But you did the best you could without
8  the translator?
9      A   Yes.
10          MR. WOODWARD:  No further
11 questions.
12      FURTHER RE-DIRECT EXAMINATION
13 BY MR. PHILLIPS:
14      Q   Mr. Damasing, were you trained on how to
15 handle garbage on a ship?
16          MR. CHALOS:  Objection.
17          THE WITNESS:  Yes.
18 BY MR. PHILLIPS:
19      Q   Was the garbage on the Irene handled
20 properly?
21          MR. CHALOS:  Objection.
22          THE WITNESS:  No.
23 BY MR. PHILLIPS:
24      Q   Explain.

## Page 110

1          MR. WOODWARD:  Objection.
2          THE WITNESS:  All the garbage is
3  collected.  It's not separated.  That's all.
4  BY MR. PHILLIPS:
5      Q   What's done with it after that?
6          MR. CHALOS:  Objection.
7          THE WITNESS:  It's thrown out to
8  the sea.
9  BY MR. PHILLIPS:
10      Q   Now, you testified that you were getting
11 paid by the company while you were here.
12      A   Yes.
13      Q   That's why you stayed in the United
14 States; correct?
15          MR. CHALOS:  Objection.
16          THE WITNESS:  Could you repeat
17 that.
18 BY MR. PHILLIPS:
19      Q   Would you get paid if you left the United
20 States?
21          MR. CHALOS:  Objection.
22          MR. WOODWARD:  Speculative.
23          THE WITNESS:  I'm not really sure.
24 BY MR. PHILLIPS:

## Page 111

1      Q   You were here because the company told
2  you this was your place to be; correct?
3          MR. CHALOS:  Objection.
4          THE WITNESS:  That I don't know.
5  BY MR. PHILLIPS:
6      Q   You were here under an agreement between
7  your company and the Coast Guard; correct?
8          MR. CHALOS:  Objection.
9          THE WITNESS:  Yes.
10 BY MR. PHILLIPS:
11      Q   Okay.  Now, when you are out to sea, do
12 you visit your family?
13      A   No.
14      Q   How long are your contracts usually for?
15      A   Ten months plus three, both party
16 consents.
17      Q   And during that contract time, how much
18 is spent at sea?
19      A   In this particular ship -- in one voyage,
20 you're asking me?
21      Q   No, during the contract.
22      A   On the full contract.
23          MR. PHILLIPS:  Okay.  No further
24 questions.  Thank you.

## Page 112

1          MR. CHALOS:  Mr. Damasing, we're
2  going to have another --
3          MR. TWERSKY:  Can we go off the
4  record for a second?
5          MR. CHALOS:  Can we finish?  If
6  we're going to have --
7          MR. PHILLIPS:  Redirect is usually
8  the end; right?
9          MR. KOTILA:  No, you can keep
10 going.  You got questions, ask him.
11          MR. CHALOS:  We had a direct; a
12 cross; we had a redirect; we had a recross; then we
13 re-redirect.
14          MR. KOTILA:  No objection.  Ask
15 your questions.
16          MR. PHILLIPS:  Go ahead.
17      FURTHER RECROSS-EXAMINATION
18 BY MR. CHALOS:
19      Q   Mr. Damasing, garbage was -- on board the
20 Irene E.M., you didn't have any responsibility for
21 the handling of the garbage, did you?
22      A   Yes.
23      Q   Okay.  And so then you know that garbage
24 was disposed of every time the ship came into port;

Roberto Damasing

26 (Pages 113 to 116)

Page 113

1  right?
2      A   Yes.
3      Q   And the company paid for the disposal to
4  the shore facilities; right?
5      A   Yes.
6      Q   Now, Mr. Phillips asked you about an
7  agreement between the company and the Coast Guard;
8  right? You weren't a party to that agreement?
9      A   I was not there.
10     Q   And the company has no right to bargain
11  away your rights; right?
12     A   Yes.
13     Q   The Coast Guard wants you here.
14     A   Yes.
15     Q   And that's why you're here?
16         MR. PHILLIPS:  Objection; asked and
17  answered.
18         THE WITNESS:  Yes.
19  BY MR. CHALOS:
20     Q   Okay. Let's talk about the time that you
21  go to sea; all right? Mr. Phillips asked if you see
22  your family when you're at sea, and you said no;
23  right?
24     A   No. No.

Page 114

1      Q   But when your ship came here to Delaware,
2  you had already been gone from home for how long?
3      A   Eleven months.
4      Q   And then you've been here for another
5  eight months?
6      A   Yes.
7      Q   So it's been at least 19 months since
8  you've seen your family?
9      A   Yes.
10     Q   And you want to go home; right?
11     A   Yes.
12         MR. CHALOS:  Okay. Nothing
13  further. Thank you.
14         MR. PHILLIPS:  Nothing further.
15         MR. WOODWARD:  Nothing further.
16         THE VIDEOGRAPHER:  Off the record
17  at 12:44.
18         (Signature having been waived, the
19         deposition of ROBERT DAMASING,
20         Volume 2 was concluded at 12:44
21         p.m.)
22
23
24

Page 115

1              I N D E X
2  WITNESS:                          PAGE
3  ROBERT DAMASING, VOLUME 2
4      Mr. Phillips              19
5      Mr. Chalos               46
6      Mr. Woodward             71
7      Mr. Phillips             84
8      Mr. Chalos               97
9      Mr. Woodward            107
10     Mr. Phillips            109
11     Mr. Chalos              112
12
13
14          E X H I B I T S
15  CSMR          DESCRIPTION        PAGE
16  23    Documents relating to employment   51
        of Mr. Damasing
17
    24    Photocopy of seaman's book and   51
18       passport of Mr. Damasing
19  25    Certificates relating to        51
        Mr. Damasing's training
20
    26    Physical and mental test results  51
21       for Mr. Damasing
22  27    Declaration of Mr. Damasing       51
23  28    Handwritten statement of          80
        Mr. Damasing (also marked as
24       Government Exhibit No. 4)

Page 116

1      EXHIBITS MOVED INTO EVIDENCE
2  CSMR Exhibit No.             PAGE
3      23                54
4      24                54
5      25                58
6      26                59
7      27                67
8
9
   Government Exhibit No.       PAGE
10
11     4                83
12
13
14
15
16
17
18
19
20
21
22
23
24

Roberto Damasing

Page 117

1    CERTIFICATE OF SHORTHAND REPORTER
2
3         I, Gail Inghram Verbano, CSR, RMR,
4    the officer before whom the foregoing proceedings
5    were taken, do hereby certify that the foregoing
6    transcript is a true and correct record of the
7    proceedings; that said proceedings were taken by me
8    stenographically and thereafter reduced to
9    typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16   _____
     Gail Inghram Verbano, CSR, RMR
17   CSR No. 8635
     Certification No.: 220
18   (Expires 1-31-2008)
19
20
21
22
23
24

Corbett & Wilcox

# EXHIBIT B

DEC 08 2005

I ROBERTO O DAMASING MARRIED FILIPINO JOINED ONBOARD LAST DEC. 22 2004 CHINA THAT I AM AWARE OF PUMPING OUT OF BILGE WATER TANK AS WILL AS SLUDGE TANK USING A BILGE PUMP THROUGH A PLASTIC HOSE THAT WILL HOSE EVERY TIME WE DEPART THE PORT TO PUMP OUT BILGE WATER TANK AND SLUDGE TANK.

THIS IS DONE WITH THE CHIEF ENGINEERS ORDER TO 2ND ENGINEER THAT HE IS ALSO TELL TO AS OILER. TO PUMP OUT.

SOME TIMES CHIEF ENGR TELL ALSO PERSONALLY TO PUMP OUT BILGE.

IM ELEVEN MONTHS ONBOARD BUT THIS BILGE OIL SEPARATOR WAS NOT USE DURING PUMPING OUT. THIS USE ONLY FOR THE PORT AUTHORITY IF THEY LIKE TO SEE IF IT WAS WORKING AND TO HEAR THE ALARM OF THE PPM.

ROBERTO O DAMASING
OILER

GOVT
EXHIBIT NO. 4
7-17-06

EXHIBIT NO. 28
CSME 8a
7-17-06