IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X

UNITED STATES OF AMERICA

Plaintiff,

Criminal Action No. 06-76 (GMS)

v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et al.*

Defendants.

---------------------------------------------------------------X

### DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC. AND VENETICO MARINE, S.A.'s, OBJECTIONS AND REQUEST FOR PRETRIAL RULINGS AS TO THE ADMISSIBILITY OF THE FOLLOWING PORTIONS OF THE RULE 15 DEPOSITION TESTIMONY OF BRYAN ESPINA.

**COME NOW,** moving defendants, Venetico Marine, S.A. ("Venetico") and

Chian Spirit Maritime Enterprises, Inc. ("CSME")(collectively, "Moving Defendants"),

who respectfully request that this Honorable Court consider and rule, before the voir dire

of the jury panel, and out of the presence and hearing of the jury panel, as to the

admissibility of the following Rule 15 deposition testimony by Bryan Espina, which the

Government has stated it will seek to introduce at trial.[1]

Specifically, Moving Defendants object to the admissibility of the following

deposition testimony by Bryan Espina, the "Fourth Engineer" on board the M/V IRENE

E., on the following grounds.  For the Court's ready reference, a correct and true copy of

the transcript of the Rule 15 deposition of Mr. Espina, conducted at the office of the

---

[1] For the Court's ready reference, Moving Defendants advise that in order to facilitate the deposition process, counsel for all parties agreed to expressly reserve making objections during the examination.

1

United States Attorney, 700 Nemours Building, 1007 Orange Street, Wilmington,

Delaware, on Monday, July 17, 2006 and Tuesday, July 18, 2006, is attached hereto as

Exhibit "A".

### Bryan Espina  (Fourth Engineer)

Moving Defendants respectfully submit that during the Rule 15 deposition

examination, Mr. Espina clearly, concisely and unambiguously testified, in sum and

substance, that he never personally worked on, with and/or had any functional

responsibility or role with respect to the operation of the vessel's oily water separation

equipment.

Specifically, Mr. Espina, testified, *inter alia*, in pertinent part, to the following:

*Q  After you got on board the Irene E.M., were you ever asked to operate the oily water*
   *separator?*
*A  No.*
*Q  Okay.  So it's fair to say that since the time you got on board the Irene E.M., you had*
   *no responsibility for the operation of the oily water separator?*
*A  None.*
*Q  Okay. You don't have any responsibility to maintain the oily water separator, do you?*
*A  If I am asked to do it.*
*Q  But you weren't asked?*
*A  The second engineer just asked me to familiarize myself because I was new.*
*Q  Okay.  But the second engineer never asked you to actually operate it, did he?*
*A  No.*
*Q  Okay.  And you don't have – you weren't asked to make any repairs to the oily water separator, were you?*
*A  They asked me to clean it.*
*Q  Okay.  The only thing they did was ask you to clean it, right?*
*A  Yes.*
*Q  They didn't ask you to test it?*
*A  No.*
*Q  So when you told Mr. Kotila that the oily water separator didn't work, the only way you know that is because someone else told you that; right?*
*A.  I know that it wasn't working. I saw the second engineer trying to work on it.*

*Q  Okay. But you yourself didn't try to work on it?*
*A  I just cleaned it.*
*Q  So the answer is no, you didn't work on it?*
*A  No.*

See Exhibit "A." *Transcript at Page 44/line 7 through Page 45/line 24.*

In view of the foregoing, Moving Defendants object to the introduction of the following testimony, as it lacks sufficient foundation; calls for speculation; calls for strictly inadmissible hearsay responses; assumes facts not in evidence and, if admitted, would be unfairly prejudicial, confusing and otherwise misleading to the trier of fact:

Page 13/line 18 – Page 14 line 2.

As for Mr. Espina's testimony concerning the purported oil record book and its contents, Mr. Espina, testified, *inter alia*, in pertinent part, to the following:

*Q  Okay. Now, Mr. Kotila showed you a book before ---for the record, I'll identify it as Government's Exhibit No. 1 – and you said you recognize this as an oil record book; right?*
*A  Yes.*
*Q  On board the Irene E.M., you didn't maintain the Oil Record Book, did you?*
*A  No.*
*Q  In fact, you never wrote in it, ever?*
*A  No.  nothing.*
*Q  So none of the handwriting in there is yours?*
*A  None.*
*Q  And, in fact, you have no responsibility to write in that book at all?*
*A  Nothing.*
*Q  Before the Government showed it to you, Mr. Espina, you never saw the contents of that book, did you?*
*A  I didn't see it.*
*Q  So the first time that you saw it was when the Government showed it to you; right?*
*A  Yes, at this time.*
*Q  Because the oil record book is not part of the fourth engineer's job; right?*
*A  You're correct.*

See Exhibit "A." *Transcript at Page 46/line1 through Page 47/line 2.*

3

In view of the foregoing, Moving Defendants object to the introduction of the following testimony, as it lacks sufficient foundation; calls for speculation; calls for strictly inadmissible hearsay responses; assumes facts not in evidence and, if admitted, would be unfairly prejudicial, confusing and otherwise misleading to the trier of fact:

Page 16/line 4 – Page 17/line14

Additionally, Moving Defendants object to the following testimony on the following grounds

Page 5/ line 18 – Page 6/line 4 (relevance);
Page 12/line 13 – Page 13/line 2 (relevance);
Page 14/line 18 - Page 16/line 21 (relevance, foundation, hearsay, best evidence rule; calls for speculation);
Page 19/lines 8 -16 (leading; lack of foundation);
Page 20/ lines 14 – 20 (leading; lack of foundation);
Page 21/lines 14-16 (leading; incomplete; no response from witness);
Page 23/line 24 – Page 25/line 20 (hearsay, foundation, best evidence rule; calls for speculation);
Page 63/line 18 – Page 64/line 1 (leading);
Page 65/lines 4-9 (foundation, leading, calls for speculation, and impermissibly calls for a legal conclusion);
Page 65/line 24 – Page 66/line 2 (lack of foundation, hearsay; leading, Impermissibly calls for speculation, assumes facts not in evidence); and
Page 66/line 22 – Page 6/line 5 (calls for speculation).

4

## **CONCLUSION**

For the reasons more fully set forth above, Moving Defendants respectfully request that this Honorable Court issue an Order:

(1)  Granting Moving Defendants' application to exclude, either in its entirety or to the extent the Court finds just and proper, the foregoing objectionable portions of the Rule 15 deposition testimony for the reasons more fully set forth above; and

(2)  For any and all such other and further relief which the Court deems to be just and proper under the specific circumstances of this matter.

Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

## CERTIFICATE OF SERVICE

I do hereby certify that, on this  6th day of November 2006, I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:

United States Department of Justice
U.S. Attorney's Office
Nemours Building
1007 N. Orange Street, Suite 700
Wilmington, Delaware  19801
Attn:  Edmond Falgowski, Esq.

United States Department of Justice
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Street
Washington, D.C. 20026
Attn:  Gregory Linsin, Esq.
        Jeffrey Phillips, Esq.
        Tracy Katz, Esq.

Respectfully submitted,

By:  George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

6

# EXHIBIT A

Bryan Espina

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

UNITED STATE OF AMERICA,          :
                                  : No.
         Plaintiff,               : 1:06-CR-00076-GMS-2
                                  :
            vs.                   :
                                  :
CHIAN SPIRIT MARITIME             :
ENTERPRISES, INC., VENETICO       :
MARINE S.A., IRENE E/M,           :
EVANGELOS MADIAS, CHRISTOS        :
PAGONES, ADRIEN DRAGOMIR,         :
                                  :
         Defendants.              :


- - -

              Videotaped deposition of BRYAN
ESPINA, taken pursuant to notice before Gail Inghram
Verbano, CSR, RMR, in the offices of United States
Department of Justice, 700 Nemours Building, 1007
Orange Street, Wilmington, Delaware, on Tuesday,
July 18, 2006, beginning at approximately 4:43 p.m.



- - -

                CORBETT & WILCOX
          Registered Professional Reporters
    1400 French Street      Wilmington, DE 19801
                (302) 571-0510
             www.corbettreporting.com

Bryan Espina

2 (Pages 2 to 5)

## Page 2

```
 1  APPEARANCES:
 2     MARK W. KOTILA, ESQ.
        JEFFREY L. PHILLIPS, ESQ.
 3     United States Department of Justice
        Environmental Crimes Section
 4     P.O. Box 23985 - L'Enfant Plaza
        Washington, DC 20026-3985
 5        Attorneys for Plaintiff
 6     GEORGE M. CHALOS, ESQ.
        FOWLER, RODRIGUEZ & CHALOS
 7     366 Main Street
        Port Washington, NY 11050
 8        Attorney for Defendants Chian Spirit
          and Venetico Marine
 9
        CARL R. WOODWARD, III, ESQ.
10     CARELLA, BYRNE, BAIN, GILFILLAN,
        CECCHI, STEWART & OLSTEIN
11     5 Becker Farm Road
        Roseland, NJ 07068-1739
12        Attorney for Defendant Dragomir
13
     ALSO PRESENT:
14
        Chris Weiss, Videographer
15     Chris Masaoay, Tagalog Interpreter
16     Adrien Dragomir
        Liviu-Lee Roth
17     Brent McKnight
        Jason F. Burgess
18
19           - - -
20
21
22
23
24
```

## 3

```
 1          THE VIDEOGRAPHER:  This is Chris
 2  Weiss, the videographer, and the court reporter today
 3  is Gail Verbano.  We are both here from the firm of
 4  Corbett & Wilcox, located at 230 North Market Street,
 5  Wilmington, Delaware.
 6          The time is 4:43 p.m. on Tuesday,
 7  July 18th, 2006.  We are documenting the videotaped
 8  deposition of Bryan Espina for the plaintiff in the
 9  matter of United States of America versus Chian
10  Spirit Maritime Enterprises, Inc., Venetico Marine,
11  Irene E.M., Evangelos Madias, Christos Pagones,
12  Adrien Dragomir, in the United States District Court,
13  District of Delaware.
14          We are at the location of the
15  United States Attorney's office, Nemours Building,
16  1007 North Orange Street, Suite 700, Wilmington,
17  Delaware.
18          Will the attorneys please state
19  their appearance for the record.
20          MR. KOTILA:  Mark Kotila on behalf
21  of the United States.
22          MR. PHILLIPS:  Jeff Phillips on
23  behalf of the Government.
24          MR. CHALOS:  George Chalos on
```

## Page 4

```
 1  behalf of the defendants, Venetico Marine and Chian
 2  Spirit Maritime Enterprises.
 3          MR. WOODWARD:  And Carl Woodward on
 4  behalf of Adrien Dragomir.
 5          MR. TWERSKY:  Michael Twersky on
 6  behalf of the witness.
 7          THE VIDEOGRAPHER:  Will the court
 8  reporter please administer the oath.
 9          (CHRIS MASAOAY was previously sworn
10  in as Tagalog-English interpreter.)
11              - - -
12          BRYAN ESPINA, having first been
13  duly sworn through the interpreter according to law,
14  was examined and testified further as follows:
15              - - -
16          DIRECT EXAMINATION
17  BY MR. KOTILA:
18      Q   Good afternoon, Mr. Espina.
19      A   Good afternoon, sir.
20      Q   My name is Mark Kotila, and I'm here on
21  behalf of the United States.  And we have spoken
22  before on several occasions; correct?
23      A   Yes.
24      Q   I want to just revisit your prior
```

## Page 5

```
 1  testimony information that you gave to us one last
 2  time today.
 3      A   Yes.  Yes.
 4      Q   How long have you been in this country?
 5      A
 6          THE WITNESS:  (In English) For
 7  about seven months.
 8      A   For about seven months.
 9      Q   And where have you stayed while you've
10  been here in the United States?
11          THE WITNESS:  (In English) In the
12  hotel.
13      A   In the hotel.
14      Q   Where?  Philadelphia?
15          THE WITNESS:  (In English) In
16  Philadelphia.
17      A   In Philadelphia.
18      Q   And your hotel bill was paid by the
19  company?
20          THE WITNESS:  (In English) Yes.
21      A   Yes.
22      Q   How about your salary?
23          THE WITNESS:  (In English) Not all.
24      A   Not all.
```

Corbett & Wilcox

Bryan Espina

3 (Pages 6 to 9)

**Page 6**

1    Q    How about your food money?
2          THE WITNESS: (In English) $40 a
3    day.
4    A    $40 a day.
5    Q    Have you been free to leave your hotel
6    and leave Philadelphia?
7          THE WITNESS: (In English) Yes.
8    A    Yes.
9    Q    But you don't have your passport?
10         THE WITNESS: (In English) I don't
11   have it.
12   A    I don't have it.
13   Q    Where do you -- where are you from?
14         THE WITNESS: (In English) Philip-
15   pines.
16   A    In the Philippines.
17   Q    And could you tell us, what is your
18   address in the Philippines?
19         THE WITNESS: (In English) 241
20   Cabalan Street, Poblacion, Talisay City, Cebu,
21   Philippines.
22   A    241 Cabalan Street, Poblacion, Talisay
23   City, Cebu, Philippines.
24   Q    How long had you lived there?

**Page 7**

1          THE WITNESS: (In English) Since
2    when I was born.
3    A    Since when I was born.
4    Q    How old are you today?
5          THE WITNESS: (In English) 30.
6    A    30.
7    Q    Tell us, what is your occupation?
8          THE WITNESS: (In English) I'm a
9    sailor.
10   A    I'm a sailor.
11   Q    And what do you do aboard vessels?
12         THE WITNESS: (In English) I was on
13   board as a fourth marine engineer.
14   A    I was on board as a fourth marine
15   engineer.
16   Q    On board what?
17         THE WITNESS: (In English) M.V.
18   Irene.
19   A    M.V. Irene.
20   Q    Was this the first vessel you ever worked
21   on?
22         THE WITNESS: (In English) No.
23   A    No.
24   Q    How about -- just roughly, how many

**Page 8**

1    vessels have you worked on in the past?
2          THE WITNESS: (In English) I was on
3    board overseas since 1999.
4    A    I was on board overseas since 1999.
5    Q    So about six years you've been --
6          THE WITNESS: (In English) Yes.
7    A    Yes.
8    Q    -- working on the seas?
9    A    Yes.
10   Q    You said you were a fourth engineer
11   aboard the Irene?
12         THE WITNESS: (In English) Yes.
13   A    Yes.
14   Q    How did you rise to the rank of a fourth
15   engineer?
16         THE WITNESS: (In English) I took
17   the exam.
18   A    I took the exam.
19   Q    What exam?
20   A
21         THE WITNESS: (In English) Exam
22   which is given by our Government to qualify --
23   A    Exam which is given by our Government to
24   qualify --

**Page 9**

1          THE WITNESS: (In English) -- if
2    you're qualified for that position.
3    A    -- if you're qualified for that position.
4    Q    Well, how much formal schooling have you
5    had?
6          THE WITNESS: (In English) Just get
7    the average.
8    A    Just get the average. What do you mean
9    by that?
10   Q    Well, I mean -- I don't know how it is in
11   the Philippines. But how many years of school?
12         THE WITNESS: (In English) Since
13   seven years old, from the elementary grade, six
14   years.
15         THE WITNESS: From seven years old,
16   the elementary grade, for six years. The high school
17   days is four years.
18   Q    Any college?
19         THE WITNESS: (In English) And
20   college is, three years plus one year apprenticeship.
21   A    And college is, three years plus one year
22   apprenticeship.
23   Q    Do you have a degree?
24   A    Yes.

4 (Pages 10 to 13)

---

Page 10

1          THE WITNESS:  (In English) Yes.
2     Q   In what?
3          THE WITNESS:  (In English) Bachelor
4  of science in marine engineer.
5     A   Bachelor of science in marine engineer.
6          (Interruption by the court
7          reporter.)
8          MR. KOTILA:  Off the record.
9          THE VIDEOGRAPHER:  We are on the
10 record at 4:49.
11         (Discussion held off the record.)
12 BY MR. KOTILA:
13    Q   Okay.  Mr. Espina, could you just tell
14 us, what kind of training have you had in order to
15 take the exam to be a fourth engineer?
16    A   There's a lot -- there's a lot of them.
17 So because there's a lot, I could not remember
18 everything.  Just some of it I can remember.
19    Q   Any training or courses regarding MARPOL?
20    A   Yes.
21    Q   And tell us, basically, what did you
22 learn there?
23    A   It is said that it's against to dump oil
24 in the sea or anywhere else, because it will destroy

---

Page 11

1  the environment.
2     Q   In your training, did you also learn
3  about pollution control equipment aboard vessels such
4  as oily water separators?
5          MR. CHALOS:  Objection.
6          THE WITNESS:  Yes, they also talk
7  about that and they teach about that.
8  BY MR. KOTILA:
9     Q   So you learned about oily water
10 separators?
11    A   Yes.
12    Q   How did you get the job aboard the Irene?
13    A   I went to apply -- I went to apply in a
14 manning agency in the Philippines, the Bright
15 Maritime.  And they were the ones that sent me
16 wherever that ship may have been.
17    Q   Do you recall where you boarded the
18 vessel?
19    A   In Fortaleza, Brazil.
20    Q   Do you recall what date that was?
21    A   November 18th.
22    Q   Of 2005?
23    A   2005.
24    Q   And when you boarded the boat in Brazil,

---

Page 12

1  had you any idea where you were heading from Brazil?
2     A   When I boarded, they told me that we
3  would be carrying some salt, and then we would go to
4  the United States.
5     Q   When you boarded the vessel, who did you
6  know would be your supervisor?
7     A   The higher officials.
8     Q   Who would be your immediate supervisory
9  official?
10    A   The chief engineer.
11    Q   What was his name?
12    A   Adrien Dragomir.
13    Q   Do you see him in the room here today?
14    A   Yes.
15    Q   Could you point him out, tell us what he
16 looks like.
17    A   He's over there.  He has a beard.
18    Q   And glasses?
19    A   Yes, he has glasses.
20    Q   And a jeans vest?
21    A   And some hair that's a little bit white,
22 yeah.  Yes.  Yes, a vest.
23         MR. KOTILA:  Let the record reflect
24 that the witness, Mr. Espina, has identified the

---

Page 13

1  defendant, Adrien Dragomir.
2  BY MR. KOTILA:
3     Q   All right.  You got on the boat
4  November 18th.  What were your duties?
5     A   My work consists of, as a fourth
6  engineer, to do the maintenance work and also to
7  follow the orders of the ones that are above me.
8     Q   And who would give you orders?
9     A   The second engineer.
10    Q   And what was his name?
11    A   Edgar.
12    Q   Villano?
13    A   Villano.
14    Q   Let me ask you about the oily water
15 separator aboard the Irene.
16         Did you take a look at it?
17    A   Yes.
18    Q   And tell us about the oily water
19 separator on the Irene.
20    A   It was old.  It wasn't working.
21    Q   Why was it not working?
22    A   I don't know why.  But when I boarded, it
23 was no longer working.
24    Q   Was it working at any time between Brazil

---

Bryan Espina

5 (Pages 14 to 17)

Page 14

1  and the United States?
2      A   No, it wasn't.
3      Q   Did you have any work in the oily bilge
4  waste?
5      A   Yes.
6      Q   What did you have to do with getting rid
7  of that waste?
8      A   We pumped it out.
9      Q   Why did you do that?
10     A   We were asked.
11     Q   By whom?
12     A   The second engineer, Edgar.
13     Q   Did he write it to you or did he tell it
14 to you?
15     A   He told me verbally. Here's the way he
16 said it to me: "Fourth, you pump out our bilges.
17 This is is an instruction from the chief engineer."
18     Q   Did you see any written instructions from
19 the chief engineer?
20         MR. CHALOS: Objection.
21         THE WITNESS: Yes.
22 BY MR. KOTILA:
23     Q   Where?
24     A   In the logbook.

Page 15

1      Q   What kind of logbook? Describe it for
2  us.
3      A   The official logbook.
4      Q   Let me show you this logbook. Was it
5  this book, Government's Exhibit --
6      A   No.
7      Q   2? 1? It's not this book?
8      A   No.
9      Q   Describe this other logbook you're
10 talking about.
11     A   It's a larger book. It's a larger book.
12     Q   Did it have a name --
13     A   It's large.
14     Q   Did it have a name on it?
15     A   It has the name of the ship.
16     Q   And what else?
17     A   It's a large book and it doesn't really
18 have any cover. It doesn't have a plastic cover.
19 That's all that I could remember.
20     Q   Where was it located on the ship?
21     A   In the engine room.
22     Q   Describe the engine room, please.
23     A   The engine room, of course, contains some
24 machineries. There's a generator, there's a

Page 16

1  propulsion, there's a compressor. All the things
2  that have to do -- all the kind of machinery that
3  makes the ship move.
4      Q   And where would this book be in that
5  room?
6      A   I can't remember where it was.
7      Q   How did you know the chief engineer's
8  handwriting was in there?
9      A   It has his signature.
10     Q   You recognize his signature?
11     A   I don't remember it at this time.
12     Q   But you recall seeing it?
13     A   Yes.
14     Q   Take a look at Government's Exhibit 1.
15 Do you recognize the signature after the entries in
16 that book?
17         MR. WOODWARD: Objection; lack of
18 foundation.
19         THE WITNESS: I can't remember
20 anymore. I don't remember the signatures anymore.
21 BY MR. KOTILA:
22     Q   Do you know what this book is?
23     A   Yes. Oil Record Book.
24     Q   Okay. Do you recognize -- I'm referring

Page 17

1  to pages on the Oil Record Book dated 10/10/05
2  through January -- December 1st, '05, a series of
3  signatures and entries.
4      Do you recognize the signature?
5         MR. WOODWARD: Objection.
6         MR. CHALOS: Objection.
7         MR. WOODWARD: Lack of foundation.
8         THE WITNESS: I don't remember
9  quite clearly, because you see, I don't look at this
10 every day.
11 BY MR. KOTILA:
12     Q   I understand that. I'm just asking you
13 if you recognize the signature of the chief engineer.
14     A   I don't remember.
15     Q   Okay. All right. Now, you told us that,
16 based on the instruction in the engine book and what
17 you were told by Villano, you pumped out the bilges.
18     A   I did it.
19     Q   You did it personally?
20     A   Yes.
21     Q   How many times from Brazil to the United
22 States?
23     A   On my duty, two times.
24     Q   Day or nighttime?

Bryan Espina

6 (Pages 18 to 21)

| Page 18 |
|---|
| 1    A    At night. |
| 2    Q    Why at nighttime? |
| 3    A    So that no one would see it. |
| 4    Q    Did you just pump the bilge tank or any |
| 5   other tanks? |
| 6    A    The bilge tank. |
| 7    Q    How did you do it?  Walk us through it |
| 8   how you did it. |
| 9    A    I opened the valves going out -- in and |
| 10   out; and then I looked at the lines as well. |
| 11    Q    What lines? |
| 12    A    The lines that you put in there, the |
| 13   thing that you call magic pipe. |
| 14    Q    The thing that we call magic pipe or the |
| 15   thing that you call magic pipe? |
| 16    A    The thing that is called magic pipe. |
| 17    Q    You knew it to be called a magic pipe? |
| 18    A    Yes. |
| 19    Q    Where have -- where, if you know, did |
| 20   that name come from? |
| 21    A    The previous ones, that's what they call |
| 22   it. |
| 23    Q    Take a look to your right there.  Do you |
| 24   recognize what's under that plastic? |

| Page 19 |
|---|
| 1    A    Yes. |
| 2    Q    And what do you recognize that to be? |
| 3    A    These are tubes. |
| 4    Q    Do you want to take a look at them? |
| 5    A    It's all right. |
| 6    Q    Do you know what they are? |
| 7    A    These are the pipes. |
| 8    Q    Those are the magic pipes you used on the |
| 9   Irene? |
| 10        MR. WOODWARD:  Objection; leading. |
| 11        THE WITNESS:  I don't remember |
| 12   anymore, because, you know, they were hiden |
| 13   underneath. |
| 14   BY MR. KOTILA: |
| 15    Q    Hidden by whom? |
| 16    A    The -- the connections were underneath. |
| 17    Q    Well, take a look in this basket here. |
| 18   What do you see those things? |
| 19    A    Flange. |
| 20    Q    Do you know what those were used for? |
| 21        MR. CHALOS:  Objection; leading. |
| 22        THE WITNESS:  That's what's used -- |
| 23   that's what you use to attach them to the other end. |
| 24   BY MR. KOTILA: |

| Page 20 |
|---|
| 1    Q    Do those look like the actual items to |
| 2   you? |
| 3        MR. CHALOS:  Objection. |
| 4        THE WITNESS:  Yes. |
| 5   BY MR. KOTILA: |
| 6    Q    How do you know? |
| 7        MR. CHALOS:  Objection. |
| 8        THE WITNESS:  I looked at it before |
| 9   I ran the pumps. |
| 10   BY MR. KOTILA: |
| 11    Q    When was the last time you saw them, |
| 12   though? |
| 13    A    When it was still attached. |
| 14    Q    How do you know those are the actual |
| 15   items, though? |
| 16        MR. CHALOS:  Objection.  He didn't |
| 17   say they were. |
| 18        MR. KOTILA:  Yes, he did. |
| 19        THE WITNESS:  Just from the size of |
| 20   it. |
| 21   BY MR. KOTILA: |
| 22    Q    I'm going to approach the witness.  Let's |
| 23   take a look at them. |
| 24        Okay.  Have you ever touched these |

| Page 21 |
|---|
| 1   before on the vessel? |
| 2    A    No. |
| 3    Q    No?  How do you know? |
| 4    A    Because I was not the one that |
| 5   attached -- or took it off. |
| 6    Q    But what do you recognize it to be then? |
| 7    A    Because I see it when I checked the |
| 8   valves out before I pump out. |
| 9    Q    Were these the valves that were used to |
| 10   pump out on the vessel? |
| 11        MR. CHALOS:  Objection; asked and |
| 12   answered. |
| 13        THE WITNESS:  These flanges are. |
| 14   BY MR. KOTILA: |
| 15    Q    They are then?  Okay. |
| 16        MR. WOODWARD:  Objection. |
| 17   BY MR. KOTILA: |
| 18    Q    And what's the difference between these |
| 19   two hoses; do you know? |
| 20    A    I really couldn't tell you what the |
| 21   difference is. |
| 22    Q    But what were they used for? |
| 23    A    To transfer different kinds of liquids. |
| 24    Q    Okay.  Were they used by you to pump out |

Bryan Espina

7 (Pages 22 to 25)

Page 22

1  bilges overboard?  Take a look at them.
2      A   Yes, that's it.
3      Q   All right.  Now, at the time you pumped
4  those bilges overboard -- two times?
5      A   Two times.
6      Q   -- how full were they?  Full?  Half full?
7  What?
8      A   I could not tell you if it was half or
9  it's full.  All I know, it was more than one meter.
10     Q   Each time?
11     A   Yes.
12     Q   And what exactly did you do?  You turned
13 on the pumps?
14     A   I run the pumps.
15     Q   And you turned them off too?
16     A   On the second one, I was the one that
17 turned -- turned on and turned it off.
18     Q   Did you ever tell the chief engineer that
19 you were pumping?
20     A   No.
21     Q   Did you tell the captain?
22     A   No.
23     Q   Did you know what you were doing was
24 against the law?

Page 23

1      A   I know.
2      Q   Why did you do it?
3      A   That was an instruction from a higher
4  person.
5      Q   When you got to the United States in
6  early December and the Coast Guard boarded the
7  vessel, you made a statement, a four-page statement?
8      A   Yes.
9      Q   All right.  So you signed a four-page
10 statement?
11     A   Yes.
12     Q   All right.  I'm not going to go through
13 the details of this thing.  But that's your
14 statement; correct?
15     A   Yes, it is.
16     Q   And you read that statement before you
17 signed it on the last page?
18     A   Yes.
19     Q   Was that given to a Mr. Christos?
20     A   It was given, yes.
21     Q   All right.  After that, did Mr. Christos
22 have a conversation with you and other engineers?
23     A   Yes.
24     Q   What did he tell you?

Page 24

1      A   That we should not tell the truth.
2      Q   Tell us exactly, the best you remember,
3  what did he say?
4      A   That you should that -- we should not
5  tell the truth because -- "because you
6  contributed" --
7      Q   How did he say that?
8      A   -- and so that you would go to jail.
9          "You, you have 10 percent of the
10 blame; you, you have 10 percent of the blame," and so
11 on and so forth.
12     Q   How many times did he tell you this?
13     A   One time.
14     Q   Where did this take place?
15     A   Officers mess hall.
16     Q   Who was there?
17     A   The second engineer, the third engineer.
18     Q   Did you respond to Christos when he told
19 you that?
20     A   I did not say anything.
21     Q   Did anybody say anything?
22     A   The second engineer did.
23     Q   Okay.  When you left the ship to stay in
24 the United States, did Christos speak to you again?

Page 25

1      A   He spoke to me before he went home.
2      Q   Oh, what did he tell you?
3      A   That, "Go ahead, you can tell the truth."
4      Q   Why?
5          MR. CHALOS:  Objection.  How does
6  he know why?
7  BY MR. KOTILA:
8      Q   Well, did he say why -- what else did he
9  say?
10     A   Because he said that, "You go ahead and
11 tell them the truth, because there is -- there is
12 nothing that we can hide.  You go ahead and tell the
13 truth so that they would give you a lower sentence."
14 That's it.
15     Q   Give you a lower sentence?
16         Oh, that you understood?
17     A   But I didn't do anything wrong.
18     Q   But you had already given that statement,
19 though; right?
20     A   Yes.
21         MR. KOTILA:  Thank you.  I have no
22 further questions.
23         MR. CHALOS:  Can we take just a
24 minute, so I can get my notes?

Bryan Espina

8 (Pages 26 to 29)

Page 26

1        THE VIDEOGRAPHER:  Off the record
2    at 5:11 -- no.
3        MR. CHALOS:  No, we don't have to
4    go off the record.
5        MR. WOODWARD:  Let's go off the
6    record.
7        MR. CHALOS:  Take a minute.
8    All right.
9        THE VIDEOGRAPHER:  Off the record
10   at 5:11.
11       (Brief recess.)
12       (Documents marked CSME Exhibits 33
13       through 38 for identification.)
14       THE VIDEOGRAPHER:  On the record at
15   5:16.
16       RECROSS-EXAMINATION
17   BY MR. CHALOS:
18   Q    Good afternoon, Mr. Espina.
19   A    Good afternoon as well.
20   Q    My name is George Chalos, and I represent
21   Venetico Marine, the company that owns this vessel;
22   and Chian Spirit Maritime Enterprises, the company
23   that manages or operates the vessel.
24       Now, let's talk a little bit about

Page 27

1    how you came to work on board the Irene E.M.
2        You went looking for a job at a
3    manning agent in the Philippines; right?
4    A    Yes.
5    Q    Okay.  And you had to prepare some
6    paperwork to make an application in order to be
7    considered to join a ship as a fourth engineer;
8    right?
9    A    Yes.
10   Q    And in fact, what happens after you do
11   that is the manning agent tells you what jobs are
12   available; right?
13   A    Yes.
14   Q    And then it's your decision which
15   contract you want to take; right?
16   A    Yes.
17   Q    Okay.  And in fact, you chose to enter
18   into a contract with your manning agent to go to work
19   on board the Irene E.M.; right?
20   A    Yes.
21   Q    I'm going to show you what we've marked
22   as CSME Defendants' Exhibit No. 33 and ask you to
23   take a look at this four-page exhibit.
24       My question to you, Mr. Espina,

Page 28

1    that's your employment contract; right?
2    A    Yes.
3    Q    And that's the documents that you signed
4    in connection with your employment on board the Irene
5    E.M.; right?
6    A    Yes.
7    Q    And you had to review those documents
8    before going on board; right?
9    A    Yes.
10   Q    Take a look at the second page.  That's
11   your signature on the bottom left-hand side; right?
12   A    Yes.
13   Q    So it's fair to say that you signed this
14   declaration?
15   A    Yes.
16   Q    And you were provided with a copy of the
17   company's safety management system and environmental
18   protection policy; right?
19   A    Yes, there is.
20   Q    Okay.  And before you went on board the
21   ship, you knew that if you were found violating the
22   policy, you could be fired?
23   A    Yes, I know that.
24   Q    Okay.  Now, you also know from your

Page 29

1    training about MARPOL; right?
2    A    Yes.
3    Q    Okay.  And you learned that both in
4    school -- right?
5    A    Yes.
6    Q    -- and then at some training classes you
7    took?
8    A    Yes.
9    Q    And in fact, you had to go for a special
10   seminar or a training course before you were
11   permitted to join the Irene E.M. in Brazil?
12   A    Yes.
13   Q    And one of the topics that you had to
14   study was the Chen Spirit environmental protection
15   policy; right?
16   A    Yes.
17   Q    Okay.  So you knew before you got on
18   board the ship that the company, if they knew, would
19   not tolerate anybody pumping oil or oily wastes into
20   the sea?
21   A    Yes.
22   Q    Okay.  And in fact, you know that there
23   was someone from the company who came on board the
24   ship in Brazil; right?

Bryan Espina

9 (Pages 30 to 33)

Page 30

1    A   Yes.
2    Q   And he came on board to make sure the
3  crew was following company policy; right?
4    A   Yes.
5    Q   Now, you told --
6        MR. CHALOS:  Okay.  I'll take that
7  back.  If I could move this into evidence, CSME
8  Defendants' Exhibit 33.
9        MR. KOTILA:  No objection.
10       (Document marked CSME Exhibit 33
11        moved into evidence.)
12 BY MR. CHALOS:
13   Q   Now, Mr. Espina, you told us about the
14 company's environmental protection policy; right?
15   A   Yes.
16   Q   I'm going to show you what's been
17 previously marked as CSME Defendants' Exhibit 7.
18       Now, that's the environmental
19 protection policy that you reviewed before joining
20 the ship; right?
21   A   Yes.
22   Q   And that was available on board the ship
23 for all the crew to see; right?
24   A   Yes, it's there in the ship.

Page 31

1    Q   That was in the engine room on the
2  bulletin board; right?
3    A   I just don't remember.
4    Q   Okay.  Well, think about this:  It was in
5  the mess room right, hung up?
6    A   Yes, in the mess hall.
7    Q   And it was also hung on the wall in the
8  hallway?
9    A   That I don't know.  I didn't notice it.
10   Q   Okay.  It was in the ship's office;
11 right?
12   A   That I didn't notice as well.
13   Q   Okay.  It was on the bridge?
14   A   That, I don't go over there.
15   Q   And what about in the engine room, on
16 the -- there was a plywood bulletin board; right?
17   A   I did not notice it there.
18   Q   Okay.  But you've seen that before?
19   A   Yes.
20   Q   And you understood that to be the
21 company's environmental protection policy; right?
22   A   Yes.
23       MR. CHALOS:  If it has not already
24 been introduced into evidence with any other

Page 32

1  witnesses, we move it into evidence now.
2        MR. KOTILA:  No objection.
3        MR. WOODWARD:  Exhibit 7?
4        MR. CHALOS:  CSME 7.
5        (Document marked CSME Exhibit 7
6        moved into evidence.)
7  BY MR. CHALOS:
8    Q   Okay.  Mr. Espina I'm going to show you
9  what we've marked for identification as CSME
10 Defendants' Exhibit No. 34.  And for the record, I'll
11 make a representation it's a four-page document.
12   A   Yes.
13   Q   Now, Mr. Espina, can we agree that those
14 are photocopies of your passport and your seaman's
15 book?
16   A   Yes.
17       MR. CHALOS:  Okay.  I'd like to
18 move that into evidence.
19       MR. KOTILA:  No objection.
20       (Document marked CSME Exhibit 34
21        moved into evidence.)
22 BY MR. CHALOS:
23   Q   Also, Mr. Espina, I want to show you what
24 we've marked as CSME Defendants' Exhibit No. 35.  For

Page 33

1  the record, I'll make a representation it's a
2  five-page exhibit.
3        Mr. Espina, will you agree with me
4  that that exhibit is a photocopy of your license that
5  was issued by the Philippines government?
6    A   This is it.
7    Q   And it also includes an endorsement from
8  a flag state administration for the vessel; right?
9    A   This is the first time that I am seeing
10 this flag.
11   Q   Well, first I'd like to move this
12 document into evidence.
13       MR. KOTILA:  Which one?
14       MR. CHALOS:  This is the license
15 documents.
16       MR. KOTILA:  And he never saw this
17 before?  What did he say?
18       MR. CHALOS:  He said he didn't see
19 the endorsement.  But I can clarify that.
20       MR. KOTILA:  Which is the
21 endorsement?
22       MR. CHALOS:  He didn't have
23 knowledge of the endorsement.
24       MR. KOTILA: .Well, why don't you

Page 34

1  separate them. Move that into evidence. He's not
2  familiar with this. I object to it.
3          MR. WOODWARD: Why don't you just
4  lay foundation.
5  BY MR. CHALOS:
6      Q    Okay. Before I move into this evidence,
7  Mr. Espina, you would agree with me that part of the
8  requirements for you going to work on the Irene E.M.
9  as the fourth engineer was that you needed to have
10  your license issued by the Philippine government
11  endorsed by the flag state administration for the
12  vessel; right?
13      A    I don't know.
14      Q    And an application was made to do that;
15  right?
16      A    Yes.
17          MR. CHALOS: Okay. Then I'd like
18  to move this into evidence.
19          MR. KOTILA: I'm just going to
20  object, because he doesn't recognize what it is.
21  BY MR. CHALOS:
22      Q    Well, take a look at the document -- the
23  Exhibit 35 again. Mr. Espina, do you recognize that
24  first page?

Page 35

1      A    Yes.
2      Q    What is it?
3      A    This is the --
4      Q    It's a copy of your license, right, which
5  has been issued by the Philippine government?
6      A    Yes, it is.
7      Q    Okay. And the next page, do you
8  recognize that document?
9      A    Yes.
10      Q    And that's also part of your license;
11  right?
12      A    Yes.
13      Q    And the next page, do you recognize that
14  document?
15      A    Yes.
16      Q    And that's the endorsement application
17  for your license?
18      A    Yes.
19      Q    And the next page is the same; right? An
20  endorsement of your seaman's book?
21      A    When this was made, I was already on my
22  way to depart. They're the ones that processed this,
23  the manning agent.
24      Q    And that's something that was a

Page 36

1  requirement for you to work on board the ship; right?
2      A    Of course.
3          MR. CHALOS: Okay. Then I can move
4  that document into evidence, or that exhibit into
5  evidence.
6          MR. KOTILA: I'm just going to
7  object to it because it was not attached to the first
8  three sheets when he was on board and -- and its
9  relevance.
10          MR. CHALOS: Okay. Well, then I
11  object to -- I mean, then I move to -- then I'd like
12  to move -- if the document in its entirety is not
13  accepted into evidence, I'd like to move the pages
14  individually that were identified as being documents
15  Mr. Espina had known.
16          (Document marked CSME Exhibit 35
17          moved into evidence.)
18  BY MR. CHALOS:
19      Q    Now, Mr. Espina, let's talk about some of
20  that training you told us about.
21          Part of the requirements for you to
22  join the Irene E.M. as fourth engineer was to undergo
23  training courses; right?
24      A    Yes.

Page 37

1      Q    And you already told us that you had to
2  go for an exam given by the Philippine government to
3  be a fourth engineer?
4      A    Yes.
5      Q    And you have a bachelor's degree from a
6  maritime academy in the Philippines; right?
7          THE INTERPRETER: I'm sorry?
8          MR. CHALOS: From a maritime
9  academy in the Philippines.
10          THE WITNESS: Yes.
11  BY MR. CHALOS:
12      Q    Okay. And then you also took special
13  places in MARPOL and pollution prevention; right?
14      A    Yes.
15      Q    And you also took special training for
16  the company's pollution prevention procedures; right?
17      A    Yes.
18      Q    And then you were permitted to go on
19  board the ship; right?
20      A    Yes.
21      Q    Okay. I'd like to show you what's been
22  previously marked as CSME Defendants' Exhibit No. 36.
23  And, for the record, it's a several-page document.
24          Mr. Espina, that's photocopies of

Page 38

1  the certificates that you earned at various training
2  courses you attended; right?
3      A   Yes.
4          MR. CHALOS:  I'd like to move that
5  document into evidence.
6          MR. KOTILA:  No objection.
7      (Document marked CSME Exhibit 36
8          moved into evidence.)
9  BY MR. CHALOS:
10     Q   That first page, Mr. Espina, is a
11  certificate for one of the MARPOL classes you took?
12     A   Yes.
13     Q   And the second page is a certificate of
14  attendance for the specific training you took for the
15  Chian Spirit safety management system and
16  environmental protection policy; right?
17     A   Yes.
18     Q   And that class that you took was a
19  two-day course from November 3rd to November 4th of
20  2005; right?
21     A   Yes.
22     Q   And that was just before you left the
23  Philippines to go get on board the ship in Brazil;
24  right?

Page 39

1      A   Yes.
2      Q   Okay.  Thank you, Mr. Espina.
3          Now, the company also required that
4  before you go on board the ship, that you had to get
5  checked out to make sure that you were both
6  physically and mentally fit to do the job of a fourth
7  engineer; right?
8      A   Yes.
9      Q   Okay.  And, in fact, they sent you -- or
10  required you to go to various medical clinics; right?
11     A   Yes.
12     Q   And you went?
13     A   Yes.
14     Q   And I'd like to show you what we've
15  marked as CSME Defendants' Exhibit No. 37, and just
16  ask you to take a look at those documents.
17         Mr. Espina, those are the reports
18  that were issued after those examinations; right?
19     A   Yes, this is it.
20         MR. CHALOS:  I'd like to move those
21  into evidence.
22         MR. KOTILA:  No objection.
23     (Document marked CSME Exhibit 37
24          moved into evidence.)

Page 40

1  BY MR. CHALOS:
2      Q   Now, Mr. Espina, let me see if I got this
3  right.  Before you were approved to join the ship and
4  go to work on the Irene E.M. as the fourth engineer,
5  the owning company and the management company
6  required a couple things; right?  They required you
7  to have a valid license?
8      A   Yes.
9      Q   And they required you to have some
10  continuing education and training courses?
11     A   Yes.
12     Q   They required you to go to their own
13  special training on their pollution prevention
14  policies; right?
15     A   Yes.
16     Q   And their environmental protection
17  policies?
18     A   Yes.
19     Q   And their safety management system?
20     A   Yes.
21     Q   For two days in the Philippines; right?
22     A   Yes.
23     Q   They required you to go to the doctor to
24  get checked out?

Page 41

1      A   Yes.
2      Q   And they wanted to make sure that you
3  were fit for the duty; right?
4      A   Yes.
5      Q   And they wanted to make sure that you
6  knew that dumping something overboard was not
7  acceptable by the company?
8      A   Yes.
9      Q   And illegal?
10     A   Yes.
11     Q   And if you did it, you're subject to
12  getting fired --
13     A   Yes.
14     Q   -- and whatever punishment that may come
15  from the authorities; right?
16     A   Yes.
17     Q   Okay.  Then you got on board the ship;
18  right?
19     A   Yes.
20     Q   Now, you told Mr. Kotila that you got on
21  board the ship in Fortaleza, Brazil; right?
22     A   Yes.
23     Q   And when was that?
24     A   November 18th.

Bryan Espina

12 (Pages 42 to 45)

Page 42

1    Q    Okay.  So you get on board the ship in
2  Forteleza, Brazil and when you got on board the ship
3  was discharging its cargo; right?
4    A    When I boarded, there was no board.
5    Q    Okay.  Because the ship left Fortaleza
6  and went to another port in Brazil to load the salt;
7  right?
8    A    Yes.
9    Q    In fact, it went to two ports in Brazil
10  to load cargo; right?
11    A    I don't remember anymore.  All I can only
12  remember one.
13    Q    Okay.  Now, as the engineer, you don't
14  have any responsibility to navigate the ship?
15  Meaning --
16    A    No.
17    Q    -- you don't receive orders where to take
18  the ship, do you, as the fourth engineer?
19    A    They just tell us that this is where
20  we're going.
21    Q    But the company doesn't tell you that,
22  does it?
23    A    No.
24    Q    So the only way you know where the ship

Page 43

1  is going is from somebody telling you that; right?
2    A    Yes.
3    Q    And to you, as the engineer, it really
4  doesn't make a difference where the ship is going,
5  does it?
6    A    No.
7    Q    In fact, your job is just to make the
8  engines run; right?
9    A    Yes.
10    Q    And where the ship goes is for someone
11  else, not you?
12    A    No.
13    Q    Okay.  Now, let's talk about the oily
14  water separator.
15        As fourth engineer on the Irene
16  E.M., you have no responsibility to operate the oily
17  water separator, do you?
18        THE INTERPRETER:  I'm sorry?
19  BY MR. CHALOS:
20    Q    You have no responsibility to operate the
21  oily water separator?
22    A    Sometimes when I am asked to do it.
23    Q    Well, listen to my question.  On
24  the Irene E.M., you were never asked to operate the

Page 44

1  oily water separator, were you?
2        MR. KOTILA:  Objection.  He
3  answered that he could.
4  BY MR. CHALOS:
5    Q    Do you understand my question?
6    A    Repeat it again.
7    Q    After you got on board the Irene E.M.,
8  were you ever asked to operate the oily water
9  separator?
10    A    No.
11    Q    Okay.  So it's fair to say that since the
12  time you got on board the Irene E.M., you had no
13  responsibility for the operation of the oily water
14  separator?
15    A    None.
16    Q    Okay.  You don't have any responsibility
17  to maintain the oily water separator, do you?
18    A    If I am asked to do it.
19    Q    But you weren't asked?
20    A    The second engineer just asked me to
21  familiarize myself because I was new.
22    Q    Okay.  But the second engineer never
23  asked you to actually operate it, did he?
24    A    No.

Page 45

1    Q    Okay.  And you don't have -- you weren't
2  asked to make any repairs to the oily water
3  separator, were you?
4    A    They asked me to clean it.
5    Q    Okay.  The only thing they did was ask
6  you to clean it, right?
7    A    Yes.
8    Q    They didn't ask you to test it?
9    A    No.
10    Q    So when you told Mr. Kotila that the oily
11  water separator didn't work, the only way you know
12  that is because someone else told you that; right?
13        MR. KOTILA:  Objection.  Not his
14  testimony.
15        THE WITNESS:  I know that it wasn't
16  working.  I saw the second engineer trying to work on
17  it.
18  BY MR. CHALOS:
19    Q    Okay.  But you yourself didn't try to
20  work on it?
21    A    I just cleaned it.
22    Q    So the answer is no, you didn't work on
23  it?
24    A    No.

Bryan Espina

13 (Pages 46 to 49)

Page 46

1    Q    Okay.  Now, Mr. Kotila showed you a book
2    before -- for the record, I'll identify it as
3    Government's Exhibit No. 1 -- and you said you
4    recognize this as an Oil Record Book; right?
5    A    Yes.
6    Q    On board the Irene E.M., you didn't
7    maintain the Oil Record Book, did you?
8    A    No.
9    Q    In fact, you never wrote in it, ever?
10    A    No, nothing.
11    Q    So none of the handwriting in there is
12    yours?
13    A    None.
14    Q    And, in fact, you have no responsibility
15    to write in that book at all?
16    A    Nothing.
17    Q    Before the Government showed it to you,
18    Mr. Espina, you never saw the contents of that book,
19    did you?
20    A    I didn't see it.
21    Q    So the first time you saw it was when the
22    Government showed it to you; right?
23    A    Yes, at this time.
24    Q    Because the Oil Record Book is not part

Page 47

1    of the fourth engineer's job; right?
2    A    You're correct.
3    Q    Okay.  Now, there was a practice on board
4    the ship whereby the bilge wells would be pumped into
5    the bilge holding tank; right?
6    A    Yes, it is pumped.
7    Q    Now, you were only on board the ship for
8    a short time, but even you know that it was pumped
9    from time to time from the bilge wells to the bilge
10    holding tank; right?
11    A    Yes.
12    Q    Okay.  Now, in order to pump from the
13    bilge wells to the bilge holding tank, no oily wastes
14    go into the sea; right?
15    A    They just transfer it, because there's a
16    lot of it.
17    Q    Right.  And in fact, the bilge holding
18    tank was gigantic; right?
19    A    That I don't know.  I have not gone
20    inside it.
21    Q    Okay.  Well, you do know, though, that
22    the bilge holding tank had more than 106 cubic meters
23    of capacity, do you not?
24    A    I didn't know that.

Page 48

1    Q    Okay.  Now, you told Mr. Kotila before
2    that you personally discharged oily wastes overboard
3    two times between Brazil and the U.S.; right?
4    A    Yes.
5    Q    Now, at the time you did that, are you
6    telling me that you didn't know what the capacity of
7    the bilge holding tank was?
8         MR. KOTILA:  Objection; asked and
9    answered.
10         THE WITNESS:  I didn't know.
11    BY MR. CHALOS:
12    Q    Okay.  So it's fair to say that there
13    could have been plenty of space in the bilge holding
14    tank?
15         MR. KOTILA:  Objection.  He
16    wouldn't know the answer.  He doesn't know the
17    capacity.
18    BY MR. CHALOS:
19    Q    Fair enough.  But you can answer.
20    A    I don't know the capacity.
21    Q    And you didn't know the quantity of the
22    contents in the bilge holding tank at the time you
23    discharged overboard; right?
24    A    I didn't know.

Page 49

1    Q    Okay.  Mr. Espina, when you made those
2    two discharges overboard, did you ever report what
3    you did to the captain?
4    A    No.
5    Q    Did you ever report what you did to Chian
6    Spirit Maritime Enterprises, the manager of the ship?
7    A    No.
8    Q    And you never reported what you did to
9    Venetico Marine, the owner of the ship, did you?
10    A    No.
11    Q    And in fact, Mr. Espina, you never even
12    reported it to Chief Engineer Dragomir?
13    A    No.
14    Q    Okay.  Now, the order you got came from
15    the second engineer, Edgar Villano; right?
16    A    Yes.
17    Q    And you told us before, his instruction
18    was, "Fourth, pump out the bilge wells; chief
19    engineer wants you to do it"?
20    A    Yes.
21    Q    And now, you never double-checked the
22    order with the chief engineer, did you?
23    A    No, I didn't anymore.
24    Q    You believed that the second engineer was

Bryan Espina

14 (Pages 50 to 53)

Page 50

1  telling you the truth; right?
2      A   Yes.
3      Q   But you don't know what the discussions
4  were between the chief engineer and the second
5  engineer, do you?
6      A   I don't know.
7      Q   Okay. And you don't know if the chief
8  engineer -- strike that. Let me change my question.
9          You don't know if the second
10 engineer misunderstood the order of the chief
11 engineer; right?
12         MR. KOTILA: Objection as to what
13 he would think the second engineer understood.
14         THE WITNESS: That was the
15 instruction to me.
16 BY MR. CHALOS:
17     Q   Okay. Now --
18         I'm looking at the notes for the
19 wrong guy. Okay. I got the right page now.
20         Okay. Now, Mr. Kotila asked you
21 some questions about these hoses and these flanges.
22 Do you remember that?
23     A   Yes. Yes.
24     Q   Okay. Now, you didn't bring those here

Page 51

1  from the ship, did you?
2      A   No.
3      Q   You never hooked up the hose to the
4  flanges when you were on board the ship, did you?
5      A   No.
6      Q   You never hooked up the flanges to any of
7  the valves, did you?
8      A   No.
9      Q   You never disconnected any of the valves
10 and flanges; right?
11     A   Certainly not.
12     Q   You never disconnected the hoses; right?
13     A   No.
14     Q   So you really don't know whether these
15 flanges and these hoses come from the Irene E.M., do
16 you?
17         MR. KOTILA: Objection; he answered
18 that he did know.
19         THE WITNESS: I saw it there when I
20 opened the valves.
21 BY MR. CHALOS:
22     Q   Okay. But you don't know if these are
23 the hoses you saw, do you?
24         MR. KOTILA: Objection; asked and

Page 52

1  answered.
2          THE WITNESS: Now -- I remember it
3  now. These are the hoses.
4  BY MR. CHALOS:
5      Q   Okay. Now, the two times that you opened
6  the valves to do these -- or started the pumps to
7  make these discharges --
8      A   Yes.
9      Q   -- you had never discussed what you were
10 doing with the chief engineer?
11         MR. KOTILA: Objection; asked and
12 answered.
13         THE WITNESS: No.
14 BY MR. CHALOS:
15     Q   Now, you told us -- hold on one second.
16 Let's talk a little bit more about the magic pipe.
17 Okay?
18         Just so I'm clear, you never hooked
19 it up; right?
20     A   No.
21     Q   You never disconnected it; right?
22     A   No.
23     Q   The chief engineer never told you to hook
24 it up?

Page 53

1      A   No.
2      Q   He never told you, "Disconnect it"?
3      A   No.
4      Q   He never told you, "Hide it"?
5      A   No.
6      Q   Okay. The captain, he never told you to
7  hook up the magic pipe, did he?
8      A   No.
9      Q   The captain never told you to disconnect
10 the magic pipe, did he?
11     A   No.
12     Q   The captain never told you to hide the
13 magic pipe, did he?
14     A   No.
15     Q   Okay. The manager of the ship, Chian
16 Spirit, they never told you to hook up the pipe;
17 right?
18         MR. KOTILA: Objection as to who
19 Chian would be aboard the vessel.
20         THE WITNESS: No.
21 BY MR. CHALOS:
22     Q   The Chian Spirit never ordered you to
23 disconnect the magic pipe, did they?
24     A   No.

Bryan Espina

15 (Pages 54 to 57)

Page 54

1    Q   Okay.  Chian Spirit didn't tell you to
2  hide the magic pipe, did you?
3    A   No.
4    Q   The company, Venetico Marine -- that's
5  the company that owns the ship -- did I understand
6  you before, you never communicated with that company?
7    A   No.
8    Q   So it's fair to say that you never
9  received any orders from that company to either hook
10  up, disconnect or hide the magic pipe?
11    A   None.
12    Q   Okay.  Let's talk about Christos.
13        The Coast Guard came on board the
14  ship when the ship arrived here; right?
15    A   Yes.
16    Q   Okay.  Now, Christos wasn't on board when
17  the Coast Guard came on board, was he?
18    A   I don't remember.
19    Q   Okay.  The Coast Guard interviewed some
20  of the crew members.  Do you remember that?
21    A   Yes.
22    Q   But they didn't interview you?
23    A   No.
24    Q   All right.  Then at some point, Christos

Page 55

1  came on board the ship; right?
2    A   Yes, he boarded.
3    Q   Okay.  And he asked some of the crew to
4  prepare a statement.  Do you remember that?
5    A   Yes.
6    Q   And what he asked was for the crew to
7  write a statement about what they told the Coast
8  Guard so he can give it to the company's lawyers;
9  right?
10    A   Yes.
11    Q   Okay.  And after Christos asked that, the
12  second engineer, Mr. Villano, called the meeting of
13  all the Filipinos; right?
14    A   Yes.
15    Q   Okay.  Now, he didn't include Mr. Tudor,
16  the electrician, right?
17    A   He wasn't there.
18    Q   He's a Romanian guy; right?
19    A   Yes.
20    Q   And he didn't include the chief engineer;
21  right?
22    A   No.
23    Q   He's another Romanian guy?
24    A   Yes.

Page 56

1    Q   But both Mr. Tudor and Chief Engineer
2  Dragomir had been interviewed by the Coast Guard;
3  right?
4    A   I don't remember if they were interviewed
5  or not.
6    Q   But they surely weren't at that meeting
7  that Second Engineer Villano organized?
8    A   They weren't there.
9    Q   So the statement that was prepared
10  that Mr. Kotila showed you before was something that
11  was prepared by Mr. Villano; right?
12    A   Yes.
13    Q   Okay.  And in fact, he had a draft of the
14  statement, but he asked you to re-write it because
15  you had better handwriting; right?
16    A   Yes.
17    Q   So not just the fourth engineer, but you
18  were the second engineer's secretary?
19    A   That's one of his order.
20    Q   Okay.  And that's what you do:  You
21  generally just follow orders; right?
22    A   Yes.
23    Q   Okay.  Now, after you gave that to
24  Mr. Christos, that's when he told the crew that they

Page 57

1  should retract their statement; right?
2    A   Yes.
3    Q   Okay.  But you had no statement to change
4  or retract, because you had never spoken to the Coast
5  Guard; right?
6    A   No.
7    Q   Okay.  And in fact, every time you spoke
8  to the Coast Guard, you've always told the truth;
9  right?
10    A   Yes.
11    Q   Okay.  And today you've told us the
12  truth?
13    A   Just the truth.
14    Q   Okay.  Just so I'm clear, Venetico
15  Marine, the company that owns the ship, never ordered
16  you to lie to anybody, did they?
17    A   I did not receive anything from the
18  owners.
19    Q   Okay.  And you didn't receive any orders
20  from the managers to lie either, did you?
21    A   Just from Christos.
22    Q   Okay.  But nothing from the company?
23    A   Nothing.
24    Q   Okay.  And the captain never ordered you

Bryan Espina

16 (Pages 58 to 61)

Page 58

1  to lie, did he?
2      A   We don't speak.
3      Q   Okay.  So it's fair to say that he never
4  told you to lie?
5      A   Yes.
6      Q   And Chief Engineer Dragomir never told
7  you to lie; right?
8      A   No.
9      Q   Okay.  There was a gentleman on board
10  named Mr. Madias.  Did you see him?
11      A   I saw him.
12      Q   Okay.  And did you greet him and did he
13  greet you?
14      A   Just say "hi."
15      Q   Okay.  Now, he never told you to lie, did
16  he?
17      A   No.
18      Q   He never told you to hide anything from
19  the Government or the Coast Guard?
20      A   No.
21      Q   Okay.  One second.  One second.
22          Now, Mr. Espina --
23      A   Yes.
24      Q   -- recently you, with the assistance of

Page 59

1  your attorney, made an application to the Court to
2  let you go home; right?
3      A   Yes.
4      Q   And part of that application included a
5  declaration that you made in support of that
6  application; right?
7      A   Yes.
8      Q   I'd like to show you what we've marked as
9  CSME Defendants' Exhibit No. 38.  For the record,
10  it's a three-page document.
11          Now, Mr. Espina, take a look at the
12  third page.  Is that your signature?
13      A   This is it.
14      Q   And before you signed it, you reviewed
15  that document?  Meaning you read it?
16      A   I read it fully.
17      Q   Okay.  And you agree with all the
18  contents?
19      A   Yes, of course.  I signed it.
20      Q   Okay.  Now, you're not here voluntarily,
21  are you?
22      A   I was asked to come here.
23      Q   Okay.  Who asked you to come here?  The
24  Coast Guard; right?

Page 60

1      A   Yes.
2      Q   Okay.  Now, Mr. Kotila asked you about
3  where you're staying.  You're staying at a motel up
4  in Philadelphia; right?
5      A   Previously.  At another time.
6          MR. CHALOS:  Okay.  Wait one
7  second.  I'd like to move into evidence CSME
8  Defendants' Exhibit No. 38.
9          MR. KOTILA:  Object to this
10  document.  This document is irrelevant to the case.
11  It appears -- the indictment goes through, I believe,
12  December of '05.  This is dated June 26th, 2006,
13  solely prepared for this purpose.  It's not even in
14  the native language; it's in English.
15          Totally object to this document,
16  and a continuing objection to that one and every one
17  in this matter.
18          MR. CHALOS:  Objection.
19          (Document marked Exhibit CSME 38
20          moved into evidence.)
21  BY MR. CHALOS:
22      Q   Okay.  Mr. Espina, when you first came
23  off the ship, you were staying in a motel in
24  Philadelphia; right?

Page 61

1      A   Yes.
2      Q   Okay.  And then just recently you've been
3  moved to a hotel here in Delaware; right?
4      A   Yes.
5      Q   Are you free to leave the United States?
6      A   No.
7      Q   Are you free to go visit with your
8  friends and family at home?
9      A   I'm free.
10      Q   You can leave to go visit them?
11      A   With the permission of my lawyer.
12          MR. CHALOS:  Okay.  So you'll have
13  to talk to Mr. Twersky about that.
14          Okay.  Mr. Espina, thank you very
15  much.  Nothing further.
16          RECROSS-EXAMINATION
17  BY MR. WOODWARD:
18      Q   Mr. Espina, my name is Carl Woodward, and
19  I represent Adrien Dragomir, the chief engineer.  I
20  just want to ask you a couple of questions.
21          I think you were showed a statement
22  by Mr. Kotila, and you were also questioned by
23  Mr. Chalos about it.  It's a four-page statement.
24          Just so I'm clear, this was

Page 62

1  originally drafted by the second engineer; correct?
2    A  Yes.
3    Q  All right. And then he wrote part of it
4  in final form and you wrote the rest.
5    A  Yes.
6    Q  That is, you copied what he had written.
7    A  Yes.
8    Q  All right. Now, there's some things in
9  here -- first of all, you signed it, right, on the
10  last page?
11    A  Yes.
12    Q  But in fact, you didn't know whether all
13  of the information in this statement was true, did
14  you? For example, any conversations between the
15  chief engineer and the second engineer, you weren't
16  present at them, were you?
17    A  I was not there.
18    Q  So therefore, you don't know whether
19  what's contained in this statement of conversations
20  between the chief engineer and the second engineer
21  are true or accurate?
22    A  I trust the second engineer.
23    Q  You trust the second engineer, but you
24  don't know whether what he said is correct in this

Page 63

1  statement, do you? Because you were not present.
2    A  Yes.
3    Q  Also, any conversations between the
4  second engineer and the electrician, you weren't
5  present for any of those conversations, were you?
6    A  I was not there.
7    Q  So therefore, the only way you know what
8  those conversations is by what the second engineer
9  wrote; correct?
10    A  Whatever it is that he said.
11    Q  All right. But you don't know whether
12  it's accurate, do you?
13    A  That I don't know.
14        MR. WOODWARD: I have no further
15  questions. Thank you very much.
16        REDIRCT EXAMINATION
17  BY MR. KOTILA:
18    Q  Quickly, Mr. Espina, Mr. Chalos here
19  asked you -- you said you never were asked to operate
20  the oily separator; correct?
21    A  Yes.
22    Q  And that's because the oily water
23  separator didn't work; correct?
24        MR. CHALOS: Objection.

Page 64

1        THE WITNESS: Yes.
2  BY MR. KOTILA:
3    Q  This practice of pumping the bilges into
4  the holding tank, did you ever do that?
5    A  Yes.
6    Q  How many times?
7    A  I don't remember anymore.
8    Q  When -- explain to me, when would bilges
9  be pumped overboard, when would they go into this
10  tank? Who would make the decision?
11    A  The bilge wells, when they get full, it's
12  transferred into the bilge tank. The bilge tank,
13  that's what we pump out.
14    Q  Okay. Now, what's the bilge holding
15  tank? What's the difference?
16    A  The bilge well will tank were located in
17  the front, two of them, starboard side and port side
18  and in the aft. And the bilge tank, it's only one
19  tank. It's larger than the bilge wells. That's it.
20    Q  Which tank was pumped overboard again?
21    A  The bilge tank.
22    Q  All right. Mr. Chalos also said to you,
23  you never reported dumping or never were told to lie
24  by Venetico or Chian Spirit; right?

Page 65

1    A  Yes.
2    Q  Those are companies.
3    A  Yes.
4    Q  Companies are made of individuals;
5  correct?
6        MR. CHALOS: Objection.
7        MR. WOODWARD: Calls for a legal
8  conclusion.
9        THE WITNESS: Yes.
10  BY MR. KOTILA:
11    Q  Now, were there any individuals from
12  Venetico or Chian on board during your voyage?
13    A  None.
14    Q  So who was the highest ranking member of
15  that ship?
16    A  The captain.
17    Q  Who was next?
18    A  In the deck department, you have the
19  captain, the chief officer, second officer.
20    Q  How about in the engine room?
21    A  The chief engineer.
22    Q  Who gave you the order to dump?
23    A  The second engineer.
24    Q  Who wrote the order to dump?

Bryan Espina

18 (Pages 66 to 69)

---

Page 66

1          MR. CHALOS: Objection.
2          THE WITNESS: The chief engineer.
3    BY MR. KOTILA:
4     Q    All right. This meeting, this meeting
5    that -- with Mr. Villano, Mr. Tudor was not invited;
6    correct?
7     A    He was not there.
8     Q    And he was the electrician?
9     A    Yes.
10    Q    And he was not an engine room employee,
11   was he?
12         MR. CHALOS: Objection.
13         THE WITNESS: How do you mean?
14   BY MR. KOTILA:
15    Q    He's not an engineer in the engine room.
16    A    He's not an engineer in the engine room,
17   but he's under the engine department.
18    Q    Okay. Now, Mr. Dragomir was not part of
19   that group either; correct?
20    A    In that particular meeting, he wasn't
21   there.
22    Q    Why not?
23    A    I don't know.
24         MR. WOODWARD: Objection; calls for

---

Page 68

1              I N D E X
2    WITNESS:                        PAGE
3    BRYAN ESPINA
4      Mr. Kotila                     4
5      Mr. Chalos                    26
6      Mr. Woodword                      61
7      Mr. Kotila                    63
8      Mr. Woodward                      67

---

Page 67

1    speculation.
2    BY MR. KOTILA:
3     Q    If you know.
4          MR. WOODWARD: He answered he
5    doesn't know.
6          MR. KOTILA: All right. I have no
7    questions. Thanks.
8          MR. CHALOS: No questions for me.
9    Thank you
10         RECROSS-EXAMINATION
11   BY MR. WOODWARD:
12    Q    Yeah, I have a question.
13         Mr. Kotila asked you about a
14   written order to dump. Or did he mean -- did you
15   understand that to mean a written order in the engine
16   log? Do you recall what it said? The exact words.
17    A    "Out all engine room bilges."
18         MR. WOODWARD: Thank you. No
19   further questions.
20         THE VIDEOGRAPHER: Off the record
21   at 6:07.
22         (Signature having been waived, the
23         deposition of BRYAN ESPINA was
24         concluded at 6:07 a.m.)

---

69

1              E X H I B I T S
2       EXHIBITS MARKED FOR IDENTIFICATION
3    CSME        DESCRIPTION            PAGE
4    33    Documents relating to employment    26
           of Mr. Espina
5
     34    Photocopy of seaman's book and      26
6          passport of Mr. Espina
7    35    Licensing documents for             26
           Mr. Espina
8
     36    Certificates relating to            26
9          Mr. Espina's training
10   37    Physical and mental test results    26
           for Mr. Espina
11
     38    Declaration of Mr. Espina           26
12
13
14
15      EXHIBITS MOVED INTO EVIDENCE
16   CSMR Exhibit No.         PAGE
17    7                32
18   33                30
19   34                32
20   35                36
21   36                38
22   37                39
23   38                60
24

---

Corbett & Wilcox

70

CERTIFICATE OF SHORTHAND REPORTER

1
2
3          I, Gail Inghram Verbano, CSR, RMR,
4   the officer before whom the foregoing proceedings
5   were taken, do hereby certify that the foregoing
6   transcript is a true and correct record of the
7   proceedings; that said proceedings were taken by me
8   stenographically and thereafter reduced to
9   typewriting under my supervision; and that I am
10  neither counsel for, related to, nor employed by any
11  of the parties to this case and have no interest,
12  financial or otherwise, in its outcome.
13
14
15
16
            _____
            Gail Inghram Verbano, CSR, RMR
17          CSR No. 8635
            Certification No.: 220
18          (Expires 1-31-2008)
19
20
21
22
23
24