IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X

UNITED STATES OF AMERICA

Plaintiff,

Criminal Action No. 06-76 (GMS)

v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et al.*

Defendants.

-----------------------------------------------------------X

## DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC. AND VENETICO MARINE, S.A.'s, OBJECTIONS AND REQUEST FOR PRETRIAL RULINGS AS TO THE ADMISSIBILITY OF THE FOLLOWING PORTIONS OF THE RULE 15 DEPOSITION TESTIMONY OF EDGAR VILLANO.

**COME NOW,** moving defendants, Venetico Marine, S.A. ("Venetico") and

Chian Spirit Maritime Enterprises, Inc. ("CSME")(collectively, "Moving Defendants"),

who respectfully request that this Honorable Court consider and rule, before the voir dire

of the jury panel, and out of the presence and hearing of the jury panel, as to the

admissibility of the following Rule 15 deposition testimony by Edgar Villano, which the

Government has stated it will seek to introduce at trial.[1]

Specifically, Moving Defendants object to the admissibility of the following

deposition testimony by Edgar Villano, the "Second Engineer" on board the M/V IRENE

---

1 For the Court's ready reference, Moving Defendants advise that in order to facilitate the deposition process, counsel for all parties agreed to expressly reserve making objections during the examination.

1

E.M., on the following grounds. For the Court's ready reference, a correct and true copy of the transcript of the Rule 15 deposition of Mr. Conge, conducted at the office of the United States Attorney, 700 Nemours Building, 1007 Orange Street, Wilmington, Delaware, on Monday, July 17, 2006, is attached hereto as Exhibit "A".

### Edgar Villano  (Second Engineer)

Moving Defendants object to the introduction of the following testimony, as it lacks sufficient foundation; calls for speculation; calls for strictly inadmissible hearsay responses; assumes facts not in evidence and, if admitted, would be unfairly prejudicial, confusing and otherwise misleading to the trier of fact:

> Page 9/lines 6 -20 (relevance);
> Page 16/lines 4 – 15 (leading; lacks foundation; calls for speculation);
> Page 21/lines 14 -21 (leading);
> Page 22/lines 4 – 16 (hearsay; leading);
> Page 23/line 7 - Page 24/line 9 (impermissible use of prior Grand Jury testimony; improper impeachment; leading);
> Page 24/line 16-19 (hearsay);
> Page 25/line 19 – Page 26/line 12; (hearsay);
> Four page statement marked for identification as "Defense Exhibit 13" (privileged document prepared at request of counsel)[2]; and
> Page 30/line 4 – Page 33/line 8 (leading; impermissible use of prior Grand Jury testimony; improper impeachment);

### CONCLUSION

For the reasons more fully set forth above, Moving Defendants respectfully request that this Honorable Court issue an Order:

---

2 *See also,* Exhibit "A," *Transcript Page 94/lines 7 -22; See also, Transcript Page 115/line 18 – Page 117/line 16.*

(1)   Granting Moving Defendants' application to exclude, either in its entirety or

to the extent the Court finds just and proper, the foregoing objectionable

portions of the Rule 15 deposition testimony and redact CSME Exhibit 13 for

the reasons more fully set forth above; and

(2)   For any and all such other and further relief which the Court deems to be just

and proper under the specific circumstances of this matter.


Respectfully submitted,


By:  George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

## CERTIFICATE OF SERVICE

I do hereby certify that, on this  6th day of November 2006, I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:


United States Department of Justice
U.S. Attorney's Office
Nemours Building
1007 N. Orange Street, Suite 700
Wilmington, Delaware  19801
Attn:  Edmond Falgowski, Esq.


United States Department of Justice
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Street
Washington, D.C. 20026
Attn:  Gregory Linsin, Esq.
        Jeffrey Phillips, Esq.
        Tracy Katz, Esq.


Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

4

# EXHIBIT A

Edgar Villano

Page 1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

—    —    —

UNITED STATE OF AMERICA,       :
                              : No.
        Plaintiff,            : 1:06-CR-00076-GMS-2
                              :
            vs.               :
                              :
CHIAN SPIRIT MARITIME          :
ENTERPRISES, INC., VENETICO    :
MARINE S.A., IRENE E/M,        :
EVANGELOS MADIAS, CHRISTOS     :
PAGONES, ADRIEN DRAGOMIR,      :
                              :
        Defendants.           :


—    —    —


                Videotaped deposition of EDGAR
VILLANO, taken pursuant to notice before Gail Inghram
Verbano, CSR, RMR, in the offices of United States
Department of Justice, 700 Nemours Building, 1007
Orange Street, Wilmington, Delaware, on Monday,
July 17, 2006, beginning at approximately 12:06 p.m.


—    —    —

                CORBETT & WILCOX
            Registered Professional Reporters
    1400 French Street      Wilmington, DE 19801
                (302) 571-0510
              www.corbettreporting.com

Edgar Villano

2 (Pages 2 to 5)

Page 2

```
1   APPEARANCES:
2        MARK W. KOTILA, ESQ.
         JEFFREY L. PHILLIPS, ESQ.
3        United States Department of Justice
         Environmental Crimes Section
4        P.O. Box 23985 - L'Enfant Plaza
         Washington, DC 20026-3985
5        Attorneys for Plaintiff
6        GEORGE M. CHALOS, ESQ.
         FOWLER, RODRIGUEZ & CHALOS
7        366 Main Street
         Port Washington, NY 11050
8        Attorney for Defendants Chian Spirit
         and Venetico Marine
9
         CARL R. WOODWARD, III, ESQ.
10       CARELLA, BYRNE, BAIN, GILFILLAN,
         CECCHI, STEWART & OLSTEIN
11       5 Becker Farm Road
         Roseland, NJ 07068-1739
12       Attorney for Defendant Dragomir
13  ALSO PRESENT:
14       Chris Weiss, Videographer
         Chris Masaoay, Tagalog Interpreter
15
         Adrien Dragomir
16       Liviu-Lee Roth
         Brent McKnight
17       Jason F. Burgess
18           - - -
19
20
21
22
23
24
```

Page 3

```
1        THE VIDEOGRAPHER: This is Chris
2    Weiss, the videographer, and the court reporter today
3    is Gail Verbano. We are both here from the firm of
4    Corbett & Wilcox, located at 230 North Market Street,
5    Wilmington, Delaware.
6        The time is 2:06 on Monday
7    July 17th, 2006. We are documenting the videotaped
8    deposition of Edgar Villano for the plaintiff in the
9    matter of United States of America versus Chian
10   Spirit Maritime Enterprises, Inc., Venetico Marine,
11   Irene E.M., Evangelos Madias, Christos Pagones,
12   Adrien Dragomir, in the United States District Court,
13   District of Delaware.
14       We are at the location of the
15   United States Attorney's office, Nemours Building,
16   1007 North Orange Street, Suite 700, Wilmington,
17   Delaware.
18       Will the attorneys please state
19   their appearance for the record.
20       MR. KOTILA: Good afternoon. My
21   name is a Mark Kotila on behalf of the United States.
22   I should correct, it's actually 12:06.
23       MR. CHALOS: George Chalos on
24   behalf of Venetico Marine and Chian Spirit Maritime
```

Page 4

```
1    Enterprises.
2        MR. WOODWARD: And Carl Woodward on
3    behalf of Adrien Dragomir.
4        MR. TWERSKY: Michael Twersky on
5    behalf of the witness.
6        THE VIDEOGRAPHER: Will the court
7    reporter please administer the oath.
8            - - -
9        (CHRIS MASAOAY was previously sworn
10   in as Tagalog-English interpreter.)
11           - - -
12       EDGAR VILLANO, having first been
13   duly sworn through the interpreter according to law,
14   was examined and testified as follows:
15           - - -
16       DIRECT EXAMINATION
17   BY MR. KOTILA:
18       Q   Good afternoon, Mr. Villano. How are
19   you?
20       A   I'm okay, sir.
21       Q   My name is Mark Kotila, and I'm here on
22   behalf of the United States.
23       A   Yes.
24       Q   And we have spoken in the past; correct?
```

Page 5

```
1        A   Yes, sir.
2        Q   You testified previously in this matter?
3        A   Yes, sir.
4        Q   And we spoke -- I'm not sure exact times,
5    maybe once or twice -- in the United States
6    Attorney's office?
7        A   Yes, sir.
8        Q   And then, correct, last week we spoke in
9    your attorney's office, Mr. Twersky's office,
10   briefly?
11       A   Yes, sir.
12       Q   All right. Where do you currently
13   reside?
14       A   At the Doubletree Hotel.
15       Q   Where are you from? What country?
16       A   Philippines.
17       Q   And what is your address there?
18       A   4649 Pinagbuklod Street, Santa Mesa,
19   Manila.
20       Q   Thank you.
21           Could you tell us, what is your
22   occupation?
23       A   Second engineer.
24       Q   Now, how do you become a second engineer?
```

Edgar Villano

3 (Pages 6 to 9)

Page 6

1    A    You need to take a board exam from the
2    PLC, Philippine Regulation Commission.
3    Q    How much basic schooling do you have?
4    A    Two years.
5    Q    Any college?
6    A    College.
7    Q    Degree?
8    A    Yes.
9    Q    Four-year degree?
10   A    Two-year degree. Two years apprentice,
11   and then you can take as a fourth engineer.
12   Q    And this is all in the shipping industry?
13   A    Yes, sir.
14   Q    What kind of training have you had in
15   addition to school?
16   A    There is a lot. I cannot tell you, sir.
17   Q    Give us a little summary, some of your
18   courses you've taken.
19   A    MARPOL 1 and 2.
20   Q    What did you learn in MARPOL 1 and
21   MARPOL 2?
22   A    That it's illegal to dispose overboard
23   any oil.
24   Q    Do you learn in MARPOL 1 and MARPOL 2 how

Page 7

1    to handle bilge waste and oil sludge and things like
2    that?
3    A    They did not teach us how to operate it.
4    Q    Okay. You just know whether it's right
5    or wrong?
6    A    Yes, sir.
7    Q    When were you hired to work aboard the
8    M.V. Irene ?
9    A    Boarded, sir?
10   Q    When were you hired to work on that
11   vessel?
12   A    In Manila.
13   Q    Okay. Tell us how the job comes to you.
14   A    I went to apply.
15   Q    With whom?
16   A    At the crewing agency.
17   Q    In the Philippines?
18   A    Yes, sir.
19   Q    And how did you get out to the vessel?
20   A    Through the airplane.
21   Q    Okay. Where did you meet up with the
22   vessel, the Irene? What country?
23   A    In Brazil.
24   Q    Do you recall the date?

Page 8

1    A    Yes, sir.
2    Q    Describe the Irene for us -- hold on
3    before you do. Let me withdraw that.
4         What was the date that you got on
5    board the vessel?
6    A    November 17, 2005.
7    Q    Could you just describe briefly the
8    vessel. What was it towing or pulling or carrying
9    what kind of cargo, that kind of thing.
10   A    It's a bulk general cargo ship, sir.
11   Q    How many people would be under your
12   supervision?
13   A    Seven, sir.
14   Q    Who would they be, what titles?
15   A    The third engineer, the electrician, the
16   fourth engineer, and the three oiler and a wiper --
17   eight, sir. Eight.
18   Q    When you're hired aboard a vessel, you're
19   hired under a contract; correct?
20   A    Yes, sir.
21   Q    Who was the contract with?
22        MR. WOODWARD: Objection.
23   BY MR. KOTILA:
24   Q    Who was the contract with? You can

Page 9

1    answer the question.
2    A    With a crewing agency.
3    Q    Okay. Aboard a vessel, who do you take
4    your orders from?
5    A    The chief engineer.
6    Q    Do you see the chief engineer in this
7    room today?
8    A    Yes, sir.
9    Q    And point him out for us and tell us what
10   his name is.
11   A    There he is.
12   Q    The gentleman wearing the jeans vest?
13   A    Yes, sir.
14   Q    Do you know his name? Go ahead.
15   A    Adrien, sir.
16   Q    Do you know his last name?
17   A    Dragomir.
18        MR. KOTILA: Well, for the record,
19   the witness has identified the defendant, Adrien
20   Dragomir.
21   BY MR. KOTILA:
22   Q    When you got on board the vessel
23   November 17th, 2005, in Brazil, tell us what you did
24   once you got on board.

Edgar Villano

4 (Pages 10 to 13)

---

**Page 10**

1      A   Of course I reported to the chief
2   engineer.
3      Q   Tell us what some of your duties were.
4   What were the actions you took when you got on board?
5      A   I'm the one that collects the job order
6   from him every day in the engine room.
7      Q   Now, you speak Filipino?
8      A   Yes, sir.
9      Q   As a first language?
10      A   Yes, sir.
11      Q   And -- but do you speak English?
12      A   Yes, sir.
13      Q   Did you ever take any training or
14   education in English?
15      A   Yes, sir.
16      Q   So you took courses of the language --
17   English language?
18      A   Since the elementary school until
19   college.
20      Q   So you speak English pretty well?
21      A   Yes, sir.
22      Q   What language did you communicate with
23   the chief engineer?
24      A   In English.

---

**Page 11**

1      Q   Okay.  Tell us about the oily water
2   separator aboard the Irene.
3          MR. CHALOS:  Objection.
4          THE WITNESS:  When I first boarded,
5   I asked the chief engineer if the oily water
6   separator was working.
7   BY MR. KOTILA:
8      Q   What did he say?
9      A   He said yes.
10      Q   What did you do next?
11      A   I asked him.
12      Q   Go ahead.
13      A   I said to him, "Did you try it?"
14      Q   And what did he say?
15      A   He said yes.
16      Q   And what happened after that?
17      A   In my particular duty, in my duty at
18   nighttime, I tried to make it run.
19      Q   Tell us what you did to try to make it
20   run.
21      A   I looked for the power source, and I
22   looked at the valves together with the manual.  But I
23   was not able to make it work that evening.
24      Q   Did it ever work when you were on board?

---

**Page 12**

1      A   The next day.
2      Q   Uh-huh.  What's the purpose of the oily
3   water separator?
4      A   To separate the oil and the water.
5      Q   Does anything go overboard?
6      A   Through the separator, sir?
7      Q   Yes.
8      A   Are we talking about a testing process?
9      Q   Yes, when you test it.  How is it
10   supposed to work?
11      A   We did not open the overboard, only the
12   testing line.
13      Q   Tell us how you tested it.
14      A   When I tested it, I was with the
15   electrician.  We tried to run it.  And so he showed
16   me where the power sources were, and so we made it
17   run.  It was running, but it did not stop on the
18   proper reading, ppm.
19      Q   What is the proper ppm?
20      A   15 ppm automatic stop.
21      Q   When did it stop, though?
22      A   After 15 ppm.
23      Q   About how much after; do you remember?
24      A   About 38, going up.  More than 40.

---

**Page 13**

1      Q   Did any part of the oily water separator
2   work?
3          MR. CHALOS:  Objection; asked and
4   answered.
5   BY MR. KOTILA:
6      Q   Did the alarm work on it?
7      A   Yes, sir.
8      Q   And why is that?
9      A   When it stops, it makes an alarm.
10      Q   Did you see the electrician do anything
11   with the alarm?
12      A   I didn't see anything.
13      Q   Okay.  Did the alarm have to be fixed; do
14   you know?
15      A   Perhaps not.  It was running, the alarm.
16      Q   It was sounding, you mean?
17      A   Yes, sir.
18      Q   Is there an overboard discharge connected
19   to the oily water separator?
20      A   Yes, there is.
21      Q   Is there a lock on it?  Can it be locked?
22      A   Yes, sir.
23      Q   And when you were testing it, was it
24   locked?

---

Edgar Villano

5 (Pages 14 to 17)

Page 14

1    A    Yes, sir.
2    Q    Was it ever unlocked during the time you
3  were on the ship?
4    A    Sometimes.
5    Q    Was the oily water separator ever used to
6  discharge any water into the ocean?
7    A    No, sir.
8    Q    Never while you were on board?
9         MR. WOODWARD:  Objection; leading.
10        THE WITNESS:  No, sir.
11  BY MR. KOTILA:
12   Q    On your trip from Brazil to the United
13  States, what if anything was discharged overboard?
14        MR. CHALOS:  Objection.
15        MR. WOODWARD:  Objection.
16  BY MR. KOTILA:
17   Q    Answer the question.
18   A    The bilges and the sludges.
19   Q    How were these items discharged
20  overboard?
21   A    Going through a magic pipe.
22   Q    Did you do this?
23   A    We were the ones that attached it.
24   Q    Who is "we"?

Page 15

1    A    Me and Robert were the ones that attached
2  it.
3    Q    Robert Damasing?
4    A    Yes, sir.
5    Q    Why did you do this?
6    A    We were asked by the chief engineer.
7    Q    Mr. Dragomir?
8    A    Yes, sir.
9    Q    What did he ask you to do?
10   A    That when the bilges are high and the
11  sludge are high, that we should just go ahead and
12  pump it overboard through the magic pipe.
13   Q    Do you recall when is the first time that
14  the chief engineer told you to do this?
15   A    I don't remember exactly what day that
16  was.
17   Q    You got on board November 17th.
18   A    Yes, sir.
19   Q    Were you told that by the chief engineer
20  a few days later?
21        MR. WOODWARD:  Objection; leading.
22        THE WITNESS:  Yes, sir.
23  BY MR. KOTILA:
24   Q    How were you told?

Page 16

1    A    He told me verbally, direct.
2    Q    In what language?
3    A    In English.
4    Q    How else were you told, if at all?
5         MR. WOODWARD:  Objection.
6         THE WITNESS:  He also wrote it in a
7  logbook with a red ball pen.
8  BY MR. KOTILA:
9    Q    What did he write in the book?
10   A    "Out all engine room bilges."
11   Q    In red ink?
12   A    Yes, sir.
13   Q    And what did you take that to mean?
14   A    Before I read it, he told me in person.
15  So I know what it meant.
16   Q    What did he say in person?  Exact words,
17  if you can recall.
18   A    All he told me was "Use the magic pipe
19  when the levels of the bilges are high.  We should go
20  ahead and dispose of it before we arrive in the
21  United States."
22   Q    You knew you were coming to the United
23  States as soon as you got on board?
24   A    When I arrived there, I knew that it was.

Page 17

1    Q    Arrived where?  In Brazil?
2    A    Yes, sir.
3    Q    How many times was it written in the
4  logbook to discharge?
5    A    Only one time, sir.
6    Q    Was this a standing order?
7         MR. CHALOS:  Objection.
8         MR. WOODWARD:  Leading.
9         THE WITNESS:  After that he no
10  longer wrote it down.  But then he would also talk to
11  me.
12  BY MR. KOTILA:
13   Q    And say what?  What did he say?
14   A    He would tell me that we should go ahead
15  and pump it out.
16   Q    How many times in the voyage, from
17  November 17th through the time you arrived in the
18  U.S. in December -- if you recall, how many times did
19  he tell you to pump overboard?
20   A    I don't remember exactly, sir.
21   Q    More than one?
22   A    Yes, sir.
23   Q    More than five times?
24   A    I don't know, sir.

Edgar Villano

6 (Pages 18 to 21)

Page 18

1      Q   But multiple times?
2          MR. CHALOS: Objection.
3          THE WITNESS: Yes, sir.
4   BY MR. KOTILA:
5      Q   How did you know what to do?
6      A   For example, what?
7      Q   Well, did he tell you to use the magic
8   pipe?
9      A   Yes, sir.
10     Q   He used those words, "magic pipe?"
11     A   Yes, sir.
12     Q   Take a look to your right. That's
13  Government's Exhibit No. 2, I believe.
14         MR. PHILLIPS: It is.
15  BY MR. KOTILA:
16     Q   Mr. Villano, do you recognize that?
17     A   Yes, sir.
18     Q   What do you recognize that piping to be?
19     A   That's what we would use.
20     Q   How do you know those -- are they the
21  exact items, if you know? You can get up and take a
22  look at them, if you want.
23     A   Yes.
24     Q   Those are the items, the exact two pipes?

Page 19

1      A   Yes, sir.
2      Q   How can you tell?
3      A   Because I were the one that put it
4   together.
5      Q   One -- how many times did you put it
6   together?
7      A   Only once.
8      Q   Did the pipes stay connected to the
9   overboard from the tanks the entire time you were
10  there, from November to December?
11     A   Yes. It was taken out before we arrived.
12     Q   Who took it out?
13     A   I don't remember who took it out.
14     Q   Do you know why it was taken out?
15     A   Yes, sir.
16     Q   Why?
17     A   It's against the law.
18     Q   And you knew that from taking the MARPOL
19  courses; right?
20     A   Yes, sir.
21     Q   Now, you say you connected the pipe?
22     A   There were two of us, with Robert.
23     Q   Walk us through it. What did you
24  connect, what to what? What tank to what?

Page 20

1      A   When we attached this, there was already
2   a flange --
3          MR. KOTILA: Hold on a second.
4          MR. PHILLIPS: Government 3.
5   BY MR. KOTILA:
6      Q   Let's take a look at Government 3. Do
7   you see it down there?
8      A   Yes, sir.
9      Q   Do you recognize that item?
10     A   Yes, sir.
11     Q   What do you recognize it to be?
12     A   That's what we connect to the line from
13  the bilge pump going to overboard.
14     Q   And how did the material go from the --
15  from the bilge well or bilge tank?
16     A   We attached it. A flange was attached,
17  and then attached to the bilge pump -- after the
18  bilge pump.
19     Q   How did the material, the oily waste, go
20  from the tanks out oversea? How did it get pumped?
21     A   There's a suction from the bilge pump.
22     Q   Okay. When did you pump, day or night?
23         MR. CHALOS: Objection. He never
24  said he pumped.

Page 21

1          THE WITNESS: At nighttime.
2   BY MR. KOTILA:
3      Q   Did you do the pumping or did you order
4   it to be pumped?
5      A   I make the order.
6      Q   Order to whom?
7      A   The fourth engineer, the third engineer.
8      Q   When did you order to be pumped, day or
9   night?
10         MR. CHALOS: Objection.
11  BY MR. KOTILA:
12     Q   You can answer.
13     A   Two days after we left Brazil.
14     Q   But at nighttime you ordered the pump?
15         MR. CHALOS: Objection.
16         THE WITNESS: Yes, sir.
17  BY MR. KOTILA:
18     Q   Why at night?
19     A   Because in the daytime they would see it.
20     Q   Who would see it?
21     A   The authorities.
22     Q   Now, you arrived in the United States
23  around December 4th; do you recall?
24     A   Yes, sir.

Edgar Villano

7 (Pages 22 to 25)

Page 22

1    Q   And the Coast Guard got on board the
2  vessel?
3    A   Yes, sir.
4    Q   And did you overhear the chief engineer
5  speaking with the Coast Guard --
6    A   Yes, sir.
7    Q   -- about the oily water separator?
8    A   Yes.
9    Q   What did you hear him tell the Coast
10 Guard?
11   A   On the first day, he said that it was
12 working.
13   Q   Was that true?
14   A   No, sir.
15   Q   When you were discharging or your crew
16 members were discharging overboard, did you ever go
17 back to the chief engineer and tell him this was
18 wrong to do?
19   A   No, sir.
20   Q   Do you remember whether you spoke to him
21 about that or not?
22       MR. CHALOS: Objection.
23       MR. WOODWARD: Objection; leading.
24 It's asked and answered.

Page 23

1        THE WITNESS: About what?
2  BY MR. KOTILA:
3    Q   About whether it was right or wrong to
4  discharge overboard.
5    A   All he told me was, "Pump out.  Go ahead
6  and pump out."  He didn't say any other thing.
7    Q   Okay.  Well, let me remind you, you
8  testified back on January 12th in a prior proceeding
9  in this matter --
10       MR. WOODWARD: Objection.  You
11 can't rehab your own witness.
12 BY MR. KOTILA:
13   Q   -- and you told the chief engineer
14 this --
15       MR. CHALOS: Objection.
16       MR. WOODWARD: Can't impeach with
17 prior inconsistent statements.
18 BY MR. KOTILA:
19   Q   You told the chief engineer it was wrong
20 to discharge bilge overboard.
21       "Answer: Yes."
22       Do you recall that?
23   A   Now I remember.
24   Q   Okay.  Now you remember.  Tell us your

Page 24

1  conversation with the chief engineer.
2        MR. CHALOS: Objection.
3        THE WITNESS: I told him that --
4  that it's not correct to be pumping out.
5  BY MR. KOTILA:
6    Q   What did he say to you?
7    A   There was nothing I could do.
8    Q   The chief said that?
9    A   Yes.
10   Q   Now let's talk about once you reached the
11 United States; you were here.  And you're on board
12 December '05; correct?
13       Did you meet with a company
14 representative named Christos?
15   A   Yes, sir.
16   Q   And who was he?
17   A   They said that he was the superintendent.
18   Q   For the company?
19   A   Yes, sir.
20   Q   How did he come on board the vessel; do
21 you know?
22   A   I don't know, because when he arrived, he
23 just called me.
24   Q   He called you personally?

Page 25

1    A   Somebody called me and asked me to go
2  over there, the captain's office.
3    Q   And did you have a conversation with this
4  Mr. Christos?
5    A   Yes, sir.
6    Q   What did he say to you?
7    A   He asked me -- he asked me if I would
8  tell him -- tell him what happened between Brazil and
9  the United States.
10   Q   And did you do that?
11   A   Yes, sir.
12   Q   And what did he say to you?
13   A   That we need to take a statement as to
14 what had happened, starting Brazil, going to the
15 United States, and that we would hand it over to the
16 attorneys.
17   Q   Did you make that statement?
18   A   Yes, sir.
19   Q   I'll show you Defense Exhibit 14,
20 four-page statement.
21   A   Yes, sir.
22   Q   Do you recognize that statement?
23   A   Yes, sir.
24   Q   And you signed it on the back on the last

Edgar Villano

8 (Pages 26 to 29)

Page 26

1    page?
2        A    Yes, sir.
3        Q    Did you write that statement?
4        A    Yes. I was the one that made it.
5        Q    All four pages?
6        A    The last page was made by the fourth
7    engineer.
8        Q    What's the fourth engineer's name?
9        A    Bryan Espina.
10       Q    Okay. And you read it, of course?
11       A    Yes, sir, because I was the one that made
12   the rough draft.
13       Q    Now, you made this statement. And did
14   you have -- did you give it to Christos?
15       A    Yes, sir.
16       Q    Now, did Christos talk to you further
17   about the incident aboard the boat afterwards?
18       A    He spoke to me many times.
19       Q    What did he say afterwards?
20       A    That we should change the statement.
21       Q    When was the first time he told you that?
22           MR. WOODWARD: Objection.
23           THE WITNESS: I don't remember any
24   more, sir.

Page 27

1    BY MR. KOTILA:
2        Q    Well, tell us what he told you then.
3        A    He told me that I should change the
4    statement -- we should change the statement, because
5    if we don't, we would go to jail.
6        Q    Christos said this?
7        A    Yes, sir.
8        Q    Did he say how you should change the
9    statement?
10       A    Yes, sir.
11       Q    Tell us.
12       A    He told us that we just made a mistake or
13   we are just afraid.
14       Q    To say that you were just afraid?
15       A    Yes, sir.
16       Q    Now, on around December 5th, you're here
17   in the U.S. still. Did there come a time that you
18   were called to the captain's office? Do you recall
19   that?
20           MR. CHALOS: Objection.
21           THE WITNESS: December 5.
22   BY MR. KOTILA:
23       Q    What happened that day? Tell us.
24           MR. CHALOS: Objection.

Page 28

1    BY MR. KOTILA:
2        Q    That you recall.
3        A    I'm asking you, who called me?
4        Q    Were you called by an oiler --
5            MR. WOODWARD: Objection; leading.
6    BY MR. KOTILA:
7        Q    -- to go up to the captain's office?
8            MR. CHALOS: Objection.
9            THE WITNESS: We were already in
10   Camden at that time.
11   BY MR. KOTILA:
12       Q    Okay. Were you called to a meeting with
13   the owner?
14       A    Yes, sir.
15       Q    Tell us about that.
16       A    That day -- that first day that they
17   arrived.
18       Q    Okay.
19       A    He said to me we could not change the
20   statement. But then on the next day, he said that we
21   need to change the statement, because if not, you
22   would go to jail.
23       Q    The first day he said, You can't do
24   anything today? Is that what he said?

Page 29

1        A    Yes, sir.
2        Q    What did that mean; do you know?
3            MR. CHALOS: Objection.
4            THE WITNESS: He said, "Whatever it
5    is that you have there, just leave it."
6    BY MR. KOTILA:
7        Q    And that's all they said that day?
8        A    Because they were having a meeting. And
9    that's what they told me.
10       Q    What was the owner's name?
11       A    Madias.
12       Q    Madias?
13       A    Yes.
14       Q    Now, you say the next day he spoke to you
15   again?
16       A    Yes, sir.
17       Q    What did he tell you the next day?
18       A    That he said that, Tell your other
19   coworkers that we need to change the statement,
20   because if not, all of you will go to jail.
21       Q    What did you say when he told you that?
22       A    I told him that, "Sir, what you're asking
23   us is complicated."
24       Q    And what did he say?

Page 30

1    A    He just said that that -- that's the help
2  that you can provide.  That's the help that I could
3  provide.
4    Q    Did the owner say anything further, like
5  how to change your statement?
6        MR. CHALOS:  Objection.
7        THE WITNESS:  "Just tell them that
8  you made a mistake.  Just change it, change the
9  statement."  There was nothing else.
10 BY MR. KOTILA:
11   Q    Did he say to tell the Coast Guard that
12 you felt pressured by the Coast Guard?
13       MR. CHALOS:  Objection; leading.
14       THE WITNESS:  Christos was the one
15 that said something like that.
16 BY MR. KOTILA:
17   Q    All right.  Are you sure it's not Madias?
18       MR. WOODWARD:  Objection; leading.
19       MR. CHALOS:  Objection.
20       THE WITNESS:  Yes, sir.
21 BY MR. KOTILA:
22   Q    Well, do you remember, or you're not
23 sure?
24   A    I'm not sure.  I don't remember.

Page 31

1    Q    Let me see if I can refresh your
2  recollection.
3        MR. CHALOS:  You can't rehabilitate
4  your own witness.
5        MR. KOTILA:  Sure you can.  Refresh
6  his recollection.
7        MR. CHALOS:  Well, he says he
8  doesn't remember.
9        MR. KOTILA:  That's why I can
10 refresh his recollection.
11       MR. CHALOS:  But he didn't say
12 that.  He said it was Christos.
13 BY MR. KOTILA:
14   Q    Do you recall also testifying in a prior
15 proceeding in this matter on February 2nd, 2006 --
16 correct?
17   A    Yes.
18   Q    Do you recall the question --
19       MR. WOODWARD:  Could we have a
20 page, please.
21 BY MR. KOTILA:
22   Q    Page 15, on February 6th.  All right.
23 Let's -- I'm going to start at the top.
24       "Question:  Did the captain ever ask

Page 32

1  you to change your story?"
2        "Answer:  No, sir.
3        "Question:  Just the owner?"
4        MR. WOODWARD:  Hold it, hold it,
5  hold it.
6        MR. KOTILA:  You on page 15?
7        MR. TWERSKY:  It's the second day,
8  Carl.
9        MR. KOTILA:  There were two.  You
10 know, let me make this easy, if we could.  I have --
11 let me give it to him, because he can read; right?
12       With the help of the interpreter
13 just read this page quickly.  15 to the top of 16.
14       THE INTERPRETER:  You want him to
15 go to the next page?
16 BY MR. KOTILA:
17   Q    Just the top of Page 16, please.
18   A    Yes.  Yes.
19   Q    Okay.  Mr. Villano, do you recall giving
20 that testimony?
21   A    Yes.
22   Q    So what did the owner tell you to say?
23       MR. CHALOS:  Objection.
24       THE WITNESS:  Just like what he

Page 33

1  said:  To change the statement, because you were just
2  pressured and afraid of the Coast Guard, and you're
3  afraid.
4  BY MR. KOTILA:
5    Q    Did --
6        MR. WOODWARD:  Objection.  Go
7  ahead.
8  BY MR. KOTILA:
9    Q    Did Mr. Madias -- when you were leaving
10 the boat to stay in the United States, did
11 Mr. Christos say to tell the truth?
12   A    Yes, sir.
13   Q    Did Mr. Madias say that too?
14   A    No, sir.
15   Q    He never did?
16   A    No, sir.
17   Q    The engine logbook you described
18 earlier --
19       MR. WOODWARD:  Objection; no
20 foundation.
21       MR. CHALOS:  He never described the
22 book.  Wrong guy.
23       MR. KOTILA:  Huh?
24       MR. CHALOS:  Wrong guy.  He never

Edgar Villano

10 (Pages 34 to 37)

Page 34

1  described the book.
2  BY MR. KOTILA:
3      Q   When you received orders from the chief
4  engineer to pump the bilges, did you receive that
5  order in writing too?
6          MR. CHALOS:  Objection.
7          MR. KOTILA:  Sure he did.
8          THE WITNESS:  Sometimes not.
9  BY MR. KOTILA:
10     Q   But you did receive that one time?
11     A   Yes, sir.
12         MR. CHALOS:  Objection.
13 BY MR. KOTILA:
14     Q   And what kind of -- how in writing?  What
15 kind of book?
16     A   Engine logbook.
17     Q   All right.  When was the last time you
18 saw that engine logbook?
19     A   Before we got off the ship, I saw it.
20     Q   Where did you see it?
21     A   Close to the door of the chief engineer.
22     Q   Mr. Dragomir?
23     A   Yes.
24     Q   Now, that engine logbook, that's not the

Page 35

1  same as this particular book?
2      A   No.
3      Q   Are you familiar with what is
4  Government's Exhibit No. 1?
5      A   Oil Record Book, sir.
6      Q   How are you familiar with this book?
7      A   I've seen it in other ships as well.
8      Q   Have you seen it on this ship?
9      A   No, I didn't see it.
10     Q   Okay.  So you did see this book.
11         (Discussion held off the
12         stenographic record.)
13 BY MR. KOTILA:
14     Q   Let me ask you a question:  Before you
15 got to the United States, did you receive an order
16 from the chief engineer to backfill the wells to
17 bring them up to a certain level?  Do you recall?
18     A   Could you repeat that.
19     Q   Did you put water, saltwater and
20 freshwater, in wells?  In tanks or wells?
21     A   Yes, sir.
22     Q   Tell us about that.
23     A   We needed to put some water -- seawater
24 and fresh for the bilge tank, freshwater for the

Page 36

1  sludge tank -- so that we could reach -- so that we
2  could reach the declared level.
3      Q   Declared where?
4      A   On the Oil Record Book of his.
5      Q   This record book?
6      A   I don't know.
7      Q   Who ordered you to do that?
8      A   The chief engineer.
9      Q   Is that a proper practice, pursuant to
10 your training and education in MARPOL?
11         MR. CHALOS:  Objection.
12         THE WITNESS:  No, sir.
13 BY MR. KOTILA:
14     Q   Why not?
15     A   That's against the law.
16     Q   I have no further questions -- hold on.
17         When did you do this?  When did you
18 give the order to fill those tanks?
19         MR. CHALOS:  Objection; no
20 foundation.  He never gave the order.  That was
21 never --
22         MR. PHILLIPS:  He testified that
23 the chief engineer --
24 BY MR. KOTILA:

Page 37

1      Q   What's your answer?  Did you give the
2  order to fill the tanks or did you fill the tanks?
3          MR. CHALOS:  Objection; leading.
4          THE WITNESS:  We were asked to do
5  that, and then we did it.
6  BY MR. KOTILA:
7      Q   You physically did it?
8      A   Yes, sir.
9      Q   How did you do it?
10     A   In the bilge tank, we used a bilge pump.
11 In the sludge tank, we used the freshwater hydrofoil
12 tank -- hydrophoric tank.
13     Q   So the bilge -- the suction tank pumped
14 from the bilge tank came from the ocean?  That's the
15 saltwater?
16     A   Yes, sir.
17     Q   When did you do this?  When on the
18 vessel?  Before you got to the United States or in
19 the United States?
20     A   Before we arrived.
21     Q   How far before you arrived?
22     A   I don't remember exactly what the
23 distance was.
24     Q   A day before you got to the United

Edgar Villano

11 (Pages 38 to 41)

Page 38

1  States?  Two days?
2      A   I believe it was a day.
3      Q   A day before you reached Delaware?
4      A   Yes, sir.
5          MR. KOTILA:  Thank you.
6          (Discussion held off the record.)
7          CROSS-EXAMINATION
8  BY MR. CHALOS:
9      Q   Mr. Villano, you told us about some
10 discussions you had with two different men, one man
11 named Madias and one man named Christos; right?
12     A   Yes, sir.
13     Q   And then you told Mr. Kotila that you
14 thought Mr. Madias was the owner of the ship; right?
15     A   Yes, sir.
16     Q   Now, look me in the eyes.  You don't know
17 that, do you?
18     A   That's what they said.
19     Q   So my question to you is, you don't know
20 what Mr. Madias' role was with the ships, do you?
21     A   He told me that he was the owner.
22     Q   He told you that?
23     A   Yes, sir.
24     Q   And when he told you that, who was

Page 39

1  present?
2      A   He himself and the wife.
3      Q   So nobody else was present?
4      A   We were at the table.
5      Q   My question is nobody else from the crew
6  was present?
7      A   The chief engineer was there.
8      Q   Mr. Dragomir was there?
9      A   Yes, sir.
10     Q   Now, Mr. Christos, you don't know who
11 Mr. Christos was, do you?
12     A   They told me that he was the
13 superintendent.
14     Q   Okay.  Well, wait a minute.  When you say
15 "they told me," who is that?
16     A   He himself told me.
17     Q   Okay.  Now, before, when Mr. Kotila asked
18 you about who Madias was, your answer was "they told
19 me he was the owner."
20     A   That's what he said.
21     Q   Wait a minute.
22     A   And he himself said that.
23     Q   Well, that's not your answer to
24 Mr. Kotila, was it?

Page 40

1      A   But the question was not phrased that
2  way, you know.
3      Q   Well, I do know; that's why I'm trying to
4  find out.
5          The question of Mr. Kotila was how
6  did you know he was the owner?  And your answer to
7  him was, "They told me."
8      A   He told me.
9      Q   You didn't tell Mr. Kotila "he" told you.
10 You told Mr. Kotila, "they told me."
11         Who was "they"?
12     A   The whole engine room said that.
13     Q   So the whole engine room said that?
14     A   The group from the engine room.
15     Q   Okay.  Now, you also told me just a
16 second ago that when you met with Mr. Madias, that
17 the chief engineer was present.
18     A   Yes, sir.
19     Q   Okay.  Now, that's not what you told the
20 Grand Jury; right?
21     A   The first day that I said, I said that he
22 was there.  The next day he wasn't there.  That's
23 what I said.
24     Q   Let's talk about your Grand Jury.  Okay?

Page 41

1          Before you went to the Grand Jury,
2  the Government made a promise to you; right?  That if
3  you'd cooperate with their investigation you
4  wouldn't get in trouble for anything that you did
5  that was wrong.
6      A   From what I know and the way I understood
7  it, nothing will happen to us if we do not tell a
8  lie.
9      Q   Okay.  But you knew that at the time the
10 Government made that promise to you you had done
11 something wrong.
12     A   All I'm telling you here is the truth.
13     Q   Okay.  Listen to my question, please.
14         At the time you made that agreement
15 with the Government that you would cooperate in their
16 investigation, their promise to you was that you
17 would not get into trouble for anything that you did
18 wrong so long as you agreed to cooperate with them;
19 right?
20     A   Yes.
21     Q   And then you went and you testified
22 before the Grand Jury on January the 12th; right?
23     A   Yes, sir.
24     Q   And then at the end of the day, after the

Edgar Villano

12 (Pages 42 to 45)

Page 42

1  Grand Jury, after the Government was finished asking
2  you questions, you took it upon yourself to go find
3  the prosecutors; right?
4      A   Yes, sir.
5      Q   And you went running to the prosecutors
6  because you wanted to tell them something else that
7  you thought would be helpful for their case; right?
8      A   Yes, sir.
9      Q   And when you went running to the
10  prosecutors, the information that you told them about
11  was what we're talking about now, your discussions
12  with Mr. Madias; right?
13      A   Yes, sir.
14      Q   And now, they asked you about if anyone
15  asked you to lie during your Grand Jury testimony;
16  right?
17      A   Yes, sir.
18      Q   And you never said anything in the first
19  session about Mr. Madias?
20      A   That was not asked as a question.
21      Q   It wasn't asked?  Well, let's take a
22  look.
23          Do you remember, there was a series
24  of questions about whether anyone told you what to

Page 43

1  tell the Coast Guard; right?
2      A   Could you repeat that.
3      Q   Yeah.  There was a series of questions
4  about whether anybody ever asked you or told you what
5  to say to the Coast Guard.
6      A   And who asked me that question?
7      Q   The prosecutors.  Do you remember that?
8      A   I don't remember that anymore.
9      Q   Okay.  So as you sit here today, you
10  don't remember what you told the Grand Jury on
11  January 12th, 2006?
12      A   Some of it I don't.
13      Q   Okay.  Now, after you finished your
14  testimony before the Grand Jury on January 12th and
15  you went to find Mr. Falgowski, you told him about
16  discussions you had with Captain Madias; right?
17      A   Yes, sir.
18      Q   And he asked you, Mr. Falgowski asked
19  you --
20          MR. KOTILA:  Objection; calls for
21  speculation.
22          MR. CHALOS:  Party statement.
23  BY MR. CHALOS:
24      Q   Mr. Falgowski asked you to tell him

Page 44

1  everything you know about all your conversations with
2  the owner -- who you thought was the owner; right?
3      A   Yes, sir.
4      Q   And you did that; right?
5      A   Yes, sir.
6      Q   And then Mr. Falgowski asked you to come
7  to the Grand Jury for a second time; right?
8      A   Yes, sir.
9      Q   And at that second session, Mr. Falgowski
10  asked you again about your discussions with
11  Mr. Madias; right?
12      A   Yes, sir.
13      Q   Okay.  And take a look now -- and I'll
14  make a representation this is a transcript of your
15  February 2nd Grand Jury appearance, and I'm asking
16  you to show me where you told Mr. Falgowski or the
17  Grand Jury that the chief engineer was present during
18  these discussions.
19      A   It was asked to me that question the
20  second day, the second time, not the first day.
21      Q   That's the second day.  That's a
22  transcript of the second day.
23      A   What I meant was that time when the chief
24  engineer -- the first day when the owner arrived, but

Page 45

1  the next day, the chief engineer was not there
2  anymore.  And so I have not told it in this
3  particular situation.
4      Q   So let me see if I got this right.
5          The only time the chief engineer
6  was present was the first day, when Mr. Madias told
7  you there's nothing you can do about your statement;
8  right?
9      A   Yes.
10      Q   So it's fair to say that all this
11  testimony that you've given us about Mr. Madias
12  telling you to change your statement occurred when
13  nobody else was present?
14      A   Yes.  Yes, sir.
15      Q   So it was just you and him?
16      A   Yes, sir.
17      Q   So there's nobody else that can confirm
18  what you're saying as being true, is there?
19      A   Only the two of us.
20          MR. CHALOS:  Okay.  Let's take a
21  break.  It's a good time for lunch.
22          THE VIDEOGRAPHER:  Off the record
23  at 1:02.
24          (Luncheon recess from 1:02 p.m. to

Edgar Villano

13 (Pages 46 to 49)

Page 46

1        2:14 p.m.)
2        (Documents marked CSME Exhibits 17
3        through 22 for identification.)
4            THE VIDEOGRAPHER:  We are on the
5    record at 2:14.
6    BY MR. CHALOS:
7        Q    Good afternoon, Mr. Villano.
8        A    Good afternoon, sir.
9        Q    Did you have an opportunity to have
10   lunch?
11       A    Yes, sir.
12       Q    During lunch, did you speak with anybody
13   about your testimony here today?
14       A    No, sir.
15       Q    Did you speak with Roberto Damasing
16   during the break?
17       A    Yes, sir.
18       Q    And Mr. Damasing is going to be the next
19   witness to testify; right?
20       A    Yes, sir.
21       Q    Let's talk a little bit about you and
22   your background and history before you were hired to
23   join the Irene E.M.
24            I'm going to show you what we've

Page 47

1    previously marked as CSME Defendants' Deposition
2    Exhibit No. 17.  For the record, I'll make a
3    representation that the exhibit is five pages.
4            Now, Mr. Villano, earlier today
5    Mr. Kotila asked you some questions about the
6    employment contract you signed.  Do you remember
7    that?
8        A    Yes, sir.
9        Q    And is Exhibit 17 a copy of the
10   employment contract and its attachments?
11       A    Could you repeat that.
12       Q    That's the papers that you signed before
13   you joined the ship; right?
14       A    Yes, sir.
15       Q    Okay.  Now, when you signed the contract
16   in the Philippines on or about November the 11th of
17   2005 -- right?
18       A    Yes, sir.
19       Q    And the deal was you were going to work
20   on board the Irene E.M. for nine months --
21       A    Yes, sir.
22       Q    -- plus a possible additional three
23   months, upon mutual consent of you and your crewing
24   agent; right?

Page 48

1        A    Yes, sir.
2        Q    Okay.  Now, take a look at the second
3    page.
4            Now, that document bears your
5    signature on the bottom left-hand side; right?
6        A    Yes, sir.
7        Q    Okay.  And this document, you made a
8    declaration that you received and you reviewed the
9    environmental protection policy of the principal of
10   the Irene E.M. vessel; right?
11       A    Yes, sir.
12       Q    Now, before you signed this document and
13   made that declaration, you reviewed that
14   environmental protection policy, did you not?
15       A    Yes, sir.
16       Q    Okay.  And you made a declaration that
17   during your time on board the ship, that you would
18   follow that policy and uphold the laws, did you not?
19       A    Yes, sir.
20       Q    And that's what you told the owner of the
21   ship and the managers of the ship you were going to
22   do if they hired you as second engineer; right?
23       A    They didn't say anything of that sort.
24   This is just from the crewing company.

Page 49

1        Q    Okay.  But the crewing company gave you
2    the principles of the environmental protection
3    policy, did they not?
4        A    Yes, sir.
5        Q    Okay.  So the deal was that if you were
6    going to be hired to work on board this ship, you
7    knew that you were expected to follow the company's
8    environmental protection policy and to uphold the
9    laws; right?
10       A    Yes, sir.
11           MR. CHALOS:  I'll take that back.
12   Thank you, Mr. Villano.
13           THE WITNESS:  Yes, sir.
14           MR. CHALOS:  If I haven't done it
15   already, I'd like to move Defendants' Exhibit No. 17
16   into evidence.
17           MR. KOTILA:  No objection.
18           (Document marked CSME Exhibit 17
19           moved into evidence.)
20   BY MR. CHALOS:
21       Q    Mr. Villano, I'm going to show you what
22   we've premarked as Defense's CSME -- Defendant CSME
23   Exhibit No. 18.  And for the record, I'll make a
24   representation it's a three-page document.

Edgar Villano

14 (Pages 50 to 53)

Page 50

1    Now, Mr. Villano, that exhibit I
2  just showed you is what?
3    A    Seaman's book, sir.
4    Q    It's a photocopy of your seaman's book;
5  right?
6    A    Yes, sir.
7    Q    And also it's a photocopy of your
8  passport; right?
9    A    Yes, sir.
10    Q    Okay. And you are a Philippine national,
11  correct?
12    A    Yes, sir.
13    MR. CHALOS: Can I move into
14  evidence Defendants' Exhibit 18.
15    MR. KOTILA: No objection.
16    (Document marked CSME Exhibit 18
17    moved into evidence.)
18  BY MR. CHALOS:
19    Q    Now, today when Mr. Kotila was asking you
20  some questions, as you're doing while I'm asking you
21  questions, you're using the assistance of our
22  interpreter.
23    A    Yes, sir.
24    Q    And the reason why you're doing that is

Page 51

1  because English is your second language; right?
2    A    Yes, sir.
3    Q    Your first language is a language called
4  Ilongo, I-L-O-N-G-O?
5    A    Yes, sir.
6    Q    And then you also speak a second language
7  called Tagalog; right?
8    A    Yes, sir.
9    Q    And you're very fortunate, you're
10  multilingual and can also speak some English;
11  correct?
12    A    Yes, sir.
13    Q    But you don't feel comfortable conducting
14  an official meeting like this solely in English, do
15  you?
16    A    I'm comfortable enough.
17    Q    Okay. I'd like you to do that then.
18    A    Okay. I'll try it.
19    MR. TWERSKY: On advice of his
20  counsel, I'm going to advise him not to do that,
21  because I'm not comfortable with him in English.
22    MR. CHALOS: I think we're going to
23  have to call the judge on this. Because we have an
24  issue here where he was interviewed several times by

Page 52

1  the Government, on board the vessel and subsequently,
2  sometimes with and sometimes without the assistance
3  of an interpreter. And I think it's going to be
4  important for the jury to see exactly how good or how
5  bad his command of the English language is.
6    MR. TWERSKY: Let's go off the
7  record.
8    THE VIDEOGRAPHER: Off the record
9  at 2:23.
10    (Brief recess.)
11    THE VIDEOGRAPHER: We are on the
12  record at 2:33.
13  BY MR. CHALOS:
14    Q    Okay. Mr. Villano, I'm going to show you
15  what we've previously marked as CSME Defendants'
16  Exhibit No. 19. For the record, I'll make a
17  representation it's a three-page document, and I'll
18  ask you to take a look at those.
19    And my first question to you,
20  Mr. Villano, is, the first page of Exhibit 19 is a
21  copy of your license; correct?
22    A    Yes, sir, is.
23    Q    And that's your license to be a second
24  engineer; right?

Page 53

1    A    Yes, sir.
2    Q    Who is that issued by?
3    A    PRC.
4    Q    What is the PRC?
5    A    Philippine Commission.
6    Q    That's the Philippine Regulatory
7  Commission; correct?
8    A    Yes.
9    Q    And the next two pages are endorsements
10  to your Philippine license from the ship's flag
11  state; right?
12    A    Yes, sir.
13    Q    So at the time that you boarded the Irene
14  E.M. in Brazil, you held a license from the
15  Government of the Philippines and an endorsed second
16  engineer's license from the flag state administration
17  for the vessel; right?
18    A    Yes, sir.
19    MR. CHALOS: I'd like to move that
20  into evidence.
21    MR. KOTILA: Objection.
22    (Document marked CSME Exhibit 19
23    admitted into evidence.)
24  BY MR. CHALOS:

Page 54

1    Q   Now, I'd like to show you what we've
2 marked as Exhibit 20.  It's an exhibit of several
3 pages.  Just take a look.
4          Now, Mr. Villano, my first question
5 to you is, do all the pages in that exhibit -- strike
6 that.
7          Are all the pages copies of
8 certificates you've received for various training
9 you've gone to over the years?
10    A   Yes, sir.
11    Q   And you've been sailing since 1991?
12    A   Yes, sir.
13    Q   And you've been on board at least 10
14 other ships besides the Irene E.M.?
15    A   Yes, sir.
16    Q   Okay.  Now, Mr. Villano, before we took a
17 break, I asked you if you would be comfortable in
18 proceeding today in English.  And you've had an
19 opportunity to meet with your lawyer to discuss his
20 objection; right?
21    A   Object?
22    Q   Well, you've had an opportunity to
23 discuss my request with your lawyer; right?
24    A   Yeah.  We talked about it, but it's not

Page 55

1 because he objected --
2          MR. TWERSKY:  I'm going to advise
3 my client not to discuss anything that we discussed.
4 That's privileged and confidential between us.
5          You can answer "yes" or "no" to
6 whether we had a conversation.  But I'm going to
7 advise you not to disclose the contents of our
8 conversation, because then they'll no longer be
9 confidential.
10          THE WITNESS:  Yes, sir.
11 BY MR. CHALOS:
12    Q   Okay.  Now, do you have a preference to
13 continue either in English or with the assistance of
14 the interpreter?
15    A   With an interpreter.
16    Q   Okay.  Now, you also had official
17 meetings on board the vessel where the Coast Guard
18 called you and the rest of the crew into the mess
19 room; right?
20    A   Yes, sir.
21    Q   And did the Coast Guard have an
22 interpreter present with them?
23    A   No, sir.
24    Q   Did the Coast Guard make an interpreter

Page 56

1 available to you?
2    A   No, sir.
3    Q   Were you advised that you had the right
4 to have an attorney present during that meeting?
5    A   No, sir.
6    Q   Okay.  Would you have preferred if an
7 interpreter was present for that meeting?
8    A   Yes, sir.
9    Q   Okay.  Take a look again at what we just
10 marked as Exhibit 20, Mr. Villano, in front of you,
11 and --
12          Well, before we get into the
13 substance, I'd like to move Exhibit 20 into evidence
14 as a copy of training certificates.
15          MR. KOTILA:  No objection.
16          (Document marked CSME Exhibit 20
17          moved into evidence.)
18 BY MR. CHALOS:
19    Q   Okay.  Now take a look, Mr. Villano, at
20 the first page now.  It talks about a MARPOL training
21 course from November 24th and November 25th of 1997
22 in Manila, the Philippines.
23    A   1999?
24    Q   I don't think so, Mr. Villano.  Are we

Page 57

1 looking at the same page?
2          This number here.  Maybe you need
3 your glasses.
4    A   Oh, yeah.  Yes, sir.
5    Q   1997; right?
6    A   Yes, sir.
7    Q   And you attended that training?
8    A   Yes.
9    Q   And did you attend another training in
10 1999?
11    A   I don't remember anymore.
12    Q   Okay.  Turn to the next page,
13 Mr. Villano.  And there's another certificate from
14 the Philippines Seafarer's Training Center --
15 Seafarer's Training Center, correct -- and it says
16 Certificate of Completion for another MARPOL class,
17 three-day class, April 26th, 27th and 28th, 2004.
18          And my question to you is, you did
19 attend that seminar, did you not?
20    A   Yes, sir.
21    Q   And in fact, this Certificate of
22 Completion has your photograph in the bottom?
23    A   Yes, sir.
24    Q   Okay.  Now, turn to the next page, if you

Edgar Villano

16 (Pages 58 to 61)

Page 58

1  will. And this is a Certificate of Completion
2  from -- it looks like the Excellence and Competency
3  Training Center in Sampaloc, Manila. And this
4  relates to a training course in maritime law for
5  ships officers that was conducted from September 19th
6  through September 24th, 2005.
7      A   Maritime law, sir?
8      Q   Yeah, the next page.
9          And you attended a week-long
10 five-day seminar on maritime law for ships officers;
11 right?
12     A   Yes.
13     Q   And that Certificate of Completion also
14 has your picture on the bottom; right?
15     A   Yes, sir.
16     Q   Now, take a look at the next page. This
17 is a Certificate of Attendance for-in house training
18 issued by Bright Maritime Corporation. Do you see
19 that?
20         Let me see, Mr. Villano. Let me
21 see if I can help you -- correct, that's the one.
22         And it says that you received a
23 certificate for having attended a seminar on the ISM
24 code and having been briefed on the policies and

Page 59

1  safety management system of Chian Spirit Maritime
2  Enterprises, Inc. from November 14th through
3  November 15th at Pasig City in the Philippines.
4      A   Yes, sir.
5      Q   And you attended a two-day seminar in the
6  Philippines on November 14th and 15th, 2005, at
7  your crewing agent; correct?
8      A   Yes, sir.
9      Q   And you discussed Chian Spirit Maritime
10 Enterprises safety management system; right?
11     A   Yes, sir.
12     Q   And Chian Spirit was the manager or the
13 operator of the Irene E.M.; correct?
14     A   Yes, sir.
15     Q   So you went to special training to learn
16 the company's policies before you got on board their
17 ship; right?
18     A   Yes, sir.
19     Q   And in fact, you were given a copy of the
20 Chian Spirit safety management system, and
21 specifically the environmental protection policy;
22 right?
23     A   Yes, sir.
24     Q   I'm going to show you what we previously

Page 60

1  marked as Exhibit 7. And I'll take Exhibit 20 from
2  you.
3          And Mr. Villano, Exhibit 7 is a
4  copy of the Chian Spirit environmental protection
5  policy that you studied before going on board the
6  Irene E.M., is it not?
7      A   Yes, sir.
8      Q   A copy of that, Mr. Villano, was readily
9  available and displayed on board the ship, was it
10 not?
11     A   Yes, sir.
12     Q   There was a copy of the company's
13 environmental protection policy posted in the ship's
14 office, was there not?
15     A   I didn't notice it.
16     Q   Okay. There was a copy that you did
17 notice in the mess room?
18     A   Yes, sir.
19     Q   And there was another copy in the
20 hallway?
21     A   That I don't remember.
22     Q   And you know that there was one in the
23 engine room on the plywood bulletin board; right?
24     A   That I could not remember.

Page 61

1      Q   It's not that you don't know; it's just
2  that you can't remember as you sit here today; right?
3      A   I don't remember.
4      Q   Okay. Is there anything that would
5  refresh your recollection, Mr. Villano, about what
6  was on that bulletin board in the engine room?
7      A   I don't remember of anything.
8      Q   Now, Mr. Villano, when you got on board
9  the ship -- or let me rephrase my question.
10         Before you got on board the ship,
11 you knew that the owner of the ship and the manager
12 of the ship were serious about environmental
13 protection.
14     A   I'm not really sure, sir.
15     Q   Well, you know that they were serious
16 enough to make sure that you went for training on
17 their policies and procedures?
18     A   That's a requirement, sir.
19     Q   And it was a requirement that you had to
20 complete; otherwise, you couldn't work on board the
21 ship, is it not?
22     A   Yes, sir.
23     Q   And the company was also serious about
24 its crew, and they wanted to make sure that you were

Edgar Villano

Page 62

1  fit for the service before you got on board your
2  ship, did they not?
3      A   Yes.
4      Q   And they asked you to go and undergo
5  various tests to make sure you were physically and
6  mentally capable of doing the job, did they not?
7      A   Yes, sir.
8      Q   And I'm going to show you what we've
9  marked as CSME Defendants' Exhibit No. 21. And those
10 were the records relating to those examinations and
11 tests you underwent before getting on board the ship?
12     A   Yes, sir.
13         MR. CHALOS:  I'd like to move
14 Defendants' Exhibit 21 into evidence.
15         MR. KOTILA:  No objection.
16         (Document marked CSME Exhibit 21
17         admitted into evidence.)
18 BY MR. CHALOS:
19     Q   Now, when you came on board the ship,
20 Mr. Villano, you checked in with the chief engineer,
21 did you not?
22     A   Yes, sir.
23     Q   And the chief engineer told you that you
24 had a certain shift or a certain watch that would be

Page 63

1  your working hours on board the Irene E.M., did you
2  not?
3      A   Yes, sir.
4      Q   And the watch that you stood or the hours
5  that you worked were 4:00 to 8:00, both during the
6  day and at night?
7      A   Yes, sir.
8      Q   So in military time, you would work from
9  0400 to 0800; and then again from 1600 hours to 2000
10 hours; right?
11     A   Yes, sir.
12     Q   And when you were working those hours,
13 you were the duty engineer, were you not?
14     A   Yes, sir.
15     Q   And not only were you the duty engineer,
16 but you had one individual that reported directly to
17 you?
18     A   Yes, sir.
19     Q   And that was an oiler named Roberto
20 Damasing?
21     A   Yes, sir.
22     Q   And during the night shift, he was the
23 only other guy in the engine room with you mostly?
24     A   Yes, sir.

Page 64

1      Q   And he's the guy you spoke to during the
2  lunch break today; right?
3      A   Yes, sir.
4      Q   You joined the ship in Brazil; correct?
5      A   Yes, sir.
6      Q   Earlier today you told Mr. Kotila it was
7  about November 17th that you joined the ship?
8      A   Yes, sir. Yes, sir.
9      Q   And that was in a place called Fortaleza,
10 Brazil; correct?
11     A   Yes, sir.
12     Q   And after you joined the vessel in
13 Fortaleza, did the vessel make any other stops in
14 Brazil?
15     A   Yes, sir.
16     Q   Where did it go?
17     A   I don't remember exactly what port that
18 was. It was a loading port.
19     Q   How long was the vessel at the loading
20 port?
21     A   I don't exactly remember how many days it
22 was.
23     Q   More than one day?
24     A   Yes, sir.

Page 65

1      Q   More than two days?
2      A   All I remember was we left on the 21st.
3      Q   Mr. Villano, the ship actually made two
4  stops in Brazil after you got on board, did it not?
5      A   I arrived in Fortaleza and then we
6  loaded, and I don't remember what that port was.
7      Q   Recife?
8      A   I don't remember. I have no memory of
9  that.
10     Q   Well, Mr. Villano, that really leads me
11 to my next point.
12         As the third engineer, you don't
13 have any responsibility for --
14         MR. KOTILA:  Objection. He's the
15 second engineer.
16         MR. CHALOS:  Okay. Let me withdraw
17 my thing. I got distracted for a second. Withdraw
18 my question and start again.
19 BY MR. CHALOS:
20     Q   As the second engineer, Mr. Villano, you
21 don't have any responsibility for the navigation of
22 the vessel, do you?
23     A   Yes, sir.
24     Q   Meaning -- "yes, sir" meaning you don't

Edgar Villano

18 (Pages 66 to 69)

Page 66

1  have any responsibility for the navigation?
2      A    In navigation?
3      Q    Navigation is my question.
4      A    The bridge system, no.
5      Q    And you worked in the engine room?
6      A    Yes, sir.
7      Q    So you don't really know where the ship
8  is when you're doing things in the engine room, do
9  you?
10     A    Sometimes they would call us -- call it
11  out to us where the location is.
12     Q    Okay.  But if they don't call out the
13  location to you from the bridge, you wouldn't be able
14  to identify your latitude and longitude, would you?
15     A    Yes, sir.
16     Q    "Yes, sir" meaning you don't know your
17  latitude and longitude?
18     A    Yes, sir.
19     Q    Okay.  Mr. Villano, what do you mean by
20  "yes, sir"?  You don't know, do you?
21     A    I don't know.
22     Q    Okay.  That's what I was trying to
23  clarify.
24         We just looked at your certificates

Page 67

1  Mr. Villano.  And from what I've seen so far, there
2  was at least two training classes that you took on
3  MARPOL; correct?
4      A    Yes, sir.
5      Q    And during the MARPOL training, you
6  learned that it was wrong to discharge oil or oily
7  wastes into the ocean, did you not?
8      A    Yes, sir.
9      Q    And you knew that if you did that, you
10  could get into trouble for it, did you not?
11     A    Yes, sir.
12     Q    And you also knew that if you did that,
13  the company who owns the ship and the company who
14  manages or operates the ship could also get into big
15  trouble for those actions?
16     A    Yes, sir.
17     Q    And you also knew that the chief engineer
18  could get in trouble for it?
19     A    Yes, but he's the one that ordered it.
20     Q    Okay.  And you also knew that the captain
21  could get in trouble for it, did you not?
22     A    Yes, sir.
23     Q    And part of that training, Mr. Villano,
24  taught you that if you observed a MARPOL violation,

Page 68

1  that you were supposed to report it to the captain;
2  right?
3      A    Yes, sir.
4      Q    Now, in this situation, you never told
5  the captain what you were doing in the engine room,
6  did you?
7      A    Yes, sir.
8      Q    When you say "yes, sir," meaning no, you
9  never told the captain what you were doing, did you?
10     A    Yes, sir.
11     Q    Okay.  Mr. Villano, when you say "yes,
12  sir," are you agreeing with me that you never told
13  the captain what you were doing in the engine room?
14     A    Could you repeat that.
15     Q    When you say "yes, sir," are you agreeing
16  with me that you never told the captain what you were
17  doing in the engine room?
18     A    What do you mean, what we were doing?
19     Q    Okay.  Mr. Villano, we're talking about
20  when you gave the orders to pump oil over the side.
21  Do you remember that?
22     A    Yes, sir.
23     Q    And you knew it was wrong?
24     A    Yes, sir.

Page 69

1      Q    And you knew that you and the captain and
2  the company could get in trouble; right?
3      A    Yes, sir.
4      Q    And you knew that if you saw a MARPOL
5  violation or someone asked you to break the law, you
6  were supposed to report that to the captain; right?
7      A    It should have been, yes.
8      Q    And you never reported to the captain --
9      A    Yes, sir.
10     Q    -- you never reported to the captain what
11  you were doing in the engine room?
12     A    Yes, sir.
13     Q    You agree with me that you never made
14  that report to the captain?
15     A    Yes, sir.
16     Q    And you never made any notifications to
17  Chian Spirit about the overboard discharge orders you
18  were giving to your junior engineers, did you?
19     A    Yes, sir.
20     Q    When you say "yes, sir," meaning no, you
21  never gave any notification, did you?
22     A    Yes, sir.
23     Q    Mr. Villano, I think we're saying the
24  same thing, but I'm not sure it's clear.

## Page 70

1      When you say "yes, sir," are you
2  agreeing with my statement?
3      A   Yes, sir.
4      Q   Now, you never reported to Venetico, the
5  company that owns the ship, that you were giving
6  orders to the junior engineers to discharge
7  overboard, did you?
8      A   Yes, sir.
9      MR. KOTILA:  Stop, George.  I'm
10  sorry.
11      THE VIDEOGRAPHER:  Off the record
12  at 2:59.
13      (Brief recess.)
14      THE VIDEOGRAPHER:  We are on the
15  record at 3:14.  This is tape 4 of Edgar Villano's
16  deposition.
17  BY MR. CHALOS:
18      Q   Okay.  Mr. Villano, let me go back and
19  revisit some areas that you told us about earlier
20  today when Mr. Kotila was asking you some questions.
21      You were the guy who gave the order
22  to the third engineer to pump the bilges overboard;
23  right?
24      A   Yes, sir.

## Page 71

1      Q   And you also gave that order to the
2  fourth engineer as well; right?
3      A   Yes, sir.
4      Q   Now, did you personally tell both the
5  fourth engineer and the third engineer, or did you
6  just tell the fourth engineer?
7      A   I told the fourth engineer.
8      Q   Okay.  So if I understand you correctly,
9  you never personally told the third engineer to
10  discharge anything overboard, did you?
11      A   Yes, sir.
12      Q   Yes, sir, you told him; or yes, sir, you
13  didn't tell him?
14      A   I did not tell the third engineer
15  directly.
16      Q   The only person that you ordered to
17  discharge anything overboard was the fourth engineer;
18  correct?
19      A   Yes, sir.
20      Q   And you believed that that's what the
21  chief engineer wanted; correct?
22      A   From what I understood, that I should
23  tell the fourth engineer, and the fourth engineer
24  will then in turn tell the third engineer.

## Page 72

1      Q   Well, Mr. Villano, you yourself never
2  discharged anything overboard, did you?
3      A   Yes, sir.
4      Q   When you say "yes, sir," you're agreeing
5  with me?
6      A   Yes, sir.
7      Q   So it's a true statement that you, Edgar
8  Villano, second engineer on board the Irene E.M.,
9  never operated the pumps to discharge any oily waste
10  overboard?
11      A   Yes.
12      Q   And it's also a true statement that the
13  captain never instructed you to either personally
14  discharge or order anyone to discharge anything
15  overboard?
16      A   Yes, sir.
17      Q   It's also a true statement, is it not,
18  Mr. Villano, that no one from Chian Spirit ever
19  instructed you to discharge anything overboard?
20      A   Yes, sir.
21      Q   In fact, it was completely contrary to
22  the interests of Chian Spirit for you or anyone else
23  to do that on board the Irene E.M.?  That's correct?
24  That's a correct statement, Mr. Villano, is it not?

## Page 73

1      MR. KOTILA:  Objection; calls for
2  speculation on behalf of what Chian's interests are.
3  BY MR. CHALOS:
4      Q   Okay.  You can answer it.
5      A   Yes, sir.
6      Q   So the record is clear, Chian Spirit
7  never directed you to discharge anything overboard?
8      A   Yes, sir.
9      Q   In fact, it was their direct instructions
10  not to discharge anything overboard?
11      A   They didn't tell me anything of that
12  sort.
13      Q   Well, you knew what their policies were;
14  right?
15      A   Yes.
16      Q   And you went to their training class, did
17  you not?
18      A   Yes, sir.
19      Q   So you knew it was the Chian Spirit
20  policy to protect the environment?
21      A   Yes, sir.
22      Q   Okay.  And same questions for Venetico,
23  the company that owns the ship:  No one from
24  Venetico -- strike that.  Let me rephrase my

Edgar Villano

20 (Pages 74 to 77)

Page 74

1  question.
2        It is a correct statement, is it
3  not, that no one from Venetico ordered you to dump
4  anything over the side into the ocean?
5    A  Yes, sir.
6    Q  And it's also a correct statement that
7  that was against the principal's policies for you or
8  anyone else to do that on board the ship?
9    A  Yes, sir.
10   Q  Let's talk a little bit more about the
11 order.
12       You said the chief engineer gave
13 you a verbal order to discharge the bilges overboard?
14   A  Yes, sir.
15   Q  When you say "bilges," what are you
16 talking about?
17   A  The water coming from -- from the bilge
18 pump.
19   Q  So it was your understanding that the
20 chief engineer, when he gave you an order to pump the
21 bilge wells -- let me strike and rephrase my
22 question. I stumbled on my words.
23       It was your understanding, when you
24 spoke to the chief engineer, he ordered you to do

Page 75

1  something with the liquid that was in the bilge
2  wells; right?
3    A  It was verbally told to me. Not only the
4  bilges, but the sludge as well.
5    Q  All right. Now, it's a fact, is it not,
6  that on board the vessel, it was the usual practice
7  to transfer materials from the bilge wells to the
8  bilge holding tank?
9    A  Yes, sir.
10   Q  And the bilge holding tank was gigantic?
11   A  Yes, sir.
12   Q  106 cubic meters at least; correct?
13   A  That I could not tell you.
14   Q  Well, bigger than you've ever seen on any
15 of the other 10 ships you were on; right?
16   A  Yes, sir.
17   Q  Okay. Now, you don't know what the level
18 of the material in that bilge holding tank was at the
19 time the chief engineer gave you that verbal order,
20 do you?
21   A  I know.
22   Q  Okay. What was it?
23   A  It was a collection of bilges from the
24 bilge well.

Page 76

1    Q  My question was, you don't know what the
2  quantity was, meaning how many tons or how many cubic
3  meters, do you?
4    A  Yes, sir.
5    Q  "Yes, sir" meaning you agree? You don't
6  know, do you?
7    A  I don't know exactly what the total
8  contents were.
9    Q  But you do know that it was the chief
10 engineer's practice to make internal transfers from
11 the bilge wells to the bilge holding tank, do you
12 not?
13       THE INTERPRETER: I'm sorry. I
14 lost that.
15 BY MR. CHALOS:
16   Q  You do know it was the chief engineer's
17 practice to make internal transfers from the bilge
18 wells to the bilge holding tank?
19   A  That's the normal procedure, sir.
20   Q  When -- and if you had done that, there
21 would be nothing that went over the side into the
22 ocean; correct?
23   A  Yes, sir.
24   Q  And that would have been a proper, legal

Page 77

1  way to maintain the oily wastes on board the vessel?
2    A  Yes, sir.
3    Q  Okay. Now, you also told us that the
4  chief engineer wrote in a logbook his order?
5    A  Yes, sir.
6    Q  And what exactly was the words he used
7  when he wrote that order?
8    A  "Out of engine room bilges."
9    Q  Okay. And that's exactly what you were
10 doing when you were making these internal transfers,
11 was it not? You were emptying out the engine room
12 bilge wells?
13   A  But it's not being done overboard.
14   Q  Well, he never wrote in the order "Pump
15 out overboard," did he?
16   A  He indicated in there "out overboard."
17 And then he even spoke to me directly.
18   Q  Wait a minute, Mr. Villano. You just
19 told us that the written order said "out engine room
20 bilges"; right?
21   A  Yes, sir.
22   Q  Now, he never wrote "pump out overboard,"
23 did he?
24   A  It's not written as "overboard," but the

Edgar Villano

Page 78

1  word "out" is written.

2      Q    The words that were written were "out

3  engine room bilges"?

4      A    Yes, sir.

5      Q    And again, that's consistent with what

6  was going on board the vessel before you joined the

7  ship, is it not?

8      A    Could you repeat that.

9      Q    I'll withdraw the question.

10          Mr. Villano, when you got on board

11  the ship, one of the duties that you're supposed to

12  have as second engineer is to operate the oily water

13  separator, is it not?

14      A    Yes, sir.

15      Q    And that's what you do on all the other

16  ships that you served as second engineer?

17      A    Depending on the chief engineer.

18      Q    All right.  Well, on this ship, when you

19  got on board, you found out that the ship was pretty

20  old; right?

21      A    Yes, sir.

22      Q    And you found out that the equipment --

23  specifically the oily water separator -- was a model

24  that you were unfamiliar with?

Page 79

1      A    Yes, sir.

2      Q    And in fact what you -- you went down to

3  try and check it out, but you couldn't even turn the

4  thing on?

5      A    Yes, sir.

6      Q    You didn't even know how to turn it on?

7      A    Yes, sir.

8      Q    You had to call the electrician to show

9  you where the switch was?

10      A    Yes, sir.

11      Q    Okay.  So now you're telling us today,

12  earlier today when Mr. Kotila was asking you

13  questions, that you're qualified to comment on how or

14  if this equipment could work?

15      A    Yes, sir.

16      Q    But the truth is, you didn't know how to

17  operate it, is it not?

18      A    I know how to operate it.  But the power,

19  I don't know where the power was coming from.

20      Q    Okay.  So you tried to familiarize

21  yourself by reading the manual; right?

22      A    Yes, sir.

23      Q    And then when you were doing some

24  testing, you found out that the sensor was having

Page 80

1  some problems; right?

2      A    Yes, sir.

3      Q    The calibration was off; right?

4      A    Yes, sir.

5      Q    And it was only off a little bit?

6      A    That, I don't know what the difference

7  is.

8      Q    Okay.  Well, I mean, you know what 15

9  ppms is; right?

10      A    Yes, sir.

11      Q    And you know what -- what did you say, 37

12  or 40 ppms was when the automatic shutoff would go

13  off?

14      A    Yes, sir.

15      Q    So ppm stands for what?

16      A    Parts per million, sir.

17      Q    So at 15 ppms, that means if you had a

18  sample of oil and water, 15 ppm would mean for every

19  one million parts of water, there would only be 15

20  parts of oil; right?

21      A    Yes, sir.

22      Q    Okay.  And 37 ppm would mean for every

23  one million parts of water in a sample, there would

24  only be 37 parts of oil?

Page 81

1      A    Yes, sir.

2      Q    And that's a very small difference, is it

3  not?

4      A    Yes, sir.

5      Q    Okay.  Now, the chief engineer never told

6  you to use the oily water separator, did he?

7          THE INTERPRETER:  Excuse me.  I'm

8  missing you.

9  BY MR. CHALOS:

10      Q    The chief engineer never told you to use

11  the oily water separator, did he?

12      A    He told me to study how to use it.

13      Q    Well, what he told you was to make sure

14  you knew how to use it in case you were asked if you

15  knew how to operate it; right?

16      A    Yes, sir.

17      Q    And that's because you didn't know what

18  you were doing?  You're unfamiliar with the

19  equipment?

20      A    I studied it and I knew how to do it.

21      Q    Okay.  But before you studied it, you

22  were unfamiliar with the equipment?

23      A    Yes.  Yes.

24      Q    Okay.  Now, let's talk about why the

Edgar Villano

22 (Pages 82 to 85)

Page 82

1 chief engineer never ordered you to use the OWS.
2          The reason why the chief engineer
3 never used the OWS and the reason why he never
4 ordered you to use the OWS was because he told you
5 that he wasn't comfortable with the accuracy of the
6 sensor? Meaning he didn't want to make pollution in
7 the ocean.
8          MR. KOTILA: Objection; calls for
9 speculation on his behalf.
10          THE WITNESS: Is what you mean is
11 that's the reason why he didn't want the separator to
12 be used? That that's the reason why he wanted to use
13 the magic pipe?
14 BY MR. CHALOS:
15     Q   Mr. Villano, he never told you to use the
16 oily water separator, did he?
17     A   What I told you, I told him -- he told me
18 that I should study how to use it.
19     Q   Okay. But besides telling you to study
20 how to use it, he never told you to use it, did he?
21     A   Yes, sir.
22     Q   Now, earlier today you told Mr. Kotila
23 about several times giving orders to discharge
24 overboard. Do you remember that?

Page 83

1     A   Yes, sir.
2     Q   How many times did you actually give an
3 order to discharge overboard?
4     A   I don't remember anymore.
5     Q   You don't remember any more?
6     A   Yes, sir.
7     Q   So it's fair to say, as you sit here
8 today, your memory of how many times you give
9 somebody an order to discharge overboard is not
10 clear?
11     A   I just don't remember. That's it.
12     Q   Was your memory better in January, when
13 you went to the Grand Jury the first time?
14     A   Yes, sir.
15     Q   Was your memory better in February, when
16 you went the second time to the Grand Jury?
17     A   Yes, sir.
18     Q   Okay. That was in January and February
19 of 2006; right?
20     A   Yes, sir.
21     Q   Was your memory even better back in early
22 December, when the Coast Guard came on board the
23 ship?
24     A   Yes, sir.

Page 84

1     Q   And actually when the Coast Guard came on
2 board the ship, they asked you to write down what
3 happened, did they not?
4     A   Yes, sir.
5     Q   And you did that?
6     A   Yes.
7     Q   And it was Mr. McKnight, this gentleman
8 over here, that asked you to do that?
9     A   Yes, sir.
10     Q   Take a look at what we've marked
11 Defendants' CSME 22, a one-page document, which
12 appears to have the date December 9th, 2005 written
13 on the top.
14          Mr. Villano, that's the statement
15 that you wrote at the request of the Coast Guard on
16 December 9th?
17     A   Yes, sir.
18     Q   And when you wrote that, your memory was
19 a lot fresher about how many times you gave the order
20 to discharge overboard, was it not?
21     A   Yes, sir.
22     Q   And you wrote here, "I was requested by
23 the chief engineer to pump out bilges through magic
24 pipe. He ordered me directly and wrote down in

Page 85

1 engine room logbook. We pump out one time since I
2 come on board."
3          You wrote that; right?
4     A   Yes, sir.
5     Q   Now, does that refresh your recollection
6 about --
7     A   Yes, sir.
8     Q   And it's a fact that since the time
9 you've been on board the ship between Brazil and the
10 United States, there was only one discharge
11 overboard?
12     A   I was afraid at that time, sir.
13     Q   You afraid at that time. What were you
14 afraid of?
15     A   Of course, they were telling me that I
16 was going to go to jail.
17     Q   Who was telling you that?
18     A   Madias and Christos.
19     Q   Wait a minute. By December 9th,
20 Mr. Villano, Christos or Mr. Madias hadn't even come
21 on board the ship.
22     A   Yes, sir, you're right. I remember.
23     Q   Okay. So you were afraid because the
24 Coast Guard was pressuring you; right?

Page 86

1    A   It's not pressure really. It's just that
2 we were scared.
3    Q   What were you scared of?
4    A   Because we know that what we had done was
5 illegal.
6    Q   When you say "we," this is your
7 statement?
8    A   All of us.
9    Q   Wait a minute, Mr. Villano. Let's take a
10 look at this page.
11        That's your signature on the
12 bottom; right? And that's your statement?
13    A   Yes, sir.
14    Q   And that's the statement that you
15 prepared at the request of the Coast Guard?
16    A   Yes, sir.
17    Q   And you wrote that you -- that you
18 discharged one time since Brazil, right?
19    A   Yes, sir.
20    Q   Are you telling us now that what you
21 wrote was a lie?
22    A   No, sir.
23    Q   So that's the truth, that it was one
24 discharge overboard?

Page 87

1    A   I only wrote the one, but I was scared at
2 that time. But it was more than once.
3    Q   Okay. So Mr. Villano, if you're scared
4 today, will you say whatever the Government wants you
5 to say so you can go home?
6        MR. KOTILA: Objection.
7        THE WITNESS: Can you repeat that.
8 BY MR. CHALOS:
9    Q   Yeah. If you're scared here today, would
10 you say whatever you think the Government wants to
11 hear?
12    A   Like what?
13    Q   Mr. Villano, you came on board
14 November 17th; right?
15    A   Yes.
16    Q   And you told us it was just a couple days
17 later that the chief engineer gave you this order;
18 right?
19    A   Yes, sir.
20    Q   You could have gotten off the ship at one
21 of the two loading ports?
22    A   I can only remember one port.
23    Q   Mr. Villano, your memory is not very
24 good, is it?

Page 88

1    A   I'm not sure of things, so --
2    Q   So you're not sure exactly how many times
3 there were discharges overboard, are you?
4    A   I don't know of how many, but I know that
5 it's a lot.
6    Q   Well, when you say "it's a lot,"
7 Mr. Villano, you never turned the pump on, did you?
8    A   Yes, sir.
9    Q   When you say "yes, sir," meaning no, you
10 agree with me, you never turned the pump on?
11    A   Yes, sir.
12    Q   And you also agree with me that you never
13 personally turned the pump off?
14    A   Yes, sir.
15    Q   And in fact, you never even saw the pump
16 operating?
17    A   Yes, sir.
18    Q   You just simply gave the order?
19    A   Yes, sir.
20    Q   And on December 9th, you wrote that you
21 gave the order one time; right?
22    A   Yes, sir.
23    Q   And that's why, Mr. Villano, that you
24 went to the U.S. attorney after your first Grand Jury

Page 89

1 session and started talking about the so-called
2 discussions you had with Mr. Madias, because you were
3 scared that you would get in trouble?
4    A   Yes, sir.
5    Q   And you thought it would help your
6 position if you went and shared that information with
7 the Government?
8    A   Yes, sir.
9    Q   Now, take a look at what we looked at
10 earlier today, Government Exhibit 2. And for the
11 record, I'll make a representation that earlier today
12 you identified those hoses as magic pipe; right?
13    A   Yes, sir.
14    Q   And just so we're clear, there's lots of
15 flexible hoses like this on board the ships that
16 you've served on, is there not?
17    A   Yes, sir.
18    Q   This isn't unusual equipment to be on
19 board a ship, is it?
20    A   Yes, sir.
21    Q   And they're used fairly frequently for
22 lots of different functions in the engine room, are
23 they not?
24    A   Yes, sir.

Edgar Villano

24 (Pages 90 to 93)

---

Page 90

1    Q   You use them with fuel oil sometimes?
2    A   Yes, sir.
3    Q   And you can use it with diesel oil;
4  right?
5    A   Yes, sir.
6    Q   And you can use it with the generators?
7    A   Yes, sir.
8    Q   And you can use it with lube oils?
9    A   Yes, sir.
10   Q   You can use it with the boilers?
11   A   That I have not used for a boiler.
12   Q   But the point is there's lots of uses for
13 these flexible hoses; right?
14   A   Yes, sir.
15   Q   Okay.  Now, take a look at what we've
16 looked at earlier today, the items that were
17 described as Government Exhibit 3, the flanges.
18   A   Okay.
19   Q   Now, there's lots of flanges on board the
20 ships that you served on, is there not?
21   A   Yes, sir.
22   Q   And there's lots of flanges on board the
23 Irene E.M.?
24   A   Yes, sir.

---

Page 91

1    Q   And there's lots of proper purposes for
2  the flanges?
3    A   Yes, sir.
4    Q   Okay.  Now, Mr. Villano, you didn't bring
5  those flanges here to this office, did you?
6    A   Yes, sir.
7    Q   Wait a minute.  You agree with me you
8  didn't bring them here?
9    A   Yes, sir.
10   Q   And you agree with me that you didn't
11 bring the hoses here?
12   A   Yes, sir.
13   Q   And can you agree with me that you don't
14 know how the hoses or the flanges got to this office?
15   A   Yes, sir.
16   Q   And you don't know who took them off the
17 ship, do you?
18   A   Yes, sir.
19   Q   You don't even know if these actually
20 came from the ship?
21   A   I know.
22       MR. CHALOS:  Take five minutes.
23       THE VIDEOGRAPHER:  Off the record
24 at 3:45.

---

Page 92

1       (Brief recess.)
2       THE VIDEOGRAPHER:  We are on the
3  record at 3:59.
4  BY MR. CHALOS:
5    Q   Mr. Villano, if I understand what you
6  told me correctly, earlier today, when Mr. Kotila was
7  asking you questions about the overboard discharge,
8  you told him that there was a lot of discharges;
9  right?
10   A   Yes, sir.
11   Q   And earlier when I asked you the same
12 questions, you suggested that there was a lot of
13 discharges; right?
14   A   Yes, sir.
15   Q   But when the Coast Guard asked you on
16 December 9th, you told them that there was only one
17 discharge; right?
18   A   Yes, sir.
19   Q   And in fact, you wrote that down in a
20 statement that you signed and gave to the U.S.
21 authorities; right?
22       MR. KOTILA:  Objection.  This is
23 asked and answered, that whole area.
24 BY MR. CHALOS:

---

Page 93

1    Q   You can answer.
2    A   Yes, sir.
3    Q   Now, you also talked about the
4  superintendent, and that was Mr. Christos?
5    A   Yes, sir.  Yes, sir.
6    Q   And you told Mr. Kotila that he asked you
7  to change your story; right?
8    A   Yes, sir.
9    Q   Okay.  Well, what actually happened was
10 he asked you to prepare a written statement of what
11 happened on board to give to the company's lawyers;
12 right?
13   A   He also told me that.
14   Q   Okay.  And then what you did was you
15 called all the Filipino crew together and held a
16 meeting; right?
17   A   Yes, sir.
18   Q   And were you the highest ranking engine
19 room officer in that meeting?
20   A   Yes, sir.
21   Q   And you didn't invite the chief engineer
22 to that meeting?
23   A   No, sir.
24   Q   Just Filipinos; right?

---

Edgar Villano

25 (Pages 94 to 97)

Page 94

1    A    Yes, sir.
2    Q    You didn't invite Paul Tudor, the
3  electrician, to that meeting?
4    A    No, sir.
5    Q    And he was a Romanian, the electrician?
6    A    Yes, sir.
7    Q    Okay. And then you prepared a four-page
8  statement for Mr. Christos to give to the lawyers;
9  right?
10   A    Yes, sir.
11   Q    And in fact, what you prepared was a
12  draft of that letter; right?
13   A    Yes, sir.
14   Q    As has the Government ever shown you a
15  copy of that draft?
16   A    Just the end part of it, sir.
17   Q    Okay. Did you ever give the draft to the
18  Government?
19   A    No, sir.
20   Q    And you didn't give the draft to
21  Mr. Christos either, did you?
22   A    The draft, no.
23   Q    So it's fair to say that the draft of
24  that statement no longer exists?

Page 95

1    A    Only the rough draft was not given, but
2  the actual draft was given to Christos.
3    Q    Okay. What did you do with the rough
4  draft? You threw it out; right?
5    A    Yes, sir.
6    Q    And when you wrote that rough draft, you
7  didn't keep a copy for yourself?
8    A    Yes, sir.
9    Q    When you got on board the ship, it was
10  only a matter of days until when the chief engineer
11  spoke to you about pumping out the engine room bilge
12  wells; right?
13   A    Yes, sir.
14   Q    And what he told you to do was to pump
15  out the engine room bilges; correct?
16   A    Yes, sir.
17   Q    Now, he never used the word "overboard?"
18   A    Verbally he told me that.
19   Q    Okay. Now, if I'm asking this for the
20  second time please, forgive me. What happened first,
21  he wrote the order or he told you the order?
22   A    He first told me verbally.
23   Q    First told you verbally?
24   A    Yes, because then when he came down, I

Page 96

1  saw it in the logbook.
2    Q    So are you telling us here today that
3  when you saw the order in the logbook, you knew
4  exactly what it meant?
5    A    Yes, sir.
6    Q    Okay. Then why did you write on
7  December 9th, "When I read the instruction in the
8  logbook, I don't know?"
9         The truth of the matter is,
10  Mr. Villano, that you didn't understand what the
11  chief told you verbally and you didn't understand
12  what he wrote, and you just made a mistake by
13  ordering the fourth engineer to discharge overboard;
14  right?
15   A    No, sir.
16   Q    So then why did you write, on
17  December 9th, you didn't know what the written order
18  meant?
19   A    Could you repeat that. What do you mean?
20   Q    So then why did you write, on
21  December 9th, 2005, when the Coast Guard asked you to
22  write down a truthful summary of what happened on
23  board, you wrote, "When I read the instruction, I
24  don't know."

Page 97

1    A    Perhaps I was just not able to fully
2  explain it in that note.
3    Q    Well, are you guessing?
4    A    No.
5    Q    Mr. Villano, take a look at your
6  statement. It's right in front of you.
7         You wrote, "When I read the
8  instruction in logbook, I don't know."
9         Do you see that, towards the bottom
10  of the page?
11   A    What I meant by that was --
12   Q    Well, Mr. Villano, I'm not asking you
13  what you meant. That's not what you wrote. What you
14  wrote was you didn't know.
15   A    And that's why I'm telling you that I was
16  not able to make a detailed explanation here.
17   Q    Why not?
18   A    Because at that time, I was trying to do
19  a shortcut, and that's all I could think of. I was
20  afraid of what was happening.
21   Q    So when the Coast Guard interviewed you
22  and asked you to write a statement of a truthful and
23  accurate summary of the events that took place on
24  board, you were taking a shortcut?

Edgar Villano

26 (Pages 98 to 101)

Page 98

1    A    That's not the way it is, not really.
2    Q    So this statement is inaccurate; right?
3    A    That is what is the truth.
4    Q    So the truth is, you ordered an overboard
5    discharge one time; and that was after you read an
6    order that you didn't understand and you went and
7    talked to Roberto, the oiler, same guy you talked to
8    at lunch today?
9    A    I really don't understand what you're
10   telling me.
11   Q    Mr. Villano, you told me you speak
12   English. My question is in basic English, you have
13   the assistance of an interpreter, and you don't
14   understand?
15   A    You're getting me confused with all your
16   questions.
17   Q    Were you confused earlier today when
18   Mr. Kotila was asking you questions?
19   A    No.
20   Q    Of course not. Because you have a deal
21   with the Government; right?
22   A    No.
23   Q    You don't have a deal with the
24   Government?

Page 99

1    A    No.
2    Q    Take a look at what we marked as
3    Exhibit 5 prior to today.
4         That summarizes the deal you had
5    with the Government; right?
6    A    All I can tell you is I am here to tell
7    the truth; that's it.
8    Q    And that's what you were doing when you
9    wrote your December 9th statement. That's all you
10   were supposed to do; right?
11   A    Yes, sir.
12   Q    You didn't do that December 9th, if we're
13   supposed to believe your testimony today; right?
14   A    I am the one that made this, sir.
15   Q    Mr. Villano, you made that as a result of
16   the Coast Guard asking you to write a truthful and
17   accurate statement of what happened; right?
18   A    Yes. And that's why I was telling you,
19   sir, that when I made this, I was a little bit
20   scared.
21   Q    So if I understand you correctly, when
22   you're scared, you don't have to tell the truth, in
23   your mind?
24   A    I don't mean that, sir.

Page 100

1    Q    Okay. So if what you wrote there is
2    inconsistent with what you said here today, what's
3    the jury supposed to believe?
4         MR. KOTILA: Objection. Objection;
5    calls for speculation.
6    BY MR. CHALOS:
7    Q    We can agree in December your
8    recollection was a lot fresher than it is today;
9    right?
10   A    Yes, sir.
11   Q    Mr. Villano, you know that some of your
12   crew mates made an application to the Court and
13   signed declarations; right?
14   A    Yes, sir.
15   Q    And you didn't do that?
16   A    Declaration of what?
17   Q    Meaning you didn't participate in a
18   petition to go home.
19   A    Yes, sir.
20   Q    Yes, sir, you agree, you didn't
21   participate?
22   A    Yes, sir.
23   Q    And the reason why you didn't participate
24   was because you're scared of what the Government

Page 101

1    could do to you?
2         MR. KOTILA: Objection. I'm going
3    to object. This is beyond the scope of my direct
4    examination. It's totally irrelevant.
5    BY MR. CHALOS:
6    Q    That's the truth, though, Mr. Villano,
7    isn't it?
8    A    No, it's not.
9    Q    It's not the truth. Okay.
10        Then why didn't you join in that
11   application to the Court?
12        MR. KOTILA: Continued objection.
13        THE WITNESS: I just wanted to wait
14   until it formally ends.
15   BY MR. CHALOS:
16   Q    Okay. Mr. Villano, in all the training
17   you had before you got on board the Irene E.M. about
18   MARPOL and the protection of the environment, you
19   also learned, sometime before you got on board the
20   ship, that if you make a report to the U.S.
21   authorities about a MARPOL violation, that sometimes
22   the Government gives reward money; right?
23   A    That I don't know about. I haven't heard
24   about that.

Edgar Villano

27 (Pages 102 to 105)

Page 102

1    Q    Mr. Villano, we met in your lawyer's
2 office last week.
3    A    Yes, sir.
4    Q    And you remember we talked about that?
5    A    Yes, sir.
6    Q    And you told me that you had learned
7 about it.
8    A    I just heard about that, I said to you.
9    Q    So then the fact is, as you sit here
10 today, you know about the fact, in certain
11 circumstances, the Government gives reward money if
12 you report a MARPOL violation?
13    A    Yes, sir.
14    Q    Thank you.
15         Now, you said that the chief
16 engineer told you to use a magic pipe; right?
17    A    Yes, sir.
18    Q    Now, you knew about a magic pipe long
19 before you even got on board this ship.
20    A    I just saw it.
21    Q    Okay. So you've seen a magic pipe on
22 other ships you worked on; right?
23    A    Yes, sir.
24    Q    And you've seen an oiler on another ship

Page 103

1 use a magic pipe; right?
2    A    Yes, sir.
3    Q    Now, on that ship that you saw this, that
4 was a different ship than the Irene; it was a
5 completely different ship that you talked about.
6    A    Yes, sir.
7    Q    That was owned by a different owning
8 company?
9    A    Yes, sir.
10    Q    Managed by a different manager?
11    A    Yes, sir.
12    Q    With a different captain?
13    A    Yes, sir.
14    Q    And a different chief engineer?
15    A    Yes, sir.
16    Q    And in fact, Mr. Villano, that was your
17 practice before coming on board the Irene, to use
18 magic pipes; right?
19         MR. TWERSKY: I want to instruct
20 the witness not to answer the question. I'm going to
21 instruct him to assert his Fifth Amendment privilege
22 against self-incrimination as to that question.
23 BY MR. CHALOS:
24    Q    Mr. Villano, are you going to invoke your

Page 104

1 Fifth Amendment privilege?
2         MR. TWERSKY: He's asking if you're
3 going to follow the advice of your lawyer and not
4 answer that question.
5         THE WITNESS: Yes, sir.
6 BY MR. CHALOS:
7    Q    Okay. Now, just a few more questions,
8 Mr. Villano.
9         You never did change your story,
10 did you? Meaning that after Christos asked you to
11 change your story and before he told you to tell the
12 truth, you never changed your story, did you?
13    A    Yes, sir.
14    Q    Okay. And when you actually spoke to
15 Mr. Christos for the last time, what he told you to
16 do was tell the truth; right?
17    A    Yes, sir.
18    Q    And that was the very same thing that
19 this gentleman named Mr. Madias told you the first
20 time you met with him?
21    A    Yes, sir.
22         MR. CHALOS: Okay. I'll look
23 through my notes, and in the interest of time, I'll
24 pass the witness to Mr. Woodward.

Page 105

1         MR. WOODWARD: Go off the record a
2 minute.
3         THE VIDEOGRAPHER: Off the record
4 at 4:18.
5    (Brief recess.)
6         THE VIDEOGRAPHER: We are on the
7 record at 4:24.
8 BY MR. CHALOS:
9    Q    Mr. Villano, I just have one or two final
10 questions.
11         Earlier today Mr. Kotila asked you
12 about taking some saltwater on to put in the bilge
13 tank and some freshwater for the sludge tank. Do you
14 remember that?
15    A    Yes.
16    Q    You can't tell us, can you, the latitude
17 and longitude the ship was at when you did it, can
18 you?
19    A    Yes, sir.
20    Q    When you say "yes, sir," you agree that
21 it's a correct statement that you don't know where
22 the ship was?
23    A    Yes, sir.
24         MR. CHALOS: Thank you. Nothing

Edgar Villano

28 (Pages 106 to 109)

Page 106

1  further.
2          CROSS-EXAMINATION
3  BY MR. WOODWARD:
4      Q  Mr. Villano, my name is Carl Woodward,
5  and I represent Chief Engineer Adrien Dragomir.
6          I've never seen you before and
7  you've never seen me; isn't that correct? Before
8  today.
9      A  From what I recollect, you were one of
10  the persons that boarded the ship.
11     Q  I boarded the ship? All right. What day
12  did I board the ship?
13     A  I believe that we were in Camden.
14     Q  In Camden. And you think I came on board
15  the ship in Camden?
16     A  I'm not sure, but --
17     Q  Did I give you my card?
18     A  No, sir.
19     Q  Who did I represent?
20     A  Chief engineer.
21     Q  And you think I was on the ship in
22  Camden?
23     A  I just think you may have been.
24     Q  But you're not sure, are you?

Page 107

1      A  Yes, sir.
2      Q  You agree with me that you're not sure?
3      A  Yes, sir.
4      Q  All right. Now, I'm going to direct your
5  attention to the logbook which had the writing from
6  the chief engineer in it. Do you have that? Do you
7  understand that?
8      A  Yes, sir.
9      Q  All right. And if I'm not mistaken, you
10  had previously testified that the exact words that
11  were written were, quote, out engine room bilges,
12  close quote?
13     A  Yes, sir.
14     Q  That is correct?
15     A  Yes, sir.
16     Q  Now, did you see that writing before or
17  after you spoke with the chief engineer about pumping
18  out engine room bilges?
19     A  After I had spoken to him.
20     Q  All right. When you spoke with the chief
21  engineer, the conversation -- where did the
22  conversation take place?
23     A  From what I remember, it was at the mess
24  hall, sir.

Page 108

1      Q  You're sure it wasn't in the forward part
2  of the main engine?
3      A  I'm not sure, sir.
4      Q  What time of day was the conversation?
5      A  I don't remember any more, sir.
6      Q  And the conversation was just between you
7  and it was -- and Mr. Dragomir; right?
8      A  Yes, sir.
9      Q  And at that time, isn't it a fact that
10  Mr. Dragomir told you to pump out the bilges?
11     A  Yes, sir.
12     Q  And isn't it a fact that you asked him
13  how to do it?
14     A  Yes, sir.
15     Q  And he told you to go talk to Roberto;
16  isn't that correct?
17     A  Yes, sir.
18     Q  Now, the next day, did you have a
19  conversation with the chief engineer about pumping
20  overboard?
21     A  I don't remember anymore.
22     Q  Didn't you go to the chief engineer and
23  tell him that you'd pumped overboard?
24     A  From what I can remember, he was the one

Page 109

1  that was asking me.
2      Q  Isn't it a fact that you told him that
3  you pumped overboard?
4      A  Yes, I told him that.
5      Q  And didn't he ask you, "Why didn't you
6  pump into the bilge tank?"
7      A  No.
8      Q  You sure about that?
9      A  I'm sure.
10     Q  Didn't he say to you, "Why didn't you use
11  the separator," or something like that?
12     A  No.
13     Q  Didn't he order you to dismantle
14  everything at that time so it couldn't be used again,
15  including the magic hose?
16     A  No.
17     Q  Do you know that the oily water separator
18  could be used manually?
19     A  Yes, sir.
20     Q  Did you ever try to use it manually?
21     A  Yes, sir.
22     Q  Did you suggest to the chief engineer
23  that you should use it manually?
24     A  No.

Edgar Villano

Page 110

1    Q    So you never suggested that to him?
2    A    Yes, sir.
3    Q    You never told him that the crew pumped
4    out the second time; isn't that right?
5    A    I told him.
6    Q    Or any other time?
7    A    I told him.
8    Q    Every single time?
9    A    Not all of it.
10    Q    How many times?
11    A    I don't remember, sir.
12    Q    Every day? Every watch?
13    A    I could not remember.
14    Q    Every watch?
15    A    I don't remember.
16    Q    Who did the pump-outs?
17    A    The fourth engineer.
18    Q    Always the fourth engineer?
19    A    Yes.
20    Q    Only the fourth engineer?
21    A    The third after him.
22    Q    Oh, so the fourth engineer and the third
23    engineer?
24    A    Yes, sir.

Page 111

1    Q    The logbook, when was the last time you
2    saw it?
3    A    I don't remember anymore.
4    Q    I want to go back to a conversation that
5    you had with the chief the first time you say you
6    pumped overboard and you told him that you had done
7    so.
8         Where did that conversation take
9    place? Strike that.
10         Yeah, where did that conversation
11    take place?
12    A    As I told you, from what I remember, it
13    was at the mess hall.
14    Q    It was in the workshop, wasn't it?
15    A    That I don't remember.
16    Q    And you and he were the only two who were
17    present; isn't that right?
18    A    Yes, sir.
19    Q    If you misunderstood his order and pumped
20    out illegally, it could go bad for you, couldn't it?
21    A    What do you mean?
22    Q    What do I mean? Well, if he did not tell
23    you to pump out overboard and you misunderstood his
24    order, you could lose your license; right?

Page 112

1    A    From what I know, sir.
2    Q    That's true; right?
3    A    I really don't know, sir.
4    Q    Well, you could be punished; right?
5    A    That's possible, sir.
6    Q    So it's important that somebody else be
7    responsible for what happened here; isn't that right?
8    A    Yes, sir.
9    Q    In the engine room, is there a blackboard
10    or a whiteboard that crew members can write on?
11    A    There is a blackboard, sir.
12    Q    All right. And oilers would take
13    soundings and periodically write the soundings on
14    those blackboards; right?
15    A    I didn't notice.
16    Q    Did you ever see anything written on the
17    blackboard?
18    A    Yes, sir.
19    Q    What did you see written?
20    A    Sometimes it's a job order, sir.
21    Q    Okay. And sometimes they're soundings;
22    right?
23    A    I don't remember if there were any.
24    Q    Now, you said that you helped Roberto

Page 113

1    hook up the magic hose. Do you recall that
2    testimony?
3    A    Yes, sir.
4    Q    So you were, what, three days out from
5    Brazil?
6    A    Two to three days, about that time.
7    Q    Two to three days out from Brazil?
8    A    Yes.
9    Q    Okay. So there was nothing hooked up at
10    that point, was there?
11    A    No, sir.
12    Q    The chief engineer didn't speak very good
13    English, did he?
14    A    That, I couldn't tell you.
15    Q    Well, you had conversations with him,
16    didn't you?
17    A    Yes, sir.
18    Q    His English wasn't very good, was it?
19    A    From what I know, I understood him.
20    Q    You thought you understood him; right?
21    A    Yes, sir.
22    Q    Do you have any relatives in the United
23    States?
24    A    Yes, sir.

Edgar Villano

30 (Pages 114 to 117)

Page 114

1    Q   Where are they located?
2    A   From what I know, they're in Seattle.
3    Q   Do you have any friends here in the
4 United States?
5    A   Not really, no.
6    Q   You'd like to stay in the United States,
7 wouldn't you?
8    A   That I don't desire.
9        MR. WOODWARD: Off the record for a
10 minute.
11       THE VIDEOGRAPHER: Off the record
12 at 4:39.
13       (Discussion off the record.)
14       THE VIDEOGRAPHER: We are on the
15 record at 4:41.
16 BY MR. WOODWARD:
17    Q   The chief engineer never asked you to
18 change your story or lie in this matter, did he?
19    A   Yes, sir.
20    Q   Now, in this statement that you wrote,
21 the four-page statement that you said you drafted,
22 was any of it written by somebody else?
23    A   Yes, sir.
24    Q   Who wrote it?

Page 115

1    A   Fourth engineer, sir.
2    Q   And why did he write part of it?
3    A   Because I saw that his penmanship was
4 better than mine.
5    Q   Okay. But with respect to the statement,
6 the part that you wrote that was in your own
7 handwriting, at least part of it recounts your
8 conversation with the chief engineer; correct?
9    A   Yes, sir.
10    Q   But those things that involved the second
11 engineer -- excuse me -- that involved the third or
12 the fourth engineer you didn't know about, did you?
13    A   Yes, sir.
14    Q   Meaning you agree with me; correct?
15    A   Yes, sir.
16    Q   So this statement does not reflect --
17 strike that.
18        You can't say that everything in
19 this statement is true?
20    A   I let them read that, sir, before they
21 signed it.
22    Q   That's not what I said -- that's not what
23 I asked you.
24        Other than the things that you know

Page 116

1 about directly, anything in here about the other crew
2 where you were not present, you don't know whether
3 those are true or not, do you?
4    A   Like, for example, what?
5    Q   Did you know Port State Control asked
6 Roberto -- or asked about the flanges and Roberto
7 replied about the flanges. You weren't present for
8 that, were you?
9    A   Yes, sir.
10    Q   You were not present?
11    A   Yes, sir.
12    Q   You agree with me that you were not
13 present?
14    A   Yes, sir.
15    Q   That's an example of what you can't say
16 is true or not; isn't that right?
17    A   Not all of it, sir.
18    Q   And in fact, the conversations that you
19 wrote down between yourself and the chief engineer
20 and the electrician were not known by anybody else
21 who signed this statement; isn't that true?
22    A   All I can tell you is they read it before
23 they signed it.
24    Q   But that didn't mean that they knew

Page 117

1 whether or not the statements were true, because they
2 weren't present?
3    A   All I can tell you, sir, is I did not
4 force them to sign this. They read it and they
5 signed it.
6    Q   That's not what I'm asking. I'm asking
7 whether they were present when you had conversations
8 with the chief engineer.
9    A   No, they're not.
10    Q   They were not; right?
11    A   Yes.
12    Q   So they wouldn't know whether the
13 conversation that you had written down between
14 yourself and the chief engineer was true or not,
15 would they?
16    A   Yes, sir.
17        MR. WOODWARD: Okay. No further
18 questions.
19        REDIRECT EXAMINATION
20 BY MR. KOTILA:
21    Q   Mr. Villano, I just have a couple of
22 follow-up.
23        One of the last few things you told
24 Mr. Chalos was, I believe the last time before you

Page 118

1  got off the ship you spoke with Christos, and
2  Christos told you to tell the truth.
3      A   Yes, sir.
4      Q   But you also agreed when Mr. Chalos said
5  Madias said to tell the truth the first time you met
6  him.
7      A   Yes, sir.
8      Q   So the first time you met Madias, he told
9  you that?
10     A   Yes, sir.
11     Q   And when did he start telling you to
12  change your story?
13     A   The next day, sir.
14     Q   And how many times after that?
15     A   I don't remember exactly anymore, sir.
16     Q   But there were other times?
17         MR. CHALOS: Objection.
18         THE WITNESS: Yes, sir.
19  BY MR. KOTILA:
20     Q   Now, you also told Mr. Chalos you had a
21  usual practice to transfer bilge wells to the bilge
22  holding tank.
23         What happened to the oily waste in
24  the bilge holding tank?

Page 119

1      A   It's there sitting.
2      Q   Okay. Well, tell me, when would
3  materials go in the bilge holding tank and when would
4  materials go overboard?
5      A   When the bilge well readings is high,
6  when we had not arrived on shore, then we let it
7  overboard.
8      Q   Now, Mr. Chalos keeps referring to a deal
9  with the Government; correct?
10     A   Yes, sir.
11     Q   You're here to tell the truth; correct?
12         MR. CHALOS: Objection.
13         THE WITNESS: Yes, sir.
14  BY MR. KOTILA:
15     Q   Just like it says in the document
16  Mr. Chalos put before you, the honest truth?
17         MR. CHALOS: Objection.
18         THE WITNESS: Yes, sir.
19         MR. KOTILA: I have no further
20  questions.
21         RECROSS-EXAMINATION
22  BY MR. CHALOS:
23     Q   Mr. Villano, that's what the Coast Guard
24  told you on December 9th; right? They asked you to

Page 120

1  tell the truth?
2      A   Yes, sir.
3      Q   And you told them that you would do that;
4  right?
5      A   Yes, sir.
6      Q   Yet the items that appear in that
7  December 9th statement are inconsistent with what you
8  said today.
9      A   Because I was afraid. That's it.
10     Q   You were also afraid, Mr. Villano, when
11  you went to the Grand Jury on January 12th, weren't
12  you?
13     A   That's a normal occurrence, sir.
14     Q   So the answer to my question is yes, you
15  were afraid?
16     A   Not totally, sir.
17     Q   But a little bit?
18     A   Yes, sir.
19     Q   And they asked you, on the 12th of
20  January, "After you arrived in the United States and
21  the Coast Guard gets on the ship, did anyone tell you
22  to lie to the Coast Guard?"
23         Your answer was, "When we arrived
24  here?"

Page 121

1          The question was, "Yes." And then
2  you go through and you tell -- give him an answer
3          And you never said anything about
4  this guy Madias telling you to lie; right?
5      A   Yes, sir.
6      Q   Okay. And then in February, you tell a
7  different story to the Grand Jury; right?
8      A   Yes, sir.
9      Q   And yet today you tell yet a third story,
10  or a fourth story, if you look at the December 9th
11  one-page letter you wrote; right?
12     A   Yes, sir.
13     Q   And a fifth story, if you look at your
14  December 11th statement you prepared for
15  Mr. Christos.
16     A   Yes, sir.
17     Q   So there's five different stories of what
18  happened; right?
19     A   That's not all different, sir.
20     Q   Okay. Well, you told Mr. Kotila earlier
21  today about something that you thought the chief
22  engineer told you to do with filling the tanks. Do
23  you remember that?
24         MR. KOTILA: Objection. This is

Edgar Villano

32 (Pages 122 to 125)

Page 122

1  beyond the scope of my redirect.
2          MR. CHALOS:  Well, it goes to your
3  question about the veracity and accuracy of his
4  testimony.
5          MR. KOTILA:  Beyond the scope of my
6  redirection.  Objection.
7  BY MR. CHALOS:
8      Q   Well, Mr. Villano, you told Mr. Kotila
9  earlier that you filled the bilge tank with seawater?
10         MR. KOTILA:  Again, objection.
11 Beyond the scope of the redirect.  Plus, this is
12 asked and answered.
13 BY MR. CHALOS:
14     Q   And the sludge tank with freshwater;
15 right?
16     A   Yes, sir.
17     Q   That's not what you wrote on
18 December 11th, 2005, is it?
19     A   What I wrote then is correct.
20     Q   Okay.  What you wrote then was, "Early
21 morning at second engineer watch, they filled bilge
22 tank and sludge tank with seawater."
23         That's different than what you told
24 Mr. Kotila today; right?

Page 123

1      A   That is the truth, what I said.
2      Q   So the truth is what?  The sludge tank
3  was filled with --
4      A   Seawater in the bilge tank, freshwater in
5  the sludge tank.
6      Q   But that's not what you wrote on
7  December 11th, 2005; right?  Do you agree with me?
8      A   From what I remember, what I told you is
9  correct.
10     Q   Okay.  Now, about this deal you had with
11 the Government, when you went in front of the Grand
12 Jury the first time, there was another prosecutor
13 there named Mr. Falgowski; right?
14     A   Yes, sir.
15         MR. KOTILA:  Objection; again,
16 asked and answered, this whole area.
17 BY MR. CHALOS:
18     Q   And Mr. Falgowski told you and all the
19 other people in the room what the deal was; right?
20 Do you remember that?
21     A   No.
22     Q   Okay I'll refresh your recollection.  On
23 January 12th, 2006 --
24         THE INTERPRETER:  I'm sorry.  What

Page 124

1  was the date?
2  BY MR. CHALOS:
3      Q   January 12th, 2006, Mr. Falgowski said to
4  you in front of the Grand Jury, "But you also
5  understand and it's fair to say that I told you
6  you're not a subject and you're not a target of this
7  investigation?"
8          Your answer:  "Yeah."
9          The question:  "All right.  That
10 the Coast Guard has no intentions of prosecuting you.
11 Do you understand that?"
12         Your answer:  "Yeah, I understand."
13     "Question:  But in return, what you
14     have to do is you have to give us your
15     cooperation; correct?"
16     "Answer:  Yes."
17         That was the deal you had with the
18 Government; right?
19     A   Yes, sir.
20         MR. CHALOS:  Nothing further.
21         RECROSS-EXAMINATION
22 BY MR. WOODWARD:
23     Q   Mr. Villano, are you scared today?
24     A   No, sir.

Page 125

1      Q   So you were scared on the 9th of
2  December, and so you lied on the 9th of December; is
3  that right?
4      A   Yes, sir.
5      Q   And so it's okay to lie if you're scared?
6      A   That I could not assure you, sir.
7      Q   Well, let me ask you this, sir.
8          On the 9th of December, you said
9  there was only one pump-out.  Today you said there
10 were more.
11         Were you lying then or are you
12 lying now?
13     A   At this time, I'm not.
14         MR. WOODWARD:  No further
15 questions.
16     FURTHER REDIRECT EXAMINATION
17 BY MR. KOTILA:
18     Q   Let me just finish up.
19         When you were in the Grand Jury on
20 January 12th, where Mr. Chalos left off, he read the
21 question "But in return" -- this is Page 4 -- "But in
22 return, what you have to do is to give us your
23 cooperation; correct?"
24     A   Yes.

Edgar Villano

33 (Pages 126 to 129)

---

Page 126

1    Q   And your answer was: "Yes."
2        But the next question: "And your
3    cooperation has to be total and you have to tell us
4    the truth."
5        And you answered: "Yeah."
6        Next question: "You have to be
7    honest with us."
8        "Answer: I know."
9        You gave those answers to those
10   questions; correct?
11   A   Yes.
12       MR. KOTILA:  All right.  No further
13   questions.
14       FURTHER RECROSS-EXAMINATION
15   BY MR. CHALOS:
16   Q   Now, Mr. Villano last question.
17       When you made that deal with
18   Mr. Falgowski and he asked for you to tell the truth,
19   that wasn't a different truth than the truth that
20   Mr. McKnight asked you to tell, is it?
21   A   It's the same.
22   Q   So if you told the truth when
23   Mr. McKnight asked you, the story should be the same
24   when Mr. Kotila asked you; right?

---

Page 127

1    A   Yes, sir.
2        MR. CHALOS:  Okay.  Thank you.
3    Nothing further.
4        MR. KOTILA:  Thank you.
5        THE VIDEOGRAPHER:  We are off the
6    record at 5 o'clock.
7        (Signature having been waived, the
8        deposition of EDGAR VILLANO was
9        concluded at 5:00 p.m.)
10
11            I N D E X
12   WITNESS:                          PAGE
13   EDGAR VILLANO
14     Mr. Kotila                4
15     Mr. Chalos               38
16     Mr. Woodward            106
17     Mr. Kotila              117
18     Mr. Chalos              119
19     Mr. Woodward            124
20     Mr. Kotila              125
21     Mr. Chalos              126
22
23
24

---

Page 128

1        EXHIBITS MARKED FOR IDENTIFICATION
2    CSME          DESCRIPTION              PAGE
3    17    Employment documents of          46
         Mr. Villano
4
     18    Photocopy of Mr. Villano's       46
5          seaman's book and passport
6    19    Licenses and acknowledgements of 46
           Mr. Villano
7
     20    Certificates of completion of    46
8          training courses
9    21    Physical and mental testing      46
           results of Mr. Villano
10
     22    Handwritten document of          46
11         Mr. Villano dated 12-9-05
12
13
14
15        EXHIBITS MOVED INTO EVIDENCE
16   CSMR Exhibit No.          PAGE
17     17              49
18     18              50
19     19              53
20     20              56
21     21              62
22
23
24

---

Page 129

1        CERTIFICATE OF SHORTHAND REPORTER
2
3        I, Gail Inghram Verbano, CSR, RMR,
4    the officer before whom the foregoing proceedings
5    were taken, do hereby certify that the foregoing
6    transcript is a true and correct record of the
7    proceedings; that said proceedings were taken by me
8    stenographically and thereafter reduced to
9    typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16   _____
     Gail Inghram Verbano, CSR, RMR
17   CSR No. 8635
     Certification No.: 220
18   (Expires 1-31-2008)
19
20
21
22
23
24

Corbett & Wilcox