IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X

UNITED STATES OF AMERICA

               Plaintiff,

                                Criminal Action No. 06-76 (GMS)

      v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et al.*

               Defendants.

-----------------------------------------------------------X

## DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC. AND VENETICO MARINE, S.A.'s, OBJECTIONS AND REQUEST FOR PRETRIAL RULINGS AS TO THE ADMISSIBILITY OF THE FOLLOWING PORTIONS OF THE RULE 15 DEPOSITION TESTIMONY OF MARIO MANZANILLA.

**COME NOW**, moving defendants, Venetico Marine, S.A. ("Venetico") and

Chian Spirit Maritime Enterprises, Inc. ("CSME")(collectively, "moving defendants"),

who respectfully request that this Honorable Court consider and rule, before the voir dire

of the jury panel, and out of the presence and hearing of the jury panel, as to the

admissibility of the following Rule 15 deposition testimony by Mario Manzanilla, which

the Government has stated it will seek to introduce at trial.[1]

Specifically, Moving Defendants object to the admissibility of the following

deposition testimony by Mario Manzanilla, an unlicensed "wiper" from the M/V IRENE

E., on the following grounds.  For the Court's ready reference, a correct and true copy of

the transcript of the Rule 15 deposition of Mr. Manzanilla, conducted at the office of the

---

1 For the Court's ready reference, Moving Defendants advise that in order to facilitate the deposition
process, counsel for all parties agreed to expressly reserve making objections during the examination.

United States Attorney, 700 Nemours Building, 1007 Orange Street, Wilmington,

Delaware, on Tuesday, July 18, 2006, is attached hereto as Exhibit "A".

### Mario Manzanilla (Wiper)

As a preliminary matter, Moving Defendants respectfully advise the Court that,

during his Rule 15 deposition examination, Mr. Manzanilla clearly, concisely and

unambiguously testified that he, personally, ***never*** worked on and/or worked with any

licensed marine engineers aboard the M/V IRENE E.M. with respect to use and/or

operation of the oily water separator equipment.

In relevant part, and as the Court will note, Mr. Manzanilla testified, *inter alia*, to

the following:

*Q  Now, I'd like to talk a little bit about what you do on board the ship Mr. Manzanilla. You're not a licensed engineer; right?*
*A  No, sir.*
*Q  You don't hold a license as an engineer?*
*A  No, sir. I'm just an oiler and a wiper.*
*Q  Okay. And on board the Irene E.M., you weren't working as an oiler, right?*
*A  No, I am a wiper.*
*Q  Okay. So when you were on the Irene E.M., you were hired to work as a wiper; right?*
*A  Yes, sir.*
*Q  And is it fair to say that a wiper is the lowest-ranking member of the engine room team?*
*A  Yes, sir.*
*Q  Now, let's talk about the oily water separator. The oily water separator is operated by the engineers; right?*
*A  Yes, sir.*
*Q  You don't operate the oily water separator?*
*A  No, sir. I'm only an oiler. Only the oiler[2] uses it.*
*Q  Okay. So that the answer is clear, you would agree with me that you don't operate the oily water separator?*
*A  No, sir.*
*Q  And you don't have any responsibility to maintain the oily water separator, do you?*

---

2 Undersigned counsel respectfully submits that this is a transcription error, as the witness testified, and the transcript should read: *"No sir. I'm only an oiler. Only the engineers use it."*

A  No, sir. Just the main engine is what I'm entail.
Q  Mr. Manzanilla, yes or no: You don't have any –
A  No, sir. No, sir.
Q  Okay. Let me finish my question. Mr. Manzanilla, you would agree with me that you
    don't have any responsibility to maintain the oily water separator?
A  No sir.
Q  So that means you agree with me, yes?
A  Yes, sir.
Q  It's also a correct statement that you don't have any responsibility to repair the oily
    water separator?
A  Yes, sir.
Q  You don't make the decision to use the oily water separator if it's being used,
    do you?
A  No, sir.
Q  And you don't make the decision not to use it if the chief engineer decides
    not to use it; correct?
A  Yes, sir.
Q  So all questions Mr. Phillips asked you about the oily water separator, you
    would agree, were questions about a piece of equipment that you don't have any
    reason to operate, no reason to maintain, no reason to repair, and no reason to
    ever use; right?
A  Yes, sir.
Q  So everything you know about the oily water separator is based on
    something someone else told you; right?
A  Yes sir.

See Exhibit "A," Transcript at page 30/line 12 through page 33/line 3.

On cross-examination, Mr. Manzanilla further testified to the following:

Q  Okay. Now, you're not authorized or qualified to report on the condition of the oily
    water separator . . . are you?
A  No, sir. Yes, sir. No, sir.
Q  Okay. So the answer to that would be no, you're not authorized or qualified; right?
A  Yes, sir.
Q  You agree with me?
A  Yes sir?

See Exhibit "A," Transcript at page 46/lines 1 through 9.

Additionally, Mr. Manzanilla testified that he never saw the purported "magic

pipe" being used on board the M/V IRENE E.M, and that he never saw any oil or oily

wastes actually being discharged into the ocean. Specifically, Mr. Manzanilla testified, in

relevant part, to the following during the Government's direct examination:

Q  Did you ever see the magic pipe being used during the voyage from Africa to Brazil?
A  No sir.
Q  You never saw it being used?
A  No sir.

See Exhibit "A," Transcript at page 13/lines 13 through 17.

Further in this regard, Mr. Manzanilla testified, during cross-examination, (and in

relevant part), to the following:

Q  And now you yourself, in all the time that you were on board the ship, never turned on
    the pumps to pump anything overboard; right?
A  No, sir.
Q  Okay. Now, you yourself never turned off the pumps?
A  No, sir.
Q  Now, the whole time you were on board the ship, the captain never asked you to set up
    a magic pipe; right?
A  No, sir.
Q  And the companies, meaning the management company and the owning company,
    never asked you to set up a magic pipe?
A  No, sir.
Q  Okay. And Chief Engineer Dragomir never asked you to set up a magic pipe, right?
A  No, sir.
Q  And Second Engineer Villano, you know him, right?
A  Yes, sir.
Q  Okay. He never asked you to set up a magic pipe?
A  No, sir.
Q  In fact, no one asked you set up the magic pipe between Brazil and the United States.
A  No, sir.
Q  And in fact, the truth is, between Brazil and the United States, you never saw anything
    with your own eyes being discharged overboard?
A  That's what I remember, that I didn't see anything.

See Exhibit "A," Transcript at page 37/line 4 through Page 38/line 16.

In view of the foregoing testimony, Moving Defendants object to the introduction

of the following testimony on the basis that it, inter alia, lacks foundation; calls for

4

speculation; and calls for answers which are strictly inadmissible hearsay. Additionally,

Moving Defendants object on the grounds that the Government's questions on direct

examination are inappropriately leading, assume facts not in evidence and if admitted,

would be unfairly prejudicial, confusing and otherwise misleading to the finder of fact:

> Page 6/line 23   - Page 7/line 2;
> Page 7/line 10   - Page 8/line 9;
> Page 12/line 20 - Page 13/line 12;
> Page 14/line 5   - Page 17/line 7;
> Page 18/line 24 - Page 21/line 4;
> Page 42/lines 18-21; and
> Page 42/line 23 – Page 43/line 21.

Additionally, Moving Defendants object to the admission of the following testing

on the following grounds:

> Page 10/line 2 – Page 12/line 8 (hearsay);
> Page 33/lines 4 – 21 (hearsay, relevance; lack of foundation; calls for
>        speculation);
> Page 42/lines 3-8 (relevance);
> Page 43/line 23 – Page 45/5 (foundation; hearsay; calls for speculation;
>        impermissibly goes beyond scope of direct and cross
>        examination);
> Page 48/lines 1-13 (relevance and foundation); and
> Page 49/lines 6-24 (hearsay; relevance).

## CONCLUSION

For the reasons more fully set forth above, Moving Defendants respectfully

request that this Honorable Court issue an Order:

(1)  Granting Moving Defendants' application to exclude, either in its entirety or

to the extent the Court finds just and proper, the foregoing objectionable

portions of the Rule 15 deposition testimony for the reasons more fully set

forth above; and

(2)  For any and all such other and further relief which the Court deems to be just

and proper under the specific circumstances of this matter.


Respectfully submitted,


By:  George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

6

## CERTIFICATE OF SERVICE

I do hereby certify that, on this  6th day of November 2006,  I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:

United States Department of Justice
U.S. Attorney's Office
Nemours Building
1007 N. Orange Street, Suite 700
Wilmington, Delaware  19801
Attn:  Edmond Falgowski, Esq.


United States Department of Justice
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Street
Washington, D.C. 20026
Attn:  Gregory Linsin, Esq.
        Jeffrey Phillips, Esq.
        Tracy Katz, Esq.



Respectfully submitted,

By: George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel: (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

UNITED STATE OF AMERICA,                    :

                                            : No.
        Plaintiff,                          : 1:06-CR-00076-GMS-2
                                            :
            vs.                             :
                                            :
CHIAN SPIRIT MARITIME                       :
ENTERPRISES, INC., VENETICO                 :
MARINE S.A., IRENE E/M,                     :
EVANGELOS MADIAS, CHRISTOS                  :
PAGONES, ADRIEN DRAGOMIR,                   :
                                            :
        Defendants.                         :

- - -

                    Videotaped deposition of MARIO
MANZANILLA, taken pursuant to notice before Gail
Inghram Verbano, CSR, RMR, in the offices of United
States Department of Justice, 700 Nemours Building,
1007 Orange Street, Wilmington, Delaware, on Tuesday,
July 18, 2006, beginning at approximately 3:24 p.m.

- - -

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street      Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

Mario Manzanilla

2 (Pages 2 to 5)

**Page 2**

1  APPEARANCES:
2    MARK W. KOTILA, ESQ.
     JEFFREY L. PHILLIPS, ESQ.
3    United States Department of Justice
     Environmental Crimes Section
4    P.O. Box 23985 - L'Enfant Plaza
     Washington, DC 20026-3985
5      Attorneys for Plaintiff
6    GEORGE M. CHALOS, ESQ.
     FOWLER, RODRIGUEZ & CHALOS
7    366 Main Street
     Port Washington, NY 11050
8      Attorney for Defendants Chian Spirit
       and Venetico Marine
9
     CARL R. WOODWARD, III, ESQ.
10   CARELLA, BYRNE, BAIN, GILFILLAN,
     CECCHI, STEWART & OLSTEIN
11   5 Becker Farm Road
     Roseland, NJ 07068-1739
12     Attorney for Defendant Dragomir
13  ALSO PRESENT:
14     Chris Weiss, Videographer
       Chris Masaoay, Tagalog Interpreter
15
       Adrien Dragomir
16     Liviu-Lee Roth
       Brent McKnight
17     Jason F. Burgess
18        - - -
19
20
21
22
23
24

**3**

1        THE VIDEOGRAPHER: This is Chris
2   Weiss, the videographer, and the court reporter today
3   is Gail Verbano. We are both here from the firm of
4   Corbett & Wilcox, located at 230 North Market Street,
5   Wilmington, Delaware.
6        The time is 3:24 p.m. on Tuesday,
7   July 18th, 2006. We are documenting the videotaped
8   deposition of Mario Manzanilla for the plaintiff in
9   the matter of United States of America versus Chian
10  Spirit Maritime Enterprises, Inc., Venetico Marine,
11  Irene E.M., Evangelos Madias, Christos Pagones,
12  Adrien Dragomir in the United States District Court,
13  District of Delaware.
14        We are at the location of the
15  United States Attorney's office, Nemours Building,
16  1007 North Orange Street, Suite 700, Wilmington,
17  Delaware.
18        Will the attorneys please state
19  their appearance for the record.
20        MR. PHILLIPS: Jeff Phillips, U.S.
21  Government.
22        MR. KOTILA: United States
23  Government -- I mean Mark Kotila, United States
24  Government.

**Page 4**

1        MR. CHALOS: George Chalos,
2   Venetico Marine and Chian Spirit Maritime
3   Enterprises.
4        MR. WOODWARD: Carl Woodward on
5   behalf of Adrien Dragomir.
6        MR. TWERSKY: Michael Twersky on
7   behalf of the witness.
8        Will the court reporter please
9   administer the oaths.
10        (CHRIS MASAOAY was previously sworn
11  in as Tagalog-English interpreter.)
12        - - -
13        MARIO MANZANILLA, having first been
14  duly sworn through the interpreter according to law,
15  was examined and testified further as follows:
16        - - -
17        DIRECT EXAMINATION
18  BY MR. PHILLIPS:
19    Q   Mr. Manzanilla, thank you for being here
20  today.
21        Could you tell the court, where are
22  you from, your hometown?
23    A   Bacolod City, Negros, Occidental.
24    Q   And how old are you?

**Page 5**

1    A   35.
2    Q   And what is your occupation?
3    A   Seaman.
4    Q   And where do you normally work?
5    A   In the engine.
6    Q   As a seaman, I assume you work on ships?
7    A   Yes, sir.
8    Q   How many ships have you worked on?
9    A   Eight, sir.
10   Q   Including the last one?
11   A   Yes, sir.
12   Q   And what kind of work do you do in the
13  engine?
14   A   Cleaning the main engine, throwing
15  garbage, assisting for the oilers and the officers.
16   Q   And assisting the oilers and officers, do
17  you ever work on an oily water separator?
18   A   No, sir.
19   Q   Do you know what an oily water separator
20  is?
21   A   Yes, sir.
22   Q   Okay. How do you know what an oily water
23  separator is?
24   A   The previous ships that I have boarded

Page 6

1  in, I saw them operating it.
2      Q  Okay. And when you say you saw them,
3  describe what you saw.
4          MR. CHALOS: Objection.
5          THE WITNESS: Sir, there is a pump,
6  a suction coming from the bilge tank, and the bilge
7  tank going into the overboard.
8  BY MR. PHILLIPS:
9      Q  Okay. And going from the bilge tank
10  overboard, but you didn't say where the oily water
11  separator was.
12      A  It was in the main engine after Pick.
13      Q  Okay. Now, when were you hired -- or
14  were you ever hired to work on the Irene?
15      A  Yes, sir.
16      Q  Do you remember when?
17      A  November 2004.
18      Q  And where did you board the Irene?
19      A  China, at the port of Lian Yun Gang.
20      Q  And when you boarded the Irene, did you
21  observe if the Irene had an oily water separator?
22      A  Yes, there is. I saw one.
23      Q  Did you observe if it worked?
24      A  When I boarded the ship, the separator

Page 7

1  was not working, the bilge pump was not in order, and
2  the ship was in critical condition.
3      Q  Where did it go from the port you boarded
4  it? What was the next port?
5      A  Guangzhou port for dry dock.
6      Q  Did you stay with the ship while it was
7  in dry dock?
8      A  Yes. For two months, I was working
9  there.
10      Q  Did you observe the oil/water separator
11  while it was at dry dock?
12          MR. CHALOS: Objection.
13          THE WITNESS: The separator was not
14  working, and so we had to use an invincible pump to
15  pump overboard.
16  BY MR. PHILLIPS:
17      Q  And then what happened after the dry
18  dock?
19      A  We left. We went to Hong Kong. But we
20  were not using that separator at that time. It was
21  not working.
22          MR. CHALOS: Objection; move to
23  strike.
24          THE WITNESS: And then --

Page 8

1  BY MR. PHILLIPS:
2      Q  Go ahead.
3      A  -- the bilge pump -- that's the only one
4  that they had fixed. And then we had a collision in
5  Hong Kong, because we didn't have a radar.
6          MR. CHALOS: Objection; move to
7  strike the portion of the answer nonresponsive to the
8  question.
9  BY MR. PHILLIPS:
10      Q  Did you eventually come to port in
11  Africa?
12      A  What do you mean by that?
13      Q  After China, did the Irene go back on the
14  sea?
15      A  We went back again for a dry dock,
16  because there was a hold.
17      Q  And then what?
18      A  So when it went to the dry dock, it got
19  fixed. And then we went into another travel going to
20  Thailand.
21      Q  Did you eventually get to Africa?
22      A  After Thailand, we went to Africa for
23  discharging.
24      Q  What do you mean?

Page 9

1      A  We went to get some loading in Thailand,
2  and so then we went to Africa to discharge.
3      Q  To discharge what you -- what the ship
4  carried?
5      A  Yes. It was rice.
6      Q  Rice. Okay.
7          And when you were in Africa, do you
8  remember what time that was? Month? year?
9      A  Africa, I don't remember that month.
10      Q  Do you remember the year?
11      A  2005. 2005.
12      Q  Do you remember where you went from
13  Africa? From Africa, the next port?
14      A  Brazil.
15      Q  Do you remember which month you arrived
16  in Brazil?
17      A  I don't remember. I think January -- no,
18  no, wait.
19          We came in November -- I think
20  October, like this. October.
21      Q  Okay. On board -- when you were in
22  Africa, who was your chief engineer; do you know?
23      A  Tomondong, the chief engineer before.
24      Q  Before what?

Mario Manzanilla

4 (Pages 10 to 13)

Page 10

1    A    Before the Chief Engineer Dragomir.
2    Q    And did you ever talk to Chief Engineer
3  Tomondong?
4    A    Yes.  We worked together for quite some
5  time.
6    Q    Did he ever give you orders?
7    A    Yes.  Yes, sir.
8    Q    Do you recall any orders he gave you?
9    A    Yes, sir.
10   Q    Tell us.
11   A    He ordered me to pick out the hard pipe,
12  the original pipes of the bilge pump overboard, the
13  line for overboard; to take out and change the magic
14  pipe.
15   Q    What is the magic pipe?
16   A    Here, sir.
17        MR. PHILLIPS:  For the record, the
18  witness pointed out Government Exhibit 2.
19        THE WITNESS:  The flange.
20        MR. PHILLIPS:  And also the flange,
21  as Government Exhibit 3.
22        THE WITNESS:  (In English) The
23  second engineer who fixed this one --
24   A    The second engineer who fixed this one --

Page 11

1        THE WITNESS:  (In English) And
2  this, also.
3        THE WITNESS:  And this also, this
4  one.
5        MR. PHILLIPS:  And we'll get to
6  that.
7        MR. TWERSKY:  I just want to advise
8  the witness to speak through the interpreter.
9        THE WITNESS:  (In English) Sorry,
10  sorry, sorry.
11  BY MR. PHILLIPS:
12   Q    And so what did you do?
13   A    He asked me to get the original piece of
14  pipe.  He asked me to hide it.  And then together
15  with the fourth engineer, the previous one and the
16  oiler, that we should take it out and then change it
17  to this.
18   Q    Why do you call it a magic pipe?
19   A    Because -- because quickly, you can put
20  it out and quickly you can hide it away.
21   Q    When -- did you ever hide it away?
22   A    This particular one, no.  But the
23  original one, yes.  I was the one that hid it.  I was
24  also the one that gave to the Coast Guard the

Page 12

1  location of where it was hidden.
2    Q    Okay.  Who asked you to hide it?
3        MR. CHALOS:  Objection.
4  BY MR. PHILLIPS:
5    Q    Did anyone ask you to hide it?
6    A    The previous chief engineer, Tomondong.
7    Q    He asked you to hide which pipe?
8    A    The original, the hard pipe.
9    Q    Okay.  Now, you eventually came to the
10  United States?
11   A    Yes.
12   Q    When did you know -- did you know you
13  were coming to the United States before you arrived?
14   A    Yes, sir, in Africa.
15   Q    How did you find out?
16   A    Because that was the news from the
17  Superintendent Tanasi and the captain.
18   Q    Superintendent Tomasi?
19   A    Tanasi.
20   Q    Tanasi.
21        On the trip from Africa to Brazil,
22  after you hooked on the magic pipe, did you -- did
23  you observe the magic pipe during the voyage?
24        MR. WOODWARD:  Sorry.  Context?

Page 13

1        THE WITNESS:  Yes, it was fixed.
2        MR. WOODWARD:  Where -- which
3  voyage?
4        MR. PHILLIPS:  This is from Africa
5  to Brazil.
6        MR. CHALOS:  Yeah, but when was it?
7  There was two of those.
8        MR. PHILLIPS:  Two voyages from
9  Africa to Brazil?  He didn't say that.
10        MR. CHALOS:  I know, but you're
11  presupposing a predicate.
12  BY MR. PHILLIPS:
13   Q    Did you ever see the magic pipe being
14  used during the voyage from Africa to Brazil?
15   A    No, sir.
16   Q    You never saw it being used?
17   A    No, sir.
18   Q    Did you ever see the pump working?
19   A    What kind of pump?
20   Q    From Africa to Brazil --
21   A    What kind of, separator or bilge pump?
22   Q    The bilge pump.
23   A    Yes, I saw it.
24   Q    What did you see?

Mario Manzanilla

## Page 14

1    A  It was working. It was working.

2    Q  What was the bilge pump connected to?

3    A  It's connected to the bilge tank, the

4  bilge pump -- the bilge well and sludge tank.

5    Q  And where would the pumping -- where

6  would the liquid go?

7        MR. CHALOS: Objection.

8        THE WITNESS: Outside.

9  BY MR. PHILLIPS:

10    Q  How would it get outside?

11    A  Because of the use of this magic pipe --

12        MR. CHALOS: Objection.

13        THE WITNESS: -- going overboard.

14  BY MR. PHILLIPS:

15    Q  How many times would you see that?

16        MR. WOODWARD: Objection; context.

17  Time?

18        MR. KOTILA: When?

19        THE WITNESS: About three times I

20  saw it.

21  BY MR. PHILLIPS:

22    Q  Three times from the trip -- from Africa

23  to Brazil?

24        MR. WOODWARD: Wait a minute.

## Page 15

1  There's been no foundation for that.

2        MR. CHALOS: Objection. Objection.

3        MR. PHILLIPS: That was the

4  original foundation.

5        MR. CHALOS: The guy said --

6        MR. WOODWARD: You're going far

7  beyond that.

8        THE WITNESS: From Africa, yes.

9        MR. CHALOS: Wait a minute. Hold

10  on a second.

11        When he testified, you asked if he

12  saw a pump between Africa and Brazil; and then he

13  said that it was working. Then you asked him where

14  it was connected, and then you asked him --

15        MR. PHILLIPS: No. Then he asked

16  if it was a oil/water separator or if it was a bilge

17  pump.

18        MR. CHALOS: No, that's not what

19  the testimony has been.

20        MR. PHILLIPS: That was the

21  testimony.

22        MR. CHALOS: You led this guy right

23  down the path and based on testimony that we've never

24  had from this witness.

## Page 16

1        MR. PHILLIPS: Okay.

2        MR. CHALOS: Can we have that read

3  back. Starting with you saw the bilge pump --

4        (Discussion off the stenograph

5      record with the court reporter

6        MR. CHALOS: The question and

7  answer said -- you asked him --

8        MR. PHILLIPS: The question is did

9  he talk about a bilge pump before that question?

10        MR. CHALOS: You asked him if he

11  saw -- if you saw a magic pipe between Africa and

12  Brazil; and he said no. Then you asked -- him the

13  next question was whether he ever saw the pumps being

14  used.

15        MR. PHILLIPS: He obviously didn't

16  get the question --

17        MR. CHALOS: Well, then --

18        MR. PHILLIPS: -- because then he

19  said he saw it.

20        MR. CHALOS: Okay. Well, if he

21  didn't get the question, that doesn't mean you can

22  just assume that he made a mistake.

23        MR. PHILLIPS: Well, he brought it

24  out when his gave his full explanation.

## Page 17

1        MR. CHALOS: I don't think so.

2        MR. PHILLIPS: So where are we?

3        If you could show me the last thing

4  we worked on.

5        (Discussion off the stenograph

6      record with the court reporter.)

7  BY MR. PHILLIPS:

8    Q  Do you remember arriving to the United

9  States?

10    A  Yes, sir.

11    Q  And can you describe what happened when

12  you got to the United States.

13    A  The Coast Guard boarded the vessel.

14    Q  And then what happened?

15    A  And then they checked the engine room.

16  The second engineer, myself and the chief engineer,

17  we checked the pumps and tanks, and that's it.

18    Q  Did you ever talk to the Coast Guard?

19    A  No, no.

20    Q  Did you ever write a statement?

21    A  Yes, sir.

22    Q  And did anybody else come on board?

23    A  The superintendent.

24    Q  Do you remember his name?

Mario Manzanilla

6 (Pages 18 to 21)

Page 18

1    A    Yes, Christos.
2    Q    And did you ever talk to him?
3    A    Yes, sir.
4    Q    And what did he say?
5    A    He told us that we should retract our
6    statement, because if not, we would go to jail.
7    Q    Who is "us"?
8    A    The engineers that are with me working:
9    The second engineer, the third engineer, the fourth
10   engineer, and the oiler, Robert.
11   Q    And what did you say, if anything?
12   A    We told them -- we told him that we could
13   not change it, because we had already done it, and
14   what is contained there is the truth and so we cannot
15   change it anymore; it's already there.
16   Q    And did you talk to him again?
17   A    When he talked to me again, before New
18   Year's in the mess hall, when we were going down
19   there, he said to us if we tell the truth, that's
20   what we should do so that we don't go to jail.
21   Q    Now, how many months total were you on
22   the Irene?
23   A    From what I remember, about 14 months.
24   Q    During that time, did the oil/water

Page 19

1    separator ever work?
2          MR. CHALOS:  Objection.
3          MR. WOODWARD:  Leading.
4          THE WITNESS:  No.  You never use it
5    since the very first time.
6    BY MR. PHILLIPS:
7    Q    So how was oily waste handled on the
8    Irene?
9          MR. CHALOS:  Objection; no
10   foundation.
11         MR. PHILLIPS:  He's already said
12   he's worked in the engine room.
13         MR. CHALOS:  Yeah.  What so?
14         THE WITNESS:  They used the bilge
15   pump to pump overboard.
16         MR. CHALOS:  One second.  I'm
17   working in the U.S. Attorney's office, but I'm not a
18   government guy.  Does that make him qualified?
19         MR. PHILLIPS:  No, but you know
20   what attorneys do.
21         MR. CHALOS:  All right.
22   BY MR. PHILLIPS:
23   Q    Okay.  How often did you observe oil
24   waste being discharged from the Irene?

Page 20

1          MR. WOODWARD:  During what period
2    of time?
3          MR. PHILLIPS:  During his time on
4    the ship.
5          MR. WOODWARD:  All 14 months?
6          MR. PHILLIPS:  That's right.
7          MR. WOODWARD:  How many times over
8    14 months?
9          MR. PHILLIPS:  This is the
10   question.  I'm asking the question.  If you're
11   objecting, you can object.
12         MR. WOODWARD:  I'm objecting to the
13   form of the question.  I'm just trying to help you
14   out.
15         MR. PHILLIPS:  No, you're not
16   helping anybody out.
17         THE INTERPRETER:  There was a
18   response there.
19         MR. WOODWARD:  Look, you don't want
20   to put in the time, that's fine.
21         MR. PHILLIPS:  I'm asking about his
22   entire time on the ship.
23         MR. WOODWARD:  Now you did, after
24   you --

Page 21

1          MR. PHILLIPS:  I already have.
2          THE WITNESS:  From what I remember,
3    many times.
4    BY MR. PHILLIPS:
5    Q    Let's start again, just so the record is
6    clear.
7          How many months were you on the
8    ship?
9    A    About 14 months, sir.
10   Q    During that time, how often did you see
11   overboard discharges?
12   A    Since the very beginning, I saw many
13   times.  I saw it, they would pump it out since even
14   when Tomondong was there.  He was the chief engineer.
15   Q    What about after Tomondong?
16   A    After Tomondong left, I don't exactly
17   remember how many times they did the pump-out.
18   Q    So you don't remember how many times?
19   A    I don't remember exactly, but I believe
20   maybe about three times.
21   Q    Three times in how long?
22   A    That I saw.  Since coming from Brazil --
23   coming from Brazil to America.
24         MR. PHILLIPS:  All right.  The

Corbett & Wilcox

Mario Manzanilla

7 (Pages 22 to 25)

Page 22

1  defense will have some questions for you.
2          CROSS-EXAMINATION
3  BY MR. CHALOS:
4      Q   Hi, Mr. Manzanilla. My name is George
5  Chalos. And I represent Chian Spirit Maritime
6  Enterprises and Venetico Marine in this proceeding.
7          Now, you know that Venetico Marine
8  is the company that owns the ship; right?
9      A   That I don't know. I only remember Chian
10 Spirit.
11     Q   Okay. So you know that Chian Spirit is
12 the operator or manager of the ship; right?
13     A   Yes, sir.
14     Q   Okay. Let's talk about how you got this
15 job.
16          You went to a crewing agent in the
17 Philippines; right?
18     A   Yes, sir.
19     Q   And you submitted some paperwork looking
20 for a job; right?
21     A   Yes, sir.
22     Q   And then the crewing agent offered you a
23 job that you could either pick or not pick; right?
24     A   Yes, sir.

Page 23

1      Q   And you picked to go to work on the
2  Irene; right?
3      A   Yes, sir.
4      Q   And when you picked to go on board the
5  Irene, you had to execute an employment contract;
6  right?
7      A   Yes, sir.
8      Q   And when you did that, the job that you
9  were signing up for was to be a wiper; right?
10     A   Yes, sir.
11         MR. CHALOS: Could we mark a couple
12 documents. Take a break and -- take three minutes to
13 mark some documents.
14         THE VIDEOGRAPHER: Off the record
15 at 3:52.
16         (Brief recess.)
17         (Documents marked CSME Exhibits 29
18         through 32 for identification.)
19         THE VIDEOGRAPHER: On the record at
20 3:57.
21 BY MR. CHALOS:
22     Q   Mr. Manzanilla, I'm going to show you
23 what we've marked as CSME Defendants' Exhibit No. 29.
24 For the record, I'll make a representation that it's

Page 24

1  a five-page document. Take a look at that document
2  would you please, sir.
3          My first question to you,
4  Mr. Manzanilla, is that the first page and the
5  employment contract you signed to go to work on the
6  Irene E.M.; correct?
7      A   Yes, sir.
8      Q   And then the rest of the documents are
9  also documents that you signed in connection with
10 your application to work on the Irene E.M.; right?
11     A   Yes, sir.
12     Q   And take a look at the second page of
13 that document, if you will. Now, that's a
14 declaration that you signed before you joined the
15 Irene E.M.; correct?
16     A   Yes, sir.
17     Q   And that is your signature on the bottom
18 left-hand side; right?
19     A   Yes, sir.
20     Q   And in fact, before you were allowed to
21 go to work on this ship, you had to go for some
22 training; right?
23     A   Yes, sir.
24     Q   And in fact, you had to go to the office

Page 25

1  of your manning agent to learn about the company's
2  policies; right?
3      A   Yes, sir.
4      Q   And some of that training involved
5  learning about the company's safety management
6  system; right?
7      A   Yes, sir.
8      Q   And the company's environmental
9  protection policy; right?
10     A   Yes, sir.
11     Q   And you also learned that if you were in
12 violation of the company's policies, you could be
13 fired; right?
14     A   Yes, sir.
15         MR. CHALOS: Okay. I'd like to
16 move into evidence Defendants' Exhibit 29, which has
17 been identified by the witness.
18         MR. PHILLIPS: No objection.
19         (Document marked Exhibit CSME 29
20         moved into evidence.)
21 BY MR. CHALOS:
22     Q   I want to show you what we've previously
23 marked and I believe moved into evidence as
24 Exhibit 7, Mr. Manzanilla. And take a look at that

Mario Manzanilla

8 (Pages 26 to 29)

Page 26

1  document.
2          That is, in fact, a copy of the
3  company's environmental protection policy; correct?
4      A   Yes, sir.
5      Q   Okay.  Now, Mr. Manzanilla, that was
6  available and posted in several places on board the
7  ship, was it not?
8      A   Yes, sir.
9      Q   That was on the bulletin board in the
10  engine room; right?  Right?
11      A   Yes, sir.  And in the mess hall.
12      Q   And also in the mess hall; right?
13      A   Yes, sir.
14      Q   And in the hallways; right?
15      A   Yes.  Yes, sir.  Yes, sir.
16      Q   All right.  Now, you also --
17          MR. CHALOS:  Okay.  If that's not
18  moved into evidence, I'd like to move that into
19  evidence with this witness.
20          MR. WOODWARD:  That's CSME 30?
21          MR. CHALOS:  CSME 7.  We'll come
22  back to this in a second.
23  BY MR. CHALOS:
24      Q   I'd like to show you what was marked as

Page 27

1  Defendants'-- CSME Defendants' Deposition Exhibit 30.
2  For the record, I'll make a representation that it's
3  a two-page document.
4          Mr. Manzanilla, that document
5  contains a photocopy of the first page of your
6  passport; right?
7      A   Yes.
8      Q   And also the first page of your seaman's
9  book; right?
10      A   Yeah.
11      Q   And that's you on there?
12      A   Yeah.
13      Q   And that is your photograph?
14      A   Yes, sir.
15      Q   With a different hair style?
16      A   Yes, sir.  Long hair.
17          MR. CHALOS:  Okay.  Now, I'd like
18  to move that into evidence.
19          MR. PHILLIPS:  No objection.
20          (Document marked CSME Exhibit 30
21          moved into evidence.)
22  BY MR. CHALOS:
23      Q   Mr. Manzanilla, I'd like to ask you to
24  take a look at what we've marked CSME Defendants'

Page 28

1  Exhibit No. 31.  It's an exhibit bearing several
2  pages.
3          And I just ask you, Mr. Manzanilla,
4  are these photocopies of some of the certificates you
5  received for the training courses you had attended
6  before joining the Irene E.M.?
7      A   Yes, sir.
8      Q   Okay.  Now, you also attended classes
9  about MARPOL before you got on board the ship; right?
10      A   Yes, sir.
11      Q   And you knew that it's illegal to
12  discharge oil or oily wastes overboard before you got
13  hired by the company to work on the Irene; right?
14      A   Yes, sir.
15      Q   And you also learned that at the training
16  seminar you went to for the company in the
17  Philippines; right?
18      A   Yes, sir.
19          MR. CHALOS:  Okay.  I'd like to
20  move into evidence Exhibit No. 31.
21          MR. PHILLIPS:  No objection.
22          (Document marked CSME Exhibit 31
23          moved into evidence.)
24  BY MR. CHALOS:

Page 29

1      Q   Okay.  Now, Mr. Manzanilla, you've been
2  going to sea for how many years?
3      A   Eight years.
4      Q   And how many ships had you worked on?
5      A   About eight, sir.
6      Q   Okay.  So based on your experience, you
7  would agree with me that the company who owned and
8  the company that managed the Irene E.M. were serious
9  companies; right?
10          MR. PHILLIPS:  Objection; vague.
11          THE WITNESS:  Yes, sir.
12  BY MR. CHALOS:
13      Q   And in fact, before you were even
14  permitted to go on board to start work, the company
15  required you to go for some examinations to make sure
16  that you were both physically and mentally fit to do
17  the job; right?
18      A   Yes, sir.
19      Q   And I'm going to show you what we've
20  premarked as CSME Defendants' Exhibit No. 32, and ask
21  you to take a look at that.
22      A   Yes, sir, these are medicals.
23          Yes, sir, these are medicals, sir.
24      Q   Okay.  So Mr. Manzanilla, these are some

Page 30

1  of the test results and the reports following your
2  prejoining examinations?
3      A   Yes, sir.
4          MR. CHALOS:  Okay.  I'd like to
5  move that into evidence.
6          MR. PHILLIPS:  No objection.
7          MR. CHALOS:  And also ask for our
8  court reporter to fix the exhibit.
9          (Document marked CSME Exhibit 32
10         moved into evidence.)
11 BY MR. CHALOS:
12     Q   Now, I'd like to talk a little bit about
13 what you do on board the ship, Mr. Manzanilla.
14         You're not a licensed engineer;
15 right?
16     A   No, sir.
17     Q   You don't hold a license as an engineer?
18     A   No, sir.  I'm just an oiler and a wiper.
19     Q   Okay.  And on board the Irene E.M., you
20 weren't working as an oiler; right?
21     A   No, I'm a wiper.
22     Q   Okay.  So when you were on the Irene
23 E.M., you were hired to work as a wiper; right?
24     A   Yes, sir.

Page 31

1      Q   And is it fair to say that a wiper is the
2  lowest-ranking member of the engine room team?
3      A   Yes, sir.
4      Q   Now, let's talk about the oily water
5  separator.
6          The oily water separator is
7  operated by the engineers; right?
8      A   Yes, sir.
9      Q   You don't operate the oily water
10 separator?
11     A   No, sir.  I'm only an oiler.  Only the
12 oiler uses it.
13     Q   Okay.  So that the answer is clear, you
14 would agree with me that you don't operate the oily
15 water separator?
16     A   No, sir.
17     Q   And you don't have any responsibility to
18 maintain the oily water separator, do you?
19     A   No, sir.  Just the main engine is what
20 I'm entail.
21     Q   Mr. Manzanilla, yes or no:  You don't
22 have any --
23     A   No, sir.  No, sir.
24     Q   Okay.  Let me finish my question.

Page 32

1          Mr. Manzanilla, you would agree
2  with me that you don't have any responsibility to
3  maintain the oily water separator?
4      A   No, sir.
5      Q   So that means you agree with me, yes?
6      A   Yes, sir.
7      Q   It's also a correct statement that you
8  don't have any responsibility to repair the oily
9  water separator?
10     A   Yes, sir.
11     Q   You don't make the decision to use the
12 oily water separator if it's being used, do you?
13     A   No, sir.
14     Q   And you don't make the decision not to
15 use it if the chief engineer decides not to use it;
16 correct?
17     A   Yes, sir.
18     Q   So all questions Mr. Phillips asked you
19 about the oily water separator, you would agree, were
20 questions about a piece of equipment that you don't
21 have any reason to operate, no reason to maintain, no
22 reason to repair, and no reason to ever use; right?
23     A   Yes, sir.
24     Q   So everything you know about the oily

Page 33

1  water separator is based on something someone else
2  told you; right?
3      A   Yes, sir.
4      Q   Okay.  Now, you also said something about
5  radar.
6          Now, you don't work on the bridge
7  of the ship; right?
8      A   Yes, sir.
9      Q   "Yes, sir," meaning you agree with me,
10 you don't work on the bridge?
11     A   Yes, sir.
12     Q   Yes, sir, you agree with me; or yes, sir,
13 you work on the bridge?  I'm not sure I understand.
14     A   I'm not working on the bridge.
15     Q   Okay, Mr. Manzanilla.  There's no radars
16 in the engine room, are there?
17     A   No, sir.
18     Q   So anything that you know about the radar
19 or anything you told us about the radar is based on
20 something that someone else told you; right?
21     A   Yes, sir.
22     Q   Okay.  Let's talk about Chief Engineer
23 Tomondong.
24     A   Yes, sir.

Mario Manzanilla

10 (Pages 34 to 37)

Page 34

1    Q    Now, you would agree with me that Chief
2  Engineer Tomondong never ordered you to discharge
3  anything overboard?
4    A    No, sir.
5    Q    So when you say "no, sir," you agree that
6  Chief Engineer Tomondong never -- strike that. Let
7  me rephrase my question. I stumbled on my words.
8        You would agree with me, right,
9  that Chief Engineer Tomondong never ordered you to
10  discharge anything overboard?
11    A    No, sir.
12    Q    When you say "no, sir," are you agreeing
13  with me?
14    A    Yes, sir.
15    Q    Okay. By the way, in addition to the
16  training that you took at the crewing agent and the
17  other training classes that you had, you also went to
18  a maritime school in the Philippines; right?
19    A    Yes, sir.
20    Q    And at that maritime school, you also
21  learned about pollution prevention?
22    A    Yes, sir.
23    Q    All right. Now, you also learned, did
24  you not, that it was illegal to discharge oil or oily

Page 35

1  wastes overboard; right?
2    A    Yes, sir.
3    Q    And you also learned that if you observed
4  any oil or oily wastes being discharged overboard,
5  that you were supposed to report that to the captain
6  or to the owner of the ship; right?
7    A    Yes, sir.
8    Q    All right. Now, all the stuff you told
9  us about chief -- that happened when Chief Engineer
10  Tomondong was on board, you never reported that to
11  the captain of the ship, did you?
12    A    No, sir. He himself, he didn't report
13  it. He knows that it's wrong.
14    Q    Mr. Manzanilla, I'm asking you what you
15  did. We'll talk to the other guys at another time.
16        Okay. You personally never
17  reported it to Chian Spirit; right?
18    A    No, sir. I don't know what to do, sir.
19    Q    And just so I'm clear, you also never
20  made a report to Venetico Marine, the owner of the
21  ship, did you?
22    A    No, sir. And I don't know who they are.
23    Q    Okay. Now, let me see if I understand a
24  couple of the things right.

Page 36

1        You told us before that in the
2  engine room, if you start on the bottom, there's the
3  wipers; right?
4    A    Yes, sir.
5    Q    And then the next promotion would be to
6  oiler?
7    A    Yes, sir.
8    Q    And then the next promotion would be to
9  engineer?
10    A    Yes, sir.
11    Q    And then the boss of the engine room is
12  the chief engineer; right?
13    A    Yes, sir.
14    Q    And the boss of the ship is the captain;
15  right?
16    A    Yes, sir.
17    Q    All right. Now, in all the time that you
18  were on board the ship, you never reported any MARPOL
19  violations to the captain; right?
20    A    No, sir.
21    Q    And now you never reported any MARPOL
22  violations to the chief engineer?
23    A    No, sir.
24    Q    And you never reported any MARPOL

Page 37

1  violations to either the management company or the
2  company that owns the ship; right?
3    A    No, sir.
4    Q    And now you yourself, in all the time
5  that you were on board the ship, never turned on the
6  pumps to pump anything overboard; right?
7    A    No, sir.
8    Q    Okay. Now, you yourself never turned off
9  the pumps?
10    A    No, sir.
11    Q    Now, the whole time you were on board the
12  ship, the captain never asked you to set up a magic
13  pipe; right?
14    A    No, sir.
15    Q    And the companies, meaning the management
16  company and the owning company, never asked you to
17  set up a magic pipe?
18    A    No, sir.
19    Q    Okay. And Chief Engineer Dragomir never
20  asked you to set up a magic pipe; right?
21    A    No, sir.
22    Q    And Second Engineer Villano, you know
23  him; right?
24    A    Yes, sir.

Corbett & Wilcox

Page 38

1    Q    Okay.  He never asked you to set up a
2  magic pipe?
3    A    No, sir.
4    Q    In fact, no one asked you to set up the
5  magic pipe between Brazil and the United States.
6    A    No, sir.
7    Q    And in fact, the truth is, between Brazil
8  and the United States, you never saw anybody
9  discharging anything overboard, did you?
10    A    Yes, sir.
11    Q    So let me see if I'm clear.
12         Between Brazil and the United
13  States, you never saw anything with your own eyes
14  being discharged overboard.
15    A    That's what I remember, that I didn't see
16  anything.
17    Q    Okay.  Now, in fact, Mr. Manzanilla, just
18  so we're clear, no one has ever asked you to hide
19  anything from the Government or the Coast Guard;
20  right?
21    A    No, sir.  No, sir.
22    Q    Not the chief engineer, Mr. Dragomir?
23    A    No, sir.
24    Q    Not the captain of the ship?

Page 39

1    A    No, sir.
2    Q    Not the company?
3    A    The superintendent only.
4    Q    Okay.  Now, the superintendent, he didn't
5  ask you to hide anything, did he?  What he asked was
6  if you could retract the statement you made; right?
7    A    Yes, that's right, sir.
8    Q    So he didn't ask you to hide anything?
9    A    No, sir.
10    Q    Okay.  Now, you also saw a man on board
11  named Mr. Madias; right?
12    A    Yes, sir.
13    Q    Now, Mr. Madias never asked you to hide
14  anything; right?
15    A    No, sir.
16    Q    And he never asked you to lie?
17    A    No, sir.
18    Q    And in fact, the captain never asked you
19  to lie either?
20    A    No, sir.
21    Q    Okay.  And Chief Engineer Dragomir never
22  asked you to lie.
23    A    No, sir.
24    Q    And you told us earlier today the

Page 40

1  companies didn't tell you to lie either; right?
2         MR. PHILLIPS:  Objection; asked and
3  answered.
4         THE WITNESS:  No, sir.
5  BY MR. CHALOS:
6    Q    Okay.  Now, even though you didn't talk
7  to the Coast Guard when they came on board, they
8  asked you to write a statement; right?
9    A    Yes, sir.
10    Q    And you did that?
11    A    Yes, sir.
12    Q    And when you wrote it, it was the truth;
13  right?
14    A    Yes, sir.
15    Q    Okay.  And at the time wrote it, this guy
16  Christos wasn't even on board the ship yet; right?
17    A    No, sir, not yet.
18    Q    Okay.  Is it fair to say that when the
19  Coast Guard asked you to write a statement, that no
20  one had told you to lie to them?
21    A    No, sir.
22    Q    So you agree with me?
23    A    Yes, sir.
24    Q    Okay.  So just so I'm clear about when

Page 41

1  this discussion took place in the mess room, you had
2  already given your statement to the Coast Guard;
3  right?
4    A    Let me try to remember that.
5         I believe I had already given it.
6    Q    Okay.  And then Mr. Christos asked if you
7  could retract the statement; right?
8    A    Yes.
9    Q    And you said that you couldn't, because
10  you had already told him the truth and given him your
11  statement; right?
12    A    Yes, sir.
13    Q    Okay.  And you never lied to the Coast
14  Guard?
15    A    No, sir.
16         MR. CHALOS:  Okay.  One second,
17  Mr. Manzanilla.
18         Okay.  Nothing further.
19         MR. WOODWARD:  I have no questions.
20         REDIRECT EXAMINATION
21  BY MR. PHILLIPS:
22    Q    Mr. Manzanilla, when you were -- when I
23  was asking you questions, and you said that you had
24  saw three overboard discharges from Brazil to the

12 (Pages 42 to 45)

### Page 42

1  United States, is that still your testimony?

2    A  That's what I remember, sir.

3    Q  Okay. Now, going back to your employment

4  contract, how much money does a wiper earn on the

5  Irene?

6    A  230 only, sir.

7    Q  Per year? Per month?

8    A  A month.

9    Q  Now, you testified, in response to

10  Mr. Chalos' questions that this was a serious

11  company. But specifically, were they serious about

12  preventing pollution?

13        MR. WOODWARD: Objection --

14        MR. CHALOS: Objection.

15        MR. WOODWARD: -- speculation.

16        THE WITNESS: I don't know, sir.

17  BY MR. PHILLIPS:

18    Q  You testified that the Irene never had an

19  oily water separator that worked?

20        MR. CHALOS: Objection.

21        THE WITNESS: Yes, sir.

22  BY MR. PHILLIPS:

23    Q  Now, you also testified that you were

24  trained on pollution prevention and how to observe

### Page 43

1  oily waste going overboard.

2        MR. CHALOS: Objection. That

3  wasn't his testimony.

4        MR. PHILLIPS: That was his

5  testimony -- that was your question.

6  BY MR. PHILLIPS:

7    Q  Now --

8        THE COURT REPORTER: What was the

9  answer?

10        THE INTERPRETER: He hasn't

11  answered.

12        "Yes, sir." Yes, sir, is the

13  answer.

14  BY MR. PHILLIPS:

15    Q  Now, can you tell when an oily water

16  separator is working?

17        MR. CHALOS: Objection.

18        MR. WOODWARD: No foundation.

19        THE WITNESS: It was not working.

20  Since I boarded the ship, it had not been working.

21  They just use it as an exhibit.

22  BY MR. PHILLIPS:

23    Q  Now, when Chief Dragomir came on board,

24  did he change the way oily waste was handled?

### Page 44

1        MR. WOODWARD: Objection; goes

2  beyond the scope of direct.

3        MR. CHALOS: And cross.

4        MR. WOODWARD: Introducing an

5  entirely new line of questioning.

6  BY MR. PHILLIPS:

7    Q  Go ahead and answer.

8    A  I don't remember, sir.

9    Q  So you don't remember if he changed the

10  way --

11    A  That I don't remember, sir.

12    Q  Did they still use the magic pipe when

13  Chief Dragomir was on board?

14        MR. WOODWARD: Objection, goes

15  beyond direct and cross.

16        MR. CHALOS: And he testified he

17  doesn't even work there.

18        THE WITNESS: They were still using

19  it.

20        MR. PHILLIPS: Okay.

21        MR. CHALOS: That doesn't come in.

22        MR. PHILLIPS: For the record,

23  Mr. Chalos asked several questions about all the

24  engineers, the chief engineers, and whether they made

### Page 45

1  orders for overboard discharges. That's what this

2  question relates to.

3        MR. CHALOS: Anything else?

4        MR. PHILLIPS: No further from me.

5  Thank you.

6        RECROSS-EXAMINATION

7  BY MR. CHALOS:

8    Q  Mr. Manzanilla, you told me that you

9  yourself never saw any overboard discharges, and

10  that's the truth; right?

11    A  Yes, sir.

12    Q  So when Mr. Phillips force-feeds you --

13        MR. PHILLIPS: Objection. This

14  is --

15        MR. CHALOS: Okay. I'll rephrase.

16        THE WITNESS: The only thing that I

17  remember is that this equipment was attached.

18  BY MR. CHALOS:

19    Q  Okay. So really the answer is that you

20  never saw any overboard discharges between Brazil and

21  the United States with your own eyes?

22    A  I don't really remember exactly, because,

23  you know, this has happened a lot, coming from Africa

24  going to the United States. It was many times.

Mario Manzanilla

13 (Pages 46 to 49)

Page 46

1   Q   Okay.  Now, you're not authorized or
2   qualified to report on the condition of the oily
3   water separator to the company, are you?
4   A   No, sir.  Yes, sir.  No, sir.
5   Q   Okay.  So the answer to that would be no,
6   you're not authorized or qualified; right?
7   A   Yes, sir.
8   Q   You agree with me?
9   A   Yes, sir.
10  Q   Okay.  Now, and Mr. Phillips asked you
11  about if you knew how oily wastes were handled on
12  board.  Do you remember that?
13  A   Yes, sir.
14  Q   You do know that there were internal
15  transfers from the bilge wells to the bilge holding
16  tank; right?
17  A   Yes, sir.
18  Q   And you also know that the bilge holding
19  tank was really big?
20  A   Yes, sir.
21  Q   In fact, the biggest one you've ever seen
22  on any of the ships you've ever sailed on?
23  A   Yes, sir.
24  Q   More than 106 cubic meters, right, were

Page 47

1   the capacity?
2   A   Yes, sir.
3   Q   And that tank never filled up while you
4   were on board, did it?
5   A   We were there in Poland, and -- what kind
6   of tanks are we talking about now?
7   Q   You remember in Poland that oily wastes
8   were discharged to a shore facility; right?
9   A   Because there's a lot of tanks, you know.
10  There's a bilge tank, a sludge tank, a bilge well.
11  Q   So my question is, you remember that oily
12  wastes were put ashore to a shore-side facility in
13  Poland; right?
14  A   In Poland, the sludge tank, yes.  But
15  they put it on shore in Poland through a suction.
16  Q   Okay.  And that was -- that discharge
17  went from the ship to a shore facility; right?
18  A   Yes, sir.
19  Q   And it didn't go to the sea?
20  A   No, sir.
21      MR. CHALOS:  Okay.  Nothing
22  further.  Thank you.
23      RECROSS-EXAMINATION
24

Page 48

1   BY MR. WOODWARD:
2   Q   Between Africa and Brazil, when you were
3   asked the question by Mr. Phillips about magic pipe
4   you said, quote, "they" used it.
5   A   Yes, sir.
6   Q   You don't know who that was, do you?
7   A   The former crew.  They've already gone
8   home.
9   Q   Mr. Dragomir never used it, did he?
10  A   In Africa he was just new, so he hadn't
11  made his orders, yet.
12      MR. WOODWARD:  Thank you.  No
13  further questions.
14      FURTHER REDIRECT EXAMINATION
15  BY MR. PHILLIPS:
16  Q   Mr. Manzanilla, how many times did the
17  Irene discharge oily waste to port?
18  A   Only one time in Poland.
19  Q   That's during your entire time on the
20  ship?
21  A   Yes, only once.
22  Q   Okay.
23  A   Because we were there for a long time.
24  We were there for one month, and then after that, the

Page 49

1   sludge tank got filled.
2   Q   Okay.  Were Chief Engineer Dragomir and
3   Chief Tomondong on the ship at the same time?
4   A   No, because he joined us in Africa.  Our
5   chief engineer in Poland was Tomondong.
6   Q   Who was giving orders from Africa to
7   Brazil?
8       MR. WOODWARD:  I'm going to object
9   to the form of the question.
10      THE WITNESS:  I remember that in
11  Africa it was still Tomondong.
12  BY MR. CHALOS:
13  Q   In Africa.  What about in the ocean from
14  Africa to Brazil?
15  A   I believe it was the second engineer that
16  was making orders then; or maybe it's coming from the
17  chief engineer.
18  Q   Do you know?
19  A   I believe that it was done that way.  I'm
20  just not sure.
21      MR. PHILLIPS:  Okay.  No further
22  questions.
23      MR. CHALOS:  Nothing further.
24      MR. WOODWARD:  Nothing further.

Mario Manzanilla

14 (Pages 50 to 52)

Page 50

1        THE VIDEOGRAPHER:  Off the record
2    at 4:30.
3        (Signature having been waived, the
4    deposition of MARIO MANZANILLA was
5    concluded at 4:30 p.m.)
6
7
8
9            I N D E X
10  WITNESS:
11  MARIO MANZANILLA                    PAGE
12    Mr. Phillips              4
13    Mr. Chalos              22
14    Mr. Phillips            41
15    Mr. Manzanilla          45
16    Mr. Woodward              48
17    Mr. Phillips            48
18
19
20
21
22
23
24

Page 52

1        CERTIFICATE OF SHORTHAND REPORTER
2
3        I, Gail Inghram Verbano, CSR, RMR,
4    the officer before whom the foregoing proceedings
5    were taken, do hereby certify that the foregoing
6    transcript is a true and correct record of the
7    proceedings; that said proceedings were taken by me
8    stenographically and thereafter reduced to
9    typewriting under my supervision; and that I am
10   neither counsel for, related to, nor employed by any
11   of the parties to this case and have no interest,
12   financial or otherwise, in its outcome.
13
14
15
16
            _____
17          Gail Inghram Verbano, CSR, RMR
            CSR No. 8635
            Certification No.: 220
18          (Expires 1-31-2008)
19
20
21
22
23
24

Page 51

1        E X H I B I T S
2
3        EXHIBITS MARKED FOR IDENTIFICATION
4    CSME    DESCRIPTION        PAGE
5    29    Documents relating to employment    23
          of Mr. Manzanilla
6
     30    Photocopy of seaman's book and    23
7          passport of Mr. Manzanilla
8    31    Certificates related to        23
          Mr. Manzanilla's training
9
     32    Physical and mental test results    23
10         for Mr. Manzanilla
11
12
13        EXHIBITS MOVED INTO EVIDENCE
14   CSMR Exhibit No.        PAGE
15   29                25
16   30                27
17   31                28
18   32                30
19
20
21
22
23
24