IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X

UNITED STATES OF AMERICA

        Plaintiff,

                                  Criminal Action No. 06-76 (GMS)

      v.

CHIAN SPIRIT MARITIME ENTERPRISES, INC.,
VENETICO MARINE S.A., *et al.*

        Defendants.

-----------------------------------------------------------X

### DEFENDANTS, CHIAN SPIRIT MARITIME ENTERPRISES, INC. AND VENETICO MARINE, S.A.'s, OBJECTIONS AND REQUEST FOR PRETRIAL RULINGS AS TO THE ADMISSIBILITY OF THE FOLLOWING PORTIONS OF THE RULE 15 DEPOSITION TESTIMONY OF PAUL TUDOR.

       **COME NOW,** moving defendants, Venetico Marine, S.A. ("Venetico") and

Chian Spirit Maritime Enterprises, Inc. ("CSME")(collectively, "Moving Defendants"),

who respectfully request that this Honorable Court consider and rule, before the voir dire

of the jury panel, and out of the presence and hearing of the jury panel, as to the

admissibility of the following Rule 15 deposition testimony by Paul Tudor, which the

Government has stated it will seek to introduce at trial.[1]

       Specifically, Moving Defendants object to the admissibility of the following

deposition testimony by Paul Tudor, the "electrician" from the M/V IRENE E., on the

following grounds. For the Court's ready reference, a correct and true copy of the

transcript of the Rule 15 deposition of Mr. Tudor, conducted at the office of the United

---

[1] For the Court's ready reference, Moving Defendants advise that in order to facilitate the deposition process, counsel for all parties agreed to expressly reserve making objections during the examination.

United States Attorney, 700 Nemours Building, 1007 Orange Street, Wilmington, Delaware, on Friday, July 14, 2006, is attached hereto as Exhibit "A".

### Paul Tudor  (Electrician)

Moving Defendants respectfully submit that during the Rule 15 deposition examination, Mr. Tudor, the electrician on board the M/V IRENE E.M. clearly, concisely and unambiguously testified, in sum and substance, that he is not a licensed marine engineer; did not have any responsibilities relating to the use, operation and/or maintenance of any engine room equipment; is not authorized or qualified to operate the oily water separation equipment; is not authorized or qualified to maintain the oily water separation system; is not authorized or qualified to make any repairs to the oily water separation system.  *See* Exhibit "A," *Transcript at Page 36/line 22 through Page 37/line 20; Page 57/line 5 through Page 58/line21; and page 66/line 20 through Page 67/line 17.*

In view of the foregoing, Moving Defendants object to the introduction of the following testimony, as it lacks sufficient foundation; calls for speculation; calls for strictly inadmissible hearsay responses; assumes facts not in evidence and, if admitted, would be unfairly prejudicial, confusing and otherwise misleading to the trier of fact:

> Page 22/lines 15- 18; and
> Page 88/lines 10 -16.

Additionally, Moving Defendants object to the following testimony on the following grounds:

> Page 19/lines 2 – 13 (relevance); and
> Page 69/lines 1 – Page 70/line 6 (relevance).

## CONCLUSION

For the reasons more fully set forth above, Moving Defendants respectfully request that this Honorable Court issue an Order:

(1)  Granting Moving Defendants' application to exclude, either in its entirety or to the extent the Court finds just and proper, the foregoing objectionable portions of the Rule 15 deposition testimony for the reasons more fully set forth above; and

(2)  For any and all such other and further relief which the Court deems to be just and proper under the specific circumstances of this matter.

Respectfully submitted,

By:  George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

## CERTIFICATE OF SERVICE

I do hereby certify that, on this  6th day of November 2006,  I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by Email and by mailing the same by United States mail, properly addressed, and first-class postage prepaid to the following:

> United States Department of Justice
> U.S. Attorney's Office
> Nemours Building
> 1007 N. Orange Street, Suite 700
> Wilmington, Delaware  19801
> Attn:  Edmond Falgowski, Esq.

> United States Department of Justice
> Environmental Crimes Section
> P.O. Box 23985
> L'Enfant Plaza Street
> Washington, D.C. 20026
> Attn:  Gregory Linsin, Esq.
>        Jeffrey Phillips, Esq.
>        Tracy Katz, Esq.

Respectfully submitted,

By:  George M. Chalos
CHALOS, O'CONNOR & DUFFY, LLP
366 Main Street
Port Washington, NY 11050
Tel:  (516) 767 3600
Fax: (516) 767 3605
Email: gmc@codus-law.com

4

# EXHIBIT A

Paul Tudor

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,            :

               Plaintiff,   :

               vs.                  :No. 1:06-CR-00076-GMS-2

CHIAN SPIRIT MARITIME                :
ENTERPRISES, INC., VENETICO
MARINE S.A. IRENE E/M,               :
EVANGELOS MADIAS, CHRISTOS
PAGONES, ADRIEN DRAGOMIR,            :

              Defendants. :

- - -

Deposition of PAUL TUDOR, taken

pursuant to notice in the offices of the United States

Department of Justice, 700 Nemours Building, 1007

North Orange Street, Wilmington, Delaware, on Friday,

July 14, 2006, at 10:36 a.m., before Lorraine B.

Marino, Registered Diplomate Reporter and Notary

Public.

- - -

CORBETT & WILCOX

230 North Market Street

Wilmington, Delaware 19801

(302) 571-0510

Paul Tudor

2 (Pages 2 to 5)

---

Page 2

```
1   APPEARANCES:
2        MARK W. KOTILA, ESQ.
         JEFFREY L. PHILLIPS, ESQ.
3        United States Department of Justice
         Environmental Crimes Section
4        P.O. Box 23985 - L'Enfant Plaza
         Washington, DC 20026-3985
5          for Plaintiff
6        GEORGE M. CHALOS, ESQ.
         Fowler Rodriguez & Chalos
7        366 Main Street
         Port Washington, NY 11050
8          for Defendants Chian Spirit and
           Venetico Marine
9
         CARL R. WOODWARD, III, ESQ.
10       Carella, Byrne, Bain, Gilfillan,
         Cecchi, Stewart & Olstein
11       5 Becker Farm Road
         Roseland, NJ 07068-1739
12         for Defendant Dragomir
13       MICHAEL K. TWERSKY, ESQ.
         Montgomery, McCracken, Walker &
14       Rhoads LLP
         123 South Broad Street
15       Philadelphia, PA 19109
           for the Witness
16
     ALSO PRESENT:
17
         ADRIEN DRAGOMIR
18       LIVIU-LEE ROTH
         TRACY I. KATZ
19       JASON F BURGESS
         BRENT S. McKNIGHT
20       MICHELLE N. FERRERI
         CARA GOELLER
21       PRESTON SATCHELL
22         ---
23
24
```

---

Page 3

```
 1          NADIA SHARON, having been first duly
 2   sworn as the interpreter, translated as follows:
 3          PAUL TUDOR, having been first duly
 4   sworn, was examined and testified at times through the
 5   interpreter as follows:
 6              DIRECT EXAMINATION
 7   BY MR. KOTILA:
 8       Q.   Good morning, Mr. Tudor.
 9       A.   Good morning.
10       Q.   My name is Mark Kotila, and I am with
11   the United States Department of Justice.  And we have
12   met several times in the past; correct?
13       A.   (without interpreter) Yes.
14       Q.   We have interviewed you.  You
15   testified at a prior proceeding; correct?
16       A.   (without interpreter) Yes.
17       Q.   Could you tell us where -- how long
18   have you been in the United States now?
19            (Discussion between witness and
20   interpreter.)
21       MR. CHALOS:  One second.  I would like
22   to make an objection.  Mr. Tudor, Mr. Tudor, one
23   second.
24            To madam interpreter, your
```

---

Page 4

```
 1   responsibility today is to just interpret what he
 2   says, not to discuss the questions, not to discuss
 3   what you think or interpret the questions to be.  It
 4   is just whatever he says, you tell us, and whatever
 5   the questioner said, you tell him.
 6            THE INTERPRETER:  My question is if
 7   you calculate the time from January 5 till -- from
 8   December 5 until January 3.
 9            THE WITNESS:  (without interpreter) If
10   I count -- sorry.  I count the period which I been
11   with the ship --
12            MR. KOTILA:  Hold on.  You probably
13   have to speak through the interpreter so we are
14   consistent.
15            THE WITNESS:  Do I have to count the
16   period that I was in anchor, from December 5 through
17   January?
18   BY MR. KOTILA:
19       Q.   Correct.  I am just saying from
20   December 5 to now you have been in the United States;
21   correct?
22       A.   (without interpretor) Yes.
23       Q.   Now, where are you from?
24       A.   (without interpreter) I am from
```

---

Page 5

```
 1   Romania.
 2       Q.   And how old are you?
 3       A.   (without interpreter) Forty-six.
 4       Q.   Could you tell us where you live in
 5   Romania?
 6       A.   Medgidia, M-E-G-I-D-E-A.
 7       Q.   Do you have an address there?
 8       A.   Yes.
 9       Q.   What is it?
10       A.   Podgorilor -- P-O-D-G-O-R-I-L-O-R --
11   Street.  The number of the street is 30.  30
12   Podgorilor.
13       Q.   Could you tell us what is your
14   occupation?
15       A.   I am an electrician.
16       Q.   How long have you been an electrician?
17       A.   (without interpreter) More than 27.
18       Q.   Twenty-seven years?
19       A.   Yes.
20       Q.   How much education have you had?
21       A.   Altogether, because I have other
22   studies, I have other things studied.
23       Q.   But how many years in school?
24       A.   Over 18 years.
```

Paul Tudor

3 (Pages 6 to 9)

Page 6

1    Q.    How did you learn to be an
2 electrician?
3    A.    I learned in school.
4    Q.    How long did you go to school?
5    A.    Four years.
6    Q.    Four years. Now, as an electrician,
7 what kind of businesses have you worked in?
8    A.    Only on the sea.
9    Q.    Only on vessels?
10   A.    Yes. A period of time also in the
11 army, but also in the same domain.
12   Q.    Which army?
13   A.    (without interpreter) Navy.
14   Q.    Romanian Navy?
15   A.    (without interpreter) Yes.
16   Q.    What kind of work have you done in
17 vessels generally?
18   A.    Maintenance and repairs.
19   Q.    All electrical maintenance and
20 repairs?
21   A.    Yes.
22   Q.    And have you worked with oily water
23 separators?
24   A.    I didn't function. I didn't work

Page 7

1 effectively with it.
2    Q.    What does that mean?
3    A.    I wasn't the person to function the
4 separator.
5    Q.    So you are not skilled with the
6 separator?
7    A.    I have experience, but I didn't
8 operate this.
9    Q.    All right. You did not operate them?
10   A.    Yes.
11   Q.    But you know how they work?
12   A.    Yes.
13   Q.    What do oily water separators do?
14        MR. CHALOS: Objection. There is no
15 foundation. The guy said he doesn't work with it. I
16 am not going to give you speaking objections, but
17 noted for the record.
18 BY MR. KOTILA:
19   Q.    You are familiar with oily water
20 separators?
21   A.    Yes.
22   Q.    You have not operated them; correct?
23   A.    Correct.
24   Q.    But you have worked on them?

Page 8

1        MR. CHALOS: Objection.
2        THE WITNESS: Yes.
3 BY MR. KOTILA:
4    Q.    Have you ever made repairs to oily
5 water separators?
6    A.    I am not able to do it.
7    Q.    So what, if any, work did you do on
8 oily water separators?
9        MR. CHALOS: Objection; asked and
10 answered.
11       MR. KOTILA: You can answer.
12       THE WITNESS: I secure the part that
13 function in the electrical domain. There I repair and
14 maintain. But there is an electronic part of it that
15 I don't have the permission to go to.
16 BY MR. KOTILA:
17   Q.    Okay. So there is an electrical part
18 of an oily water separator and an electronics part?
19   A.    Yes, sir. Yes.
20   Q.    Now, what is the part affiliated with
21 the electrical part? Tell us what you are talking
22 about.
23   A.    They are pumps. They are the electric
24 panel, that they have a contact with them, relays, all

Page 9

1 the buttons, all the interruptors, all the commuters,
2 all kinds of electric bobbins. They are
3 electromagnetic valves.
4    Q.    So those kind of times you did --
5    A.    (without interpreter) Solenoid valves.
6    Q.    How do you spell that?
7    A.    Solenoid valves.
8        THE INTERPRETER: Solenoid.
9        MR. WOODWARD: S-O-L-E-N-O-I-D,
10 solenoid.
11 BY MR. KOTILA:
12   Q.    Okay. That part of the oily water
13 separator you were able to work with?
14   A.    Yes.
15   Q.    Repairs made?
16   A.    Yes.
17   Q.    Many times?
18   A.    Whenever was the necessity.
19   Q.    What --
20   A.    In other vessels, yes.
21   Q.    Now, what are you referring to as the
22 electronics part of an oily water separator?
23   A.    The analyzer.
24   Q.    Is this also known as the sensor?

Paul Tudor

4 (Pages 10 to 13)

Page 10

1  A.  Yes. It is the same thing.
2  Q.  Now, that part of the separator you
3  did not ever work on, on any sensor?
4  A.  No, because it is not possible to be
5  repaired.
6  Q.  Okay. If it is broke?
7  A.  It has to be replaced.
8  Q.  Okay.
9  A.  It is unrepairable.
10  Q.  Okay. When did you board the vessel
11  the Irene?
12  A.  24 May.
13  Q.  May 24?
14  A.  2005.
15  Q.  How is it that you got that job?
16  A.  I took it from the former electrician,
17  but the period was a short period, around four to five
18  hours. And I took over only the important parts that
19  were important for the vessel.
20  Q.  Okay. Well, let's back up. Where
21  were you living in May of 2005?
22  A.  I don't understand the question.
23  Q.  You boarded the Irene in May 2005.
24  A.  Yes.

Page 11

1  Q.  Where were you prior to boarding the
2  Irene?
3  A.  In my town, Medgidia.
4  Q.  How were you contacted to get the job?
5  MR. CHALOS: Objection. No foundation
6  he was ever contacted.
7  BY MR. KOTILA:
8  Q.  Well, how is it that you get on board
9  the vessel?
10  A.  Through my agent, the firm of the
11  crewing agency.
12  Q.  They contacted you in Romania?
13  A.  Yes.
14  MR. CHALOS: Objection.
15  BY MR. KOTILA:
16  Q.  Okay. Where did you meet with the
17  boat in May of '05, the boat being Irene?
18  A.  I met with them at the agency.
19  Q.  Where was the Irene at the time?
20  A.  In Poland.
21  Q.  So you boarded the vessel in Poland?
22  A.  Yes.
23  Q.  Who did you meet with once you got on
24  board the Irene? Who?

Page 12

1  A.  The first person was guardian.
2  Q.  Who?
3  A.  (without interpreter) No. Watchman.
4  THE INTERPRETER: The watchman.
5  THE WITNESS: (without interpreter)
6  The gangway watchman.
7  BY MR. KOTILA:
8  Q.  Who was to be your supervisor on board
9  the Irene?
10  A.  The second mechanic, which was the
11  chief mechanic.
12  Q.  Is that also the same as the chief
13  engineer?
14  A.  Yes. Second engineer and chief
15  engineer are my supervisors on board.
16  Q.  Immediate supervisors?
17  A.  Yes.
18  Q.  So the chief engineer and the second
19  engineer give you your jobs --
20  A.  Yes.
21  Q.  -- and you do them?
22  What was the name of the chief
23  engineer when you boarded the vessel?
24  A.  Tomondong Bautista Gene.

Page 13

1  Q.  Okay. Did you take a look at the oily
2  water separator when you boarded the vessel in May of
3  '05?
4  A.  Yes. I looked at the separator along
5  with the electrician that I took the job from.
6  Q.  What was the name of that electrician?
7  A.  Aurelian, A-U-R-E-L-I-A-N. I am not
8  sure of the second name.
9  (without interpreter) Family name, I
10  am not remember.
11  (through interpreter) It might be
12  Hotoran, H-O-T-O-R-A-N. I am not sure.
13  Q.  All right. You are not sure. You
14  don't remember.
15  What was the condition of the oily
16  water separator?
17  MR. CHALOS: Objection.
18  BY MR. KOTILA:
19  Q.  You looked at the oily water
20  separator?
21  A.  Yes.
22  Q.  What parts did you look at?
23  A.  (without interperter) Everything
24  function. I start all in function.

Paul Tudor

5 (Pages 14 to 17)

Page 14

1          (through interpreter) I looked at all
2    parts.
3          Q.      All parts.  What was the condition of
4    the oily water separator?
5          A.      I was told that it is not functioning
6    a long time.
7          Q.      By who?
8          A.      The former electrician that I took
9    over the job.
10         Q.      Now, you looked at the parts or did
11   you do any testing at that time?
12         A.      Yes.
13         Q.      What did you do?
14         A.      I put it in function.  I regulated
15   to -- (witout interpreter) Adjusted.
16             (through interpreter) I adjusted to
17   the zero number.
18         Q.      Okay.  What happened?
19         A.      It gave a false alarm in the sense
20   that the indicator of ppm didn't hold at the same
21   value with the clean water.  I cannot say the value
22   that was there, the number that was there.
23         Q.      Do you mean the ppm?
24         A.      The ppm, yes.

Page 15

1          Q.      So you are putting plain water in?
2          A.      Yes.  About three times I did put in
3    water.
4          Q.      And if the oily water separator is
5    working properly, what should happen?
6              MR. CHALOS:  Objection.
7              MR. WOODWARD:  No foundation.
8              MR. CHALOS:  No foundation.
9    BY MR. KOTILA:
10         Q.      You have tested oily water separators
11   before?
12             MR. CHALOS:  Objection.
13   BY MR. KOTILA:
14         Q.      Did you?  I believe you already
15   testified that you are familiar with oily water
16   separators.
17         A.      Yes.
18         Q.      How do you test them?
19             MR. CHALOS:  Objection.  Are you
20   asking him for a hypothetical?
21             MR. KOTILA:  No.
22   BY MR. KOTILA:
23         Q.      How have you tested them in the past?
24         A.      In the past on other vessels I had

Page 16

1    tanks with zero ppm and 15 ppm to compare, for
2    comparison.
3          Q.      Ppm stands for what?
4          A.      Pp, particular.  Million -- I am a
5    little emotional so I cannot remember, but --
6          Q.      Mr. Tudor, just relax.  Take it easy.
7          A.      It is the value of water of the
8    particular of a million to explain.
9          Q.      Okay.  You were saying how would you
10   test it again?
11         A.      I adjust it to zero.
12         Q.      Adjust what?  Adjust what?
13         A.      The analyzer, the sensor.
14         Q.      Okay.
15         A.      I put water to zero and have to give
16   me the zero result.  Empty it, place water to 15.  It
17   has to give me the 15 ppm.  This happened at other
18   vessels.
19         Q.      And that's how you is the word
20   "calibrate" the oily water separator?
21         A.      Yes.
22             MR. CHALOS:  Objection.
23   BY MR. KOTILA:
24         Q.      Did you do this test on the Irene?

Page 17

1          A.      No, no, because I didn't have the
2    water containers.
3          Q.      I might be wrong, but I thought you
4    said --
5          A.      I didn't.
6          Q.      -- you tested three times with water.
7          A.      Oh, with the mineral water from a
8    bottle.
9          Q.      All right.  So you did test it?
10         A.      Yes.
11         Q.      And this is back in May of '05?
12         A.      Yes, together with the previous
13   electrician.
14         Q.      And tell us what were the results
15   again.
16         A.      False, false results mean that they
17   were never the same results.
18         Q.      What does that mean?
19         A.      The analyzer didn't work.  It was an
20   electronic problem that I don't recognize it.  I don't
21   know.
22         Q.      The electronic part that you are not
23   familiar with?
24         A.      Yes.

Paul Tudor

6 (Pages 18 to 21)

Page 18

```
1    Q.    It was not working?
2    A.    Yes.
3    Q.    When you discovered the oily water
4  separator was not working, who did you tell?
5          MR. CHALOS: Objection. He never
6  testified the oily water separator wasn't working. He
7  said the sensor wasn't working.
8          MR. KOTILA: Let me correct the
9  question.
10 BY MR. KOTILA:
11   Q.    When you discovered the oily water
12 sensor was not working, who did you tell, if anybody?
13         MR. WOODWARD: Objection.
14         THE WITNESS: I did tell to the chief
15 mechanic.
16 BY MR. KOTILA:
17   Q.    Tomondong?
18   A.    Yes.
19   Q.    Tomondong?
20   A.    Yes.
21   Q.    Let's go now to about October of '05.
22 Did a new chief engineer come on board?
23   A.    Yes.
24   Q.    Who?
```

Page 19

```
1    A.    Adrien Dragomir.
2    Q.    Do you see him in this room today?
3    A.    Yes.
4    Q.    And could you point him out?
5    A.    Yes, third man from here.
6    Q.    In the jean vest, gray hair?
7    A.    Yes.
8    Q.    Beard?
9    A.    He is there (indicating).
10         MR. KOTILA: Let the record reflect
11 that the witness has identified the chief engineer,
12 Mr. Dragomir.
13 BY MR. KOTILA:
14   Q.    Did you test the oily water separator
15 again when the chief engineer was on board,
16 Mr. Dragomir?
17   A.    Not then. Later.
18   Q.    When?
19   A.    In November 25.
20   Q.    What did you do that day?
21   A.    The same thing that I did previous
22 three times.
23   Q.    Tell us again, what did you do in
24 November of '05?
```

Page 20

```
1    A.    I repeat the same test that I did two
2  times before.
3    Q.    What were the results?
4    A.    Same.
5    Q.    So what did you do? Let's slow it
6  down. Did you have -- walk us through it. What did
7  you do?
8    A.    At the moment, at the moment that we
9  got the new equipment -- oh. At the moment that the
10 new crew member came on the vessel, the Filipino
11 person who came to the machine, to the engine
12 department --
13   Q.    The second engineer?
14   A.    Yes, he was the second engineer.
15   Q.    Mr. Villano?
16   A.    Yes.
17   Q.    Okay.
18   A.    He had to get familiarized with all
19 the installation in the vessels; right?
20         When the time came that he had to the
21 person to get familiarized also the separators in the
22 vessel, I was part of everything that happened there.
23 I assisted him. I participated. I explained them the
24 electrician part of the functioning of this part of
```

Page 21

```
1  the vessel.
2    Q.    What did you tell him?
3    A.    How do we start the pump, the function
4  that they have, either automatically or manually.
5    Q.    This is all on the oily water
6  separator?
7    A.    Yes. Yes, only on the separator.
8    Q.    Did you test the system again?
9    A.    Not then. This happened earlier. On
10 the 25th I received an order from the chief mechanic
11 to test it.
12   Q.    The chief mechanic, meaning
13 Mr. Dragomir?
14   A.    Yes.
15   Q.    When you say chief mechanic, that is
16 also chief engineer?
17   A.    Chief engineer.
18   Q.    Okay. He ordered you to test it?
19   A.    Yes.
20   Q.    When?
21   A.    The 24th or the 25th.
22   Q.    And you tested it with the second
23 engineer?
24   A.    Yes. What I said prior, it was that
```

Page 22

1  the second engineer get familiarized, but we didn't
2  test it then.
3      Q.    I know. But when you did test it --
4      A.    On the 25th I tested. It was there
5  the second mechanic participated, the fourth mechanic,
6  and two or three other motorists, oilers that I don't
7  recall their names.
8      Q.    What were the results of the testing?
9          MR. CHALOS: Objection.
10         THE WITNESS: Same as before.
11 BY MR. KOTILA:
12     Q.    Which is what?
13     A.    It was a defect in the sensor, in the
14 analyzer.
15     Q.    So it didn't work?
16     A.    No.
17         MR. CHALOS: Objection.
18         MR. WOODWARD: Objection; leading.
19 BY MR. KOTILA:
20     Q.    What was the condition of the machine?
21 Was it old, new, rusty?
22         MR. CHALOS: Objection.
23 BY MR. KOTILA:
24     Q.    What was the condition of the oily

Page 23

1  water separator?
2          MR. WOODWARD: Objection. He is not
3  qualified as an expert to testify as to the condition
4  of the machine.
5  BY MR. KOTILA:
6      Q.    You are looking at a machine. What
7  does it look like?
8      A.    I never saw it functioning, so I
9  cannot say.
10     Q.    It was never functioning?
11         MR. CHALOS: Objection.
12         MR. WOODWARD: Objection.
13         THE WITNESS: I never saw it
14 functioning.
15 BY MR. KOTILA:
16     Q.    What did it look like on the outside?
17 Did it look new; what?
18     A.    It was rusted.
19         MR. WOODWARD: I am sorry?
20         THE INTERPRETER: Rusted.
21 BY MR. KOTILA:
22     Q.    When you tested it with the second
23 engineer and the others --
24     A.    On the 25th.

Page 24

1      Q.    No. After you were done, did you tell
2  the chief engineer?
3          MR. WOODWARD: Objection; leading.
4  BY MR. KOTILA:
5      Q.    Who, if anyone, did you speak to after
6  you tested it?
7      A.    I didn't -- we didn't have to say
8  anything because everyone was there.
9      Q.    The chief engineer was there?
10     A.    Yes. Yes. I considered I didn't have
11 to say to no one because everyone was there.
12     Q.    Including Mr. Dragomir?
13     A.    Yes.
14     Q.    Was there any point in time that you
15 requested parts for the oily water separator to repair
16 the electrical side?
17     A.    No. I asked for a technician.
18     Q.    You asked for a technician?
19     A.    Yes.
20     Q.    To repair what?
21     A.    To come and repair the oil separator.
22     Q.    How many times did you request a
23 technician?
24     A.    I reported to my chief. It wasn't in

Page 25

1  my capacity, you know, to say to the company. I just
2  reported to my higher chief.
3      Q.    Who would that be?
4      A.    Mr. Tomondong.
5      Q.    Did you ever report that to
6  Mr. Dragomir?
7      A.    When Mr. Dragomir came aboard, he
8  received the report from his preceding chief mechanic.
9  I was asked and I confirmed.
10     Q.    Did you ever have any further
11 discussions with this chief engineer about the oily
12 water separator?
13     A.    Yes, when I heard that we need to come
14 to America.
15     Q.    What did you talk about?
16     A.    He was very scared at what may happen.
17     Q.    What did he say to you?
18     A.    That the way the machine looks and it
19 is -- and it will be a problem.
20     Q.    The chief engineer says this?
21     A.    Yes.
22     Q.    Why would there be a problem? Did he
23 say?
24         MR. CHALOS: Objection.

Paul Tudor

8 (Pages 26 to 29)

Page 26

1         THE WITNESS: No. No. He was scared.
2   This was the only manifestation.
3   BY MR. KOTILA:
4       Q.      What do you mean by that?
5       A.      I mean he just -- the way he showed,
6   he is scared.
7       Q.      Scared about what?
8           MR. WOODWARD: I am going to object.
9   This calls for speculation.
10  BY MR. KOTILA:
11      Q.      What I want you to do, the best you
12  can, is tell us your discussions with the chief
13  engineer, to the best of your memory, what he said
14  about being scared, if anything.
15      A.      The only discussion that we had, that
16  he said that we coming to America and we have problems
17  and he is scared that he knows that we are coming to
18  America and we have problems on the vessel. This is
19  the only discussion I had with him.
20      Q.      Did he say problems with what?
21          MR. WOODWARD: Objection; leading.
22          MR. CHALOS: Leading.
23  BY MR. KOTILA:
24      Q.      What problems, if any, did he discuss?

Page 27

1       A.      In reference to what? From my part
2   was the electrician part that I had problems.
3       Q.      With the oily water separator?
4       A.      The electrical part. Yes.
5       Q.      Was there any part of the oily water
6   separator that you repaired?
7       A.      Yes. Yes, the alarm.
8       Q.      Now, what part of the oily water
9   separator is the alarm? Is it the electrical part you
10  already discussed?
11      A.      Electrical part.
12      Q.      Why did you fix the alarm?
13      A.      Yes.
14      Q.      Did it work?
15      A.      Yes.
16      Q.      When did you fix it?
17      A.      After first -- I tested more in May.
18  July 1, this is when I detected that the alarm is
19  defective, so --
20      Q.      In July?
21      A.      In July.
22      Q.      When did you fix it?
23      A.      The second or the third day is when I
24  fixed it.

Page 28

1       Q.      Of July?
2       A.      In July.
3       Q.      Why just fix the alarm?
4       A.      Because the bell that helped serve the
5   separator served also other objects in the vessels.
6       Q.      I don't understand then.
7       A.      It was a bell that served more, many
8   other alarms in the vessel.
9       Q.      This was a bell on the oily water
10  separator?
11      A.      Yes.
12      Q.      And you repaired that?
13      A.      (without interpreter) Yes. But that
14  bell to serve also the burner boiler and expansion
15  tanks, the supply pumps from burner boiler. It was
16  many, many others which give alarm to this bell.
17      Q.      This one alarm?
18      A.      Yes.
19      Q.      It served all these functions?
20      A.      (without interpreter) Yes. Not all.
21  Parts of them.
22      Q.      But it is on the oily water separator,
23  this bell?
24      A.      (without interpreter) Yes.

Page 29

1           (through interpreter) The bell served
2   the many other alarms in the vessels.
3       Q.      Right. But also the oily water
4   separator?
5       A.      (withouth interpreter) Yes.
6       Q.      For the oily water separator, why only
7   fix the alarm for that?
8       A.      It was necessary because the wire was
9   not in place there, so I had to fix it.
10      Q.      When you come to ports, would anybody
11  test the oily water separator alarm --
12          MR. WOODWARD: Objection.
13          MR. KOTILA: -- in the port control?
14  Were you familiar --
15          MR. WOODWARD: Objection.
16          THE WITNESS: I didn't understand the
17  question.
18  BY MR. KOTILA:
19      Q.      When you get to a port, have you ever
20  seen --
21      A.      (without interpreter) Here in the
22  United States?
23      Q.      Here, here in the United States,
24  anybody test an oily water separator, any authorities,

Paul Tudor

9 (Pages 30 to 33)

Page 30

1    before?
2        A.    The Coast Guard.
3        Q.    What do they test?  What have you seen
4    them test?
5            MR. CHALOS:  Objection.  When?
6            THE WITNESS:  I wasn't there.
7    BY MR. KOTILA:
8        Q.    Oh, okay.  Not in this case?
9        A.    Yes.
10       Q.    In other cases?
11           MR. KOTILA:  Give me a minute, guys.
12           THE WITNESS:  The first time the Coast
13   Guard came in, I wasn't there.  The second time I was
14   there when they came, the Coast Guard.
15   BY MR. KOTILA:
16       Q.    In the United States?
17       A.    Yes.  Check it two times, but the
18   first time I don't be there.  The second time.
19       Q.    Was it working when they tested it?
20       A.    No.
21       Q.    What was wrong with it?
22           MR. CHALOS:  Objection.
23           THE WITNESS:  The same thing.
24

Page 31

1    BY MR. KOTILA:
2        Q.    The same thing you tested?
3        A.    Yes.
4        Q.    I asked you about spare parts that you
5    would request to do your job; right?
6        A.    Yes.
7        Q.    Did you ever make any requests --
8        A.    Yes.
9        Q.    -- of your company -- of who?  Who
10   would you make the request to?
11       A.    I made the list and I gave it to --
12   three times I made lists and I gave it to the chief
13   mechanic, chief engineer.
14       Q.    What kind of information was on the
15   list?  What kind of parts?
16       A.    For maintenance and repair.
17       Q.    When was this?
18       A.    I don't recall.  It was in three
19   different periods in every port and before each time
20   we get to a port.
21       Q.    Did you ever ask for any parts for the
22   oily water separator?
23       A.    No.  I ask only for a technician.
24       Q.    Even for the electrical part?

Page 32

1        A.    If the technician will came on the
2    vessel, he will came with everything.
3        Q.    Why did you request a technician?
4        A.    Because it was a problem that wasn't
5    to my capacity, capability.
6        Q.    And how often did you request a
7    technician?
8            MR. CHALOS:  Objection.
9            MR. KOTILA:  Answer the question.
10           THE WITNESS:  I asked for one time
11   from the -- to Mr. Tomondong.
12   BY MR. KOTILA:
13       Q.    How about Mr. Dragomir?
14       A.    It wasn't necessary because another
15   person from the company part will do this.  It was
16   another person was aboard to do this.
17       Q.    Who?
18       A.    A person from the company.  I don't
19   know his name.
20       Q.    Did you ever work with the second --
21   you said you worked with the second engineer on the
22   oily water separator; correct?
23       A.    Yes.
24           MR. CHALOS:  Objection.

Page 33

1    BY MR. KOTILA:
2        Q.    Well, did you ever work with him on
3    the oily water separator?
4            MR. CHALOS:  Objection.  What does
5    "work" mean?
6            THE WITNESS:  No.
7    BY MR. KOTILA:
8        Q.    Only testing it?
9        A.    Yes.
10       Q.    And at that time did you -- and this
11   was when?  In October.  No, November.
12       A.    Yes.
13       Q.    Did you repair the bell at that time
14   on the oily water separator?
15       A.    No.  This was in July.
16       Q.    Back when you boarded the vessel back
17   in May of 2005 and you met with Tomondong; right?
18           MR. CHALOS:  Objection.
19   BY MR. KOTILA:
20       Q.    -- who else from the company was on
21   board the vessel?
22           MR. CHALOS:  Objection.
23           MR. KOTILA:  You can answer the
24   question.

Paul Tudor

10 (Pages 34 to 37)

Page 34

1          THE WITNESS: It was the DPA.
2  BY MR. KOTILA:
3      Q.    A what?
4      A.    DPA.
5      Q.    What does DPA stand for?
6      A.    Pitaolis, Mr. Pitaolis.
7      Q.    Who is he; do you know?
8      A.    (without interpreter) Yes.  He is the
9  DPA.  The designated person ashore.
10     Q.    For the company?
11     A.    For the company.
12     Q.    Were the owners ever on board?
13     A.    Yes.
14     Q.    Were they present when you spoke about
15 the oily water separator with Tomondong?
16     A.    No.  This was in Poland.  I never
17 spoke -- then I didn't spoke with no one about the
18 separator.
19         (Recess taken.)
20 BY MR. KOTILA:
21     Q.    Mr. Tudor, we are just about finished,
22 and I just want to ask you again what -- we spoke a
23 lot about the oily water separator.  What other items
24 on the ship did you work on that needed repair or

Page 35

1  parts?
2          MR. CHALOS: Objection; foundation.
3          THE WITNESS: I had a problem that we
4  came to the United States and they didn't resolve it
5  until we came to The States.  It was the outlet, the
6  outlets on the deck.
7  BY MR. KOTILA:
8      Q.    And what was the problem with the
9  outlets on the deck?
10     A.    They were either burned or rusted,
11 rusty.  They didn't have covers.
12     Q.    Had you ever requested parts for
13 various pieces of machinery or equipment?
14         MR. CHALOS: Objection; relevance.
15         THE WITNESS: For outlets I made the
16 request separate.
17 BY MR. KOTILA:
18     Q.    Did you receive any?
19     A.    No.
20         MR. CHALOS: Objection; relevance.
21 BY MR. KOTILA:
22     Q.    Who did you make the request to?
23         MR. CHALOS: Objection; relevance.
24         THE WITNESS: The chief mechanic.

Page 36

1  BY MR. KOTILA:
2      Q.    And you never received a response?
3      A.    No.
4          MR. KOTILA: Well, fellows, I think I
5  am -- hold on.
6          Thank you very much.
7          THE WITNESS: (without interpreter)
8  You are welcome.
9          (Recess taken.)
10         (CSME Deposition Exhibit Nos. 1
11 through 7 were marked for identification.)
12         CROSS-EXAMINATION
13 BY MR. CHALOS:
14     Q.    Good morning, Mr. Tudor.
15     A.    (without interpreter) Good morning.
16     Q.    My name is George Chalos, and I
17 represent the owner of the ship, Venetico Marine, and
18 the managers of the ship, Chian Spirit Maritime
19 Enterprises.  And I would like to just ask you a few
20 questions about your personal background and then get
21 into your experience on board the Irene.  Okay?
22         Now, earlier today Mr. Kotila, on
23 behalf of the government, asked you some questions
24 about what your job is.  Did I understand correctly

Page 37

1  that you are a trained electrician?
2      A.    Yes.
3      Q.    And to become an electrician, you
4  attended special training schools?
5      A.    Yes.
6      Q.    And you hold a license that allows you
7  to work as an electrician; correct?
8      A.    Yes.
9      Q.    And that's a license that you have to
10 qualify for by training and experience; correct?
11     A.    Yes.
12     Q.    Now, you are not a marine engineer by
13 training, are you?
14     A.    No.
15     Q.    Okay.  Just so the record is clear,
16 you are not a marine engineer by training, are you?
17     A.    No, as an engineer, no.
18     Q.    And you don't have any experience
19 sailing on board ships as an engineer, do you?
20     A.    Of course not.
21     Q.    Okay.  So it is fair to say that you
22 as an electrician on board a ship would have a
23 completely different job than that of an engineer;
24 correct?

Paul Tudor

Page 38

1    A.    Of course. Of course.
2    Q.    I am sorry. Can you say your answer
3  again?
4    A.    Yes.
5    Q.    Okay. Thank you. Now, tell me, you
6  can speak basic English; correct?
7    A.    Yes.
8    Q.    But English is not your first
9  language?
10    A.    Yes.
11    Q.    Yes, meaning it is not?
12        THE INTERPRETER: Meaning it is not.
13        THE WITNESS: It is not.
14  BY MR. CHALOS:
15    Q.    Now, how did you learn English?
16    A.    By myself.
17    Q.    Okay. So you self-taught yourself
18  some basic English; is that right?
19    A.    Yes.
20    Q.    Okay. And what is your first language
21  or your natural language?
22    A.    (without interpreter) Romanian.
23    Q.    And on board the ship were any of the
24  engineers Romanian?

Page 39

1        MR. KOTILA: Objection. Can you
2  clarify? What ship?
3  BY MR. CHALOS:
4    Q.    Okay. Let me be more specific. You
5  were on board the Irene since October of 2005; right?
6    A.    From May.
7    Q.    Oh, right. Sorry. May. You joined
8  the ship in Poland; correct?
9    A.    Yes.
10    Q.    Now, at the time that you got on board
11  the ship in May of 2005, were any of the engineers
12  Romanians?
13    A.    No.
14    Q.    We heard some discussion earlier today
15  about a guy name Tomondong. Was he a Romanian?
16    A.    No.
17    Q.    Did he speak Romanian?
18    A.    No.
19    Q.    And English wasn't his first language
20  either, was it?
21    A.    No, it wasn't his first language.
22    Q.    Okay. Then at some point in time -- I
23  will withdraw that question and move on.
24        Now, apart from Mr. Dragomir, who sits

Page 40

1  in the room today, it is fair to say that all the
2  other engineers the whole time you were on board the
3  ship were Filipinos? Right?
4    A.    Yes.
5    Q.    And you don't speak Filipino, do you?
6    A.    No.
7    Q.    Nor do you speak any dialect that the
8  Filipinos may speak?
9    A.    No.
10    Q.    And none of the Filipinos spoke
11  Romanian?
12    A.    No.
13    Q.    Now, is it fair to say that there was
14  some language barrier between the Romanians and the
15  Filipinos on board?
16    A.    Possibility. I don't know, because we
17  understood each other. I understood them. Not
18  everyone I understood.
19    Q.    So you didn't understand everybody?
20        MR. KOTILA: Objection. That is not
21  his answer.
22        THE INTERPRETER: No. This wasn't.
23  He said, "I was the one that I understood them. I
24  don't know about others."

Page 41

1        THE WITNESS: (through interpreter) On
2  board was too many other people that they didn't
3  understand them, the Philippine.
4  BY MR. CHALOS:
5    Q.    Okay. Now, as an electrician you
6  would work certain hours each day on board the Irene;
7  correct?
8    A.    Yes.
9    Q.    Oh, by the way, before I forget, when
10  you said that you would understand the Filipinos, what
11  language did you communicate with?
12    A.    English.
13    Q.    Okay. Now, let's go back to your duty
14  on board as the electrician. You would work when?
15    A.    From 7:00 a.m. till 6:00 p.m. daily.
16    Q.    Okay. So you worked during the day?
17    A.    Yes.
18    Q.    All right. Now, let's talk about what
19  you did to prepare to come here today. Now, you met
20  with the government; correct?
21    A.    Yes.
22    Q.    And you met with Mr. Kotila?
23    A.    Yes.
24    Q.    And Mr. Phillips?

Paul Tudor

12 (Pages 42 to 45)

Page 42

1    A.    Yes.
2    Q.    How many times did you meet with each
3 of them?
4    A.    I may be correct as I calculate it or
5 count it today would be the fifth time.
6    Q.    Today would be the fifth time?
7    A.    Yes.
8    Q.    And you met with the Coast Guard
9 representatives as well?
10   A.    Yes, on the boat.
11   Q.    Okay.  And when you met with the
12 government lawyers, Mr. Kotila and Mr. Phillips, did
13 you review any documents with them?
14   A.    What do you refer to?
15   Q.    Well, my question is:  Did they show
16 you any papers and ask you to review them?
17   A.    No.
18   Q.    Okay.  Never?
19   A.    No.  I saw a picture only once.  At
20 one time I saw a picture.
21   Q.    What was the picture of?
22   A.    Of a hose, but I didn't know to give
23 the answer to it.  They showed me a picture of a hose,
24 but I didn't know to give the answer to it.

Page 43

1    Q.    Okay.  It was just one picture of one
2 hose?
3    A.    Yes.
4    Q.    And you didn't take the picture?
5    A.    No.
6    Q.    And you don't know who took the
7 picture?
8    A.    No.
9    Q.    You don't know where it was taken?
10   A.    No.
11   Q.    Okay.  Thank you.  Okay.  Mr. Kotila
12 also asked you some questions about how you became
13 employed on the Irene.  Do you recall that?
14   A.    Yes.
15   Q.    Okay.  Now, let's go over this a
16 little bit.  You went to a crewing agent in Romania
17 looking for work; right?
18   A.    Yes.
19   Q.    The owner of the ship, Venetico,
20 didn't look for you; right?
21   A.    Yes.
22   Q.    Nor did the manager, Chian Spirit;
23 correct?  They didn't come looking for you?
24   A.    No.

Page 44

1    Q.    You went to the crewing agent looking
2 for a ship to join to work?
3    A.    Of course.
4    Q.    And the name of your crewing agent is
5 Bright Balkan Shipping Services in Romania; right?
6    A.    Yes.
7    Q.    Okay.  Now, when you go to this
8 crewing agent, you can go to a lot of different
9 crewing agents?
10   A.    Yes.
11   Q.    And how many years have you been going
12 to sea?
13   A.    Twenty-seven.
14   Q.    Twenty-seven years.  And during the 27
15 years that you have been going to sea, this was the
16 very first time that you worked with Bright Balkan
17 Shipping -- I will say that again.  I keep stumbling.
18 Bright Balkan Shipping Services as your crewing agent
19 right?
20   A.    Yes.
21   Q.    Now, in fact, what you do is you send
22 your paperwork to a bunch of agencies and then you
23 take the best job offer that is available; right?
24   A.    Yes.

Page 45

1    Q.    And the job that you took was a decent
2 job, but the pay, you have made more on other ships?
3    A.    Yes.
4    Q.    But you took the job anyways?
5    A.    Yes.
6    Q.    And the reason why you took the job is
7 because you wanted to go to work?
8    A.    Yes.  This was the principal motive of
9 it.  I wanted to work.
10   Q.    Like all of us, you have bills to pay,
11 so you have to make money; correct?
12   A.    Yes.
13   Q.    So in addition to holding an
14 electrician's license, you also received a license
15 from the ship's flag state; right?
16   A.    Yes.  I got this license from another
17 company, not from this company.
18   Q.    Okay.  So let me see if I understand
19 you correctly.  Then at the time that you were hired
20 to work on the Irene E.M., you were not only a
21 licensed electrician but you also held a license from
22 the flag state of the vessel.  That's the
23 St. Vincent's and Grenadines --
24   A.    Yes.

Paul Tudor

13 (Pages 46 to 49)

Page 46

1   Q.   -- flag state administration?
2   A.   Yes.
3   Q.   So you held two licenses?
4   A.   Yes.
5   Q.   And you had 27 years of experience?
6   A.   Yes. More.
7   Q.   More. Okay. Now, after you received
8  the offer and you accepted it, you went to the office
9  of Bright Balkan Shipping Services; right?
10  A.   Yes.
11  Q.   And you had some training?
12  A.   Yes.
13  Q.   And part of the training was the
14 procedures of the company before you joined their
15 ship; right?
16  A.   Yes.
17  Q.   Okay. Now, I am going to show you
18 what we have marked as CSME Defendant 1 Exhibit. For
19 the record, I will note it is a six-page document.
20 Have you seen it? Do you have a copy?
21       MR. KOTILA:  Let me see what you have.
22       MR. CHALOS:  It should be the first
23 six pages of what I passed to you.
24

Page 47

1  BY MR. CHALOS:
2   Q.   Now, Mr. Tudor, I am passing to you
3  what we have marked as Deposition Exhibit No. 1 and
4  ask you to take a look at the first page. And once
5  you have had an opportunity to review it -- and you
6  can certainly use the assistance of our interpreter --
7  look up so I will know you are ready for the next
8  question.
9   A.   I don't have my glasses, but I will
10 try to --
11       THE INTERPRETER:  I mean, that's what
12 he said, but I will try to help. I have my glasses.
13 BY MR. CHALOS:
14  Q.   Okay. Now, you want to just take a
15 minute to look it over together. Let me ask you this,
16 Mr. Tudor.
17  A.   (without interpreter) Just a second.
18 I can borrow one glass?
19       THE INTERPRETER:  They have the same
20 size, I guess.
21 BY MR. CHALOS:
22  Q.   Okay. Mr. Tudor, is that your
23 signature that appears at the bottom?
24  A.   Yes.

Page 48

1   Q.   Okay. Now, and this is the terms of
2  your contract; correct?
3   A.   Yes.
4   Q.   Turn to -- let me turn to look at that
5  with you -- the third page of that exhibit.
6   A.   Yes.
7   Q.   And is it fair to say that that is a
8  declaration that you signed prior to joining the
9  vessel?
10  A.   Yes.
11  Q.   And that document bears your signature
12 on the bottom; correct?
13  A.   Yes.
14  Q.   And it says to the master --
15       MR. KOTILA:  Objection. First of all,
16 we don't have a document that has been placed in
17 evidence to quote off or read from.
18       MR. CHALOS:  He said he signed it. It
19 is a declaration he prepared.
20       MR. KOTILA:  It is not in evidence at
21 this point.
22       MR. CHALOS:  Well, we would like to
23 move it into evidence, although we don't have a judge
24 to move it in.

Page 49

1  BY MR. CHALOS:
2   Q.   Okay. Let me just do it the way I
3  think it ought to happen in court and leave it for the
4  record for later determination.
5       Mr. Tudor, is this a document that you
6  reviewed and signed?
7   A.   Yes.
8   Q.   And when you signed it, did you adopt
9  the terms and conditions and the contents of it?
10  A.   Yes.
11       MR. CHALOS:  Okay. At this point I
12 would like to move what we previously have marked as
13 CSME Exhibit 1 into evidence in its entirety.
14       MR. KOTILA:  Well, I am going to
15 object to the document moved into evidence because it
16 is not relevant, and also object because it is beyond
17 the scope of my direct examination.
18 BY MR. CHALOS:
19  Q.   Okay. Now, Mr. Tudor, it says 2, "The
20 master and owners of the M.V. Irene E.M." --
21       THE INTERPRETER:  Page 3? Page?
22       MR. TWERSKY:  Yes.
23
24

Corbett & Wilcox

Paul Tudor

14 (Pages 50 to 53)

Page 50

1  BY MR. CHALOS:
2     Q.    Okay. And it says --
3     A.    (without interpreter) Page 3.
4     Q.    I have it right here. "I, Tudor Paul,
5  holder of Seaman's Book No. 9630, have read and
6  understood the following company's policies." And
7  then if you read --
8     A.    Yes.
9     Q.    -- further down, it says, "The health,
10 safety and environmental policy of the company";
11 right?
12    A.    Yes.
13    Q.    Now, I would like to show you what we
14 have marked as CSME Defendants' Deposition Exhibit
15 No. 7 and ask you to take a look at that. And my
16 question to you is: Do you recognize this as --
17    A.    Yes.
18    Q.    -- the Chian Spirit safety management
19 system and environmental policy?
20    A.    Yes.
21          MR. CHALOS: Okay. Now, Mr. Tudor,
22 that document -- we marked that as Defendants' Exhibit
23 7. First we would like to move it into evidence.
24          MR. KOTILA: Once again, I am going to

Page 51

1  object. It is beyond the scope of my direct
2  examination. It is not relevant. Mr. Tudor's
3  signature is not on this document nor is his name
4  placed anywhere on this document. Objection to its
5  admission.
6  BY MR. CHALOS:
7     Q.    Now, Mr. Tudor, this document was
8  posted in several places on the ship, was it not?
9     A.    Yes.
10    Q.    So let me see if I got this right.
11 You are presented a copy of this before you joined the
12 vessel by your crewing agent; right?
13    A.    Yes.
14    Q.    Then when you got on board, this
15 document was posted in several places; right?
16    A.    Yes.
17    Q.    It was in the ship's office?
18    A.    Yes.
19    Q.    It was on the bridge?
20    A.    Yes.
21    Q.    It was in the hallway?
22    A.    Yes.
23    Q.    It was in the mess hall?
24    A.    Yes.

Page 52

1     Q.    And in the engine room there was a
2  board, a plywood board where it was also posted;
3  right?
4     A.    Yes.
5     Q.    Okay. So is it fair to say that at
6  the time that you boarded the vessel, you knew that it
7  was the company's policy --
8     A.    Yes.
9     Q.    -- to protect the environment?
10    A.    Yes.
11    Q.    And they were not -- the company, both
12 the management and the owning company, were not going
13 to accept any crew members violating that policy?
14    A.    Yes.
15    Q.    And, in fact, if a crew member would
16 violate the policy, they would be fired and put
17 ashore; right?
18    A.    Yes.
19    Q.    And on their own to get back home,
20 wherever they live?
21    A.    Yes.
22    Q.    Now, in fact, Mr. Tudor, part of your
23 training was that if you personally had observed any
24 sort of pollution or MARPOL violation, you were

Page 53

1  supposed to report that to the captain immediately;
2  right?
3     A.    (without interpreter) Yes. Not to the
4  captain. To the watch officer which was on duty.
5     Q.    Okay. But the point is, if you had
6  seen such a violation, it was your obligation to
7  report it?
8     A.    (without interpreter) Yes, of course.
9     Q.    Now, I would like to show you what we
10 have marked as Deposition Exhibit 2. And it is a
11 six-page document that I ask you just to look through
12 it and identify each page. And I will make a
13 representation for the record that it appears to be
14 your passport and seaman's book, but I will ask you to
15 just to look through it and identify it.
16    A.    Yes.
17    Q.    What is the first page, Mr. Tudor?
18    A.    (without interpreter) It is my
19 passport.
20    Q.    And who issued that passport?
21    A.    The place --
22          MR. KOTILA: I am going to object
23 because you didn't move it into evidence yet or
24 attempt to.

Paul Tudor

15 (Pages 54 to 57)

Page 54

1       MR. CHALOS: Okay. I just --
2       THE WITNESS: Romania, the place of
3  Constanta.
4  BY MR. CHALOS:
5       Q.    So you are a Romanian?
6       A.    Yes.
7       Q.    A citizen of Romania?
8       A.    Yes.
9       Q.    Okay. What is the second page of that
10 exhibit?
11      A.    My copy of my seaman book.
12      Q.    And that is a copy of your seaman's
13 book; is that right?
14      A.    (without interpreter) Yes. It is the
15 first page.
16      Q.    Okay. A copy of the first page of
17 your seaman's book?
18      A.    Yes.
19      Q.    The third page of that exhibit,
20 Mr. Tudor?
21      A.    Yes. It is my copy of the -- my
22 certificate, my license.
23      Q.    Okay. And the next page of that?
24      A.    It is my extension date of seaman's

Page 55

1  book.
2       Q.    Okay. And the next page, Mr. Tudor?
3       A.    It is first page of my license.
4       Q.    Okay. Now, Mr. Tudor, the next page?
5       A.    Is the flag license.
6       Q.    And that is the second license that
7  you held to be the electrician?
8       A.    Yes.
9       Q.    Okay. Now, all those documents which
10 are part of CSME Defendants' Exhibit No. 2 are all
11 documents that relate to your professional ability to
12 serve on board the M.V. Irene E.M.; correct?
13      A.    Yes.
14      MR. CHALOS: Okay. We would like to
15 move them into evidence.
16      MR. KOTILA: No objection.
17      MR. CHALOS: Thank you.
18 BY MR. CHALOS:
19      Q.    Okay. Now, Mr. Tudor, I am going to
20 show you what we have marked as CSME Deposition
21 Exhibit No. 3, which is a document that bears four
22 pages. Now, Mr. Tudor, my question to you is, take a
23 look at these four pages. Are these all certificates
24 that you received?

Page 56

1       A.    Yes.
2       Q.    Now, and these are training courses --
3       A.    IMO.
4       Q.    -- and seminars that you have taken in
5  connection with the International Marine
6  Organization's standard training for seafarers; right?
7       A.    Yes.
8       Q.    And this -- you have attended other
9  classes as well?
10      A.    Yes.
11      Q.    And this is also certificates that
12 relate to your capacity and ability and prior training
13 before serving on board the --
14      A.    Yes.
15      Q.    -- Irene?
16      Now, you also went to the Romanian
17 Maritime Training Center, did you not, and sat for a
18 prevention of pollution of marine environment class?
19      A.    (without interpreter) MARPOL?
20      Q.    MARPOL.
21      A.    Yes.
22      Q.    And you received a certificate for
23 that as well; correct?
24      A.    Yes.

Page 57

1       Q.    Just give me one second. And, in
2  fact, Mr. Tudor, that is the first page of that
3  exhibit?
4       A.    Yes.
5       Q.    Now, let's talk for a minute about
6  when you first came on board the ship. You told
7  Mr. Kotila that you came on board the ship in Poland;
8  is that right?
9       A.    Yes.
10      Q.    Okay. And when you got on board the
11 ship, you did a handover with the prior electrician;
12 right?
13      A.    Yes.
14      Q.    And during that handover you went over
15 the machinery or the electronic parts?
16      A.    (without interpreter) Electrical
17 parts, yes.
18      Q.    Electrical parts?
19      A.    Yes, electrical parts.
20      Q.    Now, you didn't go over any of the
21 engine room machinery, did you? Specifically, you
22 didn't go over the main engines?
23      A.    (without interpreter) No.
24      Q.    You didn't go over the turbochargers?

Paul Tudor

16 (Pages 58 to 61)

Page 58

1    A.    (without interpreter) No.
2    Q.    You didn't go over the shaft
3 generator?
4    A.    (without interpreter) No.
5    Q.    You didn't go over the function of the
6 oily water separator?
7    A.    (without interpreter) No.
8    Q.    None of those fall within your job, do
9 they?
10    A.    Can you repeat the question?
11    Q.    Yes. Working on those types of --
12 that type of machinery and equipment is jobs for the
13 engineers; right?
14    A.    Yes.
15    Q.    Okay. And, in fact, you don't hold
16 any marine engineering license?
17    A.    No.
18    Q.    Okay. And you don't have any
19 authority to operate any of the engine room equipment,
20 do you?
21    A.    No.
22    Q.    Okay. Now, you talked a little bit
23 about an exchange that you had with the prior chief
24 engineer. That was Tomondong; right?

Page 59

1    A.    Yes.
2    Q.    And when you spoke to him, you spoke
3 to him in English; right?
4    A.    Yes.
5    Q.    And over the course of a few months
6 you prepared three different lists for repairs --
7    A.    Yes.
8    Q.    -- and maintenance of equipment;
9 right?
10    A.    Yes.
11    Q.    And you submitted it to him hopefully
12 for requisitioning the parts; right?
13    A.    Yes.
14    Q.    Now, you don't know as you sit here
15 today whether he ever sent that requisition to the
16 company; right?
17    A.    No, no.
18    Q.    You don't know if it was ever received
19 by the company?
20    A.    No.
21    Q.    All you know is what you talked to
22 Mr. Tomondong about; right?
23    A.    Yes.
24    Q.    And in all three of those lists,

Page 60

1 neither in the first list nor the second list nor the
2 third list, did you ever ask for any equipment for the
3 oily water separator; right?
4    A.    Yes.
5    Q.    Yes, meaning that you didn't ask?
6    A.    No. Never asked.
7    Q.    And that is because the oily water
8 separator is not your job?
9    A.    Yes.
10    Q.    Okay. Now, there came a time that
11 there was a problem with the alarm in the engine room;
12 right?
13    A.    Yes.
14    Q.    And what you did was, you went and
15 fixed the electrical power to the alarm; right?
16    A.    Yes.
17    Q.    It had nothing to do with the oily
18 water separator operation, whether the engineers were
19 using it or not?
20    A.    I repair only the alarm.
21    Q.    Okay. Thank you. Now, and after you
22 made the repair, you were satisfied that the
23 equipment, the alarm was working properly; right?
24    A.    (without interpreter) Yes.

Page 61

1    Q.    Now, after Mr. Tomondong left the
2 ship, Mr. Dragomir came on board, and he became the
3 chief engineer; right?
4    A.    (without interpreter) Yes.
5    Q.    And Mr. Dragomir is also a Romanian?
6    A.    (without interpreter) Yes.
7    Q.    And when you speak to Mr. Dragomir,
8 you speak with him in Romanian; right?
9    A.    (without interpreter) Yes, right.
10    Q.    And there is no language barrier
11 between you guys?
12    A.    (without interpreter) Right.
13    Q.    And when you speak to Mr. Dragomir,
14 you understand his orders?
15    A.    (without interpreter) Yes.
16    Q.    And he, to your knowledge, understands
17 your responses?
18    A.    (without interpreter) Yes.
19    Q.    You were on board the ship during its
20 voyage from West Africa to Brazil; correct?
21    A.    (without interpreter) Yes, correct.
22    Q.    Now, during that voyage you didn't
23 have any idea where the ship was going to go after
24 Brazil, did you?

Paul Tudor

17 (Pages 62 to 65)

## Page 62

1    A.    I knew it from when we were in Africa.
2    Q.    Okay. Let me be more specific. When
3 you left Africa, you knew the ship was going to go to
4 Brazil; right?
5    A.    Yes.
6    Q.    And then once you got to Brazil,
7 that's when you learned the ship was going to go to
8 the United States; right?
9    A.    No. When we left Africa, I knew that
10 we will arrive to the United States after Brazil.
11    Q.    How did you know that?
12    A.    It was announced, the voyage.
13    Q.    Okay. And who announced it?
14    A.    The officers.
15         (without interpreter) The mate.
16         (through interpreter) Somebody from
17 deck. One mate.
18    Q.    And how do you know that this was in
19 Africa when you learned this?
20    A.    Because I learned after one or two
21 days, three days anyhow between Brazil.
22    Q.    Okay. Because the ship wasn't ordered
23 to go to The States --
24         MR. KOTILA: Objection.

## Page 63

1         MR. CHALOS: Okay. Let me rephrase
2 it.
3 BY MR. CHALOS:
4    Q.    When the ship arrived in Brazil, it
5 made three stops in Brazil; right?
6    A.    Yes.
7    Q.    And it wasn't till after the first
8 stop in Brazil that it was known the ship was going to
9 go to the United States; is that right?
10         MR. KOTILA: Objection. That counted
11 as what he already testified to, he already knew.
12         MR. CHALOS: Well, I am refreshing his
13 recollection.
14         MR. KOTILA: Objection again. He
15 didn't say he had a problem with his recollection.
16 BY MR. CHALOS:
17    Q.    Mr. Tudor, do you remember the exact
18 place and time that you learned the ship was -- where
19 you were?
20    A.    (without interpreter) Anyhow between
21 Africa and Brazil, before to arrive in Brazil.
22    Q.    Okay. So if I understand you
23 correctly, sometime before arriving in Brazil was when
24 you first learned that the ship was going to go to the

## Page 64

1 United States?
2         MR. KOTILA: Objection. We are asked
3 and answered now.
4         MR. CHALOS: You can answer.
5         THE WITNESS: Between Africa and
6 Brazil there were five days that we were in the sea.
7 In this period the announcement was made.
8 BY MR. CHALOS:
9    Q.    Okay. After the vessel made its three
10 stops in Brazil, where was she headed?
11    A.    We had only two stops in Brazil with
12 this trip.
13    Q.    Okay. That's your recollection of
14 Brazil, two stops?
15    A.    (without interpreter) We had three
16 stops in Brazil, but previous, the first one was in
17 another trip.
18    Q.    Okay. So I understand, between Africa
19 but before arriving in Brazil it is your recollection
20 that you were told the ship was going to go to the
21 United States; right?
22    A.    Yes.
23         MR. KOTILA: Objection; asked and
24 answered again.

## Page 65

1 BY MR. CHALOS:
2    Q.    Now, did you know where in the United
3 States the ship was going to go?
4    A.    (without interpreter) The first
5 time --
6         (through interpreter) The first time
7 it was talk that we are supposed to go to Baltimore.
8    Q.    Okay. But the ship never went to
9 Baltimore; right?
10    A.    No.
11    Q.    Okay. So let's go back and let's talk
12 about your communications with Mr. Dragomir.
13    A.    Yes.
14    Q.    There came a time after the ship left
15 Brazil that you discussed with Mr. Dragomir that the
16 ship was going to be going to the United States;
17 right?
18    A.    Yes.
19    Q.    And Mr. Dragomir told you that he had
20 received a message from the office asking for a report
21 on the condition of some equipment; right?
22         MR. KOTILA: Objection; no foundation.
23         MR. CHALOS: This is cross.
24

Paul Tudor

18 (Pages 66 to 69)

Page 66

1  BY MR. CHALOS:
2      Q.    Right?
3      A.    Sorry?
4      Q.    Mr. Dragomir told you that he had
5  received information and a request from the manager of
6  the ship asking for a report on the condition of some
7  of the vessel's equipment; right?
8      A.    Yes.
9      Q.    And, in fact, what he did was he asked
10 you to go and check some equipment?
11     A.    Yes.
12     Q.    And the reason why you did that --
13 strike that.
14         And you reported to Mr. Dragomir;
15 right?
16     A.    Yes.
17     Q.    And you don't know what Mr. Dragomir
18 reported to the company?
19     A.    No.
20     Q.    And just to be clear, you are not
21 authorized to make any repairs to the oily water
22 separator; right?
23     A.    Of course.
24         MR. KOTILA: Objection. Objection,

Page 67

1  because I believe he said he is on part on his direct
2  examination.
3  BY MR. CHALOS:
4      Q.    Okay. Now, you told Mr. Kotila before
5  about some repairs that needed to be made to the oily
6  water separator; right?
7      A.    Yes.
8      Q.    And it was your testimony, was it not,
9  that an authorized technician needed to be called?
10 Right?
11     A.    Yes.
12     Q.    And you don't have the authority or
13 the training --
14     A.    Yes.
15     Q.    -- or the capability to make any
16 repairs?
17     A.    Of course.
18     Q.    Okay. Now, in fact, once Mr. Dragomir
19 came on board the ship -- I will withdraw that.
20         You told us before that you had done
21 some tests and you found that the solenoid sensor
22 would give inconsistent results; right?
23     A.    Yes.
24     Q.    And at some point in time you told

Page 68

1  Mr. Dragomir that; right?
2      A.    Yes.
3      Q.    And, in fact, Mr. Dragomir never used
4  the oily water separator because he knew there was a
5  problem with it; right?
6      A.    Yes.
7      Q.    Now, did Mr. Dragomir tell you that he
8  was maintaining all his sludge and oily wastes on
9  board the ship?
10     A.    Sorry?
11     Q.    Did Mr. Dragomir tell you that he was
12 storing all the sludge and oily wastes --
13     A.    (without interpreter) Yes.
14     Q.    -- on board in a special tank?
15     A.    No. I never discussed it with him.
16     Q.    Okay. Because you are not an
17 engineer; right?
18     A.    Yes.
19     Q.    And that is not something that you
20 would discuss with the chief engineer?
21     A.    Yes.
22     Q.    But you never saw any oil ever being
23 discharged overboard?
24     A.    Never.

Page 69

1      Q.    Mr. Tudor --
2      A.    Just a moment. Just a moment.
3  Because here it is one point I report. I report one
4  time, but it was one accident. After dropped anchor
5  in the 5th of December.
6      Q.    Okay. Now, I was going to refine my
7  question to get to that. There was one time that
8  there was a stern tube leak; right?
9      A.    Yes.
10     Q.    And that was something that you saw --
11     A.    Yes.
12     Q.    -- and you reported?
13     A.    Yes.
14     Q.    And, in fact, that fact that there was
15 a stern tube leak was reported to the U.S. Coast
16 Guard?
17     A.    Yes.
18     Q.    And they were on board?
19     A.    Yes.
20     Q.    And the Coast Guard representatives if
21 they wanted to could have seen it with their own eyes?
22         MR. KOTILA: Objection. Objection for
23 the relevance of this whole line of testimony.
24 Objection what the Coast Guard could have seen. How

Paul Tudor

19 (Pages 70 to 73)

Page 70

1  could he tell what a Coast Guard agent could have
2  seen?
3  BY MR. CHALOS:
4      Q.      Okay. But you can answer. You could
5  see it with your eyes; right?
6      A.      Yes.
7      Q.      Okay. So now, going back to my first
8  question, you never saw any oil intentionally being
9  discharged into the sea, did you?
10     A.      Never.
11     Q.      Never?
12     A.      Never.
13     Q.      Now, Mr. Kotila in preparation for
14 today showed you a picture of a hose; right?
15     A.      I understood today. When; today?
16     Q.      Well, at some point when you met with
17 the government, they showed you a picture of a hose.
18     A.      Yes. Another time, not today, yes.
19 One picture.
20     Q.      And you had never seen that hose;
21 right?
22     A.      I saw this model of the hose but I
23 don't know this hose, what it is. I saw a model of
24 this hose, but I never saw this hose, and I don't know

Page 71

1  what this hose is.
2      Q.      Now, just to be clear, the captain of
3  the ship, Mr. Manolache, he never ordered you to
4  discharge overboard; right?
5      A.      Yes.
6      Q.      Yes, he never ordered you or yes, he
7  did order you?
8      A.      No, never.
9      Q.      Okay. So the record is clear, Captain
10 Manolache never ordered you to discharge anything
11 overboard?
12     A.      Never.
13     Q.      Okay. Chief Engineer Dragomir never
14 ordered you to discharge anything overboard?
15     A.      Never.
16     Q.      Chief Engineer Tomondong never ordered
17 you to discharge anything overboard?
18     A.      Never.
19     Q.      Okay. None of the engineers ever
20 ordered you to discharge anything overboard?
21     A.      Never.
22     Q.      Okay. Now, we talked before about
23 being on board the ship in Poland.
24          MR. CHALOS: Is this a good time? She

Page 72

1  needs to change a tape.
2          (Recess taken.)
3  BY MR. CHALOS:
4      Q.      Okay, Mr. Tudor, you told Mr. Kotila
5  earlier today that when you joined the ship on board
6  in Poland, at some point in time you saw the owner of
7  the ship; right?
8      A.      Yes.
9      Q.      Okay. Now, when you saw the owner on
10 board the ship --
11     A.      Yes.
12     Q.      Okay. When you saw the owner on board
13 the ship, he never asked you to lie to any
14 authorities, did he?
15          MR. KOTILA: Objection. Objection;
16 hearsay.
17 BY MR. CHALOS:
18     Q.      Okay. Now, in your discussions with
19 the owner, he never asked you to lie; right?
20     A.      Yes. Correct.
21     Q.      Correct, meaning he never asked you?
22     A.      Yes.
23     Q.      Okay. Now, you also saw the owner on
24 board the ship in Delaware; right?

Page 73

1      A.      Yes. Yes.
2      Q.      Now, when you spoke to the owner on
3  board in Delaware, he never asked you to lie to the
4  U.S. Government, did he?
5      A.      Correct. Never.
6          MR. CHALOS: Your answer was?
7          (The court reporter read back as
8  requested.)
9  BY MR. CHALOS:
10     Q.      Okay. Thank you, Mr. Tudor. Okay.
11 Now, you also saw a guy on board named Christos
12 right?
13     A.      Correct.
14     Q.      Now, Christos never asked you to lie
15 to anybody, did he?
16     A.      Correct. Never.
17     Q.      Correct, never. Okay. And you saw
18 Christos and spoke to Christos almost every day --
19     A.      Yes.
20     Q.      -- when the ship was here in the
21 United States; right?
22     A.      Yes.
23     Q.      And he never asked you to lie?
24     A.      Never.

Paul Tudor

20 (Pages 74 to 77)

Page 74

1    Q.    Okay.  Now, the captain never asked
2 you to lie; right?
3    A.    Correct.
4    Q.    Never?
5    A.    Never.
6    Q.    And Chief Engineer Dragomir never
7 asked you to lie; right?
8    A.    Correct.
9    Q.    Correct; never?
10    A.    Never.
11    Q.    He never asked you to lie?
12    A.    No.
13    Q.    Now, Mr. Tudor, I am going to show you
14 what we have marked as CSME Deposition Exhibit No. 4.
15 I just ask you to take a look at these.
16    A.    Yes.
17    Q.    Now, before I ask you about the
18 document, let me ask you some foundation questions.
19 Now, before getting on board the ship, the company
20 paid for you to go to a medical exam; right?
21    A.    No.  I paid.
22    Q.    Okay.  But the company asked you to
23 confirm that you were in good health before joining
24 the ship; right?

Page 75

1    A.    Right.  Right.
2    Q.    And was it your understanding that the
3 company was concerned about your health and safety?
4    A.    Correct.
5    Q.    Correct.  Right?
6    A.    Correct.
7    Q.    Now, remember on board once the ship
8 arrived in Delaware, the Coast Guard came on?
9    A.    Yes.
10    Q.    And they came on for several days in a
11 row; right?
12    A.    Correct.
13    Q.    And they spoke to you twice?
14    A.    Correct.
15    Q.    Now, the first time they spoke to you
16 they asked you some questions, and that question-and-
17 answer session lasted less than five minutes; right?
18    A.    Around five minutes.
19    Q.    Okay.  Five minutes.  Then the second
20 time they spoke to you, they asked you to help, and
21 they asked you to translate for one of the other crew
22 members named Nikolai; right?
23    A.    Yes.  I translated for both of them.
24    Q.    And that was the extent of your

Page 76

1 discussions with the Coast Guard; right?
2    A.    I spoke with them about the separator,
3 and the second time I spoke in behalf of that person,
4 Nikolai, and also on behalf of me.
5    Q.    Okay.  So if I understand you
6 correctly, the questions that were posed directly to
7 you that you answered, that question-and-answer
8 session was about five minutes?
9    A.    First time, yes.
10    Q.    And that question-and-answer session
11 focused on a piece of equipment in the engine room
12 that you don't operate?
13    A.    Yes.
14    Q.    That's correct?
15    A.    Yes.  Correct.
16    Q.    And as a result the government has
17 detained you here for eight months after a five-minute
18 conversation about a piece of equipment you don't
19 operate; right?
20        MR. KOTILA:  Objection.  Objection to
21 the phrase "detained."  He is here based on an
22 agreement, a surety agreement with the company.
23 BY MR. CHALOS:
24    Q.    Mr. Tudor, are you here voluntarily?

Page 77

1 I will withdraw my last question and ask you --
2    A.    No.  I don't understand the question.
3        (At this point Mr. Roth spoke in
4 Romanian.)
5        THE WITNESS:  No.
6 BY MR. CHALOS:
7    Q.    You are here because the government
8 asked you to be here; right?
9    A.    Yes.
10    Q.    Now, in fact, you prepared papers that
11 were filed in court asking for the government to let
12 you go home; right?
13    A.    Yes.
14    Q.    And that was the basis for us having
15 this session today; right?
16        MR. KOTILA:  Objection.  Objection to
17 information for the record.
18        THE WITNESS:  I don't know.  I am not
19 sure.
20 BY MR. CHALOS:
21    Q.    Now, Mr. Tudor, the first time you met
22 with the government, they asked you to come to
23 Delaware; right?
24    A.    Yes.

Page 78

1    Q.    And you drove more than an hour to
2  come to the meeting; right?
3    A.    No. I don't drive. I came with the
4  agency car.
5    Q.    Okay. You were in a car for more than
6  an hour to come to the meeting?
7    A.    Yes.
8    Q.    Closer to two hours?
9    A.    Yes, back and forth, yes.
10    Q.    And the day that you had that meeting,
11  nobody talked to you. You sat there all day; right?
12          MR. KOTILA: I am going to object to
13  this line --
14          THE WITNESS: No.
15          MR. KOTILA: -- of questioning as not
16  relevant and again beyond the scope of the direct
17  examination.
18  BY MR. CHALOS:
19    Q.    Now, since you have been -- now,
20  Mr. Tudor, I am going to show you what we have marked
21  for the record as CSME Defendants' Deposition Exhibit
22  No. 5. And for the record, I will make a
23  representation it is a letter on the Department of
24  Justice letterhead dated January 11, 2006, to

Page 79

1  Mr. Twersky, Esquire. Now, before you look at that,
2  Mr. Tudor, Mr. Twersky is your lawyer; correct?
3    A.    Yes.
4    Q.    Have you seen that document before
5  today?
6    A.    Yes.
7    Q.    Now, is it your understanding that
8  your lawyer on your behalf has made an agreement with
9  the government that they won't prosecute you in return
10  for your cooperation in their investigation?
11    A.    Yes.
12    Q.    Okay. And you agreed to cooperate
13  with the government; right?
14    A.    I have nothing to hide.
15          MR. CHALOS: And, in fact, I would
16  like to move into evidence what we previously marked
17  as CSME Defendants' Exhibit No. 5.
18          MR. KOTILA: I am going to object to
19  that as irrelevant to the case. I also object it is a
20  hearsay document.
21          MR. CHALOS: Well, it is a statement
22  of a party, isn't it?
23          MR. KOTILA: Falgowski?
24          MR. CHALOS: Yes. He is government.

Page 80

1  BY MR. CHALOS:
2    Q.    Okay. I am going to show you what we
3  have marked for the record as CSME Deposition Exhibit
4  No. 6, a three-page document entitled "Declaration of
5  Paul Tudor." Mr. Tudor, have you seen that document
6  before?
7          Let me withdraw that question and ask
8  you this. Does that document bear your signature on
9  the third page?
10    A.    Yes.
11    Q.    Okay. Now, take a look, Mr. Tudor, at
12  paragraph 18. And specifically, I want to point you
13  to the first sentence. You write, "I have done
14  nothing" --
15          MR. KOTILA: Objection. This document
16  is not in evidence.
17          MR. CHALOS: Okay. Then I would like
18  to move --
19          MR. WOODWARD: It doesn't have to be
20  in evidence.
21          MR. CHALOS: It is part of the court
22  record, but I would like to move the document into
23  evidence.
24          MR. WOODWARD: Off the record.

Page 81

1          (Discussion off the record.)
2  BY MR. CHALOS:
3    Q.    Okay. Mr. Tudor, is that a
4  declaration that you made and signed on or about
5  June 26, 2006?
6    A.    Yes. Yes.
7          MR. CHALOS: Okay. I would like to
8  move this into evidence.
9          MR. KOTILA: I am going to object for,
10  one, its relevancy. It is beyond the scope of my
11  direct examination. I also object because I
12  understand it is in English. His first language is
13  Romanian. I object because what it is is nothing but
14  a bolstering. He is here to testify.
15  BY MR. CHALOS:
16    Q.    Mr. Tudor, at the time that you signed
17  this, did you understand the contents of the
18  declaration?
19    A.    Yes.
20    Q.    And when you wrote, "I have done
21  nothing wrong," that's the truth; right?
22    A.    Yes.
23    Q.    Now, since the time that you have been
24  asked to come off your ship and stay in the United

Paul Tudor

22 (Pages 82 to 85)

Page 82

1  States, you have been staying in a hotel; right?
2      A.    Yes.
3      Q.    And that hotel bill is being paid by
4  the company; right?
5      A.    Yes.
6          MR. KOTILA: Objection to the
7  relevance of this line of inquiry.
8  BY MR. CHALOS:
9      Q.    The company is also paying for your
10  meals as well; right?
11      A.    Yes. Correct.
12      Q.    And the company has also agreed to pay
13  your salary as if you were on board the ship; right?
14      A.    Correct.
15      Q.    And they have done all that?
16      A.    Correct.
17      Q.    And to be clear, everything the
18  company said they were going to do they have done;
19  right?
20      A.    Yes.
21          MR. KOTILA: Objection; vague.
22  BY MR. CHALOS:
23      Q.    Just one last question, I think.
24  There were some questions earlier by Mr. Kotila about

Page 83

1  the oily water separator having some rusted parts. Do
2  you remember that?
3      A.    Yes.
4      Q.    Now, you can't tell by looking at
5  whether it is rusty or not whether or not the
6  machinery works, can you?
7          MR. ROTH: The question is: (Mr. Roth
8  spoke in Romanian.)
9          THE WITNESS: Correct.
10          MR. ROTH: Yes, correct. You can't
11  tell.
12          MR. CHALOS: You cannot tell; right?
13          MR. ROTH: You cannot tell.
14  BY MR. CHALOS:
15      Q.    Now, in fact, Mr. Tudor, in your
16  experience almost 30 years on board ships, the
17  equipment is exposed to the sea air; right?
18      A.    Yes, correct.
19      Q.    And sometimes pieces and parts do
20  rust; right?
21      A.    Of course.
22      Q.    But they still operate?
23      A.    Yes, of course.
24          MR. CHALOS: Okay. I will pass the

Page 84

1  witness. I will take a look at my notes, but I will
2  pass. Thank you, Mr. Tudor.
3          THE WITNESS: (without interpreter)
4  You are welcome.
5          MR. WOODWARD: One moment.
6          MR. KOTILA: Can we go off the record
7  for a second?
8          (Luncheon recess taken at 1:00 p.m.)
9          AFTERNOON SESSION
10          (Reconvened at 2:10 p.m.)
11  BY MR. WOODWARD:
12      Q.    Mr. Tudor, my name is Carl Woodward,
13  and I represent Adrien Dragomir, the chief engineer
14  and defendant in this case. I think you know
15  Mr. Dragomir; correct?
16      A.    Yes. Correct.
17      Q.    I am just going to ask you a few
18  questions. One, I want to go back to the first time
19  or the times that you were interviewed by the United
20  States Coast Guard back in December of 2005. Okay?
21      A.    Yes.
22      Q.    I think you said you were interviewed
23  for a very short period of time.
24      A.    The first time I was interviewed for

Page 85

1  about five minutes, and the next time was a longer
2  period, maybe --
3      Q.    How much longer?
4      A.    Approximately up to half an hour, but
5  don't quote me on this. I cannot recall it. And I
6  was together with Nikolai.
7      Q.    All right. So that interview involved
8  not only you, Mr. Tudor, but also Nikolai; correct?
9      A.    Correct.
10      Q.    Both those interviews that were
11  conducted by the Coast Guard with you and with
12  Nikolai, they were conducted in English; correct?
13      A.    Correct.
14      Q.    Was an interpreter provided?
15      A.    No.
16      Q.    Were you offered the opportunity to
17  have an interpreter?
18      A.    No. I wasn't offered.
19      Q.    Were you advised that you could have a
20  lawyer present, too?
21      A.    I don't recall.
22      Q.    Now, I want to direct your attention
23  back to sometime in the summer of 2005. And
24  specifically, did there come a point in time when

Paul Tudor

23 (Pages 86 to 89)

Page 86

1 Chief Engineer Tomondong asked you to assist him in
2 preparing a nonconformity report?
3     A.    Yes.
4     Q.    And did you give him advice
5 regarding -- give him technical advice regarding the
6 operation of the oily water separator?
7     A.    Yes.
8     Q.    That is, the electronics on the --
9     A.    Yes.
10    Q.    -- on the electrical part of the oily
11 water separator?
12    A.    Yes.
13    Q.    And did he prepare a report from that?
14    A.    I don't know.
15    Q.    Do you know what Mr. Tomondong did
16 with any of that information?
17    A.    I don't know.  No, I don't know.
18          MR. WOODWARD:  No further questions.
19          REDIRECT EXAMINATION
20 BY MR. KOTILA:
21    Q.    Just a couple questions, Mr. Tudor.  I
22 just got a couple of questions for you.  Again, for
23 the record, Mark Kotila.  Again, I am from the
24 Department of Justice.

Page 87

1          Mr. Tudor, you took a MARPOL course.
2     A.    Yes.
3     Q.    How long was that course?
4     A.    The course was a half a day.
5     Q.    Half a day.  What, if anything, do you
6 recall in that course -- when did you take the course?
7     A.    Before I signed the contract.
8     Q.    In this Irene, for the Irene matter?
9     A.    What course do you refer to?
10    Q.    The MARPOL course.  I believe you have
11 a certificate in there, defendants' exhibit.  Pull it
12 out.
13    A.    (without interpreter) This one.
14    Q.    The top one is craft and rescue boats,
15 safety training, familiarization safety training for
16 ratings, Maritime English.  You took that course.
17    A.    Yes.
18    Q.    How long was that course?
19    A.    One week.
20    Q.    One week?
21    A.    Yes.
22    Q.    And you learned English?
23    A.    No, no, no.  That was only training
24 for the technical words.

Page 88

1     Q.    In English?
2     A.    Yes.
3     Q.    Okay.  One of the documents placed in
4 evidence by Mr. Chalos, back in the year 2002 you took
5 the course regarding to MARPOL 7378?
6     A.    Yes.
7     Q.    Do you recall what you learned in that
8 course?
9     A.    Yes.
10    Q.    Do you recall if a ship can operate
11 with an inoperable oily water separator while at sea?
12    A.    Yes.
13    Q.    Can it operate with an inoperable --
14    A.    No.
15    Q.    It cannot?
16    A.    No, it cannot operate.
17    Q.    This document, if I may -- I am not
18 going to refer to the document.  You have been here in
19 the United States since December?
20    A.    Yes.
21    Q.    And you have been in a Philadelphia
22 hotel?
23    A.    Yes.
24    Q.    And you received your salary from the

Page 89

1 company?
2     A.    Yes.
3     Q.    And you are free to move about the
4 United States at will --
5     A.    Yes.
6     Q.    -- correct?
7          And your hotel is paid?
8     A.    Yes.
9          MR. KOTILA:  All right.  I have no
10 further questions.
11          MR. CHALOS:  Just a little recross.
12          RECROSS-EXAMINATION
13 BY MR. CHALOS:
14    Q.    Now, Mr. Tudor, just a few questions
15 about the OWS.  It is not part of your job to know
16 when to use the OWS, is it?
17          MR. KOTILA:  Objection.  That is
18 beyond the scope of my redirect.
19          MR. CHALOS:  You just asked him about
20 operating it.
21          MR. KOTILA:  I asked him about MARPOL
22 Go ahead.  Ask your question, but I object because
23 that is beyond the scope of what I asked him.
24

Paul Tudor

24 (Pages 90 to 93)

Page 90

1  BY MR. CHALOS:
2      Q.    Okay.  Well, let me just be clear.
3  You don't really know, do you, Mr. Tudor, whether or
4  not a ship can sail between two ports if the OWS isn't
5  being used, do you?
6          MR. KOTILA:  Objection; asked and
7  answered.
8          MR. CHALOS:  Okay.  You can answer,
9  though.
10         THE WITNESS:  No.  Whatever I said was
11 referred to MARPOL.
12 BY MR. CHALOS:
13     Q.    Let me see if I understand.  Have you
14 ever read the MARPOL treaty?
15     A.    Yes, through the course.
16     Q.    And apart from reading it in the
17 courses, have you ever received any legal training?
18     A.    What do you refer to?
19     Q.    Well, you are not a lawyer, are you?
20 No?
21     A.    No.
22     Q.    And you are not a judge?
23     A.    Of course.
24     Q.    And it is not part of your job to

Page 91

1  interpret laws or international treaties, is it?
2      A.    Correct.
3      Q.    Correct.  It is not part of your job?
4      A.    Yes.
5      Q.    So to say whether or not the MARPOL
6  treaty speaks about the operation of an oily water
7  separator, would you agree that that is best decided
8  by the lawyers and the judge?
9          MR. KOTILA:  Objection; calls for
10 speculation.
11         THE WITNESS:  I don't have an idea.
12         MR. KOTILA:  You don't have any idea.
13         THE WITNESS:  No.
14         MR. CHALOS:  Okay.  Nothing further.
15         MR. WOODWARD:  No further questions.
16         MR. KOTILA:  Thank you, Mr. Tudor.
17         MR. TWERSKY:  Reserve reading and
18 signing.
19             - - -
20         (Deposition concluded at 2:20 p.m.)
21             - - -
22
23
24

Page 92

1  I HAVE READ THE FOREGOING DEPOSITION, AND IT IS TRUE
2  AND CORRECT TO THE BEST OF MY KNOWLEDGE.
3
4
5
        PAUL TUDOR
6
7             - - -
8             INDEX
9  PLAINTIFF'S WITNESS  Direct  Cross  Redr.  Recr.
10 Paul Tudor           3      36     86     89
11 CSME DEFENDANTS' EXHIBITS              Marked
12 1  Employment contract dated 5/23/05, between
      Chian Spirit and Mr. Tudor------------------ 36
13
14 2  Copy of Mr. Tudor's passport and seaman's
      book--------------------------------------- 36
15 3  Mr. Tudor's certificates for attendance at
      various courses---------------------------- 36
16
17 4  Mr. Tudor's medical exam report dated
      5/12/05------------------------------------- 36
18 5  Letter dated 1/11/06, from Mr. Connolly to
      Mr. Twersky--------------------------------- 36
19
20 6  Declaration of Paul Tudor, dated 6/26/06--- 36
21 7  Chian Spirit's safety and environmental
      protection--------------------------------- 36
22             - - -
23 (Exhibits attached to original transcript and copies.)
24

Page 93

1          CERTIFICATE
2          I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, PAUL TUDOR, after being duly
5  sworn by me, was examined by counsel for the
6  respective parties and the questions of said witness
7  and her answers were taken down by me in stenotype
8  notes and thereafter transcribed into typewriting at
9  my direction.
10         I certify that the foregoing is a true
11 and correct transcript of the testimony given at said
12 examination of said witness.
13         I further certify that the deposition
14 was made available to the witness for reading and
15 signing.
16         I further certify that I am not
17 counsel, attorney, or relative of either party, or
18 otherwise interested in the event of this suit.
19
20
21
        Registered Diplomate Reporter and Notary Public
22        Certificate No. 181PS/Exp.: Permanent
23
    Date: 7/24/06
24