UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:06-cr-00076 |
| | ) | |
| CHIAN SPIRIT MARITIME | ) | |
| ENTERPRISES, INC.; and VENETICO | ) | |
| MARINE S/A, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF PLEA AGREEMENT

Pursuant to discussions between the United States of America, by and through its attorneys, representing and binding only the Environmental Crimes Section of the United States Department of Justice and the Office of the United States Attorney for the District of Delaware, and the Defendants, Chian Spirit Maritime Enterprises, Inc., (hereinafter "Chian Spirit"), and Venetico Marine S/A, (hereinafter "Venetico"), operator and owner, respectively, of the vessel *M/V Irene E.M.* (hereinafter "*Irene*") by and through their attorney, the following agreement is hereby entered into by the respective parties and submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C):

### Charges of Indictment

1.    The Defendants agree to enter pleas of guilty to Count 2 in the current Indictment, charging them, in pertinent part, with the following:

### COUNT 2

On or about December 5, 2005, while in the District of Delaware, Defendants Chian Spirit Maritime Enterprises, Inc., and Venetico Marine S/A, did knowingly

1

fail to maintain an Oil Record Book for the <u>Irene</u> in which all unprocessed overboard discharges of oily sludge and bilge wastes from the <u>Irene</u> were required to be fully recorded.  All in violation of Title 33, United State Code, Section 1908(a), Title 18, United States Code, Section 2, and Title 33, Code of Federal Regulations, Section 151.25.

2.      Upon acceptance of this Plea Agreement and sentencing by the Court, the United States shall move to dismiss all remaining charges in the current Indictment against the Defendants, Chian Spirit and Venetico.

Potential Penalties, Assessments, and Restitution

3.      The Defendants understand and agree that the statutory penalties applicable to a corporate defendant for the felony count of the offense to which they are entering a plea of guilty is a maximum fine of either Five Hundred Thousand Dollars ($500,000.00), or twice the gross gain or loss resulting from the unlawful conduct, pursuant to 18 U.S.C. § 3571 (c) and (d), a term of probation of five (5) years, pursuant to 18 U.S.C. § 3561(c)(1), and a special assessment of Four Hundred Dollars ($400.00), pursuant to 18 U.S.C. § 3013(a)(2)(B).

4.      The Defendants understand that the Court shall order restitution to any identifiable victims unless, pursuant to Title 18, United States Code, §§ 3663 and 3663A, the Court determines that restitution would be inappropriate in this case.

5.      Unless otherwise ordered, should the Court order a fine of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of a fine amount not paid within fifteen (15) days after the judgment date, pursuant to Title 18, United States Code, Section 3612(f).  Other penalties and fines may be assessed on the unpaid balance of a fine pursuant to Title 18, United States Code, §§ 3572(h), (i),3612(g).

2

<u>Waiver of Constitutional and Statutory Rights</u>

6.    The Defendants represent to the Court that they are satisfied that their attorney has rendered effective assistance. The Defendants understand that by pleading guilty in this case, they agree to waive certain rights afforded by the Constitution of the United States, by statute or both, including but not limited to: the right to plead not guilty; and the right to a jury trial. At a jury trial, the Defendants would have the right to be represented by counsel, to confront and cross-examine witnesses against it, to compel witnesses to appear and testify, to present other evidence in his behalf and to decide whether to testify. The Defendants would further have the right to have the jury instructed that they are presumed innocent until proven guilty, and that the burden will be on the United States to prove the Defendant's guilt beyond a reasonable doubt. If the Defendants were found guilty after a trial, they would have the right to appeal the conviction.

<u>Waiver of Appeal</u>

7.    The Defendants, through their authorized representative, are aware that 18 U.S.C. § 3742 gives the right to appeal the sentence to be imposed, and that other federal statutes give a Defendant the right to appeal other aspects of the conviction. In consideration of the Agreement with the United States as set forth herein, the Defendants knowingly and voluntarily agree to waive the following rights: (a) the right, conferred by 18 U.S.C. § 3742, to appeal any sentence imposed by the Court for the conviction of these offenses, including restitution and community service; (b) the right to appeal any aspect of Defendant's conviction, including any pre-charge or pre-trial dispositions of motions or other issues; and (c) the right to bring any collateral attack against Defendant's conviction or sentence, except as it may relate to the effectiveness of legal representation.

3

### Voluntariness of the Plea

8.      The Defendants, through their authorized representative, acknowledges

that they have entered into this Plea Agreement freely and voluntarily and that they have been

fully advised by counsel, and that no threats or promises were made to induce them to enter the

guilty pleas called for by this Plea Agreement.

### Corporate Authorization

9.      The Defendants represent that both are authorized to enter into this Plea

Agreement and to bind themselves to the terms of the Environmental Compliance Plan (ECP).

At the time of signing this agreement, the Defendants shall provide to the United States a written

statement in the form of notarized legal documents certifying that the Defendants are authorized

to enter into and comply with all of the provisions of this Plea Agreement. The resolutions

further shall certify that Defendants' Boards of Directors have authorized these actions, and that

all corporate formalities for such authorizations have been observed.

### Applicability of the Sentencing Guidelines and Recommended Sentence

10.     The Parties fully and completely understand that this Plea Agreement is

submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). The Parties

agree that Chapter 8 of the United States Sentencing Guidelines Manual governs this case with

regard to any payment of restitution, community service, and probation. Regarding

determinations of an appropriate fine, however, pursuant to the Commentary to U.S.S.G.

§ 8C2.1, the provisions of § 8C2.2 and § 8C2.9 do not apply to counts for which the applicable

guideline offense level is determined under Chapter Two, Part Q (Offenses Involving the

Environment). For such cases, § 8C2.10 (Determining the Fine for Other Counts) is applicable.

U.S.S.G. § 8C2.10, in turn, directs the Court to apply the provisions of Title 18, United States Code, §§ 3553, 3572 to determine the appropriate fine.

### Withdrawal of Plea Agreement

11.    Should the Defendant's guilty pleas not be accepted by the Court for any reason, this agreement shall be null and void.  In such an event, the Defendants hereby waive any defense to any charges in these Charging Instruments which might otherwise have been available under any statute of limitations, the Speedy Trial Act, or any common law, equitable, or Constitutional claim involving pre-indictment delay.

### Criminal Fine

12.    The Defendants shall each pay a fine in the amount of Five Hundred Thousand U.S. Dollars ($500,000.00), for a total aggregate criminal fine in the amount of One Million U.S. Dollars ($1,000,000.00.)

13.    The Parties agree that $1,000,000.00 is an appropriate aggregate fine.

14.    The Defendants shall each pay, on the day of sentencing, a special assessment of $400.00, according to 18 U.S.C. § 3013(a)(2)(B).

15.    The Defendants shall make organizational community service payments in the total amount of Two Hundred and Fifty Thousand U.S. Dollars ($250,000.00), pursuant to 18 U.S.C. § 3553(a), payable at sentencing.  The Parties agree that $250,000.00 is an appropriate community service project amount and that the Court will order that the Defendants fund the project pursuant to the terms of this Agreement.  This joint recommendation is made pursuant to the Organizational Community Service Provisions which appear at the Sentencing Guidelines' Community Service provisions at § 5B1.3 and § 8B1.3.

16.     The Parties agree and recommend that the Court order a community service project in the amount of $250,000 payable to the National Fish and Wildlife Foundation, Special Funds Program Management and Fiduciary Services for Settlement Accounts (hereinafter the "Foundation"). The Foundation is a charitable and nonprofit corporation established pursuant to 16 U.S.C. §§ 3701-3709. Its purposes include the acceptance and administration of "private gifts of property for the benefit of, or in connection with, the activities and services of the United States Fish and Wildlife Service," and the performance of "such other activities as will further the conservation and management of the fish, wildlife, and plant resources of the United States, and its territories and possessions for present and future generations of Americans." Id. § 3701(b)(1),(2). The Foundation is empowered to "do any and all acts necessary and proper to carry out" these purposes, including, specifically, solicitation, acceptance, and administration of "any gift, devise or bequest . . . of real or personal property." Id. § 3703(c)(1),(7). The Foundation will be responsible for all administrative, communications and fiduciary services required to implement a targeted ecological improvement grant investment program. The Foundation will coordinate with public and private marine and aquatic conservation initiatives in the District of Delaware to fund projects that may include creating coastal wetlands and upland buffers, enhancing rivers and riparian corridors that support the Delaware Bay's endangered and threatened species habitats and improving coastal national wildlife refuges. The receipt, management and expenditure of these funds shall be accounted for to Congress in annual reports required by 16 U.S.C. § 3706(b).

17.     The Defendants will be placed on a term of probation of three (3) years in accordance with Title 18, United States Code, Sections 3553(a), 3561, and 3562. The Defendants agree that three (3) years is an appropriate term of probation. The period of

probation shall include as a condition of probation the implementation of an Environmental

Compliance Plan (hereinafter "ECP") as described in Attachment A. The Defendants may, after

thirty (30) months, move for early termination of probation at the Court's discretion and

consistent with 18 U.S.C. § 3564. The Government reserves the right to respond to any such

motion based upon the nature of the Defendant's compliance with the terms of probation,

including the provisions of the ECP. The Government's consent to any such motion will not be

unreasonably withheld.

    18.    As part of this plea agreement, the Defendants understand and admit to the

relevant conduct described in the Joint Statement of Facts attached to this plea agreement. The

Parties agree that said facts, as set forth in the Joint Statement of Facts, are accurate and provide

an adequate factual basis to support the Defendants' pleas of guilty to Count 2 of the Indictment.

Scope of Agreement

    19.    Other than the offense to which the Defendants agree to plead guilty pursuant to

this agreement, the Environmental Crimes Section and District of Delaware agree not to charge

the Defendants with any other criminal offenses committed before execution of this agreement

within the District of Delaware relating to the criminal investigation and subject matter of the

Indictment in this case and about which the Government has knowledge. The Defendants

understand that this plea agreement affects only criminal charges and shall not be construed, in

whole or in any part, as a waiver, settlement, or compromise of any remedies available to the

United States, or any other civil or administrative remedies, including suspension and

debarment, available to the United States by law. In the event that any other local, state or

federal enforcement agency investigates conduct related to this plea agreement, the

Environmental Crimes Section agrees to advise said agency of the terms of this agreement and

the nature and extent of the Defendants' cooperation under this agreement.

7

<u>Reservation of Allocution</u>

20.    The Parties reserve their full rights of allocution for purposes of sentencing in this matter, subject to the terms of this plea agreement.  The Parties reserve the right to describe fully, both orally and in writing, to the sentencing judge the nature and seriousness of the Defendant's misconduct, including misconduct not described in the charge to which the Defendants are pleading guilty.  The Parties also reserve their rights to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this plea agreement.

<u>Application of the Agreement</u>

21.    This Agreement shall bind the Defendants, all successors-in-interest, if applicable, and all successors and assigns.  This Agreement shall apply to all vessels which the Defendants, own, operate, man, and all vessels owned, manned or operated by the Defendants during the period of probation.  The Defendants shall provide to the Environmental Crimes Section with immediate notice of the following: any corporate name changes; any purchase or sale of vessels; any purchase, sale or reorganization of the ship management companies, or any other change impacting upon or affecting this Agreement and the Environmental Compliance Plan (ECP).  No change in name, corporate or individual control, business reorganization, change in ownership, merger, change in legal status, sale or purchase of assets, or similar action shall alter the Defendants responsibilities under this Plea Agreement.  The Defendants understand and agree that they shall not engage in any action to seek to avoid the obligations and conditions set forth in this Plea Agreement.

<u>Cooperation</u>

22.     As part of this Plea Agreement, the Defendants shall, during the period of

probation, and at all reasonable times, with prior notice by the government as practicable,

provide full access to vessels technically managed, manned, or owned by the Defendants or their

subsidiaries while in U.S. ports or waters, as well as all maintenance and operation records

related to the vessel.  Such access shall include access to, and production of authenticated

records, access to the engine room for inspection and photographs of all equipment, and access

to ship-board and shore-side computers.

<u>Breach of Agreement</u>

23.     The Defendants understand and agree that upon a finding by the U.S.

District Court that they have failed to perform or to fulfill each and every one of their

obligations under this plea agreement, or have committed any further crimes during the period of

probation, they will have breached this plea agreement.  In the event of such a breach, (a) the

United States will be free from its obligations under the agreement; (b) the Defendants will not

have the right to withdraw the guilty plea; (c) the Defendants shall be subject fully to criminal

prosecution for any other crimes which it has committed or might commit, if any, including

perjury and obstruction of justice; and (d) the United States will be free to use against the

Defendants, directly and indirectly, in any criminal or civil proceeding all statements made

regarding the subject matter of this Indictment by employees of either Defendant while subject to

cross examination by counsel for the Defendants and any documents provided by employees of

either Defendant during discussion with the government, including the Defendants' statements

made during proceedings before the Court pursuant to Federal Rule of Criminal Procedure 11.

24.     Any prosecutions of the Defendants not time-barred by the applicable statute of

limitations on the date of the signing of this plea agreement may be commenced against the

Defendants in accordance with this paragraph, notwithstanding the running of the statute of

limitations before the commencement of such prosecutions. The Defendants knowingly and

voluntarily agree to waive any and all defenses based on the statute of limitations for any

prosecutions commenced pursuant to the provisions of this paragraph. The Defendants

understand and agree that the United States shall only be required to prove a breach of this plea

agreement by a preponderance of the evidence. The Defendants further understand and agree

that the United States need only prove a violation of federal, state, or local criminal law by

a preponderance of the evidence

~~probable cause~~ in order to establish a breach of this plea agreement.

### Prosecution by Other Agencies/Jurisdictions

25.    This agreement only binds the Environmental Crimes Section of the United States

Department of Justice and the District of Delaware. It does not bind any other office or

agency of the United States government, including, but not limited to, the Tax Division of the

United States Department of Justice, the Internal Revenue Service of the United States

Department of the Treasury; the Environmental Protection Agency; or any state or local

prosecutor. These individuals and agencies remain free to prosecute the Defendants for any

offense(s) committed within their respective jurisdictions.

### Completeness of Agreement

26.    This Agreement is the complete and only agreement between the

Parties. No promises, agreements or conditions have been entered into other than those set forth

in this Agreement. This Agreement supersedes prior understandings, whether written or oral.

This Agreement cannot be modified other than in a written memorandum signed by the parties or

on the record in court.

10

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

George M. Chalos, Esq., of Chalos, O'Connor & Duffy, LLP
As Authorized Representative of Chian
Spirit Maritime Enterprises, Inc.

George M. Chalos, Esq., of Chalos, O'Connor & Duffy, LLP
As Authorized Representative of
Venetico Marine, S/A

George M. Chalos, Esq., of Chalos, O'Connor & Duffy, LLP
Attorney for the Defendants

By: _____
Jeffrey L. Phillips
Trial Attorney
Environmental Crimes Section

By: _____
Gregory F. Linsin
Special Litigation Counsel
Environmental Crimes Section

COLM F. CONNOLLY
United States Attorney

1-18-07   By: _____
Edmond Falgowski
Assistant United States Attorney
District of Delaware

Dated:

    AND NOW, this 29 day of January, 2007, the foregoing Memorandum of Plea Agreement
is hereby (accepted) (rejected) by this Court.

_____
The Honorable Gregory M. Sleet
United States District Judge

11

ATTACHMENT A
Environmental Compliance Plan


**PURSUANT TO PLEA AGREEMENT**

**United States v. Chian Spirit Maritime Enterprises, Inc., and Venetico Marine S.A.** (1:06-cr-00076)

The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PROGRAM (ECP) have been prepared pursuant to the Plea Agreement between Chian Spirit Maritime Enterprises, Inc (herein after "CSME") and Venetico Marine S.A. and the United States (hereinafter "Government") filed in the United States District Court for the District of Delaware. Compliance with all of the standards and requirements of the ECP is an essential term of the Plea Agreement. The vessels currently covered under this ECP are known as:

    (1) *Nicholas M* – IMO Number 7433452

    (2) *Captain P. Egglezos* – IMO Number 8005927

    (3) *Maria N.M.* – IMO Number 8109113

    (4) *Irene E.M.* – IMO Number 7433593

The ECP includes various provisions to ensure that all vessels directly or indirectly operated, managed, manned and/or controlled by CSME, which call or may call at ports or places in the United States, comply with all maritime environmental requirements established under applicable international, flag state, and port state law, including, but not limited to, the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL), and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA) and the Oil Pollution Act (OPA), and with the requirements of this agreement itself.

**A. APPLICABILITY/PURPOSE**

    (1) This ECP shall cover and apply to all of CSME's operations, including all subsidiaries, affiliated business entities, and agents (owned wholly or partially by CSME), involved in the operation of seagoing vessels which are operated, managed and/or manned by CSME, on the date of sentencing or at anytime during the period of probation. It shall also include all persons working for CSME, its subsidiaries, affiliated business entities, agents, and any other individuals or organizations who are involved in the operation, maintenance and repair of aforesaid seagoing vessels, operated, managed and/or manned by CSME, as direct employees or independent contractors, on the date of sentencing or at any time during the period of probation.

(2) The ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of CSME's operated and/or managed vessels which call or may call at ports or places in the United States, shore side facilities, and operations involving said vessels; increase training of all of CSME's personnel involved with said vessels; develop and implement management and engineering controls to better manage, detect and prevent environmental violations; and require periodic reports to the United States Probation Office for the District of Delaware, the United States Attorney's Office for the District of Delaware, the Environmental Crimes Section of the United States Department of Justice, the Environmental Protection Agency, and the United States Coast Guard (collectively hereinafter "the United States") to ensure that CSME is following the requirements of this ECP and that all the vessels comply with all maritime environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations and that an effective environmental management system is in place to prevent recurrence of violations.

## B. CORPORATE COMPLIANCE MANAGER

(1) Within sixty (60) days of entry of the Plea Agreement, CSME shall designate a senior corporate officer as Corporate Compliance Manager (hereinafter "CCM") who shall report directly to the President and/or Managing Director of CSME. CSME shall provide the name of the CCM to the United States. The CCM should be the same individual as CSME's "designated person" under the International Safety Management Code (hereinafter "ISM") unless reasons are provided to the United States justifying why the "designated person" should not also be the CCM. The CCM shall be responsible for coordinating with the Independent ECP Consultant (hereinafter "IC"), as more fully described below, developing and implementing all of the procedures and systems required herein, establishing and implementing training programs for the officers and crew of CSME's operated and/or managed vessels, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the IC and the United States. All reports required under this ECP shall be reviewed by the CCM and signed under the penalty of perjury.

(2) CSME shall establish a procedure and reporting system that requires and enables all officers, crewmembers and employees, and shore side personnel involved in the manning and/or operation of seagoing vessels of CSME's operated and/or managed vessels, including all persons working for CSME, its subsidiaries, affiliated business entities (owned wholly or partially by CSME) and agents of CSME as either direct employees or independent contractors, to notify the CCM of any violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the IC and the United States in carrying out their reviewing, auditing and oversight functions required by applicable law and this ECP. CSME

agrees to establish a procedure that makes failure to notify the CCM of any violations of any applicable environmental requirements and failure to cooperate fully with the Classification Societies, the IC and the United States in carrying out their auditing and oversight functions required by applicable law and this ECP, grounds for dismissal. CSME agrees not to retaliate against any officer, crewmember, employee, or shore side personnel involved in the manning and/or operation of seagoing vessels, including all persons working for CSME, its subsidiaries, affiliated business entities (owned wholly or partially by CSME) and agents of CSME as either direct employees or independent contractors or entity making any such report.

(3) The CCM shall be authorized to access all records and personnel regarding all vessels subject to the ECP for the purpose of assuring compliance with the ECP. The CCM shall be authorized to implement all requirements of the ECP on all vessels subject to the ECP. The CCM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the USPO, IC, the designated representative of the Coast Guard, and CSME. The CCM position will be filled by an individual(s) with significant maritime vessel operational background, who possesses audit experience and is thoroughly familiar with the requirements of this ECP, and is knowledgeable about domestic and international maritime environmental laws and regulations.

CCM Responsibilities:

    a. Development and Maintenance of Effective Training Programs

        - To the extent not already completed, the CCM will be responsible for developing training programs to educate and train CSME's employees of their environmental commitment, the requirements of the ECP, the policies and procedures for complying with the ECP, and the possible consequences to the CSME's and to individuals for failure to comply with environmental laws.

        - Provide environmental consultants and contractors of CSME with documents and training to make them aware of the ECP.

    b. Auditing and Compliance Assessment

        - Ensure that the IC conducts the review and audits required by the ECP and that the required reports are prepared.

    c. Fleet Reviews

        - Supervise annual overall reviews of the environmental compliance programs and "focused" reviews of key environmental areas to promote the adoption of "best practices".

  d. Reporting of Non-Compliance by Employees and Crew Members

    - Establish a means by which employees may report (anonymously if so desired) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection.

## C. MASTER and CHIEF ENGINEER

(1) The Master of each of CSME's vessels subject to this ECP, with the assistance of the CCM, shall ensure that prompt reports are made to the United States Coast Guard of any non-compliant condition of any of CSME's vessels that call upon any port or place in the United States or sail into any waters under the jurisdiction of the United States.

(2) The Chief Engineer on board all vessels subject to this ECP shall perform the following duties regarding this ECP:

    - To daily measure, monitor and manage shipboard generated wastes;

    - Report to the CCM and cooperate with CSME to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment and document all efforts to do so in a log that is available for review and audit at all times.

## D. INDEPENDENT ECP CONSULTANT (IC) AND INITIAL ENVIRONMENTAL REVIEW

(1) No later than thirty (30) days following the District Court's final imposition of sentence in United States v. Chian Spirit Maritime Enterprises, Inc. and Venetico Marine S/A, CSME shall nominate an IC who meets the qualifications below to conduct an Initial Environmental Review, and a Report of Findings for all of CSME's operations as defined below. The United States will notify CSME in writing of its approval or disapproval as expeditiously as possible. The United States' approval shall not be unreasonably withheld.

(2) Qualified candidates for the IC position must have expertise and competence in the regulatory programs under U.S. and international environmental laws, and have expertise and competence in waste stream evaluation monitoring and control technologies, with a primary emphasis on engine room and machinery space operations, used by CSME to achieve and maintain compliance in respect to CSME's seagoing vessels. The IC shall also have sufficient expertise and competence to assess whether CSME has an adequate Environmental Management System in place to assess regulatory and ECP compliance, correct non-compliance, and prevent future non-compliance. CSME and the United States acknowledge that the functions of the IC may, by mutual agreement, be fulfilled by one or more individuals.

4

(3) The IC must not directly own any stock in any of CSME, its subsidiaries, affiliated business entities (owned wholly or partially by CSME) or any agents of CSME, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The IC must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If CSME has any other contractual relationship with the IC, both CSME and the IC shall disclose to the United States such past or existing contractual relationships.

(4) If the United States determines that the proposed IC does not reasonably meet the qualifications set forth in the previous paragraphs, or that past or existing relationships with the IC would affect the IC's ability to exercise the independent judgment and discipline required to conduct the ECP review and evaluation, such IC shall be disapproved and another IC shall be proposed by CSME within thirty (30) days of CSME's receipt of the United States' disapproval.

(5) The IC shall conduct an Initial Environmental Review of CSME's operations (vessel and shore side) and CSME's seagoing vessels may be reviewed while the vessels are in port or while the vessels are underway and operating. CSME and the IC shall coordinate the underway inspections to accommodate, as much as practicable, the vessel's operations and schedule. The Initial Environmental Review shall be performed to ascertain and evaluate various aspects of CSME's vessels: their systems, equipment and components; current practices whether documented or not; and the knowledge, skills, and abilities of ship and shore side personnel as they relate to the requirements of this ECP, and other maritime environmental protection requirements.

(6) The Initial Environmental Review may be considered as a discovery action in that its purpose is to review all areas of operation that may impact various elements of pollution prevention and environmental protection. It will exceed a typical SMS audit in scope and will be used to determine practices, procedures and equipment conditions not typically documented during a routine inspection by class society, port or flag state inspection processes. The results of the initial environmental review will be used to shape and revise the Environmental Management System established by this ECP.

(7) The Initial Environmental Review shall meet the following specific requirements:
  (a) It shall assess all waste streams developed from any system, equipment and components found in each machinery space onboard CSME's vessels. This will include observation and documentation describing the leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:
  (i) all pump and valve seals and glands during operation,
  (ii) all piping systems, flanges, gaskets, fittings and joints,
  (iii) all equipment casings such as main and auxiliary engines, and reduction gears,
  (iv) operation of engines, boilers, incinerators, and evaporators, and
  (v) all other mechanical components found aboard CSME's vessels.

5

(b) It shall assess the adequacy and performance of the Oily Water Separator (OWS) and Incinerator, Sewage System, and any other pollution prevention equipment to handle the quantities and types of wastes, developed during normal operations. It will include an evaluation of the capacities for all tanks or containers associated with the management of sludges, bilges and oily wastes or other wastes. It will include an evaluation of documentation tracking, maintenance and repair, modifications of all pollution prevention equipment, and notifications of equipment failure to the ECM or other shoreside personnel.

(c) It shall assess each vessel's crew and their current workloads relating to all work performed on the vessel's systems, equipment and components, in an effort to ascertain that even the least significant leakages contributing to waste streams are remedied in a prompt and effective manner.

(d) It shall assess the adequacy of the policy, procedures, current practices and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel and the effectiveness of garbage management plans.

(e) It shall assess the adequacy of the policy, procedures, current practices and equipment associated with cargo management developed during all evolutions of cargo operations.

(f) It shall assess the ability of the vessel's crewmembers to create, devise or implement an unauthorized process to dispose of a shipboard waste including regular garbage, machinery space and cargo generated wastes.

(g) It shall assess the adequacy of the vessel crewmembers to maintain the following records and includes a complete comparative analysis (against each other where possible) of the following records:
(i) Oil Record Book
(ii) Engine Room Alarms
(iii) Tank sounding sheets
(iv) Personal work records and lists
(v) Maintenance records
(vi) Vendor service records
(vii) Bilge waste and sludge receipts
(viii) Deck Log
(ix) Garbage Record Book
(x) Wastewater Discharge Log
(xi) Oil to Sea Equipment Interface Logs
(xii) Hazardous waste manifests
(xiii) Solid waste discharge receipts
(xiv) Content Monitor (OWS) calibration logs
(xv) Training records
(xvi) Vetting documents
(xvii) Inspection Documents
(xviii) SMS or SQE Audit documents.

(h) It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:
(i) Solvents

6

(ii) Degreasers
(iii) Cleaning wastes
(iv) Batteries
(v) Paints
(vi) Oily rags
(vii) Fluorescent and incandescent bulbs
(viii) Expired boiler and engine chemicals
(ix) Used boiler and engine chemicals
(x) Galley greases
(xi) Pyrotechnics
(xii) Medical supplies
(xiii) Contaminates fuels
(xiv) Used Oils and greases
(xv) Incinerator ash
(xvi) Transformer oils
(xvii) Contaminated refrigerants
(xviii) Hazardous materials.

(i) It shall assess and evaluate documentation containing the certifications that all vessel officers understand the requirements of this ECP and shall require signed statements by all vessel officers attesting that they understand false entries in the Oil Record Book for Machinery Space operations is a violation of law.

(j) It shall assess the policy, procedures, and current practices associated with the Master and Chief Engineer's capability to communicate with shoreside personnel, including the CCM and designated persons, and shall review such communications.

(k) It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

(l) It shall assess the policy, procedures, and current practices used on vessels and ashore to track crewmember environmental training, as well as the availability of and access to training resources.

(m) It shall assess the adequacy of existing hotline reporting methods to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crewmembers and shoreside personnel.

(n) It shall assess the policy, procedures, and current practices to ensure that vessel vendors, technicians, and other non-crewmembers follow CSME's requirements regarding pollution prevention and environmental protection.

(o) It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including the storage of seals and preventing the use of duplicate seals.

(p) It shall assess the policy, procedures, and current practices and equipment used to maintain refrigeration units, including availability and status of refrigerant recovery units, procedures for recovering refrigerants, and maintenance of a leak log.

(q) It shall assess the policy, procedures, current practices, and equipment related to Oil Transfer Procedures, including slops discharges, conditions of hoses, connections and transfer equipment, and shall include reviews of Declarations of Inspections.

(r) It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of vessels, including a review of the Shipboard Oil Pollution Emergency Plan and evaluation of personnel performing such duties.

(s) It shall assess the policy, procedures, and current practices associated with ballast water management and invasive species requirements.

(t) It shall include a survey of all fleet engineers at all levels for information on how to make the OWS, OCM, associated systems and waste management processes tamper proof and for methods on reducing or handling waste accumulations within machinery spaces. Participation shall be mandatory for all engineering personnel. The survey shall request the opinions of the vessels' engineers into their ability to adequately maintain the vessel systems, equipment and components. The survey will emphasize non-retaliation for open and honest opinions and reports of current non-compliant circumstances. The responses will be maintained in original format and made available to the IC. The original survey responses shall be included in the Report of Findings.

(8) At the conclusion of the Initial Environmental Review, but in no event later than one hundred twenty (120) days following imposition of sentence, the IC shall prepare a Report of Findings. If the IC believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, CSME may request that the Government grant the IC such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. The Report of Findings shall be provided to CSME and the United States. Based on the Report of Findings, CSME shall develop an Environmental Management System (hereinafter EMS) and Manual as described below.

## E. ENVIRONMENTAL MANAGEMENT SYSTEM (EMS)

(1) The CCM shall be responsible for establishing an Environmental Management System (EMS). To the extent possible, the EMS shall be based upon the ISO 14001 / 2004 standards. The EMS shall include the following core requirements:

(2) Environmental Policy:

(a) The EMS should be based upon a documented and clearly communicated policy. This policy should set out the CSME's commitment towards a cleaner marine environment.

It should include:

(i) provision for compliance with environmental requirements;

(ii) commitment to continuous improvement in environmental performance, including those areas required by this ECP;

(iii) commitment to pollution prevention that emphasizes source reduction, to include funding and human resources necessary to effectively maintain and repair the systems, equipment and components found in machinery spaces of vessels;

8

    (iv) commitment to continuous reduction of environmental risks; and

    (v) commitment to sharing information with external stakeholders on environmental performance.

(3) Environmental Requirements and Voluntary Undertakings:

  (a) The EMS must provide a means to identify, explain and communicate all environmental requirements and voluntary undertakings to all employees, vendors, technicians, and other non-crewmembers, whose work could affect CSME's ability to meet those requirements and undertakings.

  (b) Environmental requirements include statutes, regulations, permits, and agreements such as this ECP. Voluntary undertakings include the adaptations of additional best practices or industry norms that CSME may choose to adopt.

  (c) The EMS must include procedures for ensuring that the organization meets these environmental requirements, voluntary undertakings and the additional requirements of this ECP. The EMS must also specify procedures for anticipating changes to environmental requirements, including new requirements that may apply as a result of changes in operations and incorporating these changes into the ECP.

(4) Objectives and Targets:

  (a) The EMS shall establish specific objectives and targets for:

    (i) achieving and maintaining compliance with all marine environmental protection requirements and the requirements of this ECP;

    (ii) environmental performance demonstrating continuous improvement in regulated and non-regulated areas;

    (iii) pollution prevention that emphasizes source reduction with respect to machinery space waste streams and effective management of cargo related wastes; and

    (iv) sharing information with external stakeholders on environmental performance against all EMS objectives and targets.

  (b) The EMS shall establish appropriate time frames to meet these objectives and targets. These must be documented and updated as environmental requirements change or as modifications occur in activities and structures within organizations in a manner that affects environmental performance or as a result of recommendations made by the IC or other Auditor.

(5) Structure, Responsibility and Resources:

  (a) CSME will ensure that it is equipped with sufficient personnel and other resources to meet its objectives and targets. The EMS will describe in detail the procedures and steps for achieving those objectives and targets. The EMS will define the compliance roles and responsibilities of all vessel and shoreside personnel involved with the operation maintenance and repair of CSME's vessels, and will indicate how they and other corporate personnel will be held accountable for achieving and maintaining compliance with this EMS, the requirements of the EMS, and other marine environmental protection requirements. Additionally, it will describe how environmental performance and compliance information will be communicated to all vendors, technicians, and other non-crewmembers onboard CSME's vessels.

The EMS will also establish procedures for receiving and addressing concerns raised by these personnel regarding environmental performance and compliance.

(6) Operational Control:

The EMS will identify and provide for the planning and management of all CSME's operations and activities with a view to achieving the ECP objectives and targets. For example, vessel deck department and engine room machinery space maintenance and repair will be an important aspect in achieving and maintaining compliance and enhancing environmental performance.

(7) Corrective and Preventive Action and Emergency Procedures:

(a) CSME, through its EMS, will establish and maintain documented procedures for preventing, detecting, investigating, promptly initiating corrective action, and reporting (both internally and externally) any occurrence that may affect the organization's ability to achieve the ECP objectives and targets.

(b) Such measures must address incidents that may have an effect on compliance with environmental requirements as well as on environmental performance in regulated and non-regulated areas, including requirements of this ECP, or other marine environmental protection requirements. Examples of such situations include incinerator or oily water separator malfunctions, overflows of fuel or slop tanks, overflow of tanks within machinery spaces, fuel oil, lube oil, saltwater line failures, operator errors and other accidental releases.

(c) The EMS must also establish documented procedures for mitigating any adverse impacts on the environment that may be associated with accidents or emergency situations. If the environmental violation or incident resulted from a weakness in the system, the EMS should be updated and refined to minimize the likelihood of such problems recurring in the future. The EMS should also, to the extent possible, provide for the testing and evaluation of emergency procedures.

(8) Training, Awareness and Competence:

The EMS must establish procedures to ensure that all personnel (including vendors, technicians, and other non-crewmembers) whose job responsibilities affect the ability to achieve the ECP objectives and targets, have been trained and are capable of carrying out these responsibilities. In particular, the training should highlight means to enhance the ability of such personnel to ensure compliance with environmental requirements and voluntary undertakings, the requirements of the ECP and other marine environmental protection requirements.

(9) Organizational Decision-making and Planning:

The EMS must describe how these elements will be integrated into the organization's overall decision-making and planning, in particular, decisions on capital improvements, training programs, and vessel operations, maintenance and repair activities.

(10) Document Control:

The EMS must establish procedures to ensure maintenance of appropriate documentation relating to its objectives and targets and should also ensure that those records will be adequate for subsequent evaluation and improvement of the operation of the EMS. Additionally, all records will be

maintained and made available to the IC, auditors and port and flag state personnel.

(11) Continuous Evaluation and Improvement:

    (a) The EMS must include methods to perform periodic, documented and objective internal auditing of the organization's performance in achieving these objectives and targets, and on how well the ECP assists the organization in achieving those objectives and targets. This requirement is independent from the auditing requirements detailed elsewhere in this plan. The goal of these internal audits and reviews will be to allow management to continuously monitor and assess vessel systems, equipment and components, and the ability and proficiency at which vessel crew members and personnel ashore comply to the policies and procedures established by this ECP.

    (b) The EMS will identify an ongoing process for assessing when a vessel is to be taken out of service for an environmental discharge related repair, such as when a discharge is caused by leaking stern tubes, thrusters or other equipment.

    (c) The EMS will include organization charts, as appropriate, that identify shore side and vessel individuals having environmental performance, risk reduction, and regulatory compliance responsibilities. The charts shall also specify responsibilities of Port Captains, Port Engineers, and Engineering Superintendents to report information related to environmental releases or inadequate performance of environmental pollution protection equipment, casualties causing internal spills, excessive waste development and leaking equipment with oil-to-sea interfaces.

    (d) The EMS will promote non-retaliatory practices and ensure that employees are not punished or otherwise suffer negative consequences for reporting violations of environmental laws, regulations, or policies.

    (e) The EMS will describe potential consequences for departure from specified operating policies and procedures, including possible termination of employment, as well as criminal/civil/administrative penalties as a result of noncompliance.

    (f) The EMS will make employee compliance with environmental policies of the ECP, and other marine environmental protection requirements a positive factor, and failure to comply a negative factor, in all evaluations undertaken for the performance of all its employees.

    (g) The EMS will include policies against any incentive or bonus programs based on minimizing operational costs associated with the operation, maintenance and repair of machinery space systems, equipment and components to ensure that employees do not avoid such costs and thereby sacrifice environmental compliance.

    (h) The EMS will describe a confidential non-compliance reporting system that is adopted to ensure that employees may quickly and confidentially report discharges, spills, environmental incidents and other environmental performance data.

    (i) The EMS will identify all operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on vessel engine room operations, systems, equipment and components and cargo residue management.

(j) The EMS will identify the types of records developed and maintained in support of the ECP such as reports, audit working papers, correspondence, communications, reports from the confidential system for non-compliance reporting, and identify personnel responsible for their maintenance, and procedures for responding to inquiries and requests for release of information. The EMS shall provide a system for conducting and documenting routine, objective self-inspections by CSME's internal auditors, supervisors, and trained staff to check for malfunctions, deterioration, and inadequate maintenance of pollution prevention equipment, worker adherence to SOPs, unusual situations, and unauthorized releases.

## F. COURT APPOINTED MONITOR

As part of the ECP, the CSME agrees to pay for a Court Appointed Monitor (hereinafter "Monitor") that will be appointed by and report to the Court during the entire period of probation. The Monitor can, at CSME's option, serve concurrently in the additional capacity of Third Party Auditor (hereinafter "TPA") under the terms of this Agreement. Within thirty (30) days of the entry of the imposition of sentence CSME will submit a list of three qualified candidates for the Monitor from which the United States and the Court will appoint one of the candidates. In the event that the United States and the Court does not find one of the candidates satisfactory, or if they do not find the work of the Monitor satisfactory, at any time they may request CSME to supply additional candidates. Further, if an agreement can not be reached regarding the selection, the decision shall be left up to the Court. The Monitor must have staff with the following experience:

a. Expertise and competence in the regulatory programs under United States and international marine safety and environmental laws; expertise and competence to assess whether CSME has adequate management systems in place to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance; and demonstrated capability to evaluate CSME's required effort and commitment in satisfying the requirements of this ECP and the EMS. CSME shall ensure that the Monitor is provided all reports and notifications as established in this plan.

b. The Monitor shall be assigned the following tasks and responsibilities and provide written submissions to the Court as set forth below:

- Review the relationship between CSME and the IC and TPA and evaluate the adequacy of measures taken to ensure that the IC and TPA act with independence.

- Conduct a review and submit an annual report to the USPO, CSME, designated representative of the Coast Guard, and the Environmental Crimes Section, United States Department of Justice regarding each of the audits conducted by the IC and TPA pursuant to the Plea Agreement and the ECP. The Monitor's reports shall provide a summary of the findings regarding the adequacy of any audits required by this ECP and adequacy of recommendations for change, as found necessary.

- The annual report shall also include and address any other information that the Monitor is aware of which pertains to CSME's capabilities to meet the objectives of this ECP or any other marine environmental protection requirements.

- All known inadequacies of the IC, the TPA or with respect to CSME's performance whether personnel based or related to any of its vessels, systems, equipment, or components shall be reported in the annual report.

- If the Monitor receives information regarding a direct violation of any existing marine environmental protection requirement or requirement of this ECP, the Monitor must immediately report the occurrence to the USPO and to the United States. At any time during the probationary period the Monitor may inspect or investigate any aspect of the IC or TPA activities as they relate to the requirements of this plan or with respect to CSME's operations, and shall be provided full access to all records, audit personnel, vessels and shore side facilities as is necessary to perform its duties.

- Provide any additional reports, in both electronic and hard copy form, to the USPO, CSME, designated representative of the Coast Guard and the Environmental Crimes Section, United States Department of Justice, as requested by the Court or as appropriate and to include inadequacies in the audit process, violations of the terms and conditions of the ECP and EMS and any other findings of significant problems or deficiencies.

## G. ENVIRONMENTAL MANAGEMENT SYSTEM (EMS) MANUAL

(1) Within six (6) months of receiving the Report of Findings on the Initial Environmental Review from the IC, CSME shall prepare an EMS Manual, which shall describe and document the EMS and contain any additional EMS implementation schedules as needed to ensure complete compliance in all operations and procedures. If CSME believes that additional time is needed to analyze available information or to gather additional information to prepare the EMS Manual, CSME may request that the Government grant it such additional time as needed to prepare and submit the EMS Manual, which request shall not be unreasonably denied. If necessary, the United States may grant additional time in thirty (30) day increments for completion of the EMS Manual.

(2) CSME shall submit a proposed final EMS Manual to the CCM, the IC and the United States immediately upon its completion. The IC and the United States shall provide comments on the proposed EMS Manual within ninety (90) days of receipt unless additional time for review is requested in writing. CSME shall submit a supplement to the EMS or a written response, as appropriate, within sixty (60) days of receipt of the comments. The EMS is subject to final approval from the United States, which approval shall not be unreasonably withheld.

(3) All elements of the EMS Manual shall be fully implemented no later than nine (9) months following final approval by the United States. Upon receipt of final approval, CSME shall immediately commence implementation of the EMS in accordance with the schedule contained in the EMS Manual. CSME shall submit reports to the designated

representative of the Coast Guard, and the Environmental Crimes Section, United States Department of Justice beginning no later than one hundred twenty (120) days following the publication of the Report of Findings by the IC, regarding the status of the development and implementation of the EMS and the results of the review and evaluation of CSME's operations or audits conducted pursuant to the EMS. These reports shall be made on an annual basis.

## H. FINAL EMS/ECP COMPLIANCE AUDIT

(1) Beginning no later than twelve (12) months following implementation of the EMS, CSME shall arrange for, fund and complete a Final EMS/ECP Compliance Audit of CSME's fleet management offices and all vessels that were not previously audited pursuant to this EMS/ECP, to verify compliance with applicable environmental laws and regulations and the requirements of this EMS and ECP. All such vessels must be examined while the vessels are underway and operating. CSME and the TPA shall coordinate the underway examinations to accommodate, as much as practicable, the vessel's operations and schedule. These underway examinations will be conducted, to the extent practical, on voyages of short duration (i.e. four (4) days). The TPA will have full access to CSME's facilities, records, employees and officers at all times. During this final audit phase CSME shall immediately advise the TPA of any issue that comes to its attention that adversely impacts CSME's compliance with all applicable laws and regulations and the EMS/ECP.

(2) The TPA will be certified by the American National Standards Institute-Registration Accreditation Board or will have comparable credentials and experience in performing EMS/ECP audits. Selection of the TPA is subject to the same conditions identified in Section C above regarding selection of the IC. Selection of the TPA will be approved by the United States. The United States will notify CSME in writing of its approval or disapproval as expeditiously as possible.

(3) The Final EMS/ECP Compliance Audits shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 14012 as supplemental guidance. The TPA shall assess conformance with the elements covered in the Initial Environmental Review, with all additional requirements presented in the EMS and with the additional requirements of this plan. Designated United States representatives may participate in the audits as observers at Government expense. CSME shall make timely notification to the United States regarding audit scheduling in order to make arrangements for observers to be present.

(4) The TPA shall deliver each vessel's and facility's audit report to the appropriate company official upon completion. In addition, the TPA will deliver an Audit Report to the USPO, designated representative of the Coast Guard, and Environmental Crimes Section, United States Department of Justice within thirty (30) days after the completion of each audit. If the TPA believes that additional time is needed to analyze available information or to gather additional information, CSME may request that the Government grant the TPA such additional time as needed to prepare and submit the Audit Report. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Audit Report. Should the Government or the United States Probation Office seek to revoke CSME's probation based on the TPA's failure to file a timely EMS/ECP Final

14

Compliance Audit Report, CSME shall have the right to contest the reasonableness of such revocation in the appropriate U.S. District Court.

(5) The Final EMS/ECP Compliance Audit Reports shall present the Audit Findings and shall, at a minimum, contain the following information:

(a) Audit scope, including the time period covered by the audit;

(b) The date(s) the on-site portion of the audit was conducted;

(c) Identification of the audit team members;

(d) Identification of the company representatives and regulatory personnel observing the audit;

(e) The distribution list for the Final EMS/ECP Compliance Audit Report;

(f) A summary of the audit process, including any obstacles encountered;

(g) Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

(h) Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

(i) Certification by the TPA that the Final EMS/ECP Compliance Audit was conducted in accordance with this document and general audit principles.

(6) Within sixty (60) days from completion of the Final EMS/ECP Compliance Audit of a particular facility or vessel, CSME shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing CSME into full conformance with all applicable laws and regulations and the EMS/ECP manual. The Action Plan shall include the result of any root cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. CSME may request that the United States permit a brief extension of the time limit stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(7) The Action Plan shall be reviewed by the United States who shall provide written comments within thirty (30) days of receipt. After making any necessary modifications to the Action Plan based on the comments, CSME shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, CSME shall submit a written Action Plan Completion Certification to the United States.

**I. NON-COMPLIANCE**

(1) This EMS/ECP does not in any way release CSME from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other international maritime conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties.

(2) The EMS/ECP shall be part of the Plea Agreement and adherence to it will be a condition of probation. Failure to comply with any part of this EMS/ECP (including but not limited to refusal to pay valid charges for the IC or TPA and failure to provide the IC or TPA access to vessels, facilities, personnel or documents) shall be a violation of the Plea Agreement and shall be grounds for the revocation or modification of CSME's probation. Should the United States or the United States Probation Office seek to revoke or modify CSME's probation based on CSME's refusal to pay valid charges for the IC or TPA and/or its failure to provide the IC or TPA access to vessels, facilities, personnel, or documents, and/or as a result of any disagreement regarding any of the provisions of this EMS/ECP, CSME shall have the right to contest the reasonableness of such revocation before the appropriate U.S. District Court.

## J. CCM/VESSEL MASTER RESPONSIBILITIES

The Master of any of CSME's vessels covered under this ECP, with the assistance of the CCM, shall ensure that timely reports are made to the United States Coast Guard of any non-compliant condition of any of CSME's operated and/or managed vessels that calls upon any Port or Place in the United States or sails into any waters under the jurisdiction of the United States. CSME shall establish that enforcement of and employee compliance with the EMS/ECP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to comply with such policies, regulations and laws will be a negative factor in all appropriate personnel evaluations.

## K. BOARD OF DIRECTORS

CSME shall ensure that at least twice yearly its Board of Directors or equivalent governing structure receive and review reports from the CCM and any applicable report from the IC concerning the implementation of this EMS/ECP, including environmental compliance, EMS implementation, and manager, officer, and crew training. Copies of those portions of the meeting agendas and internal company reports concerning these items shall be included in the reports to the United States.

## L. TRAINING REQUIREMENTS

(1) The CCM will be responsible for developing training programs to educate and train CSME's vessel and shore side employees associated with the operation and management of its vessels. The CCM may name a Corporate Training Officer to ensure that the requirements of this section are met.

(2) Training shall occur annually for all employees and be performed by qualified instructors at a training facility before an employee assumes his or her duties. The training shall consist of pertinent sections of this ECP, the EMS, and existing marine environmental protection requirements. The training shall include shipboard-related technical and practical information associated with pollution prevention and the operation, maintenance and repair of pollution prevention equipment and systems, and be appropriate for the work responsibilities and department in which an employee works. The training must include discussion of the consequences to CSME and its employees for failure to comply with the requirements of this ECP, EMS, and existing marine environmental protection requirements.

(3) Where possible, a basic initial training program shall be provided to vessel employees currently onboard vessels in an effort to promptly mitigate pollution risk and ensure environmental protection. However, such employees must receive the shore side training prior to returning to a vessel on a new contract.

(4) Additionally, the training shall include instruction regarding:

  (a) Corporate environmental compliance structure, including the CCM and contact information.

  (b) Comprehensive overview of this ECP, the EMS, and other marine environmental protection requirements.

  (c) The reporting system used to report non-compliance.

  (d) Sanctions and consequences for violations such as remedial training, suspension, termination, and civil and criminal liability.

  (e) Pollution prevention and minimization programs specifically relating to steward, deck, and engine department procedures and operations.

  (f) All requirements set forth in the Engineering section of this ECP.

  (g) Position specific training in the operation, maintenance and repair of oily water separators, incinerators, oil content discharge monitoring equipment, and other pollution prevention equipment.

  (h) Procedures for solid and hazardous waste segregation and storage, disposal, and reporting of releases.

  (i) All other shipboard environmental protection related procedures examined and described in the required initial review.

(5) All new crewmembers hired to work on CSME's vessels shall receive training within seven days of beginning to work on board the vessel. CSME shall maintain documentation onboard each of its operated and/or managed vessels verifying that all officers and crewmembers working on the vessel have received the required training. Such documentation shall be made available to the IC and the United States Coast Guard upon request.

(6) The Chief Engineer onboard each of CSME's operated and/or managed vessels listed shall prepare independent written verification that all engine room crew members have received the training required by this EMS/ECP. All engine room

17

crewmembers shall sign and date a statement acknowledging completion of the training. This written verification, together with the signed acknowledgment, shall be completed semi-annually and maintained in the engine control room of each vessel.

## M. ENGINEERING REQUIREMENTS

(1) Unless otherwise stated, all of the requirements set forth below, if not in contravention of any Class, Treaty or other Flag State requirements, shall be implemented on the vessels covered under this ECP as soon as practicable, as determined by the CCM and not later than one year from the date of the signing of the plea agreement.

(2) Bilge Main Cross – Connections:

    (a) CSME shall immediately notify all of its vessels regarding the prohibition against non–emergency use of cross connections from engineroom bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The message shall state that the usage of these crossovers is similar to bypassing the OWS equipment and strictly prohibited.

    (b) The deck plates above or near the locations of these cross connections and the valves bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby - "Bilge System Piping Crossover - Emergency Use Only."

    (c) To prevent unauthorized usage, Chief Engineers shall place numbered seals on these valves.

    (d) The seal numbers shall be tracked in a seal number logbook and explanations shall be given anytime a crossover to the bilge main is opened. Seals shall be used in other areas of the machinery space. The Master of the vessel shall retain the replacement seals in the vessel's safe. He/she will keep an additional log documenting when seals are replaced and their respective numbers. The CCM will be responsible for ensuring fleet wide that no duplication of seal numbers occur and will have a master tracking document indicating which series were supplied to each vessel.

    (e) If the valves are remotely operated from the engine control room, the control must also be disabled and notice made near the associated push buttons or switches. They shall also be sealed.

    (f) All other bilge suction valves not connected to the bilge main, including independent emergency suctions to the vessel's engineroom bilges like those that may be connected to sea water circulating pumps, will be painted brightly and labeled similarly "Emergency Bilge Suction - Emergency Use Only." Their valve wheels will also have a numbered and logged seal capable of breakaway during emergency. Seal numbers shall be kept the in the Chief Engineer's official seal log book and explanations given for breakage or replacement.

(3) Blank Flanges:

(a) To prevent unauthorized connections within the engine-room and machinery spaces of CSME's vessels, every blank flange associated with any piping leading overboard, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed or fitted with numbered seals through the flange bolts to prevent unauthorized connections and discharges. The seals used shall be numbered and records kept in the previously mentioned log.

(b) The blank flange securing the bilge and sludge transfer system and the shore connection discharge valve at the discharge stations shall also require a numbered seal that will be maintained. Seal numbers shall be kept in the Chief Engineer's official seal log book.

(4) Bilge Sampling and OWS Performance Analysis:

(a) CSME agrees within the first year of the probationary period to take samples of the bilge water from 50% of its vessels. The sample shall be taken from the surface of the water of the most commonly used bilge well within the engineroom -- that is, the bilge well receiving most of the accumulation. The purpose of this collection is to capture a sample that adequately represents the common fluids and contaminates that accumulate. No attempt should be made to collect a clean sample only.

(b) The samples shall be forwarded to an appropriate lab selected by the CCM at CSME's cost for a content analysis. The comparative results of all the analyses shall be used to develop a representative sample of bilge water and its associated contaminates. This representative sample will then be provided to the manufacturer of the predominate oily water separator found onboard CSME's vessels.

(c) CSME agrees to work cooperatively with the manufacturer to verify the equipment's capability to process such fluids having this content. CSME may choose to work with the manufacturer in this verification process and also to develop ways to improve the performance of existing equipment or may explore other separation technologies capable of handling the fluid.

(5) Tank Sounding Log:

The CCM shall ensure the immediate usage of Tank Sounding Log Books on all vessels. Engineroom crewmembers shall be required to sound all waste, sludge, and bilge tanks associated with bilge water, oil wastes, or sludge during each watch for vessels having a manned engineroom or twice daily for those having an unmanned engineroom. The Tank Sounding Log shall be initialed by the crewmember that obtained the reading. The Tank Soundings Log shall be maintained in the engine control room and made available during all inspections and audits required by this agreement.

(6) Fuel Oil / Lube Oil Purifier Settings and Line Breaks:

(a) CSME agrees to immediately develop for each vessel a log book relating to fuel oil and lube oil management and to the operation of the fuel oil and lube oil purifiers and for line or piping failures. The shoot interval settings of each purifier will be documented at all times. Any change in the setting must note the date and respective motor controller hours. Any incident involving ships having received poor quality fuel will be noted. References to appropriate

19

receipts shall be made. Any extraordinary operations, such as the need for frequent draining of fuel oil service and settling tanks, excessive water, waxing, compatibility, stratification or other contamination problems, shall be noted and explanations provided for the handling of unburned oils or used filters.

(b) Any time, any line or component on a fuel, lube, or waste oil system fails, including high pressure lines on diesel engines, a record shall be made and a notation given as to the quantity released and an explanation given as to how the unintended released fluid was handled. Additionally, unintended releases of abnormal quantities of water, salt, fresh, condensate, or cooling, shall also be recorded. The lowest level engineer involved in any of the circumstances previously described will make the entry and provide his or her signature.

(7) Oil-to-Sea Interfaces:

(a) CSME agrees to immediately develop for each vessel a log book relating to equipment having oil-to-sea interfaces. Such systems may be oil lubricated stern tubes, bow or stern thrusters, stabilizers, hydraulically operated controllable pitch propellers, and similar equipment whereby the leakage of a sealing component may cause a loss of operating medium into the surrounding waters of the vessel. Any replenishment of oil into the head tanks, operating systems reservoirs or other receivers associated with this equipment shall be logged regardless of quantity. Ingress of water into these systems must also be logged.

(b) When known, an explanation of the loss shall be provided, along with dates and time and signature. Routine stern tube lube oil loss must be logged and reported to the CCM immediately on each occasion. CSME agrees to remove from employment any Chief Engineer who fails to report these conditions.

(8) Record Keeping:

(a) All Soundings and Logs required by this section shall be maintained onboard the vessel for a period of three years from the date of the final entry.

## N. DOCUMENTATION AVAILABLE FOR INSPECTION

The CCM shall ensure that all documentation required by this EMS/ECP is maintained and available for inspection by the IC, TPA, and the United States Coast Guard. The Master of each of CSME's covered under this ECP, shall maintain on board the vessel, all records required by international conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this EMS/ECP, such as crew training records, and will make these records available to the IC, TPA, and the United States Coast Guard upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the United States by the IC and TPA.

## M. CHANGES IN OWNERSHIP/MANAGEMENT

The parties recognize that during the term of probation, the number and identity of vessels operated, managed, manned and/or controlled by CSME that call on ports or places in the United States may increase or decrease. Any vessel, the operation, management, manning or control of which is assumed by CSME, and which calls on ports or places in the United States shall be subject to the terms and conditions of this EMS/ECP. Any vessel removed from the operation, management, manning or control by CSME, or which stops calling in the United States, shall be excluded from the scope of the EMS/ECP. CSME agrees that it will immediately (but in no event later than 21 days following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of any such CSME's vessels, to include any vessel the operation, management, manning or control of which is assumed by CSME and which calls in the United States. CSME agrees that this EMS/ECP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are managed, operated or manned by CSME. The CSME shall notify the United States before any vessel is released from the requirements of the EMS/ECP due to a change in ownership, management, manning or control, or if such vessels cease calling on ports or places in the United States.

**O. SELF-ENFORCEMENT**

CSME further agrees that it will undertake and implement the necessary procedures to ensure that this EMS/ECP is diligently complied with by the officers and crew of each of CSME's operated and/or managed vessels, as well as by all shore side employees, managers and other employees of CSME's subsidiaries, affiliated business entities (owned wholly or partially by CSME) and agents of CSME engaged wholly or partially in the manning, and/or operation of aforesaid seagoing vessels or contracted to do the same, on the date of sentencing or at any time during the period of probation.

**P. REVISIONS/MODIFICATIONS**

The requirements of this EMS/ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Should CSME be unable to comply with any of the deadlines, CSME shall immediately notify the United States in writing of the reason(s) for non-compliance, and propose a revised timetable. The United States shall then determine as to whether the revised timetable should be accepted.

**Q. REPORTS**

All reports, documents and correspondence required under this EMS/CP to be sent to the United States shall be sent to the following offices:

(a) U.S. Attorney's Office

District of Delaware
ATTN: Edmond Falgowski

b) U.S. Department of Justice
Environmental Crimes Section
ATTN: Jeffrey Phillips
601 "D" Street, NW
Washington, D.C. 20004

(c) Environmental Protection Agency
Region III
ATTN:
Associate Regional Counsel for Criminal Enforcement
Office of Regional Counsel

(d) U.S. Coast Guard Commandant (CG-3PCV)
Office of Vessel Activities
2100 Second St., S.W.
Washington, D.C. 20593-0001
Attn: Designated Representative of the Coast Guard

(e) U.S. Probation Department
District of Delaware

Defendant has read this ECP carefully and understands it thoroughly. Defendant enters into this ECP knowingly and voluntarily, and therefore agrees to abide by its terms. By its signatures below, the corporate representative agrees that he/she is duly authorized by the corporation's Board of Directors or equivalent governing structure pursuant to the same notarized legal document filed in United States v. CHIAN SPIRIT MARITIME ENTERPRISES, INC. and VENETICO MARINE S/A, certifying that the defendant companies are authorized to enter into and comply with all of the provisions of this Plea Agreement.

DATED:                        CHIAN SPIRIT MARITIME ENTERPRISES, INC., and
                              VENETICO MARINE S/A

                        By:

As counsel for the Defendant we represent, we have discussed with our corporate client and its duly authorized representative the terms of this EMS/ECP and have fully explained its requirements. We have no reason to doubt that our client is knowingly and voluntarily entering into this EMS/ECP.

DATED: _____

GEORGE M. CHALOS, Esq. of Chalos, O'Connor; Duffy, LLP
Chalos, O'Connor and Duffy, LLP
Counsel for Defendants

_____
GEORGE M. CHALOS, Esq. of Chalos, O'Connor; Duffy, LLP
As Authorized Representative
of Chian Spirit Maritime
Enterprises, Inc.

_____
GEORGE M. CHALOS, Esq. of Chalos, O'Connor; Duffy, LLP
As Authorized Representative
Of Venetico Marine, S/A

On behalf of the United States, the following agree to the terms of the EMS/ECP:

DATED: 1-18-07 _____
EDMOND FALGOWSKI
Assistant United States Attorney

DATED: _____
JEFFREY L. PHILLIPS
Trial Attorney
Environmental Crimes Section

23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,            )
                                     )
              Plaintiff,             )
                                     )
       v.                            )        No. 1:06-cr-00076
                                     )
CHIAN SPIRIT MARITIME                )
ENTERPRISES, INC., and VENETICO      )
MARINE S/A,                          )
                                     )
                                     )
              Defendants.            )

## JOINT STATEMENT OF FACTS

The United States of America, by and through the Environmental Crimes Section

of the United States Department of Justice, the Office of the United States Attorney for

the District of Delaware, and the Defendants, CHIAN SPIRIT MARITIME

ENTERPRISES, INC., (hereinafter "CHIAN SPIRIT") and VENETICO MARINE, S/A,

(hereinafter "VENETICO") agree and stipulate that this Joint Factual Statement is a true

and accurate statement of the Defendants' criminal conduct and that it provides a

sufficient basis for the Defendants' pleas of guilty to Count Two of the pending

Indictment in this case. At all times relevant to the Indictment:

1. The *M/V Irene E.M.* (hereinafter "*Irene*"), a 21,947 gross ton vessel, registered

under the flag administration of St. Vincent and the Grenadines, was operated by CHIAN

SPIRIT and was owned by VENETICO. The *Irene* was engaged in international

commercial maritime operations and transported bulk products from and to various ports

in the United States of America and elsewhere.

2.  CHIAN SPIRIT was a private limited company incorporated under the laws of the Republic of Liberia; the company was engaged in the business of technical and commercial management of bulk carrier vessels, including the *Irene*, which were engaged in international commerce; the operating address of the company was 10 Ambatielou Ant. Street, 18536, Piraeus, Greece. VENETICO was a private limited company incorporated under the laws of the Republic of Liberia; the operating address of the company was 10 Ambatielou Ant. Street, 18536, Piraeus, Greece.

3.  Defendants, CHIAN SPIRIT and VENETICO, by and through their employees and agents, including the senior engineers and other crew members on board the *Irene*, acting on behalf of and for the benefit of the Defendants, were responsible for the operation and supervision of the Engine Department on board the *Irene*, including the management, treatment, storage and disposal of oil residue, oily mixtures and machinery space bilge water.

4.  The Chief Engineer on board the *Irene*, with the assistance of other crew members, was also responsible for the maintenance, operation, and documentation of the vessel's pollution prevention equipment, including the vessel's Oily Water Separator (hereinafter "OWS").

5.  The Chief Engineer on board the *Irene* was also responsible for recording the movement, discharge, and disposal of oil residue, oily mixtures and machinery space bilge water, including any non-accidental overboard discharges of oily waste in the vessel's machinery space Oil Record Book (hereinafter "ORB").

6.  CHIAN SPIRIT was responsible for the implementation and certification of the International Safety Management Code within the company's shore-side management

2

operations and on board the vessels it operated to ensure that company policies and procedures were designed to ensure compliance with international safety and environmental requirements.

7.    The United States is party to an international treaty, the International Convention for the Prevention of Pollution from Ships (hereinafter "MARPOL"). MARPOL was implemented in the United States by the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901 et seq. APPS regulations require that each vessel of more than 400 gross tons, such as the *Irene*, maintain an ORB. The ORB must fully reflect transfers of oil, the disposal of sludge and waste oil, discharges of water from slop tanks, and overboard discharges of bilge water that have accumulated in machinery spaces, and thus are contaminated with oil. MARPOL, Annex 1 Regulation 20 and 33 CFR § 151.25(h). The United States Coast Guard routinely inspects ORBs on board vessels to determine whether the vessel has been discharging any oil or oily mixtures in violation of MARPOL and APPS.  33 C.F.R. § 151.23.  The ORB must be maintained on board the vessel for three (3) years and be readily available for inspection at all reasonable times. MARPOL, Annex 1, Regulation 20.

8.    From at least June through November 2005, the Chief Engineer on board the *Irene* knew that the Oil Content Monitor (hereinafter "OCM") associated with the vessel's OWS did not function properly.  During this time period, engineering officers on board the *Irene* directed other crew members to pump oily waste overboard and into the ocean.  This was accomplished with the use of a by-pass pipe that was fabricated and installed at the direction of the senior engineers on board the *Irene*.  On multiple occasions, at the direction of senior engineers on board the *Irene*, crew members

3

discharged oil residue, sludge, oily wastes, and machinery space bilge water directly into the ocean, using the by-pass pipe.

9.   From at least June through November 2005, the Chief Engineer on board the *Irene* knowingly failed to make several required entries in the vessel's ORB, including: the fact that the vessel's OCM was not functioning properly; and the fact that oil residue, sludge, oily wastes, and machinery space bilge water were, on multiple occasions, discharged through the by-pass pipe directly into the ocean, circumventing the pollution prevention equipment required by MARPOL. During this time period, the Chief Engineer knowingly also made false entries in the vessel's ORB, representing that discharges were made from the vessel through the OCM.

10. On or about December 5, 2005, the United States Coast Guard conducted a Port State Control boarding and inspection of the *Irene* while the vessel was at anchor within the Big Stone Anchorage located in the Delaware Bay within the waters of the State of Delaware and within the District of Delaware.

11. On or about December 5, 2005, during the course of the Port State Control boarding, the Chief Engineer on board the *Irene* knowingly caused the vessel's inaccurate ORB to be presented to representatives of the United States Coast Guard.

4

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

George M. Chalos, Esq. of CHALOS, O'Connor; Duffy, LLP
As Authorized Corporate Representative for
Chian Spirit Maritime Enterprises, Inc.

George M. Chalos, Esq., of CHALOS O'Connor; Duffy, LLP
A1 Corporate Representative for
Venetico Marine, S.A.

George M. Chalos, Esq. of CHALOS, O'Connor; Duffy, LLP
Attorney for the Defendants

By:   Jeffrey L. Phillips
      Trial Attorney
      Environmental Crimes Section
      U.S. Department of Justice

By:   Gregory F. Linsin
      Special Litigation Counsel
      Environmental Crimes Section
      U.S. Department of Justice

COLM F. CONNOLLY
United States Attorney
District of Delaware

1-18-07

By:   Edmond Falgowski
      Assistant United States Attorney
      District of Delaware

Dated:

5